Richard Arjun Kaul, MD
PROPRIA PERSONA
120 Temple Terrace
Palisades Park, NJ 07650
Tel: (201) 989 -2299

U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

2017 AUG 10  A 11: 18

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RICHARD ARJUN KAUL, MD, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER J. CHRISTIE, ESQ (in both his official and individual capacities), JEFFREY CHIESA, ESQ (in his individual capacity), AMERICAN SOCIETY OF INTERVENTIONAL PAIN PHYSICIANS, ANDREW KAUFMAN, MD (in his individual capacity), PETER STAATS, MD, GREGORY PRZYBYLSKI, MD (in his individual capacity), CONGRESS OF NEUROLOGICAL SURGEONS, CHRISTOPHER WOLFLA, MD, THOMAS PETERSON, MD, ALLSTATE NEW JERSEY INSURANCE COMPANY, GEICO, GEICO INDEMNITY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY, TD BANK, NA, DIVYESH KOTHARI, RUTGERS UNIVERSITY HOSPITAL, JAMES GONZALEZ, ROBERT HEARY, STEVEN LOMAZOW, MD (in his individual capacity), WILLIAM MITCHELL, MD, MARC COHEN, MD, WILLIAM ROEDER, ( in both his official and individual capacities), NORTH JERSEY MEDIA GROUP, INC, LINDY WASHBURN, LEWIS STEIN, ESQ, HACKENSACK UNIVERSITY MEDICAL CENTER, ROBERT GARRETT, ATLANTIC HEALTH SYSTEM, JOHN ROE 1-50, | Civil Action No. 16-cv-02364<br><br><br>SECOND AMENDED COMPLAINT DEMAND FOR JURY TRIAL |

| JOHN DOE 1-50, ABC CORP. 1-50, AND/OR XYZ, P.C. 1-50<br><br>Defendants | |
|---|---|
| | |

## TABLE OF CONTENTS

I.      INTRODUCTION...................................................................................................................1

II.     PARTIES...............................................................................................................................8

III.    JURISDICTION AND VENUE................................................................................................11

IV.     PRELIMINARY STATEMENT................................................................................................12

        A.  Political Corruption + The Opiate Epidemic............................................................12

        B.  The GEICO + Allstate Complaints............................................................................12

        C.  Professional Jealousy...............................................................................................14

V.      FACTUAL ALLEGATIONS

        A.  Unconstitutional Configuration of the Mechanism of Physician Regulation........17

        B.  Fraudulent OAL Proceedings...................................................................................18

        C.  The Coburn Opinion.................................................................................................19

        D. Santos v Kaul...........................................................................................................19

        E.  Superior Patient Outcomes.....................................................................................20

            1.   RB..................................................................................................................25

            2.   FK..................................................................................................................29

            3.   LM.................................................................................................................32

            4.   GH.................................................................................................................33

            5.   HS.................................................................................................................34

            6.   SS..................................................................................................................35

            7.   TZ..................................................................................................................36

            8.   PM.................................................................................................................37

            9.   KS..................................................................................................................38

10. JZ...........................................................................................................................................39

11. JJ...........................................................................................................................................40

D.  Minimally Invasive Spine Surgery Qualifications.........................................................................41

E.  State Misconduct + Forged Transcripts........................................................................................44

VI.    CLAIMS FOR RELIEF..................................................................................................................48

COUNT ONE – VIOLATIONS OF 18 U.S.C. § 1962(C)K  (D) THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ* (Against Defendants Christie + Kaufman + Przybylski + Heary +
Mitchell + Staats + CNS + ASIPP) ......................................................................................................................48

A.  Description of the CAC RICO Enterprise........................................................................................49

B.  The CAC RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues.....52

C.  Predicate Acts: Mail and Wire Fraud............................................................................................54

COUNT TWO – VIOLATIONS OF 18 U.S.C. § 1962(C)K  (D) THE RACKATEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ* (Against Defendants Christie + Allstate
+ Geico + TD + Kothari)......................................................................................................................................59

A.  Description of the CAGTK RICO Enterprise....................................................................................60

B.  The CAGTK RICO Enterprise Sought to Fraudulently Increase Defendants' Profits
and Revenues......................................................................................................................................63

C.  Predicate Acts: Mail and Wire Fraud............................................................................................66

COUNT THREE – VIOLATIONS OF 18 U.S.C. § 1962(C)K  (D) THE RACKETEER INFLUENCED AND CORRUPT ACT,
18 U.S.C. § 1961, *ET SEQ* (Against Defendants Christie + HUMC + AHS + Garrett + UH + Gonzalez + Chiesa) ..71

A.  Description of the CHE RICO Enterprise........................................................................................71

B.  The CHE RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues.....75

C.  Predicate Acts: Mail and Wire Fraud............................................................................................78

COUNT FOUR – VIOLATIONS OF 18 U.S.C. 1962(C)K  (D) THE RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ (Against Defendants Christie + NJMG + Washburn + Stein) ..82

    A.  Description of the CMS RICO Enterprise.........................................................................................83

    B.  The CMS RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues.....86

    C.  Predicate Acts: Mail and Wire Fraud.............................................................................................89


COUNT FIVE – FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTIONS 16 OF THE  CLAYTON ACT FOR DEFENDANTS' VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT
(Against Defendants Kaufman + Staats + Przybylski + CNS + Wolfla + Peterson + UH + Heary + Lomazow + Mitchell + Cohen + HUMC + AHS) ...............................................................................................................95

COUNT SIX – FOR MONOPOLIZATION (Against Defendants Przybylski + Kaufman + Staats + Cohen + Heary + Mitchell + HUMC + AHS + UH) ...............................................................................................................97

COUNT SEVEN – FOR CONSPIRACY TO MONOPOLIZE UNDER STATE LAW (Against Defendants Przybylski + Kaufman + Staats + Lomazow + Cohen + Heary + Mitchell + HUMC + AHS) ....................................................106

COUNT EIGHT – FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW (Against Defendants Przybylski + Kaufman + Staats + Cohen + Lomazow + Heary + Mitchell + HUMC + AHS + UH).....115

COUNT NINE – FOR UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (Against Defendants ASIPP + Kaufman + Staats + Przybylski + CNS + Peterson + Heary + Lomazow + Mitchell + Cohen + HUMC + AHS) ..124

COUNT TEN – UNJUST ENRICHMENT (Against Defendants ASIPP + Kaufman + Przybylski + CNS + Peterson + UH + Heary + Lomazow + Mitchell + Cohen + HUMC + AHS) ...........................................................................130

COUNT ELEVEN – DEPRIVATION OF RIGHT UNDER COLOR OF LAW (Against Defendants Christie in both his personal and official capacity + Chiesa in his personal capacity + Roeder in both his personal and official capacity + Lomazow in his personal capacity + Kaufman in his personal capacity + Przybylski in his personal capacity) ...................................................................................................................................................131

COUNT TWELVE – COMMERCIAL DISPARAGEMENT (Against Defendants ASIPP + Kaufman + Przybylski + Peterson + Allstate + Geico + UH + Heary + Lomazow + Mitchell + Cohen + HUMC + AHS) ............................134

COUNT THIRTEEN – INTENTIONAL INTERFERENCE WITH PROPSPECTIVE ECONOMIC ADVANTAGE (Against Defendants ASIPP + Kaufman + Staats + Przybylski + CNS + Peterson + Allstate + Geico + UH + Heary + Lomazow + Mitchell + Cohen + HUMC + AHS)...............................................................................................135

COUNT FOURTEEN – AID IN THE COMMISSION OF TORT (Against all Defendants) .........................................137

VII.    DEMAND FOR JUDGMENT..................................................................................................................138

VIII.   DEMAND FOR JURY..............................................................................................................................139

IX.     DEMAND FOR INSURANCE....................................................................................................................139

X.      REFERENCES..........................................................................................................................................140

Plaintiff Richard Arjun Kaul, MD brings this action against Defendants Christopher J. Christie, Esq ("Governor Christie"), the American Society of Interventional Pain Physicians ("ASIPP"), Andrew Kaufman, MD ("Dr. Kaufman"), Peter Staats, MD ("Dr. Staats"), William Mitchell, MD ("Dr. Mitchell"), Marc Cohen, MD ("Dr. Cohen"), Robert Heary, MD ("Dr. Heary"), Gregory Przybylski, MD ("Dr. Przybylski"), the Congress of Neurological Surgeons ("CNS"), Christopher Wolfla, MD ("Dr. Wolfla"), Thomas Peterson, MD ("Dr. Peterson"), Allstate New Jersey Insurance Company ("ANJ"), GEICO ("GEICO"), TD Bank, N.A. ("TD"), Divyesh Kothari ("Kothari"), Steven Lomazow, MD ("Dr. Lomazow"), Hackensack University Medical Center ("HUMC"), Atlantic Health System ("AHS"), Robert Garrett ("Garrett"), James Gonzalez ("Gonzalez"), Jeffrey Chiesa, Esq ("Chiesa"), North Jersey Media Group, Inc. ("NJMG"), Lindy Washburn ("Washburn") and Lewis Stein, Esq ("Stein"), University Hospital ("UH") (collectively, "Defendants") to redress Plaintiff's economic and reputational injuries due to the Defendants' scheme to permanently eliminate Plaintiff from the practice of medicine anywhere in the world. Plaintiff's allegations are based on his own experiences and personal knowledge, his research, publicly available articles, studies, reports and other sources, a reasonable inquiry under the circumstances, and on information and belief. Plaintiff's allegations are likely to have further evidentiary support after a reasonable opportunity for further investigation and discovery.

# I.    INTRODUCTION

### The prevalence of back pain

1.      Low back pain is an increasingly common affliction of modern society, due in large part to an increased sedentary lifestyle, poor diet and increased obesity **(Ref. #1 + #7.** The spinal column consists of approximately thirty (30) separate bony units that are interconnected by ligaments, muscles and intervertebral discs, that function to protect the spinal cord and nerves, and permit motion.

2.      It is the latter benefit of the biomechanical configuration, that has become the basis for the degenerative process of the elements of the spinal column. The constant flexing, extending, rotating and bending exert repetitive forces on the discs, whose collagenous disc structures degenerate, which can lead to herniated discs, which can cause back and leg symptoms.

3.      The ensuing pain impedes motor and sensory function, causes a deterioration in quality of life, and has a deleterious economic impact on society **(Ref. #2).** Many of the affected individuals are able to find temporary relief, but no permanent cure. Poverty and obesity exacerbate spinal pain, and there is a strong association between low socio-economic status, complaints of back pain, claims for disability, and claims for legal compensation.

### The secondary gain of chronic pain

4.      Patients, predominantly Caucasian, of low socio-economic status, in their middle age and with no job prospects, have been shown to initiate legal action more frequently than any other demographic groups. Hispanic and African-American patients are least likely to file suit.

5.      Secondary gain plays a critical role in patients with chronic pain syndromes. Patients with chronic benign pain are often regularly involved with the legal system (e.g. workmen's compensation or tort action). In the United States, the legal system is geared towards financially rewarding "pain and suffering" from alleged injures or activities; pain and suffering litigation, therefore, serves to alleviate such patients of the obligation to work. It is critical that any evaluating and treating physician be aware of the "reward' system applicable to the situation at hand. The patient's motivation to want to "get better" and the veracity of their

1

claims, may be examined with review of surveillance carried out by third party groups (e.g. private detectives).

6.      This type of sleuthing is not taught as part of the education for most medical personnel, but is an essential tool in exposing patients who exploit their pain for secondary gain. The auto insurance industry has a well developed surveillance program, that according to some confidential sources was bootlegged from the NSA.

### Frivolous medical lawsuits

### "When the pain won't wane, its mainly in the brain"

7.      Financial rewards have been shown to play a significant role in the decision making process of patients who seek to have multiple spinal surgeries **(Ref. #9).** The secondary gain is often disguised with complaints of ongoing disability, pain and dissatisfaction with the previous physicians. Furthermore, once the patient has surgical scar on their back, they have a "reason" (e.g., spinal surgery) for any layman to see, that their pain is real and organic.

8.      This can clearly influence any court or jury regarding their case, and these patients require appropriate psychological/psychiatric evaluations before subsequent treatment is instituted. None of these mental health evaluations were employed by any of the surgeons who operated, unnecessarily, on some of the 11 patients, that DAG Hafner exploited to manufacture her fraudulent case.

### Complications of spinal surgery

9.      The majority of patients that seek therapeutic intervention for their spinal pain, have long complicated histories of progressively worsening neurological and musculoskeletal symptoms, for which conservative care has failed. A recommendation for spinal surgery is made based on the patient's failure to respond to conservative therapies, in conjunction with clinical, radiological and neurophysiological evidence. Due to the complicated nature of pain, it is rarely the case that the patient's pain disappears entirely, and quite often the symptoms will resume after a period of pain relief. This finding that is consistent with the relentless degeneration of

2

diseased spines. An article **(Ref. #4)** published on August 13, 2010 in the Journal Neurosurgical Spine found the following:

10.     *"In the 105 articles reviewed, there were 79.471 patients with 13.067 reported complications for an overall complication incidence of 16.4% per patient. Complications were more common in thoracolumbar (17.8%) than cervical procedures (8.9%; p < 0.0001. OR 2.23). Prospective studies yielded a higher incidence of complications (19.9%) than retrospective studies (16.1%; p < 0.0001, OR 1.3). The complication incidence for prospective thoracolumbar studies (20.4%) was greater than that for retrospective studies (17.5%; p < 0.0001). This difference between prospective and retrospective reviews was not found in the cervical studies".*

11.     Although the article compares the accuracy of retrospective and prospective studies, the **complication rate is in the range of 16.1% to 20.4%.** The Plaintiff's complication rate was **0.1%,** a fact supported by neurosurgeon, Richard Jordan, who reviewed the Plaintiff's practice in April 2012, and a fact that would have been verified, had the medical board complied with the Plaintiff's common sense suggestion to have his practice independently assessed.

## Medical professional turf wars

12.     The more money there is any professional arena, the more fights there are, and the more vicious they become. The commercial battles of medicine are complicated and magnified by the professional egos of quasi-scientific minds, who steadfastly hold to their theories of how medicine should be practiced.

13.     Surgeons are known for having the most fragile egos **(Ref. #10),** and it is no secret within the medical community that some are technically gifted, and some are not. This becomes evident on a daily basis in the operating room, where the surgeons' performance is disseminated across the hospital grapevine. Medicine is an intensely political pursuit, where personal, economic and professional vendettas are settled with false allegations of poor patient care **(Ref # 21).**

3

14.     There is nothing more emotive than an accusation that a patient has allegedly been injured by a physician, except when the accusation become international news, at which point all reason and scientific thought are abandoned.

15.     An article **(Ref. #5)** published in 1991 in the New York Times, "The Nation; As Doctors Become More Specialized, and numerous Turf Wars Erupt Over Body Parts', talks to the fight that occurred between cardiac surgeons and interventional cardiologists. Pre 1991 the majority of patients with cardiac pathology required open heart surgery. However, the invention of dynamic vascular fluoroscopy revolutionized the manner in which coronary arteries and diseased valves were treated, and today this mode of intervention has become the standard of care.

16.     This is the same path followed by spine, and the neurosurgeons, having realized that open procedures were becoming obsolete, moved, in approximately 2004, into the fluoroscopically guided world of minimally invasive spine surgery, an arena in which the Plaintiff had established himself since 2002.

### The growth of minimally invasive spine surgery

17.     The minimally invasive spine surgery market has, since 2006, been one of the most rapidly expanding sectors of global healthcare. This is due to an improved understanding of spinal pathology, advanced diagnostic and therapeutic tools, the ability to correct deformities on an outpatient basis **(Ref #3),** and an expanding population with an increased incidence of degenerative spinal conditions.

18.     The willingness of patients to travel to other countries to receive care has globalized the market, a feature the Plaintiff recognized when he commenced plans in 2012 to expand his outpatient model to Africa, India and South America. This explains why Defendant Kaufman and DAG Hafner attempted, in their 'settlement' negotiations in April 2013, to have the Plaintiff agree to cease working anywhere in the world for seven years, in addition to paying a $ 1,000,000.00 fine.

19.     The attempt to extract this amount of money, before any evidence had been presented, albeit as part of the 'sham' litigation, cannot reasonably be interpreted as being consistent with

4

that of a professional penalty. It was nothing more than extortion, and was the prelude to the 'fine' that was actually levied, and then used as leverage, to prevent the Plaintiff, in 2015, from simply presenting his case for reinstatement.

20.    An article **(Ref. #6)** published on June 16, 2014 in Becker's Spine found that revenues from the sale of devices, in the global minimally invasive spine surgery market, inclusive of both fusion and non-fusion technologies, will exceed $ 9 billion. The numbers are exclusive of professional, anesthetic and facility fees.

### Fluoroscopic Guidance and Interpretation + Neurosurgical Complications + Opiate Dependency

21.    Underpinning the economic, legislative and political threads of this case is technology. Commencing in the mid 1990s with the invention of a mobile x-ray or fluoroscopic unit, also known as a C-arm, the ability to visualize the bony anatomy of the spine, without having to open the back, became a reality of clinical practice.

22.    Prior to this invention the only way to address, for example a herniated spinal disc, was to remove the surrounding muscles, ligaments and bone. This approach caused immense collateral damage to the back, that resulted in poor clinical outcomes. The C-arm revolutionized spine care in much the same way that x-ray contrast angiography changed the course of cardiac care in the late 1980s. Today 95% of patients with coronary artery disease are treated not by cardiac surgeons, but by interventional cardiologists.

23.    In approximately 1995 the field of interventional pain started to emerge. Anesthesiologists combined their skills in performing epidural injections, with enhanced visualization of the spine afforded by the C-arm. This permitted spinal injection of pain relieving steroids, to become safer and more effective. These procedures were carried out on a same day basis, and began to mitigate the need for spine surgery. This signaled the commencement of the encroachment into spine care of physicians from non-neurosurgical specialties.

24.    Advances in anesthesia and post operative pain control, allowed an increasing number of spinal procedures to be performed in outpatient surgical centers. The shift away from hospitals and into physician owned surgical centers, reduced the hospitals' revenue stream. The surgical centers provided a more clinically and cost effective option. Physicians who had been

5

denied clinical privileges at hospitals for commercial or political reasons, were now able to perform minimally invasive spine surgeries in their Medicare certified surgical centers.

25.    By 1999 the use of the fluoroscopic C-arm became the standard of care for all minimally invasive spinal procedures. The particular skill that physicians who regularly performed these procedures, became known as Fluoroscopic Guidance and Interpretation **(FGI)**. To understand how a minimally invasive spine surgeon safely and effectively combines radiological data obtained from 2-D imaging, with a knowledge of 3-D spinal anatomy can be illustrated by referring to the temporo-spatial techniques that an instrument rated fighter pilot uses, as he maneuvers his plane at night in a 3-D frame, based on 2-D instrument data.

26.    The instrument rated pilot is the equivalent of the minimally invasive spine surgeon skilled in FGI, while the neurosurgeon is the equivalent of the non-instrument rated pilot, who can only fly under direct vision. The latter is the equivalent of only being able to perform open spine surgery, an approach that requires the destruction of muscle, bone and ligaments, and is associated with severe post operative pain, a prolonged recovery, increased infection, increased blood loss and a prolonged reliance on opiate painkillers.

27.    In fact, one of the Plaintiff's motivations, that led to the development of his technique to perform the first outpatient minimally invasive spine fusion in 2005, was his clinical experience of having treated patients who had been operated on, unsuccessfully, by neurosurgeons. As a consequence of the destruction of collateral spinal structures, many patients developed chronic pain syndromes, and thus opiate dependencies. The current opiate epidemic can be traced to the aggressive antiquated techniques of neurosurgeons, who would frequently 'dump' their failed patients on pain management doctors, who in their quest to help patients, unfortunately succumbed to the aggressive marketing strategies of the opiate manufacturers.

28.    Many of these companies are located in New Jersey, and are hand-in-glove with political lobbyists and politicians. The Plaintiff identified these patterns in approximately 2002, and witnessed the immense suffering caused by the 'butchering' of patients' spines, invariably at the hands of neurosurgeons, who operated at hospitals. These complications were, and are,

6

kept out of the press, because of the disproportionate political influence these groups exert with politicians.

29.    One example of this, is that of a female patient who in approximately 2010, became incontinent after having been operated on by Defendant Przybylski at JKF Medical Center. The details of this event were communicated to the Plaintiff in 2012, by interventional pain physician, Didier Demesmin. Similarly, in 2014, the president of the New Jersey Neurosurgical Society, Raaj Rabnik, misdiagnosed a forty five-year old female with a head injury, who subsequently died. The case found its way to the Appellate Court, but neither Raknik nor the hospital found their names on the front of the local newspapers. In fact, had the case occurred in the UK, Rajnik, might have found himself charged with manslaughter.

30.    The Defendant neurosurgeons have long histories of many complications, and deaths, but because of their 'donations' to politicians and lobbyists they have been able to conceal their catastrophes. There has never been a death in the Plaintiff's minimally invasive spine surgery practice, and none of the Plaintiff's patients have been left with bladder incontinence or as quadriplegics, as occurred with at least one of Defendant Heary's patients. In fact, the Plaintiff's complication rate is 0.1% and his outcomes are good to very good in 90-95% of cases.

31.    In late 1999/early 2000 the endoscopic technology, that had been used in orthopedic joint procedures since the mid 1990s, was modified for use in the spine. A number of surgical instrument companies developed spinal endoscopes that permitted the removal of herniated disc fragments. The placement of these endoscopes required the physician to be proficient in FGI, which meant that minimally invasive spine surgeons, because of their extensive training with the C-arm, were often more technically capable than neurosurgeons, whose training did not involve FGI.

32.    The percutaneous placement of inter-body fusion devices and pedicle screws, employs the same technical skills that the Plaintiff commenced acquiring in 1995, when he began performing discography, kyphoplasty and vertebroplasty. These procedures involved the placement under FGI of large bore needles and cannulas through the pedicles, into the vertebral bodies.

7

33.     The critical component of FGI is the ability of the practitioner to contemporaneously interpret 2-D radiological data, into a 3-D anatomical configurations of the bony spinal elements, while simultaneously adjusting the position of needles, probes, cannulas and surgical instruments **(Ref # 17).**

34.     As these differences in technical capability emerged, the neurosurgeon's share of the spinal market continued to decrease. The less invasive approach associated with minimally invasive technologies led to improved patient outcomes, which resulted in more patients choosing to have their back pain treated by minimally invasive spine surgeons, such as the Plaintiff.

35.     The fear among patients of paralysis decreased, which combined with improved diagnostics, caused a rapid increase in the number of patients willing to undergo surgery. The treatment of patients with back pain had progressed from the simple dispensation of medications in the 1980s, to one of the most profitable sectors of global healthcare in 2012. Post-residency fellowships in minimally invasive spine surgery had become some of the most sought after programs, and the fight over who was qualified to perform these procedures, culminated in the coalescing of political corruption and unfair trade practices in New Jersey, that provide the basis for this action.

## II. PARTIES

36.     Plaintiff, **RICHARD ARJUN KAUL, MD**, was a resident of the State of New York when this cause of action accrued and was formerly a Medical Doctor licensed to practice medicine in the State of New Jersey.  Kaul's residence when this cause of action accrued was 69 West 83rd Street, New York, New York.

37.     Defendant, **CHRISTOPHER CHRISTIE, ESQ**, is the Governor of the State of New Jersey. He is the head of the Executive Branch of the State Government, which oversees The New Jersey Board of Medical Examiners.

38.     Defendant, **JEFFREY CHIESA, ESQ**, was the New Jersey Attorney General in 2012.

39.     Defendant, **LEWIS STEIN, ESQ**, is a New Jersey, Morris County based, medical malpractice attorney.

8

40.    Defendant, **ALLSTATE NEW JERSEY INSURANCE COMPANY (hereinafter "ANJ")** is the New Jersey subsidiary of Allstate Insurance Company.

41.    Defendants, **GOVERNMENT EMPLOYEES INSURANCE CO, GEICO INDEMNITY, GEICO GENERAL INSURANCE COMPANY** and **GEICO CASUALTY (hereinafter "GEICO")** are the largest providers of auto insurance in New Jersey.

42.    Defendant, **TD BANK, NA**, is a Canadian bank, whose US headquarters are in Cherry Hill, New Jersey.

43.    Defendant, **ATLANTIC HEALTH SYSTEM (AHS)**, is private healthcare company whose headquarters are in Morristown, New Jersey. It is the parent company for Morristown Memorial Hospital, Overlook Hospital, Chilton Memorial Hospital and Hackettstown Hospital. It's business covers Morris, Sussex and Passaic counties. Defendants, **COHEN, HEARY, CARMEL, LOMAZOW** and **KAUFMAN** engage in healthcare business with **AHS.**

44.    Defendant, **RUTGERS UNIVERSITY HOSPITAL (RUTGERS)**, is the teaching hospital for The University of Medicine and Dentistry of New Jersey (UMDNJ) which is the state-run health sciences institution for New Jersey. Defendants, **HEARY**, **CARMEL** and **KAUFMAN** engage in healthcare business with the defendant.

45.    Defendant, **HACKENSACK UNIVERSITY MEDICAL CENTER (HUMC)**, is 900 bed private hospital seven miles west of New York City. Defendant neurosurgeons, **PETERSON** and **HEARY**, engage in healthcare business with the defendant.

46.    Defendant, **DR. ROBERT HEARY**, is the Director of the Neurological Institute of the New Jersey Spine Center and Neurosurgical Intensive Care Unit located in Newark, Essex County, New Jersey. The latter is part of defendant Rutgers. The defendant is also an attending at HUMC and Overlook Hospital in Summit, New Jersey which is part of Atlantic Health System.

47.    Defendant, **DR. STEVEN LOMAZOW**, is a neurologist who was a senior member of Defendant, NJBME in 2012.

48.    Defendant, **DR. GREGORY PRZYBYLSKI**, is the director of neurosurgery at the New Jersey Neuroscience Institute at JFK Medical Center located in Edison, Middlesex County, New Jersey. He was also the 2011 President of defendant NASS and is a member of defendant CNS.

49. Defendant, **DR. WILLIAM MITCHELL** is an attending neurosurgeon at JFK Medical

9

50.     Center, which is located in Edison, New Jersey.

51.     Defendant, **THOMAS PETERSON**, is a neurosurgeon who engages in healthcare business with defendant **HUMC.**

52.     Defendant, **DR. PETER STAATS**, was the 2015 President of defendant **ASIPP,** and is editor of Pain Medicine News.

53.     Defendant, **DR. MARC COHEN**, is an orthopedic spine surgeon with a medical office at 221 Madison Avenue, Morristown, New Jersey 07960. He is a member of defendant NASS, and engages in healthcare business with defendant **AHS.**

54.     Defendant, **THE AMERICAN SOCIETY OF INTERVENTIONAL PAIN PHYSICIANS, (ASIPP)** is a professional medical society with a business address at 2831 Lone Oak Road, Paducah, Kentucky, 42003. Defendant, **DR. PETER STAATS**, was the 2015 President.

55.     Defendant, the **CONGRESS OF NEUROLOGICAL SURGEONS, (CNS)** is a professional medical society with a business address located at 725 Fifteenth Street, NW, Suite 500, Washington, DC 20005. Defendants, **HEARY, PRZYBYLSKI, CARMEL, MITCHELL, MOORE** and **PETERSON** are members.

56.     Defendant, **CHRISTOPHER WOLFLA**, is a neurosurgeon located at 725 Fifteenth Street, NW, Suite 500, Washington, DC 20005. He is the Chairman of the Professional Conduct Committee for defendant, **CNS**.

57.     Defendant, **DR. ANDREW KAUFMAN**, is an individual with a business located at 90 Bergen Street #3400, Newark, New Jersey 07103, and is a senior member of defendant **ASIPP.**

58.     Defendant, **WILLIAM ROEDER**, is the executive director of defendant, NJBME. His address is 140 E Front Street, Trenton, New Jersey 08608.

59.     Defendant, **LINDY WASHBURN**, is an individual located at 1 Garret Mountain Plaza, Woodland Park, New Jersey 07424. She is employed as a journalist by defendant, **NORTH JERSEY MEDIA, INC.**

60.     Defendant, **NORTH JERSEY MEDIA, INC** is a corporation located at 1 Garret Mountain Plaza, Woodland Park, New Jersey 07424. It publishes The Bergen Record.

61.     Defendant, **JAMES GONZALEZ**, is an individual located at 150 Bergen Street, Newark, New Jersey 07103. He was the president of Rutgers University Hospital.

62.     Defendant, **DIVYESH KOTHARI**, is the Vice-President of TD Bank, N.A.

63.     Defendant, **ROBERT GARRETT**, is an individual located at 30 Prospect Avenue, Hackensack, New Jersey 07601. He is the president of defendant, HUMC.

64.     Defendants, **JOHN ROE 1-50**, and **JOHN DOE 1-50** are as yet unidentified individuals who have assisted the named defendants in the commission of their crimes.

65.     Defendants, **ABC CORP. 1-50, AND/OR XYZ, P.C. 1-50** are as yet unidentified corporations that have assisted the named Defendants in the commission of their crimes.

## III.   JURISDICTION AND VENUE

66.     Subject Matter Jurisdiction. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, and under 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1337 because this action alleges violations of an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies. And 15 U.S.C. § 4 and § 16 confer subject matter jurisdiction on this Court over claims brought under the Sherman Act. This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), (5), because Plaintiff is a citizen of a different state to certain Defendants, the aggregate amount in controversy exceeds seventy-thousand dollars.

67.     Personal Jurisdiction. The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4)k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New Jersey.

11

## IV.    PRELIMINARY STATEMENT

### Political Corruption + The Opiate Epidemic

68.    The reduction in the availability of minimally invasive spine care has contributed to the opiate epidemic in New Jersey, because patients became unable to receive care for their chronic spinal pain. Subsequent to the fee schedule modifications and legislative changes, the number of clinical facilities and physicians that provided minimally invasive spine care dropped by almost fifty percent **(Ref. #8).**

69.    The Defendant Carriers bribed New Jersey politicians to introduce fees schedules in 2005 and 2009, that curtailed funding for outpatient surgical services. A large percentage of auto accident victims have no secondary insurance, and were unable to procure care at hospitals. These individuals were forced to resort to opiate medications, and when they became unaffordable or unobtainable, they resorted to street grade heroin.

70.    The Defendant Carriers and Hospitals bribed the Defendant politician to introduce legislation that limited minimally invasive spine surgery to hospitals.

### The GEICO + Allstate Complaints

71.    From approximately 2006 to 2012 the Plaintiff successfully treated thousands of patients who had sustained spinal injuries consequent to car accidents. Hundreds of these individuals had purchased expensive personal injury protection policies from Defendant GEICO, with the understanding that should they require medical attention for traumatic injuries, the costs would be covered. New Jersey has a no-fault system, that over the last decade has incorporated a fee arbitration system that ensures healthcare providers and facilities are compensated for the provision of clinical services. The arbitrators are lawyers, well versed in healthcare law, and render payment decisions based on the medical evidence presented.

72.    From 2006 to 2012 the Plaintiff prevailed on almost ninety-nine percent (99%) of all claims presented for arbitration. Defendant GEICO employed their legions of lawyers to contest each and every claim, and lost almost ninety-nine percent (99%) of all claims. When the Defendant CARRIERS are unable to prevail in the state sanctioned arbitration forums, they

12

resort to filing frivolous lawsuits in federal and state courts, in the knowledge that the majority of providers are unable to match their legal resources.

73.    The Defendant CARRIERS pattern of racketeering is that Defendant GEICO runs into federal court, while its racketeering comrade, Allstate, runs into the Union County state court. Defendant GEICO, unable to defeat the Plaintiff in the arbitration forums, filed a one hundred and eight page (108), three hundred and thirty-nine paragraph complaint, against the Plaintiff, his corporations, and three of his employee physicians, on April 23, 2017. The document was served on the Plaintiff in mid to late June 2013, during an intermission in the OAL hearing.

74.    The matter was dismissed with prejudice on December 8, 2014, with absolutely no evidence ever having been presented to support any of the eleven (11) causes of action, despite Defendant GEICO's unlimited legal resources. Not a shred of evidence to bolster their claims of, (i) unjust enrichment, (ii) aiding and abetting fraud, (iii) common law fraud, (iv) violation of RICO, 18 U.S.C. § 1962(d), (v) violation of RICO, 18 U.S.C. § 1962(c), (vi) violation of New Jersey Insurance Fraud Prevention Act – N.J.S.A. 17:33A-1 et seq.

75.    Defendant GEICO's systematic use of this litigation/business strategy is a fraud on the public, from whom it takes money with promises of medical coverage, but on whom it then commits a theft, by diverting the money into the pockets of its executives and lawyers.

76.    On February 15, 2015 Defendant Allstate filed an almost identical lawsuit against the Plaintiff in the New Jersey Superior Court, Union County Court. The matter was assigned by the presiding judge, Kenneth Grispin, to himself. Judge Grispin adjudicates all matters pertaining to Defendant Allstate, and every pending Allstate lawsuit in New Jersey, is in front of Judge Kenneth Grispin.

77.    The Plaintiff filed an interlocutory appeal regarding an order entered on May 11, 2017, that denied his application to vacate an order entered on September 30, 2016 that suppressed his answers. As a consequence of the revocation of the Plaintiff's license his corporations filed for Chapter 11 Protection in the United States Bankruptcy Court, District of New Jersey, on June 17, 2013.

78.    The business servers, on which exists the information the Plaintiff requires to comply with discovery, is in the possession of the trustee, who has refused to provide the Plaintiff with

copies of the information. The trustee receives legal business from Defendant Allstate. As with its racketeering comrade, GEICO, Defendant Allstate has not presented a scintilla of evidence in support of its one hundred and eleven (111) page, three hundred and sixty-four paragraph, seventeen (17) count complaint. It is simply Defendant Allstate's avenue to re-litigate claims it lost against the Plaintiff in state sanctioned arbitration forums.

### Political corruption + Professional Jealousy

79.    Dr. Richard Arjun Kaul is a minimally invasive spine surgeon, who graduated in 1988 from the Royal Free Hospital School of Medicine in London. He subsequently underwent eight years of post-graduate training in the US and UK, in the fields of general surgery, anesthesiology, interventional pain and minimally invasive spine surgery.

80.    From 2002 to 2012 he performed eight hundred (800) minimally invasive spine surgeries and 6000 interventional spine procedures, with no mortalities, no life threatening complications and good to very good outcomes in 90-95% of cases, with a complication rate of 0.1%.

81.    From 1992 to 2002 he performed 10,000 anesthetic cases.

82.    In 2005 Kaul performed the first outpatient lumbar spinal fusion at the Market Street Surgical Center, Saddlebrook, New Jersey. Kaul's innovative work caused overt hostility within the New Jersey neurosurgical community, whose members frequently slandered Kaul. One such example occurred in late 2013, when Defendant Peterson publicly called Kaul a "murderer", to one of Kaul's employees, Linda Reyes, on whose brother Peterson had just operated. Peterson's vile rhetoric, a rhetoric that unfortunately seems to be the norm in New Jersey, was prompted when Peterson noted Reyes was wearing a baseball cap emblazoned with "We support Dr. Kaul". It should be noted that none of the individuals who, over a decade, defamed, slandered and criticized Kaul, ever had the fortitude to state such comments directly to his face, or send a letter in which they expressed their opinions.

83.    On March 3, 2011 Kaul opened the NJSR Surgical Center, a Medicare certified, AAAHC accredited facility in Pompton Lakes, New Jersey. It is a four-thousand square foot facility, in

14

which Kaul performed interventional spinal procedures, and outpatient minimally invasive fusions and discectomies.

84.     Kaul came to know through conversations with spine device representatives, patients and physicians, that his professional and commercial success had caused immense jealousy within the medical community. Further examples of this included defamatory comments made by Defendant Heary to Kaul's patient, Frances Kuren in 2008, by Defendant Kaufman to Kaul's patients Corey Johnson in 2010, and John Zerbini in 2012.

85.     Kaul's commercial success presented an economic threat to the insurance carriers, who used their purchased political leverage with the Christie administration, to have Kaul's license revoked. The purpose was to negate their statutory economic obligation to pay Kaul for clinical services, he had legitimately rendered to their customers.

86.     Kaul's practice grew three hundred percent from March 2011 to April 2012, and he performed cases on an outpatient basis, that although termed 'complex' by neurosurgeons, proved to be simple, because of the surgical techniques employed by Kaul. Many neurosurgeons do not have good hand-eye coordination skills, and Kaul observed during many of the CME courses, that their ability to maneuver minimally invasive spine instruments was clumsy.

87.     In the US the completion of a residency and board certification, do not require the graduate to pass a technical skills test, but simply a written and oral examination. That would be akin to issuing a driver's license without the road test. Thus the only way that one could compare the abilities of two surgeons, as for example with two baseball players, is to observe them in action.

88.     Kaul's videos demonstrate him in action, while no video evidence exists to support the technical abilities, or lack thereof, of any of the other physician defendants. In fact, many of Kaul's colleagues observed him operating, and submitted letters that attested to his surgical skills. When Kaul's license was suspended in April 2012, he suggested to the medical board that he be independently observed. This common sense suggestion was ignored.

15

89.     Kaul's reputation in the field of minimally invasive spine surgery grew steadily from 2002, and he frequently taught his technique to other physicians, who observed him in the operating room and attended hands-on cadaver training courses **(Ref # 22).**

90.     In 2011 Kaul performed the first outpatient correction of an adolescent spondylolisthesis.

91.     In 2011 Kaul performed the first outpatient correction of a three-level degenerative scoliosis.

92.     In early January 2012 two inspectors from the state made an unannounced visit to the NJSR Surgical Center. These individuals lied to Kaul when he asked the purpose of the visit. They then interviewed Kaul's staff and collected evidence. The inspectors presented no warrants. The Court is correct in asserting that the proceedings are quasi-criminal, but the investigators did not inform Kaul or his staff of their rights, before they commenced their interviews and gathering of evidence.

93.     The law appears to hold no appeal, for the investigators and lawyers of the executive branch of the New Jersey state government, or in the words of Robert Conroy, spoken on June 13, 2012, "When those sworn to uphold the law, behave in a lawless manner, it is called a tyranny". In 2016 the State of Pennsylvania criminally convicted its Attorney General, Kathleen Kane, for abuse of public office.

94.     On June 22, 2009 an independent arbitrator entered a judgment against State Farm and awarded Kaul his fee for having performed a minimally invasive spinal fusion on patient FK. The arbitrator found that Kaul, based on his qualifications and delivery of clinical care, was entitled to payment.

95.     On September 16, 2013, Kaul filed an ethics complaint against Hafner. Kaul brought this complaint to Keating's attention in 2014, when he suggested that Hafner should have no involvement in Kaul's application for license reinstatement. Keating dismissed Kaul's concerns, despite the fact that Hafner' use of pejorative language in official communications, demonstrated her personal animus towards Kaul, a fact also evident in her communications with patient JZ.

16

96. Commencing in 2010 Kaul's philanthropic and professional work received extensive media coverage. A segment on Channel 12 news in August 2011 apparently caused members of the New Jersey neurosurgical community to tell Spineology representative, Robert McGann, that "it was the last straw".

# V. FACTUAL ALLEGATIONS

### A.    Unconstitutional configuration of the mechanism of physician regulation

96.    The medical board is controlled by the Division of Consumer Affairs, and its members are political appointees, with no senate approval, that occupy their position at the pleasure of the Governor. The Defendant politician used the medical board to further his political agenda, just as he used "The War on Terror" to ratchet up manufactured convictions, while the US Attorney for New Jersey. Clearly his efforts at making the world a safer place did not work, as became evident in 2013, when he donned the terrorist cloak, and closed the GWB.

97.    The Office of the Attorney General is controlled by the Department of Law and Public Safety, and assigns lawyers who simultaneously prosecute cases against physicians, while acting as internal counsel to the board. The DLPS is controlled by the Governor. There is an unconstitutional, and illegal, merger of investigative, prosecutorial and adjudicative function.

98.    The Office of Administrative Law is part of the executive branch of state government, and its members are politically appointed. The executive is the defendant politician.

99.    The unconstitutional configuration of physician regulation permitted the defendant politician to exercise complete control of the legal proceedings that caused the revocation of Kaul's license. At best it was a charade, at worst a 'kangaroo' court, that dispensed a politically motivated judgment based on false expert and patient testimony. The Defendants have many decades of experience in 'kangaroo' justice, and went to immense lengths to ensure that there was an appearance of the "full panoply" of due process. The earliest indication that the outcome had been pre-ordained, was when Defendant Chiesa, on May 9, 2012, broadcast to the media, that the Plaintiff was not qualified to perform minimally invasive spine surgery. These comments were made before the commencement of any evidentiary proceedings.

17

100.    The Defendants exercised control of the aforementioned process by funneling money to the defendant politician, that was disguised as 'campaign donations', and fees to lobbyists and public relation companies.

**101.**    The process is not independent, is purely political and is in violation of the due process clause of the Fourteenth Amendment, that requires an impartial tribunal, when life, liberty and property are at stake. Simply by the mere fact that the mechanism of physician regulation is unconstitutional, none of these protections/rights were afforded to the Plaintiff.

**102.**    However, to add insult to injury, the Defendants forged court transcripts, to fit their fraudulent narrative. The Defendants have not denied this claim, and Defendant Washburn discussed this fact with the Plaintiff on August 13, 2013, and with the Plaintiff's public relations officer, Kelley Blevins, two weeks earlier at a meeting in Manhattan. The medical board admitted that differences existed between the two transcripts, and ought to have referred the matter for an independent analysis.

**103.**    The medical board's opinion that the difference was "insignificant" is worthless, as the medical board were central to the criminal conspiracy, and it defies all logic to think that they could or would, have offered a truthful opinion. The quasi-criminal nature of these proceedings, as with criminal convictions that are the result of prosecutorial/procedural misconduct, must be re-examined, and the evidence analyzed by independent forensic experts. The Defendants well rehearsed pattern of misconduct had been in existence for many years, prior to the Plaintiff's case.

**104.**    Physician, Kenneth Zahl, described to the Plaintiff in 2016, how members of the attorney general's office had engaged in the illegal shredding of critical pieces of evidence, in other cases.

## B. Fraudulent OAL Proceedings

105.    From April 9, 2013 to June 28, 2013, there were twenty-three days of testimony In the Matter of the Suspension or Revocation of the License of Richard Kaul, MD, Docket No.: BDS 08959-2012 N

18

106.     On October 15, 2013 Kaul submitted a post-hearing trial brief, and on December 13, 2013 Solomon submitted his decision, a decision that bore little resemblance to the evidence presented between April 9, 2013 to June 28, 2013.

107.     The two main issues litigated in the hearing pertained to patient outcomes, and whether Kaul was qualified to perform minimally invasive spine surgery.

108.     Defendants Przybylski and Kaufman, who competed locally with Kaul, provided knowingly false testimony, on June 13, 2012, when they testified against Kaul in a hearing before the medical board in Trenton. Defendants Przybylski and Kaufman repeated their false testimony in April 2013, when they testified against Kaul in the OAL proceedings in Newark. The latter proceeding resulted in the revocation of Kaul's license. Defendants Kaufman and Przybylski took an oath, and then lied with impunity.

## C.  The Coburn Opinion

109.     On January 24, 2012, at the conclusion of Jarrell v Kaul (MRS-L-2634-07) Judge Coburn, sitting in the Morris County Superior Court, Morristown New Jersey, rendered an opinion, the substance of which is detailed in paragraphs ---. The opinion directly contradicts the testimony given on June 13, 2012 and in April 2013, by Defendant Przybylski, regarding what constitutes the standard of care **(exhibit 1i)**.

## D.  Santos v Kaul

110.     The Third Party Claims in this matter were dismissed without prejudice on July 21, 2017, pursuant to NJ. Court Rules 1:13-7 or 4:43-2, for lack of prosecution **(exhibit ---)**. However, the Court in December 2016 and February 2017, quashed deposition and document subpoenas issued by the Plaintiff to Third Party witnesses, on the basis, incorrectly, of the res judicata and collateral estoppel effect of the federal action. The Plaintiff explained to the Court that there had been no judgment in the federal matter, and the preclusion doctrines were thus inapplicable.

111.    The argument, not surprisingly, fell on dear ears. The subpoenas were directed to multiple neurosurgeons and a member of the medical board, Jacqueline Degregorio, who had voted on June 13, 2012 against the rescindment of the consent agreement, into which the Plaintiff and the medical board had entered on May 9, 2012. The state Court, or rather Judge Kenneth Grispin, the Allstate Judge, blocked the Plaintiff's efforts to gather further evidence, and deferred the claims to the federal court. The dismissal of the claims for lack of prosecution, means that the Defendants cannot summon the Colorado River Abstention doctrine.

### E.  Superior Patient Outcomes

112.    Defendant Przybylski provided opinions about the care Kaul provided to eleven (11) patients. However, only six (6) patients actually testified, but Solomon incorporated Przybylski's testimony about the five (5) non-attendees, none of whom Przybylski had ever spoken with, examined or whom the Plaintiff had an opportunity to cross examine. Fundamentally, phantom patients, that denied Kaul his constitutional due process right, to examine witnesses who sought to deprive him of his property.

113.    Below is a table that highlights the multiple misrepresentations made by Defendant Przybylski, during a period of direct examination (April 15, 16, and 17, 2013), and cross examination (May 6, 2013), which Defendant Solomon ignored and omitted from his report, issued on December 13, 2013.

|  | Testified | Clinical outcome | Hospital privileges | Training | Surgical technique | Consent form | Discography |
|---|---|---|---|---|---|---|---|
| RB | No | improved | GP-gross deviation **Judge Coburn-no deviation** | GP direct-gross deviation **GP cross-admitted MISS training was same, and commenced three years** | GP direct-gross violation that Kaul used off-label device **GP cross-admitted that he used off-** | GP-gross deviation because form not signed **Evidence submitted by Kaul-All consent forms signed** | GP-gross deviation because control level omitted in two cases. **Evidence submitted by Kaul-patient improved** |

20

|  |  |  |  |  | after that of Plaintiff. Judge Coburn- training is not a standard | label devices |  | after surgery |
|---|---|---|---|---|---|---|---|---|
| FK | No | improved | GP-gross deviation **Judge Coburn- no deviation** | GP direct- gross deviation **GP cross- admitted MISS training was same, and commenced three years after that of Plaintiff Judge Coburn- training is not a standard** | GP direct- gross violation that Kaul used off- label device **GP cross- admitted that he used off- label devices** | GP-gross deviation because form not signed **Evidence submitted by Kaul- All consent forms signed** | GP-gross deviation because control level omitted in two cases. **Evidence submitted by Kaul- patient improved after surgery** |
| LM | Yes | improved | GP-gross deviation **Judge Coburn- no deviation** | GP direct- gross deviation **GP cross- admitted MISS training was same, and commenced three years after that of Plaintiff Judge Coburn- training is not a standard** | GP direct- gross violation that Kaul used off- label device **GP cross- admitted that he used off- label devices** | GP-gross deviation because form not signed **Evidence submitted by Kaul- All consent forms signed** | GP-gross deviation because control level omitted in two cases. **Evidence submitted by Kaul- patient improved after surgery** |

21

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| GH | Yes | improved | GP-gross deviation **Judge Coburn-no deviation** | GP direct-gross deviation **GP cross-admitted MISS training was same, and commenced three years after that of Plaintiff Judge Coburn-training is not a standard** | GP direct-gross violation that Kaul used off-label device **GP cross-admitted that he used off-label devices** | GP-gross deviation because form not signed **Evidence submitted by Kaul-All consent forms signed** | GP-gross deviation because control level omitted in two cases. **Evidence submitted by Kaul-patient improved after surgery** |
| HS | No | improved | GP-gross deviation **Judge Coburn-no deviation** | GP direct-gross deviation **GP cross-admitted MISS training was same, and commenced three years after that of Plaintiff Judge Coburn-training is not a standard** | GP direct-gross violation that Kaul used off-label device **GP cross-admitted that he used off-label devices** | GP-gross deviation because form not signed. **Evidence submitted by Kaul-All consent forms signed** | GP-gross deviation because control level omitted in two cases. **Evidence submitted by Kaul-patient improved after surgery** |
| SS | Yes | improved | GP-gross deviation **Judge Coburn-no deviation** | GP direct-gross deviation **GP cross-admitted MISS training was same,** | GP direct-gross violation that Kaul used off-label device | GP-gross deviation because form not signed **Evidence submitted by Kaul-** | GP-gross deviation because control level omitted in two cases. |

22

|  |  |  |  | and commenced three years after that of Plaintiff Judge Coburn-training is not a standard | GP cross-admitted that he used off-label devices | All consent forms signed | Evidence submitted by Kaul-patient improved after surgery |
|---|---|---|---|---|---|---|---|
| TZ | Yes | improved | GP-gross deviation Judge Coburn-no deviation | GP direct-gross deviation GP cross-admitted MISS training was same, and commenced three years after that of Plaintiff Judge Coburn-training is not a standard | GP direct-gross violation that Kaul used off-label device GP cross-admitted that he used off-label devices | GP-gross deviation because form not signed Evidence submitted by Kaul-All consent forms signed | GP-gross deviation because control level omitted in two cases. Evidence submitted by Kaul-patient improved after surgery |
| PM | No | improved | GP-gross deviation Judge Coburn-no deviation | GP direct-gross deviation GP cross-admitted MISS training was same, and commenced three years after that of Plaintiff Judge Coburn-training is | GP direct-gross violation that Kaul used off-label device GP cross-admitted that he used off-label devices | GP-gross deviation because form not signed Evidence submitted by Kaul-All consent forms signed | GP-gross deviation because control level omitted in two cases. Evidence submitted by Kaul-patient improved after surgery |

23

| | | | | not a standard | | | |
|---|---|---|---|---|---|---|---|
| <u>KS</u> | No | improved | GP-gross deviation **Judge Coburn-no deviation** | GP direct-gross deviation **GP cross-admitted MISS training was same, and commenced three years after that of Plaintiff Judge Coburn-training is not a standard** | GP direct-gross violation that Kaul used off-label device **GP cross-admitted that he used off-label devices** | GP-gross deviation because form not signed **Evidence submitted by Kaul-All consent forms signed** | GP-gross deviation because control level omitted in two cases. **Evidence submitted by Kaul-patient improved after surgery** |
| <u>JZ</u> | Yes | No change | GP-gross deviation **Judge Coburn-no deviation** | GP direct-gross deviation **GP cross-admitted MISS training was same, and commenced three years after that of Plaintiff Judge Coburn-training is not a standard** | GP direct-gross violation that Kaul used off-label device **GP cross-admitted that he used off-label devices** | GP-gross deviation because form not signed **Evidence submitted by Kaul-All consent forms signed** | GP-gross deviation because control level omitted in two cases. **Evidence submitted by Kaul-patient improved after surgery** |
| <u>JJ</u> | Yes | improved | GP-gross deviation **Judge Coburn-no deviation** | GP direct-gross deviation **GP cross-admitted MISS** | GP direct-gross violation that Kaul used off- | GP-gross deviation because form not signed | GP-gross deviation because control level |

| | | | | training was same, and commenced three years after that of Plaintiff Judge Coburn- training is not a standard | label device GP cross- admitted that he used off- label devices | Evidence submitted by Kaul- All consent forms signed | omitted in two cases. Evidence submitted by Kaul- patient improved after surgery |
|---|---|---|---|---|---|---|---|

114.    The evidence presented below, which was the evidence placed before Defendant Solomon, proves that the entire proceeding was a "sham", that ought to have been administered by a special prosecutor and ad hoc medical board, and that ought to have had the transcripts and audio recordings forensically examined by an independent expert.

**RB**

**Clinical course**

115.    This patient first consulted with Kaul on December 3, 2004 with complaints of lower back and leg pain, in conjunction with numbness, tingling and weakness **(exhibit 1a)**. The patient was diagnosed with lumbar disc displacement and bilateral psoas syndrome, and over the ensuing nine months underwent a number of endoscopic discectomies. The patient completed a questionnaire on December 5, 2005 in which he stated, "I do not regret attempting to resolve these issues. I am very impressed with the care and concern extended to me by you and the staff at the Sparta Pain Clinic" **(exhibit 1b)**. The patient was followed up on April 28, 2006 and reported that he had no pain, but still had some intermittent numbness and tingling in his right leg. Kaul instructed him to continue his care with medications as needed **(exhibit 1c)**.

116.    The patient received numerous checks from his insurance carrier, Horizon Blue Cross Blue Shield, that were intended as reimbursement for the professional services provided by Kaul. The checks were issued in the patient's name, and he cashed them, instead of signing

25

them over to Kaul. The patient signed an agreement on July 5, 2006, to make restitution to Kaul, but became delinquent after two payments. Kaul's billing staff sent the patient a letter dated January 4, 2007 that requested the patient remain compliant with the agreement **(exhibit 1d)**. This letter, as with all of the previous notices, was ignored, and the patient stole approximately $15,000 from Kaul.

117.   On September 12, 2007 the patient, desirous of terminating his financial obligations, filed a medical malpractice suit against Kaul, and on May 18, 2011 was deposed by Kaul's attorney, Charles Shaw **(exhibit 1e)**. The entire deposition focused on the checks stolen by RB, and surveillance videos that showed him on November 13 2009 transporting a large computer from his car into a store, and on November 19 2009 lifting heavy weights in a gym. These events are evident in a video posted on You Tube **(Ref. # 10)**

118.   On approximately November 11, 2011, Kaul contacted the Sussex County Prosecutor's Office to ascertain whether RB could be charged with theft. The detective informed Kaul that because the check had been issued in RB's name, it would be difficult to prosecute him criminally **(exhibit 1f)**.

**119.**   On April 2, 2012 Kaul's medical license was suspended, an event that was widely reported, and as a consequence Kaul was advised by his attorney to settle the case. On December 21, 2012 Kaul and RB entered into an agreement in which there was no admission of liability. The Attorney General's office had engaged in a prolonged and highly prejudicial media campaign, intended to cause a settlement, a portion of which is alleged to have been funneled back to the Defendant politician, as part of a quid pro quo. **(exhibit 1g)**.

<strong>Alleged deviations</strong>

120.   Defendant Przybylski alleged the following deviations of care against Kaul:

Hospital Privileges

Q. "The fact that Dr. Kaul did not have hospital privileges, would that be a deviation from the standard of care? *A. Yes, it would. Q. And how severe a deviation? A. That would be a gross deviation because again it puts patients ... get them to a hospital setting."* **(exhibit 1h-18:24-19:4)**.

26

121. The issue of hospital privileges was addressed on January 25, 2012 by New Jersey Superior Court Judge Howard Coburn **(exhibit 1i):**

*"The licenses in New Jersey, I think the law is well-settled on this, are plenary, and the doctor can perform anything that a doctor can do. If while he's performing it he deviates that's a separate issue. But the idea that someone can walk into court who happens to be an orthopedic doctor and a neurological doctor and say, well, he can't do this kind of operation because he doesn't have the kind of training that I had, or that the hospital insists on, I think is not a standard of medicine at all. The standards of medicine are how you practice the medicine, how you do the various steps in whatever you're doing ... I don't think he demonstrated that it was a standard, by the way, of medical practice ... So I think that's not a – not a medical issue but a legal issue, and he was expressing an opinion on something he had no right to express an opinion on, so I reject that. "*

*On the testimony with respect to qualifications, that was a clear example of a direct conflict between Dr. Hodosh (neurosurgeon at Defendant Atlantic Health System) and The New Jersey Legislature. The New Jersey Legislature has said that if you're a doctor you're a doctor. Well, the hospitals take a somewhat different view of that. They're concerns are legitimate with respect to patients and malpractice, and all the rest, they won't let just any old doctor operate in their facilities, and they have a right to do that, but that doesn't make it a deviation from – that's not a deviation from medical practices to do something that a hospital doesn't want you to do, or doesn't think you should do, or that Dr. Hodosh thinks you shouldn't do unless you're a neurosurgeon or an orthopedic surgeon ... So, anyway, that – that – that theory of his I think, is inconsistent with the law and is a legal issue, not an issue of medical standards, and it can't be turned into an issue of medical standards by a hospital, or by Dr. Hodash"*

121.     The facility at which Kaul operated on RB had a transfer agreement with Newton Memorial Hospital, in the same manner that NJSR Surgical Center had a transfer agreement with Chilton Memorial Hospital. **(exhibit 1j).**

122.    Surgical technique

GP testified that because Kaul utilized multiple procedures to remove a disc fragment, and had inserted an Optimesh implant, an off-label device, that he grossly deviated from the standard of care. Defendant Cohen, until his attorney discovered that Spineology representative, Robert McGann, had testified on behalf of Kaul in the OAL proceedings in 2013, inserted fifty percent of all such devices in New Jersey. The multiple surgical procedures performed by Kaul caused a reduction in RB's pain, and permitted him to recommence weight lifting **(Ref. #10)**. However, on May 6, 2013 GP testified **(exhibit 1k)**

*Q. And it's also an accepted standard of practice to utilize other medical devices in spine surgery today in an* **OFF-LABEL** *manner, true? A. Yes. Q. You are aware, Doctor, are you not that the rationale for utilizing medical devices off label in spine surgery, as well as other industries, is that this has been reviewed – are you aware that the government has reviewed why they permit this; do you understand why? A. Well, I am not too sure … FDA does not regulate physician practice … therefore if a physician feels that it's clinically appropriate to use a medical device or pharmaceutical off label, then it's the purview of the physician" (19:6-24)* …

*Q. So as we sit here today, we know there is* **NO STANDARD** *by which individuals similarly situated as you, Doctor, are guided with regard to the applicability or use of a fusion, true? A. Again, it would depend on how you use the word standard in terms of standard, guideline and option, then I would agree with you." (37:2-9).*

123. Consent form

GP testified that because Kaul had not indicated on the operative report the reason for the discrepancy between the consent and operative report, he had grossly deviated from the standard of care. The alleged "gross deviation" caused no harm to the patient, and in fact, the diagnostic testing and surgery performed by Kaul on RB caused a reduction in RB's pain.

123.    Discography

GP testified that Kaul's discography grossly deviated from the standard of care **(exhibit 1k-34:17-35:25)**. RB improved after the minimally invasive spine surgery, that was recommended after the discography, and which allowed RB to be discharged from care on April 28, 2006.

124.    Training

28

GP criticized Kaul's training, but admitted that his training in minimally invasive spine surgery commenced in 2005, three years after Kaul, and consisted of the taking the same hands-on continuing medical education courses, for which he had criticized Kaul **(exhibit 1k-59:23-61:9)**:

*Q. You are aware, are you not, that individuals, like I said, similarly aged, graduated contemporaries around your time, in order for them to venture into that spine industry, minimally invasive, let's say and take that, their course of action was to take CME classes and ultimately perform the procedures to become skilled in that venue, true ?. A. Yes, Q. In fact, your specific CV and your testimony which enlightened the CV is that you, yourself, at a certain point started taking a wealth of CME classes with regard to minimally-invasive spine surgery, true ?. A. Yes, Q. And we can agree, because on voir dire you indicated that there was no specific class that you took, I believe even during your residency, during any time of your education that was specifically entitled fluoroscopic – that had anything that was fluoroscopically defined. In other words, it was a component, but it wasn't the whole class, true?. A. Agree, Q. In all these technologies, fluoroscopic technology and use, minimally invasive, all were, you indicated, a small part of your prior training and education back in the late '90's, mid to late '90's, true ?. A. Yes, Q. But the real – the substance of your current practice, the technology and the knowledge in which you practice for the last three or four years was predominantly obtained by completing procedures, performing procedures and by CME classes, true ?. A. I would agree.*

### FK

### Clinical course

125.    This patient was initially evaluated on April 4, 2008, and presented with a history of chronic trauma related back and leg pain, that had commenced prior to 1997 **(exhibit 2a)**. FK had undergone multiple surgeries that had provided partial temporary relief, and in 2007 underwent a lumbar fusion with spinal orthopedic surgeon, Arash Emami, that failed to provide any pain relief.

126.    Emami testified against Kaul on May 21, 2013. Kaul operated on FK on July 28, 2008 and removed a screw that had been misplaced by Emami **(exhibit 2b)**. FK improved after the

29

surgery, but sustained an injury to her left leg two months after the surgery, when she tripped in her house, and a fish tank fell on her leg. She told her acquaintance, Cheryl Schwartz, that she could not sue Emami, because she needed his testimony for her personal injury case, but that she would sue Kaul, because he had a "history in England". FK testified during a deposition on June 11, 2012 **(exhibit 2c)** that she was told about this "history" by Defendant Heary, and Third Party Witness, Richard Winne, a pain management physician at Defendant AHS, with whom the Plaintiff attempted to schedule an interview, in 2016:

127.  *Q. Do you recall how you determined that Dr. Kaul had been charged with manslaughter ?. A. By a doctor, Q. Do you recall which physician ?. A. Dr. Heary ... Q. And what did Dr. Heary tell you about Dr. Kaul?, A. Did I know of him being convicted of manslaughter and that he wasn't qualified to do what he did to my back (19:9-22).*

*Q. Why did you start to research Dr. Kaul's qualifications following you July 2008 surgery ?. A. Cause I was informed by the doctor about Dr. Kaul. Q. So it was after your appointment with Dr. Heary that you first started researching Dr. Kaul; correct ?. A. And also I was informed by another doctor. Yes, I was. Q. Who was the other physician that you're thinking of ? ... Q. Is it possible that it was Winne?. A. Yeah. Winne, right. (21:7-21).*

*Q. What did Winne do for you ?. A. He evaluated me. Q. Did he refer you to any other physicians ?. A. Dr. Heary. Q. Any other physicians ?. A. Dr. Kaufman but I did not go see Dr. Kaufman. (23:16-23).*

128. During surveillance in August 2012, FK was observed on the same day washing her car, sweeping the lawn, carrying large bags of laundry and bending over in search of drugs **(exhibit 2d)**. These events are evident on a video posted on You Tube **(Ref # 11)**. These were activities she claimed in her lawsuit, that she was unable to perform. A copy of the tape was sent to the medical board, but they failed to respond. FK was encouraged by Heary to file a complaint against Kaul with the medical board. Schwartz sent the medical board a letter that explained why FK had developed leg pain **(exhibit 2e)**. FK was discharged on April 13, 2009 with some left leg discomfort, but full motor function and an "adequate" range of motion, compared to the "severe" pain she had on April 4, 2008, and the reduced range motion in the lumbar spine **(exhibit 2f)**.

30

**Alleged deviations**

129. Training

GP criticized Kaul's training as being a gross deviation from the standard of care, with regards to the performance of minimally invasive spine surgery. However, GP admitted on May 6, 2013 that his training in minimally invasive spine surgery commenced in 2005, three years after Kaul, and consisted of the same courses that Kaul took to become proficient in the technique. FK improved after the surgery, in contrast to her post-operative course after surgery with orthopedic spine surgeon, Arash Emami, in 2006.

130. Discography

GP criticized the manner in which Kaul performed the discography, but the minimally invasive spine fusion, which was based on the outcome of the test, was successful in reducing FK's pain, until she tripped, and a fish tank fell on her leg.

131. Surgical technique

On April 15 2013, GP criticized Kaul's off-label use of the Optimesh device as gross deviation, but then admitted on May 6, 2013 that he uses devices in an off-label manner.

*"Again, mesh cages were used in this operation which is an off-label FDA use"* (exhibit 2g-128:15-16).

However, on May 6, 2013 under cross examination GP testified:

*Q. And you are aware, are you not, I am sure you are, that – well, let me ask you a question. You, in the course of your practice utilize medical devices and products that are not FDA approved for their specific purpose; isn't that true ?, A. Yes. Q. Isn't is also true that the use of a specific medical device, let's say Optimesh, in a way not prescribed for that specific use by the FDA is a common use in the spine industry; isn't that true ? … A. It depends on how you define commonly, but they are used. Q. Isn't it true that the use, for example, of medical devices, as far as you know, I am talking about your personal knowledge, that medical devices utilized in spinal surgery that are not FDA approved for a specific purpose have been reviewed by New Jersey Courts?, A. I'm not specifically aware of what the New Jersey Courts have said about that. Q. Are you aware that it's been reviewed by the United States Supreme Court ?, A. I am not aware of that* (exhibit 2h-15:9-16:15).

31

132. On April 15, 2013 GP criticized Kaul for the use of unilateral constructs, but then on May 29, 2013, GP's colleague and Defendant neurosurgeon, Robert Heary, admitted during a deposition in Kuren v Kaul, that he used unilateral ("staggard") constructs:

**THE COURT: I'm sorry. What was the conclusion of not bilaterally affixing the screws?. A. A gross deviation (exhibit 2i-134:2-4).**

However, Defendant Heary testified on May 29, 2013 **(exhibit 2j-21:4-19)** in Kuren v Kaul that he used unilateral, or what the attorney referred to as "staggard" constructs:

**Q. Dr. Heary, I'm going to ask you about the arrangement of pedicle screws that we just discussed in paragraph three of Heary 2, whereby there were screws on the right side at L2, 3 and 4 and on the left side at L3, 4 and 5, and simply, for ease of reference, I'm going to call that a staggard arrangement. Do you understand what I mean when I say "staggard arrangement?", A. Yes. Q. Have you, yourself, ever performed a surgery whereby you prepared and installed a staggard arrangement of pedicle screws?, A. Yes, I have.**

GP criticized Kaul for the use of allograft, but the use of autograft by Emami in the previous surgery, had failed to reduce FK's pain and failed to result in a fusion. Kaul revised Emami's failed procedure, and FK improved after Kaul's surgery **(exhibit 2k).**

### LM

### Clinical course

133. This patient initially presented on May 3, 2011 with a history of chronic pain in the back, neck, arms and legs, that had failed to respond to conservative therapy **(exhibit 3a).** LM underwent corrective surgeries, and on June 5, 2012 was noted to have a normal neurological and musculoskeletal examination, and to have made "excellent" progress. This was the last time the patient consulted with Kaul **(exhibit 3b).**

134. LM filed a lawsuit against Kaul on October 5, 2012, after the widespread publicity surrounding the suspension of his medical license.

### Alleged deviations

135. Surgical Technique

32

GP criticized the manner in which Kaul diagnosed and then operated on LM's spinal column, as being a gross deviation from the standard of care **(exhibit 3c-141:15-23)**. However, LM improved after the surgery, and did not, as GP testified, develop foot drop or atrophy **(exhibit 3d-27:18-20)**. No objective neurophysiological evidence was presented that confirmed either Rieger's or Przybylski's false claim that LM had foot drop. GP criticized the use of the Optimesh device as grossly deviating from the standard of care, because it was used in an off-label manner. However, on May 6, 2013 GP testified that he uses devices in an off-label manner **(exhibit 1k-17:1-19:9).**

136. Training

On April 16, 2013 GP criticized Kaul's training, but he undertook the same training in minimally invasive spine surgery, that only commenced in 2005, three years after Kaul. GP testified:

"*However, as I've testified before, Dr. Kaul does not have the training background to perform this type of surgery. Nonetheless, he does perform the L4-5 fusion surgery. And that is a gross deviation*" (**exhibit 3e-28:25-29:3**).

However, on May 6, 2013 GP admitted that his practice in minimally invasive spine surgery began in 2005. Kaul commenced in 2002.

Q. "*Now, we had a discourse during your training and voir dire where we talked about your training and experience, and I came up with, in your word, seminal date which was 2005, remember that, for minimally invasive technology? A. I remember the discussion. I remember that I told you that I had started minimally invasive surgery before that, but that it became a predominant part of my practice around that time*" **(exhibit 1k-54:11-20).**

137. However, the most critical component of MISS is FGI, in which Kaul was trained since 1993, but in which GP received no training until 2005 **(exhibit 1k-60:13-61:2).**

## GH

### Clinical course

138. This patient initially presented on November 14 2011 with a history of back and leg pain, numbness and weakness, and ability to perform activities of daily living **(exhibit 4a).** The patient underwent discography and then a spinal fusion on December 9, 2011. GH symptoms

33

disappeared after the surgery, and he was referred for a six-month follow-up on March 26, 2012 (exhibit 4b).

### Alleged deviations

139. Surgical Technique

GP criticized the manner in which Kaul diagnosed and then operated on GH's spinal column, as being a gross deviation from the standard of care (exhibit 4c-47:17). However, GH improved after the surgery and on May 6, 2013 GP testified that there were no standards were minimally invasive spinal fusions (exhibit 4d-37:2-9).

140. GP characterized the off-label use of the Optimesh device as a "gross deviation", but admitted on May 6, 2012 that he used devices in an off-label manner.

### HS

### Clinical course

141. This patient initially presented on July 5, 2011 with complaints of pain in the head, neck, left arm, mid back. Lower back and right leg, associated with numbness and tingling in the right leg, and weakness in the left arm and right leg. His neurological and musculoskeletal examinations indicated that he had had sustained damage to the nerves, muscles and ligaments, of his spinal column (exhibit 5a).

142. HS underwent diagnostic testing, that included radiological, neurophysiological and interventional pain mapping procedures. HS underwent a minimally invasive spinal fusion on December 21, 2011, and was discharged to conservative care on May 2, 2012, having reported that there had been a marked reduction in his back and leg pain. His neurological and musculoskeletal examinations indicated that the damage to the nerves, muscles and ligaments of his spinal column had disappeared (exhibit 5b). HS sent the defendant politician a letter on June 20, 2012 that requested the reinstatement of Kaul's medical license, and in which he stated, *"Without him only God knows if I would had been able to walk again"* (exhibit 5c). HS received no response, as did any of the patients, who sent letters to the Defendant politician.

### Alleged deviations

143. Surgical Technique + Hospital Privileges

34

GP criticized the manner in which Kaul diagnosed and operated on HS's spinal column, as being a gross deviation from the standard of care **(exhibit 5d-101:11-14),** because he did not possess hospital privileges or have a transfer agreement in place. Kaul submitted into evidence the transfer agreement with Chilton Memorial Hospital **(exhibit 5e),** but this was willfully ignored by Defendant Przybylski, Defendant Solomon and DAG Hafner. The issue of hospital privileges was addressed on January 25, 2012 by New Jersey Superior Court Judge Howard Coburn **(exhibit 5f)**. HS improved after the surgery, and refused to testify on behalf of the state, despite an in person visit from Doreen Hafner, and multiple post visit phone calls. Many of the Plaintiff's patients complained to Kaul, that Hafner had attempted to harass them into testifying against Kaul.

### SS

### Clinical course

144. This patient initially presented on August 1, 2007, with a fifteen-year history of complaints of pain in the neck, left arm, lower back and right leg. SS also complained of numbness and tingling in the right leg, difficulty walking and headaches. SS had weakness over the left hip flexors at 4/5 and over the left knee extensors at 4/5. A deficit of sensation was noted in the L5 dermatome of the left leg. SS had tenderness in both the cervical and lumbar spines, with a reduced range of motion, and had a positive straight leg raising test on the left at 25 degrees **(exhibit 6a)**.

145. SS received both diagnostic and therapeutic care from Kaul for five years, during which the cause of his pain was investigated and treated with interventional spinal procedures and minimally invasive spine surgery. SS was discharged to conservative care on January 24, 2012, at which time his symptoms had diminished to "some discomfort" in the right lower extremity. SS had no motor or sensory deficits, his straight leg raising tests were normal, and his walking pattern was normal **(exhibit 6b)**. SS has initially agreed to testify on behalf of Kaul **(exhibit 6c)**, but was told by Hafner that if he testified against Kaul, it would help his malpractice case, and that in return she would testify on his behalf.

### Alleged deviations

35

146. Surgical Technique

GP criticized the manner in which Kaul diagnosed and operated on SS's spinal column, as being a gross deviation from the standard of care **(exhibit 6d-157:9 + 157:25 + 158:15 + 159:11 + 160:3 + 161:5 + 161:9 + 161:18 + 161:24 + 171:8)**. It should be noted that the deviation identified at 171:8 was one that Defendant Przybylski characterized as being in the "hypothetical". This, the Plaintiff suggests, is typical of the existential Kafkaesque insanity of the entire proceeding. A "sham", "show" trial, orchestrated by the Defendant politician, and his dutiful underlings in the executive branch of state government. **However, on a more practical note, SS actually improved after the care that was provided by Kaul, and agreed to testify on Kaul's behalf in April 2012.**

147. Training

GP criticized Kaul's training as being a gross deviation from the standard of care, with regards to the performance of minimally invasive spine surgery. However, GP admitted on May 6, 2013 that his training in minimally invasive spine surgery only commenced in 2005, and consisted of the same courses that Kaul took to become proficient in the technique. SS improved after the surgery **(exhibit 6e-55:24-57:4).**

148. Off-label

GP criticized Kaul for the off-label use of the Optimesh device, but then admitted on May 6, 2013 that he used off-label devices **(exhibit 6e-17:11-19:9)**

### TZ

### Clinical course

149. This patient initially presented on January 21, 2010, with complaints of pain in the head neck, left arm, lower back and right leg. TZ also complained of numbness and tingling in the left arm, numbness and tingling in the right leg, weakness in the left shoulder, left wrist and right hip, with dizziness and headaches. TZ complained of difficulty in moving from the sitting to the standing position. TZ had motor, sensory and musculoskeletal deficits **(exhibit 7a).**

TZ received care from Kaul and his associates until November 2, 2011, on which date she reported to **Dr. Nasar Shahid** that her pain had decreased to 6/10, and that there had been "some partial improvement" after the minimally invasive spinal fusion **(exhibit 7b).**

### Alleged deviations

150. Surgical Technique

GP criticized the manner in which Kaul diagnosed and operated on TZ's spinal column, as being a gross deviation from the standard of care. TZ reported that there had been a reduction in her pain after the surgery.

Training

151. GP criticized Kaul's training in minimally invasive spine surgery, but admitted that his own training in minimally invasive spine surgery only began in 2005, and consisted of the same hands-on continuing medical education courses that Kaul had commenced in 2002. In fact, GP never undertook a MISS fellowship, as did Kaul, and never obtained board certification in MISS, as did Kaul. However, Defendant Solomon did not allow such facts to grace his opinion.

### PM

### Clinical course

152. This patient initially presented on November 8, 2017 with complaints of pain in the lower back and both legs. PM also complained of bowel and bladder dysfunction, and numbness, tingling and weakness in the hip and ankle joints. PM presented with motor deficits in the left ankle, and left hip, with sensory deficits over the L5 dermatome of the left leg, and a depressed ankle reflex on left. There was tenderness in the lumbar spine with a reduced range of motion, a positive straight leg raising test on the left, and difficulty walking **(exhibit 8a).**

153. PM received care from Kaul from November 8, 2007 to January 8, 2009, during which she underwent diagnostic testing and a minimally invasive spine fusion. PM was discharged to conservative care on January 8, 2009 and was noted to have experienced a "significant improvement" in her lower back and leg pain. PM reported that she was walking, was back at work and had improved. Her physical examination indicated some mild weakness over the left hip flexors, a normal sensory and reflex examination, with an improved range of motion in the

37

lumbar spine and a normal gait. PM reported that she was pleased with the outcome of the surgery **(exhibit 8b).**

### Alleged deviations

154. PM was not called to testify at the hearing. PM and FK are friends, and used the same attorney to sue Kaul. Kaufman and Przybylski withdrew as experts from the PM case after their cross examinations in the administrative law proceedings **(exhibit 8c).**

155. Surgical technique

GP criticized Kaul's use of trans-facet pedicular screws, and the off-label use of the Optimesh device **(exhibit 8d-70:24-71:4)**. It was also evident from his testimony that he was not familiar with the technique of inserting trans-facet screws, as he incorrectly described an entry point at the base of the spinous process **(exhibit 8d-56:13)**. On May 6, 2013 GP admitted under cross examination that he used off-label screws **(exhibit 8e-17:23-18:4)**. PM actually improved after the surgery, despite all of the alleged deviations the Plaintiff was, at least according to Defendant Przybylski, supposed to have committed. Incredible.

### KS

### Clinical course

156. This patient initially presented on August 23, 2010 with complaints of pain in the head, neck, both arms, lower back, left leg and left knee. KS also complained of numbness and tingling in the arms and legs, with weakness in the left arm and leg. KS had motor deficits in the left shoulder and left hip, sensory deficits in the left arm and leg, and depressed reflexes in the left arm and leg. There was tenderness in the cervical and lumbar spine, with a reduced range of motion, and signs consistent with spinal injury. Straight leg raising was positive on the left, and KS had difficulty with walking **(exhibit 9a)**.

157. KS received care from Kaul from that commenced on August 23, 2010, and on October 17, 2011, KS was evaluated approximately one month after having undergone a minimally invasive spinal decompression. KS reported a marked reduction in his back and leg pain, and that he was pleased with the outcome of the surgery. The neurological and musculoskeletal deficits in his lumbar spine and legs had disappeared, and his symptoms were limited to his neck and arms,

38

which were investigated and ultimately treated with a minimally invasive spinal fusion, performed on December 19, 2011. At the follow up examination on January 5, 2012, KS reported that the pain in his neck and arms had decreased after the surgery, but had worsened after he sustained injuries during an altercation in late December **(exhibit 9b)**.

### Alleged deviations

158. Surgical Technique

GP criticized the manner in which Kaul diagnosed and treated KS. However, KS improved after both the cervical and lumbar minimally invasive spine surgeries.

159. Training

The argument advanced above in Barbetta, is reasserted.

160. Hospital privileges

The argument advanced above in Barbetta, is reasserted.

### 161. Statement

KS has provided a statement that details his clinical and legal experiences with Kaul, Kaufman and Hafner, in the period from 2010 to 2013.

### JZ

### Clinical course

162. This patient initially presented on November 24, 2010 with complaints of severe chronic angina, that had persisted for several years, and which had failed to respond to any interventions, with a pain level that averaged 8-9/10 **(exhibit 10a)**. As a consequence of the severe pain, JZ had become dependent on opiates. JZ had no insurance, and Kaul provided charity care, that involved persuading Medtronic to provide a spinal cord stimulator, a device that was inserted into JZ's epidural space to provide pain relief **(exhibit 10b)**.

163. The trial device provided 80% to 90% pain relief, and JZ was recommended for insertion of a permanent device, which was performed on May 23, 2011.However, on August 21, 2011, due to an infection in the pocket in which the battery had been inserted, which is an accepted complication, JZ was scheduled to have it removed. On May 6, 2012 JZ posted a review online, in which he described his experience with Kaul **(exhibit 10c)**.

39

**Alleged deviations**

164. GP criticized the manner in which Kaul performed the thoracic epidurals, and placed the dorsal column stimulating leads. GP was not educated or trained how to perform thoracic epidurals, had no experience in performing thoracic epidurals, and was thus not qualified to testify about thoracic epidurals. The clinical notes indicate that JZ went to Chilton Memorial Hospital, from where he was discharged, and instructed to consult with Kaul, who then removed the leads.

**165. Statement**

JZ has provided a statement that details his clinical and legal experiences with Kaufman, Hafner and Datta, in the period from July 2012 to September 2013.

**JJ**

**Clinical course**

166. This patient initially presented on September 9, 2005 with complaints of severe chronic pain in the lower back and legs, that was associated with numbness, tingling and weakness, all of which caused JJ to have difficulty with sleep and work. JJ had weakness in the right hip and knee, with sensory deficits in the right leg, and tenderness in the lumbar spine, with a reduced range of motion, and positive straight leg raising bilaterally **(exhibit 11a)**. JJ underwent a minimally invasive spinal fusion on October 11 2005, was followed up on November 7, 2005, and reported that the pain had decreased in his back and leg, and that he had returned to work as a construction foreman **(exhibit 11b)**.

167. However, subsequent to a fall at work and a spinal manipulation, he developed pain in the left leg, for which Kaul ordered a CT scan, which showed an extruded fragment, and on December 26, 2005, Kaul recommended a minimally invasive neuroforaminal decompression **(exhibit 11c)**. On June 26, 2017 Kaul filed suit against Jarrell, with allegations of common law fraud **(exhibit 11d)**.

**Alleged deviations**

168. Surgical Technique

GP criticized Kaul's off-label use of the Optimesh device, but yet on May 6, 2013 he admitted he used devices in an off-label manner.

169. Training

The argument advanced above in Barbetta, is reasserted.

## Minimally invasive Spine Surgery Qualifications

170. Kaul graduated from the Royal Free Hospital school of Medicine in London, UK in 1988 and underwent eight years of post-graduate training in the US and UK in the specialties of general surgery, anesthesiology and interventional pain.

171. Dr. Richard Arjun Kaul is a minimally invasive spine surgeon, who graduated in 1988 from the Royal Free Hospital School of Medicine in London, after which he underwent eight years of post-graduate training in the US and UK, in the fields of general surgery, anesthesiology, interventional pain and minimally invasive spine surgery.

172. In August 1996 Kaul became licensed to practice medicine and surgery in New Jersey.

173. In September 1996 Kaul became board certified by the American Board of Anesthesiology.

174. From 2002 to 2012 performed eight hundred (800) minimally invasive spine surgeries and a total of six thousand spine procedures, with good to very good outcomes in 90-95% of cases, and a complication rate of 0.1%.

175. From 1992 to 2001 Kaul administered approximately ten thousand anesthetics, with one mortality.

176. In 2005 Kaul performed the first outpatient minimally invasive lumbar fusion **(Ref # 17),** and in 2011 Kaul performed the first outpatient corrections of an adolescent spondylolisthesis and a multi-level degenerative scoliosis.

177. From 2003 to 2012 Kaul was credentialed by at least six state licensed surgical centers to perform minimally invasive spine surgery.

178. From 2002 to 2012 Kaul attended approximately eighty spinal hands on cadaver training courses, and educated numerous physicians in the minimally invasive spinal technique.

179. Defendant Przybylski commenced performing minimally invasive spine surgery in 2005, three years after Kaul.

180. In 2004 Kaul became board certified by the American Academy of Minimally Invasive Medicine and Surgery.

41

181. None of the physician defendants are board certified by the American Academy of Minimally Invasive Spinal Medicine and Surgery

182. On March 3, 2011 Kaul opened NJSR Surgical Center, a Medicare certified, AAAHC accredited facility in Pompton Lakes, New Jersey. It is a four-thousand square foot facility, in which Kaul performed interventional spinal procedures and outpatient minimally invasive fusions and discectomies.

183. Between 2010 to 2012 multiple articles were published about Kaul's work in minimally invasive spine surgery and in 2011 it was reported that NJSR Surgical Center had a zero (0) % post-operative infection rate.

184. In 2008 Kaul established the Spine Africa Project, a 501 (c) 3 US based charity whose mission is to provide free healthcare and education to impoverished communities in Africa, India and the US **(Ref. # 13).**

185. Kaul came to know through conversations with spine device representatives, patients and physicians, that his professional and commercial success had caused immense jealousy within the medical community. Examples of this included defamatory comments made by Defendant Heary to Kaul's patient, Frances Kuren in 2008, by Defendant Kaufman to Kaul's patient, Corey Johnson in 2010 and by Defendant Peterson to Kaul's employee, Linda Reyes, in 2013.

186. Kaul's commercial success presented an economic threat to the insurance carriers, who used the political leverage they had purchased with the Christie administration, to have Kaul's license revoked. The purpose of this was to negate their statutory economic obligation to pay Kaul for clinical services he had legitimately rendered to their customers.

187. Kaul's practice grew three hundred percent from March 2011 to April 2012, and he increasingly performed cases on an outpatient basis, that although termed 'complex' by neurosurgeons, proved to be simple because of the surgical techniques employed by Kaul

188. Kaul's reputation in the field of minimally invasive spine surgery grew steadily from 2002, and he frequently taught his technique to other physicians, who observed him in the operating room and attended hands-on cadaver training courses he tutored. This video **(Ref # 14)** was presented at the medical board hearing on June 13, 2012 by DAG Hafner, as evidence,

incredulously, of Kaul's alleged malfeasance. A procedure is done perfectly, and the Plaintiff is criticized.

189. In 2011 Kaul performed the first outpatient correction of an adolescent spondylolisthesis **(Ref # 15).**

190. In 2011 Kaul performed the first outpatient correction of a three-level degenerative scoliosis **(Ref # 16).**

191. In early January 2012 two inspectors from the state made an unannounced visit to NJSR Surgical Center, the purpose of which they concealed from Kaul, as they interviewed Kaul's staff and collected evidence. The inspectors presented no warrants. The Court is correct in asserting that the proceedings are quasi-criminal, but the investigators did not inform Kaul or his staff of their rights, before they commenced their interviews and gathering of evidence.

192. On June 22, 2009 an independent arbitrator entered a judgment against State Farm and awarded Kaul his fee for having performed a minimally invasive spinal fusion on patient FK. The arbitrator found that Kaul was properly licensed, the procedure was properly performed and was medically necessary **(exhibit 12l).** Significantly the arbitrator found, after a review of all of the clinical evidence, *"Dr. Kaul recommended pain management intervention followed by surgical intervention. The course of treatment performed by Dr. Kaul was consistent with the clinically supported symptoms, diagnosis and indications of the patient. Dr. Kaul's treatment plan was the most appropriate level of service that is in accordance with the standards of good practice and standard professional treatment protocols".*

192. Kaul utilized the same treatment algorithms on all of his patients.

193. On September 16, 2013 Kaul filed an ethics complaint against Hafner, which he brought to Keating's attention in 2014, when he suggested that Hafner should have no involvement in Kaul's application for license reinstatement. Keating dismissed Kaul's concerns, despite the fact that Hafner had used prejudicial and perjorative terms in her opposition to Kaul's application.

194. Commencing in 2010 Kaul's work received extensive media coverage.

195. Defendant Kaufman publically defamed Kaul on multiple occasions from at least 2010 onwards, and made highly derogatory remarks to two of Kaul's patients, Corey Johnson and John Zerbini, the latter who testified for the state in the 2012-2013 licensure proceedings.

43

196. Kaul was defamed by defendant Peterson in 2013, when he referred to Kaul as a "murderer" while talking to one of Kaul's employees, upon whose brother Peterson had just operated.

197. The neurosurgeons used their influence within the credentialing committees to prevent Kaul from obtaining hospital privileges.

198. The rapid growth of Kaul's business presented an economic threat to the insurance companies, who improperly used state agencies and courts to revoke Kaul's license.

### State Misconduct + Forged Transcripts

199. In early January 2012 two inspectors from the state made an unannounced visit to NJSR Surgical Center, the purpose of which they concealed from Dr. Kaul, as they interviewed Dr. Kaul's staff and collected evidence. The inspectors presented no warrants. The Court is correct in asserting that the proceedings were quasi-criminal, but the investigators did not inform Dr. Kaul or his staff of their rights, before they commenced their interviews and gathering of evidence.

200. On April 2, 2012 the defendant medical board filed a complaint to suspend or revoke Kaul's license.

201. On May 9, 2012 Kaul signed an interim consent order with the board, in which he agreed, pending the outcome of a full hearing, to limit his practice to interventional spinal procedures. The order permitted Kaul to apply for minimally invasive spine privileges at a hospital, and on, or about May 16 Kaul submitted an application to a local hospital.

202. On May 9, 2012 the defendant attorney general made prejudicial comments to the media that Kaul was not qualified to perform minimally invasive spine surgery.

203. On May 22, 2012 the acting director of the division of consumer affairs, Eric Kanefsky, unilaterally and without due process suspended Kaul's CDS prescribing privileges, an act that prevented Kaul from practicing medicine entirely.

204. Kaul indicated that unless the CDS license was reinstated, he would initiate legal action. Kanefsky retaliated by filing a motion on May 29, 2012 to rescind the consent order, based on false allegations that Kaul had not modified his website and complied with a subpoena request.

205. Kaul filed an application on June 7, 2012 with the Mercer County Superior Court that requested the appointment of a special prosecutor and ad hoc medical board.

The application was denied, as was the subsequent appeal.

206. On June 13, 2012 Kanesfsky's motion to rescind the consent order was granted, and Kaul's license was suspended, after a hearing at the medical board, based on false allegations that he had not changed his website and responded to document subpoenas. DAG Hafner played a video of a patient, who had improved after Dr. Kaul performed a successful minimally invasive outpatient lumbar fusion **(Ref # 18),** Hafner considered the video, evidence that Dr. Kaul had deviated from Defendant Przybylski's fictitious standard of care, a standard that he admitted on May 6, 2013 did not exist. However, it mattered not to Hafner that the patient improved, because she must have held the same view that Defendant Lomazow expressed at the end of his 2014 video interview, which is that patients "know nothing" **(Ref # 12).**

207. On December 20, 2012 the state issued a cease and desist letter to Kaul that ordered him to close the NJSR Surgical Center. Subsequent to the suspension of Kaul's license, other physicians had been performing procedures at the facility. Kaul appealed the order, which was stayed pending the outcome of the licensure proceedings.

208. On April 9, 2013 the hearing commenced in the New Jersey Office of Administrative Law.

209. On the days that Defendant Przybylski testified, Kaul requested that an independent transcriptionist record the proceedings.

210. In support of their case, the state relied on eleven (11) patients, whom they alleged had sustained complications consequent to surgeries performed by Kaul. Only six (6) patients actually testified, but the administrative court permitted defendant Przybylski's testimony about the other five patients to be entered onto the record. This testimony was subsequently used by the court as part of the basis for the revocation of Kaul's license. Kaul was denied the opportunity to examine these five patients.

211. There were twenty-three days of testimony, that concluded on June 28, 2012.

212. Kaul, upon becoming aware that the attorney general had forged court transcripts, sent a series of letters in September 2013 to numerous parties **(ECF # 179-1 + 179-2).**

45

213. On September 23, 2013, one of Kaul's patients, Corey Johnson, filed a complaint with defendant Gonzalez, then the president of University Hospital, in which he described the defamatory statements made by Kaufman against Kaul.

214. On Sunday November 17, 2013 the Bergen Record published a six thousand (6000) word article, written by defendant Washburn, in which Kaul's appearance was defamed with references to his "frayed wallet ... laceless shoes", and his "upper crust British accent".

215. The Defendants have removed these articles from the internet, within the last three months.

216. After the Washburn article a number of Dr. Kaul's patients provided a video response **(Ref # 20).**

217. On December 13, 2013 the administrative law court issued an opinion, in which it revoked Kaul's license.

218. On December 26, 2013 Kaul sent a letter to the administrative law judge in regards to the story published on November 17, 2013 in the Bergen Record.

219. On January 5, 2014 Kaul sent a letter to President Obama, that sought the assistance of the federal government to investigate the forged transcripts.

220. On January 9, 2014 Kaul sent a letter to defendant Washburn that requested a copy of the audio recording of the interview she had conducted with Kaul on August 13 2013, at the commencement of which she acknowledged that the transcripts had been forged.

221. On or about January 22, 2014, Defendant Lomazow gave an interview, in which he discussed the events of his eight-year tenure at the New Jersey Board of Medical Examiners. During the interview he suggested that Dr. Kenneth Zahl was responsible for the death in 2006 of Deputy Attorney General, Paul Kenny, and described his interactions with Zahl. The interview concludes with Lomazow's scathing description of the the patients who had come to support Zahl (time segment 2:10 – 2:18) **(Ref # 12)**

222. On February 6, 2014 Kaul sent a letter to the defendant medical board, in which he stated that he would not attend its hearing on February 12, 2014, and in which he raised the issue of forged transcripts and Kaufman's defamatory conduct. The defendant medical board failed to have an independent investigation conducted, and on March 24, 2014 revoked Kaul's license.

46

The defendant medical board attempted to minimize the issue of forged court transcripts, and did not investigate Kaufman's defamatory conduct.

223. On January 29, 2015 Kaul filed a complaint with the US Attorney for the District of New Jersey, that sought an investigation into the forged transcripts. Two weeks after Kaul had filed the complaint, he telephoned the office of the US Attorney to ascertain the status of the complaint and was told, "We are not an investigative agency". Kaul had initially approached the FBI, but had been referred to the US Attorney.

224. In 2015 Kaul submitted multiple letters to the New Jersey Attorney General, the US Attorney and insurance carriers, that sought their assistance in retrieving a copy of his medical board file, and investigating the forged transcripts and illegal audio recording. A letter was also sent on November 11, 2015 to the International Criminal Court, regarding the defendant politician.

225. In May 2016, the defendant state, after having been named as a defendant in Kaul v Christie, filed a retaliatory action against Kaul in Mercer Country Court regarding alleged unpaid state taxes.

226. On September 15, 2016 Kaul made an unannounced visit to J. H. Buhrer, the company employed by the state to transcribe the 2013 licensure proceedings in the office of administrative law. Kaul interviewed its owner.

227. On September 21, 2016 Kaul was arrested at 1:30 am by eight armed officers from the Somerset County Probation Department, on a warrant for unpaid child support.

228. In October, 2016 Kaul submitted a request with the Court that sought permission to file a TRO and injunction against the state, pending the outcome of the federal proceedings.

229. The Court's opinion of June 30, 2017, on page 48, footnote 38, references three cases, that pertain to the intersection of RICO allegations, and the doctrines of absolute and qualified immunity. Cullinan v Abramson, 128 F.3d 301 (6th Cir. 1997), Van Beek v Ag-Credit Bonus Ptnrs., 316 **F. App'x** 554 (9th Cir. 2008) and Parette v Virden, 173 **F App'x** 534, 536 (8th Cir. 2006). Two of the citations are in the Federal Appendix, and all three are devoid of any allegations that the Defendants **forged, tampered with, and altered court transcripts**.

47

230. None of the State Defendants have denied these allegations, but Defendant Geico did in their supplemental brief. The fact that Defendant Geico, a private corporation, stated as fact, that the transcripts had not been altered, has raised the question of how to come they came to know. It is also, the Plaintiff suggests, evidence of the hand-in-glove relationship with the state government, the corrupt nature of which, underpins the subject matter of this case.

# VI.    CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
### THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ.
### (By Plaintiff against Defendants Christie + Kaufman + Przybylski + Heary + Mitchell + Staats + CNS + ASIPP)
### The CAC RICO Association-In-Fact-Enterprise

231. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

232. Plaintiff brings this Count against Defendant Andrew Kaufman

At all relevant times Defendant Kaufman has been a "person" under 18 U.S.C. § 1961(3) because he is capable of holding, and does hold, "a legal or beneficial interest in property." Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

233. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

234. As explained in detail below, Defendant Kaufman sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing. Defendant Kaufman sought to achieve these ends, so that that the Plaintiff would be foreclosed from working anywhere in the world. Defendant Kaufman pursued these ends through a fraudulent scheme designed to secure increased revenues and market share, increase his political power within

48

the medical community, secure his referral relationships with the Defendant neurosurgeons and satisfy a bizarre personal animus towards the Plaintiff. As explained in detail below, Defendant Kaufman's years-long misconduct violated sections 1962(c) and (d).

## A. Description of the CAC RICO Enterprise

235. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

236. For years ASIPP played a small but meaningful role in the emerging field of minimally invasive spine surgery. It entered into verbal agreements with the neurosurgical members of other spine societies, from whom its members were referred patients, that it would limit its members scope of practice to percutaneous discectomies.

237. The Plaintiff was a member of ASIPP for a brief period in 2004, but did not renew his membership, because he disagreed with the limited scope of practice agreements, and it's focus on medical politics, as oppose to the development of surgical skills.

238. In the past decade, however, ASIPP began to exert influence in their role as the arbiters of who was qualified to perform minimally invasive spine surgery, to dictate the success or failure of high profile interventional pain physicians who did not contribute financially to ASIPP, but who had expanded their scope of practice. ASIPP, because of its agreements with other spine societies, wanted to control who entered the interventional pain and minimally invasive spine surgery sector.

239. Negotiations between ASIPP and other spine societies regarding the division of the spine market, took place in complex, closed-door meetings, during which the parties discussed the threat of the Plaintiff's expanding outpatient minimally invasive spine surgery practice. In order to ensure that their members continued to receive referrals from the neurosurgeons, who had become concerned that the Plaintiff's practice would expand nationally, ASIPP agreed to participate in a scheme with the neurosurgeons to have the Plaintiff's medical license

49

revoked, and stop him from performing minimally invasive spine surgery. The neurosurgeons had become aware that the Plaintiff was training other minimally invasive spine surgeons, and that his work was being widely publicized.

240. This scheme to maintain the profits of ASIPP members through the eradication of the Plaintiff's practice, benefitted the neurosurgeons, and the hospitals at which the two spine specialties engaged in healthcare business. The Plaintiff's minimally invasive spine surgery practice was based in free standing ambulatory surgical centers, at which neither Kaufman nor the neurosurgeons operated or had financial interests.

241. At all relevant times, Defendant Kaufman, along with other members of ASIPP, Defendant neurosurgeons and Defendant CNS, operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that that their horizontal agreements and market share distributions continued to grow, by fraudulently excluding the Plaintiff, monopolizing the market and then artificially increasing their prices. A large majority of these meetings occurred behind closed doors in Trenton. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4)

242. Alternatively, each of the ASIPP RICO Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the CNS RICO Defendants conducted their pattern of racketeering activity. The ASIPP RICO Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the ASIPP RICO Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "ASIPP CNS RICO Enterprise"

243. At all relevant times, the ASIPP CNS RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated –in-fact for the common purpose of engaging in the ASIPP CNS RICO Defendants profit making scheme, and the fraudulent scheme to provide experts to ensure the revocation of the Plaintiff's license.

244. The association-in-fact ASIPP CNS RICO Enterprise consisted of the following entities and individuals: (a) ASIPP and Defendants Kaufman and Staats; (b) CNS and Defendants Heary, Przybylski and Mitchell.

245. While each of the ASIPP CNS RICO Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the ASIPP CNS RICO Enterprise's affairs, at all relevant times, the ASIPP CNS RICO Enterprise: (a) had an existence separate and distinct from each ASIPP CNS RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the ASIPP CNS RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the ASIPP CNS RICO Defendants, along with other individuals and entities, including unknown third parties.

246. The ASIPP CNS RICO Defendants and their co-conspirators, through their illegal ASIPP CNS RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the ASIPP CNS RICO Enterprise's activities by bribing the defendant politician to have the Plaintiff's license revoked, protecting their illegal horizontal 'fusion-percutaneous' agreements, monopolizing the markets, artificially elevating their prices, and illegally reducing competition.

247. Defendants Staats, Kaufman, Przybylski, Heary and Mitchell orchestrated the ASIPP CNS RICO Scheme, whereby they leveraged their dominant political position with the defendant politician, and medical board to have the Plaintiff's medical license revoked. The purpose of the Scheme which was to eliminate competition, and facilitate the Defendant neurosurgeons monopolization of the minimally invasive spine surgery market, from which Defendants

248. Kaufman and Staats profited through increased referrals from the Defendant neurosurgeons.

249. Defendants Chiesa and Christie participated in the ASIPP CNS RICO Scheme by providing the enterprise with the use of state agencies, personnel and resources necessary to revoke the Plaintiff's license. These services were provided in return for bribes and 'campaign donations'

250. In furtherance of the scheme, the ASIPP CNS RICO Defendants each affirmatively misrepresented or concealed from their members, the existence of bribes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. The Defendants understood that if the general members became aware of the scheme, they would have passed a vote against it, realizing the liability it would incur. Specifically, the ASIPP CNS RICO Defendants claimed that the monies paid to the defendant politician, were intended to assist them in their

51

efforts to counter pending fee reductions from the defendant insurance carriers, when, in fact, they were quid pro quo payments to the defendant politician to have the Plaintiff's license revoked. The majority of ASIPP and CNS members were not direct commercial competitors of the Plaintiff, as were defendants Kaufman, Staats, Heary, Przybylski and Mitchell, who all competed for patients from the same pool. i.e. New Jersey.

## B. The CAC RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

251. Each ASIPP CNS RICO Defendant benefited financially from the ASIPP CNS RICO Enterprise. They all commenced treating patients that had been under the care of the Plaintiff, and Kaufman and Staats, for their cooperation with the scheme, received more referrals from Heary, Przybylski and Mitchell. The increased patient flow led to increased revenues, and the perception within the medical community of their increased political power, caused an increase in referrals from community physicians.

252. In exchange for bribes paid by Defendant Staats to Defendant Christie, one of Staats's partners was appointed to the medical board, a position he used to block the Plaintiff's application in 2014 for license reinstatement. The inability of the Plaintiff to recommence clinical practice, has permitted the ASIPP CNS RICO Defendants to improperly profit from the continuance of reduced competition, and has enabled them to fortify their monopolies and raise prices.

253. At all relevant times, the ASIPP CNS RICO Enterprise: (a) had an existence separate and distinct from each ASIPP CNS RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the ASIPP CNS RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the ASIPP CNS RICO Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise, which was formed for the purpose of bribing Defendant Christie, in order to have him instruct the medical board revoke the Plaintiff's license, the result of which was an increase in revenue to the ASIPP CNS RICO Defendants, but not necessarily to the general members of ASIPP and CNS.

52

254. The ASIPP CNS RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the ASIPP CNS RICO Defendants and other entities and individuals associated-in-fact with the Enterprise's activities through their illegal scheme to have the Plaintiff's license revoked, and profit from the increased revenues that flowed from increased patient referrals. The ASIPP CNS RICO Defendants, as well as Defendant Staats's partner, Metzger, all consult for the insurance industry, and regularly provide opinions that deny payment to other physicians, for services for which they are reimbursed.

255. The ASIPP CNS RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and delivery of minimally invasive spine surgery throughout the country, and the receipt of monies from the provision of such services.

256. Within the ASIPP CNS RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The ASIPP CNS RICO Enterprise used this common communication network for purposes of promoting the suspension and revocation of the Plaintiff's license, in order to intimidate other minimally invasive spine surgeons into not performing minimally invasive fusions. The reduced competition caused an increase in revenue for the ASIPP CNS RICO Defendants. The network was also used to attack the Plaintiff's character, and disseminate false allegations that he had engaged in insurance fraud. The falsity of these latter claims was proved when Defendant Geico's lawsuit filed in the DNJ on April 27, 2013 was dismissed with prejudice on December 8, 2014. The network was used to promote the ASIPP CNS RICO Defendants, which after the publicity surrounding the revocation of the Plaintiff's license, raised their professional profiles internationally, and led to an increase in consultancy contracts with insurance and medical device companies.

257. Each participant in the ASIPP CNS RICO Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the ASIPP CNS RICO Enterprise, the ASIPP CNS RICO Defendants functioned as a continuing unit with the purpose of furthering the ASIPP CNS RICO Scheme.

The ASIPP CNS RICO Defendants participated in the operation and management of the ASIPP CNS RICO Enterprise by directing its affairs, as described herein. While the ASIPP CNS RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

258. The ASIPP CNS RICO Defendants exerted substantial control over the ASIPP CNS RICO Enterprise, and participated in the affairs of the enterprise by: (a) deciding how monies were dispersed from the political action committees; (b) communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Defendant Christie, and members of both state and federal governments; (c) developing policies and guidelines for clinical care, that were consistent with the horizontal agreements and market share plans; (d) procuring appointments to regulatory boards and insurance panels, which they used to further their personal economic agendas; (e) procuring positions on hospital credentialing committees, which they used to exclude competition from the hospital; (f) procuring positions on medical expert panels, which they used to testify against their competition in medical malpractice suits; (g) misrepresenting and/or concealing from the general members the true nature of the relationship and agreements between the members of the enterprise and the scheme to bribe Defendant Christie in order to revoke the Plaintiff's medical license; (h) otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; (i) ensuring that the other ASIPP CNS RICO Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

259. Without each ASIPP CNS RICO Defendants' willing participation, the ASIPP CNS RICO Scheme and common course of conduct would not have been successful.

The ASIPP CNS RICO Defendants directed and controlled the ongoing organization necessary ti implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

### C.  Predicate Acts: Mail and Wire Fraud

54

260. To carry out, or attempt to carry out, the scheme to defraud, the ASIPP CNS RICO Defendants, each of whom is a person associated-in-fact with the ASIPP CNS RICO Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the ASIPP CNS RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

261. Specifically, the ASIPP CNS RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

262. The multiple acts of racketeering activity which the ASIPP CNS RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the ASIPP CNS RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the ASIPP CNS RICO Enterprise. The ASIPP CNS RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

263. The ASIPP CNS RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

264. In devising and executing the illegal scheme, the ASIPP CNS RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public and the Plaintiff's patients, that the Plaintiff was not qualified to perform minimally invasive spine surgery, a materially false representation. For the purpose of executing the illegal scheme, the ASIPP CNS RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

265. The ASIPP CNS RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)
include, but are not limited to:

(a)  Mail Fraud: The CAC RICO Defendants violated 18 U.S.C.

§ 1341 by sending or receiving, or by causing to be sent and/or received,
materials via U.S. mail or commercial interstate carriers for the purpose of
executing the unlawful scheme to design, manufacture, market, price, and/or sell
the insulin products described herein by means of false pretenses,
misrepresentations, promises, and omissions.

(b)  Wire Fraud: The CAC RICO Defendants violated 18 U.S.C.

§ 1343 by transmitting and/or receiving, or by causing to be transmitted and/or
received, materials by wire for the purpose of executing the unlawful scheme to
defraud and obtain money on false pretenses, misrepresentations, promises, and
omissions.

266. The ASIPP CNS RICO Defendants' use of the mails and wires include, but are not limited to:
(a) the transmission of letters, e-mails and other materials negotiating the horizontal
agreements and market share distributions; (b) the transmission of letters, emails and other
materials indicating that the ASIPP CNS RICO Defendants had instructed their members not to
support the Plaintiff in any litigation; (c) written, telephone, or electronic communications
regarding the events surrounding the revocation of the Plaintiff's license; (d) written,
telephone, or electronic communications instructing its members not to support the Plaintiff in
any litigation; (e) written, telephone, or electronic communications regarding discussions
between the ASIPP CNS RICO Defendants and state and federal politicians about the scheme to
revoke the Plaintiff's license; (f) the use of the mails or wires to bill for or collect the increased
revenues that flowed from the elimination of the Plaintiff from the practice of medicine.
267. The ASIPP CNS RICO Defendants also communicated by U.S. mail, by interstate facsimile,
and by interstate electronic mail with every state licensing board, the Federation of State
Medical Boards, the American Board of Anesthesiology, the General Medical Council of the
United Kingdom, and other healthcare related third-party entities in furtherance of the scheme.

The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the elimination of the Plaintiff from the practice of medicine.

268. Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

269. The CAC RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the ASIPP CNS RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the ASIPP CNS RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct. The CAC RICO Defendants aided and abetted other in violations of the above laws

270. To achieve their common goals, the CAC RICO Defendants encouraged patients to file lawsuits against the Plaintiff, filed complaints with state and federal healthcare regulatory authorities, instructed their members to discontinue communications with the Plaintiff and encouraged the media to publish defamatory articles.

271. The ASIPP CNS RICO Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the ASIPP CNS Defendants and their co-conspirators had to agree to conceal their fraudulent scheme and illegal tactics. The ASIPP CNS RICO Defendants knew, and intended that Plaintiff's patients and business network, would rely on the material misrepresentations and omissions made by them and would cease treating and engaging in healthcare commerce with the Plaintiff. Indeed, the

57

Defendants knew that the only way they could compete with the Plaintiff, was through defamation and slander.

272. As described herein, the ASIPP CNS RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicated acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus eliminating the competition he presented, and increasing the ASIPP CNS RICO Defendants revenues. The predicate acts also had the same or similar results, participants and methods of commission. The predicate acts were related and not isolated events.

273. During the ASIPP CNS RICO Defendants' perpetration of their scheme, the true purpose of the fraudulent nature of their racket to increase revenues through the elimination of the Plaintiff from the practice of medicine, was revealed to each of the ASIPP CNS RICO Defendants. Nevertheless, the ASIPP CNS RICO Defendants continued to disseminate falsehoods that the Plaintiff was not qualified to perform minimally invasive spine surgery, in furtherance of their scheme.

274. By reason of, and as a result of the conduct of the ASIPP CNS RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his business and/or property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of his children's home and the loss of his relationship with his children.

275. The ASIPP CNS RICO Defendants violations of 18 U.S.C. §1962© and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c)

## COUNT TWO
### VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
### THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961 ET SEQ
### (By Plaintiff against Defendants Christie + Allstate + Geico + TD + Kothari)
### The CAGTK RICO Association-In-Fact Enterprise

276. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

277. Plaintiff brings this Count against Defendants Christie + Allstate + Geico + TD + Kothari (inclusively, for the purposes of this Count, the "CAGTK RICO Defendants")

278. At all relevant times the CAGTK Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property." Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

279. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

280. As explained in detail below, Defendants CAGTK sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing. The purpose of their scheme was to manufacture an excuse to avoid paying the Plaintiff's bills for the minimally invasive spine surgeries he had performed on customers of CAGTK Defendants, Allstate and Geico. The CAGTK RICO Defendants sought to achieve these ends, so that that the Plaintiff would leave the country, and not be able to litigate the wrongful conduct of the CAGTK RICO Defendants. The CAGTK RICO Defendants pursued these ends through a fraudulent scheme of bribes and kickbacks that were designed to secure increased revenues, an increased NYSE share price, increased political power and influence over state legislators, increased market share of the banking and insurance sector, and the manufacture of anticompetitive case law advantageous to their commercial. As explained in detail below, the CAGTK RICO Defendants' years-long misconduct violated sections 1962(c) and (d).

### D. Description of the CAGTK RICO Enterprise

281. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

282. For years the CAGTK RICO Defendants have played a central role in the political and business spheres of the State of New Jersey. The Department of Banking and Insurance is a branch of the executive arm of state government, and a 'revolving door' exists and has existed, between the private and public sectors. Legislators have been purchased by the CAGTK RICO Defendants, and received bribes from the CAGTK RICO Defendants, through middle men known as 'political lobbyists' and 'public relation gurus'. The CAGTK RICO Defendants engaged in a scheme of bribes and kickbacks that advanced legislation that resulted in increased revenues for the CAGTK RICO Defendants at the expense of the Plaintiff, and without any benefit to the public. The effect of these changes has been to reduce the availability of minimally invasive spine surgery, a causative factor in the opiate epidemic. Despite the increased revenues to the CAGTK RICO Defendants, the public, of which the Plaintiff is a member, continues to pay increased fees for banking services, and auto insurance.

283. In the past five years, the CAGTK RICO Defendants have, through the increased revenue generated through their decades old scheme of kickbacks and bribery, increased their control of the state government, its agencies, its legislature and certain members of its judiciary. This permitted them to exert control over the mechanism of physician regulation, to revoke the Plaintiff's medical license. The excuse given by the medical board to revoke the Plaintiff's license was that he had, according to Defendants Przybylski and Kaufman, deviated from a standard of care, that they ultimately admitted did not exist. The real reason for the revocation was money. If the Plaintiff had provided minimally invasive spine surgery services for free, the CAGTK RICO Defendants would not have conspired to revoke the Plaintiff's license.

Discussions between the CAGTK RICO Defendants regarding the Plaintiff's invoices for minimally invasive spine surgery, took place in complex, closed-door meetings, during which the parties discussed the threat to their corporate profits, of the Plaintiff's expanding outpatient minimally invasive spine surgery practice.

284. In order to ensure that their corporate profits were not affected by the increasing commercial success of the Plaintiff's minimally invasive spine surgery practice, and the expanding number of minimally invasive spine surgeons being trained by the Plaintiff, the Defendant insurance carriers co-orchestrated a scheme, with the other CAGTK RICO Defendants to have the Plaintiff's medical license revoked. As part of the scheme the defendant insurance carriers disseminated false information within the medico-legal community, that the Plaintiff had committed insurance fraud. This was done in order to discredit the Plaintiff and isolate him from his colleagues and patients. The clinical and commercial success of the Plaintiff's practice was a consequence of his ability to operate efficiently, due to his advanced skills in the use of Fluoroscopic Guidance and Interpretation (FGI), which permitted him to place needles, probes, dilators and surgical instruments more precisely than his competitors. Similarly, the Plaintiff's practice grew through word of mouth, and the success was directly related to his low complication rate (0.1%) and above average outcomes (good to very good in 90-95% cases). The scheme to maintain and increase the profits of the defendant insurance carriers through the elimination of the Plaintiff's practice, benefited the shareholders, the corporate executives, corrupted members of the political and legal establishment, and the middle men, through whom the CAGTK Defendants funneled bribes.

285. At all relevant times the CAGTK Defendants operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that their fraudulent scheme to have the Plaintiff's license revoked was perpetrated to its conclusion. A large majority of these meetings occurred behind closed doors in Newark and Trenton, many of which were attended by members of the Office of the New Jersey Attorney General, and in particular DAG Doreen Hafner. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4)

61

286. Alternatively, each of the CAGTK Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the other Defendants conducted their pattern of racketeering activity. The CSAGTK Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the other Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CAGTK Enterprise"

287. At all relevant times, the CAGTK RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated –in-fact for the common purpose of engaging in the CAGTK Defendants profit making scheme, and the fraudulent scheme to corrupt state agencies and actors to ensure the revocation of the Plaintiff's license.

288. The association-in-fact CAGTK Enterprise consisted of the following entities and individuals: (a) Defendant Christie; (b) Defendant Allstate New Jersey Insurance Company; (c) Defendant GEICO; (d) Defendant TD Bank; (e) Defendant Divyesh Kothari

289. While each of the CAGTK Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CAGTK Enterprise's affairs, at all relevant times, the CAGTK Enterprise: (a) had an existence separate and distinct from each CAGTK Defendant; (b) was separate and distinct from the pattern of racketeering in which the CAGTK Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CAGTK Defendants, along with other individuals and entities, including unknown third parties.

290. The CAGTK Defendants and their co-conspirators, through their illegal CAGTK RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CAGTK Enterprise's activities by bribing the defendant politician to have the Plaintiff's license illegally revoked, in order to manufacture an excuse to not pay the Plaintiff monies for the provision of minimally invasive spine surgery. The CAGTK RICO insurance carrier Defendants used the revocation of the Plaintiff's license as a basis to deny payment to other similarly trained minimally invasive spine surgeons.

291. Defendants Christie, Allstate and Geico orchestrated the CAGTK RICO Scheme, whereby they leveraged their dominant political position with the medical board to have the Plaintiff's medical license revoked. The purpose of the Scheme which was to eliminate the Plaintiff from the practice of medicine, and thus eradicate their debt and eliminate any future financial liability that would have developed had the Plaintiff continued to practice minimally invasive spine surgery. The CAGTK RICO Defendants knew that the Plaintiff planned to open a four operating room state licensed surgical center in New Jersey, and had plans to expand nationally.

292. Defendant Chiesa participated in the CAGTK RICO Scheme by providing the enterprise with the use of state agencies, personnel and the resources necessary to revoke the Plaintiff's license. These services were provided in return for bribes and monies disguised as 'campaign donations' to the CAGTK RICO Defendant politician. The monies were part of a quid pro quo scheme, not protected by Noerr Pennington, in which there was an explicit understanding that the bribes were payment for the revocation of the Plaintiff's license.

293. In furtherance of the scheme, the CAGTK RICO Defendants each affirmatively misrepresented or concealed from their shareholders, the existence of bribes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. The Defendants understood that if the shareholders became aware of the scheme, they would have passed a vote against it, realizing the liability it would incur. Specifically, the CAGTK RICO Defendants claimed that the monies paid to the defendant politician, were intended to assist them in their legislative efforts, when in fact, they were quid pro quo payments to the defendant politician to have the Plaintiff's license revoked.

### E. The CAGTK RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

294. Each CAGTK RICO Defendant benefited financially from the CAGTK RICO Enterprise. The Defendant politician acquired funds for his political campaigns, while the Defendant insurance carriers eliminated past debt, and future liability. Defendants TD and Kothari were rewarded with regulatory favors, not offered to their banking competitors, that led to increased profits, increased executive compensation and an increased NYSE share price.

295. As part of a quid pro quo that existed within the CAGTK RICO Enterprise, Defendant Christie, discouraged his department of banking and insurance from enforcing regulatory violations against Defendant TD. This was in return for Defendant TD and Kothari's acts of foreclosing in 2012, on the Plaintiff's surgical center loans, attempting in 2013 to impede the sale of his Manhattan townhouse, and causing in 2013 a receiver to seize control of his businesses. The latter event precipitated the filing by the Plaintiff on June 17, 2013, for Chapter 11 protection. This caused many of Dr. Kaul's employees, a large percentage of whom were single mothers, to become unemployed and lose their health insurance **(Ref # 19).** This has resulted in vast profits for the CAGTK RICO Defendant, that, but for their involvement in the quid pro quo, would not have occurred.

296. At all relevant times, the CAGTK RICO Enterprise: (a) had an existence separate and distinct from each CAGTK RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the ASIPP CNS RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the ASIPP CNS RICO Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise, which was formed for the purpose of bribing Defendant Christie, in order to have him instruct the medical board revoke the Plaintiff's license, the result of which was an increase in revenue to the ASIPP CNS RICO Defendants, but not necessarily to the general members of ASIPP and CNS.

297. The CAGTK RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CAGTK RICO Defendants and other entities and individuals associated-in-fact with the Enterprise's activities through their illegal scheme to have the Plaintiff's license revoked, and profit from the increased revenues that flowed from the eradication of past debt and the elimination of future liability. The CAGTK RICO Defendants, comprise a group of "persons" who simultaneously regulate and profit from the New Jersey Banking and Insurance Sector.

298. The CAGTK RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the

commercialization of risk, the lending of capital and the sale of financial products, the consequences of which generated enormous profits.

299. Within the CAGTK RICO Enterprise, there was a common communication network by which con conspirators shared information on a regular basis. The CSGTK RICO Enterprise used this common communication network for purposes of promoting false information that the Plaintiff was not qualified to perform minimally invasive spine surgery, had committed insurance fraud Medicare fraud and bank fraud. The purpose of this propaganda campaign was to isolate the Plaintiff from the medicon legal community and any source of capital. The CAGTK Defendants filed a complaint in 2013 with www.checksystems.com that prevented the Plaintiff access to banking services. The Plaintiff's compromised economic position hindered his ability to litigate the ongoing legal matters, and collect monies owed from the CAGTK RICO insurance carrier defendants. It also caused him to become homeless. The falsity of these latter claims was proved when Defendant Geico's lawsuit filed in the DNJ on April 27, 2013 was dismissed with prejudice on December 8, 2014. The network was used to disseminate these falsehoods to the minimally invasive spine surgery community, in order to dissuade them from pursuing their accounts receivable. This permitted the CAGTK RICO insurance carrier Defendants to improperly profit from a scheme polluted with bribes, fraud, kickbacks, obstruction of justice and forged transcripts.

300. Each participant in the CAGTK RICO Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CAGTK RICO Enterprise, the CSGTK RICO Defendants functioned as a continuing unit with the purpose of furthering the CSAGTK RICO Scheme.

301. The CAGTK RICO Defendants participated in the operation and management of the CAGTK RICO Enterprise by directing its affairs, as described herein. While the CAGTK RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements. The CAGTK RICO Defendants exerted substantial control over the CAGTK RICO Enterprise, and participated in the affairs of the enterprise by: (a) deciding how monies were dispersed from

the political action committees; (b) communicating directly with lawyers, public relation agents
and political lobbyists with direct connections to Defendant Christie, and members of both
state and federal governments; (c) developing policies, guidelines and fee schedules for clinical
care, in which the CAGTK RICO insurance carrier Defendants colluded with other insurance
market competitors to fix the prices of both auto insurance and the fees paid to healthcare
providers; (d) procuring appointments to regulatory state agencies, which they abused to
further their personal economic agendas; (e) writing healthcare related legislation; (f) funding
state administered litigation against minimally invasive spine surgeons to whom they owed
substantial monies; (g) misrepresenting and/or concealing from the public the true nature of
the relationship and agreements between the members of the enterprise and the scheme to
bribe Defendant Christie in order to revoke the Plaintiff's medical license; (h) otherwise
misrepresenting and/or concealing the increased personal profits that inured to their benefit as
a consequence of the illegal elimination of the Plaintiff from the practice of medicine; (i)
ensuring that the other CAGTK RICO Defendants and unnamed co-conspirators complied with
and concealed the fraudulent scheme.

302. Without each CAGTK RICO Defendants' willing participation, the CAGTK RICO Scheme and
common course of conduct would not have been successful.

303. The CAGTK RICO Defendants directed and controlled the ongoing organization necessary
to implement the scheme at meetings and through communications of which Plaintiff cannot
fully know at present, because such information lies in the Defendants' and others' hands.

### F. Predicate Acts: Mail and Wire Fraud

304. To carry out, or attempt to carry out, the scheme to defraud, the CAGTK RICO Defendants,
each of whom is a person associated-in-fact with the CAGTK RICO Enterprise, did knowingly,
conduct or participate, directly or indirectly, in the affairs of the CAGTK RICO Enterprise through
a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and
1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341
(mail fraud) and § 1343 (wire fraud).

305. Specifically, the CAGTK RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

306. The multiple acts of racketeering activity which the CAGTK RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CAGTK RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the CAGTK RICO Enterprise. The CAGTK RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

307. The CAGTK RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

308. In devising and executing the illegal scheme, the CAGTK RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public, the Plaintiff's patients and his professional colleagues, that the Plaintiff was not qualified to perform minimally invasive spine surgery and had committed insurance and bank fraud, materially false representations. For the purpose of executing the illegal scheme, the CAGTK RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

309. The CAGTK RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:

(a) Mail Fraud: The CAGTK RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent and /or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of bribes and kickbacks, to have the Plaintiff's license improperly revoked, his reputation destroyed, eradicate debt, eliminate future financial liability and prevent other minimally invasive

67

spine surgeons from collecting monies that they were owed. These ends were pursued by means of false representations and omissions.

(b) Wire Fraud: The CAGTK RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be received, materials by wire for the purpose of executing the unlawful scheme to defraud the Plaintiff of monies he was owed for the provision of minimally invasive spine surgery, based on false pretenses, misrepresentations that the Plaintiff was not qualified to perform minimally invasive spine surgery, and had committed insurance and bank fraud.

(c) The CAGTK RICO Defendants' use of the mails and wires include, but are not limited to: (a) the transmission of letters, e-mails and other materials regarding the price fixing of auto insurance policies and physician fee schedules; (b) the transmission of letters, emails and other materials indicating that the CAGTK RICO Defendants had advised the medico-legal community not to support the Plaintiff in any litigation; (c) written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; (d) written, telephone, or electronic communications instructing the medico-legal community not to support the Plaintiff in any litigation; (e) written, telephone, or electronic communications regarding discussions between the CAGTK RICO Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; (f) the use of the mails or wires to further schemes to eradicate the CAGTK RICO Defendants' debt to the Plaintiff, and eliminate future liability; (g) the use of the mails and wires to instruct the Chapter 7 trustee not to pursue the monies owed to the Plaintiff's corporations, and creditors.

310. The CAGTK RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with every American state licensing board, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United Kingdom, and other healthcare related third-party entities in furtherance of the scheme, the purpose of which was to harm the Plaintiff's economic and reputational standing. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from

68

the elimination of the debt owed to the Plaintiff, and the eradication of future financial liability. The CAGTK RICO carrier defendants did not refund the customers, who purchased personal injury protection, but whose bills were not paid to the Plaintiff by the CAGTK RICO carrier defendants.

311. Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

312. The CAGTK RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CAGTK RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CAGTK RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

313. The CAGTK RICO Defendants aided and abetted other in violations of the above laws To achieve their common goals, the CAGTK RICO Defendants encouraged their clients to file lawsuits against the Plaintiff, filed complaints with state and federal healthcare regulatory authorities, instructed their members to discontinue communications with the Plaintiff and encouraged the media to publish defamatory articles. The 'high command' or the 'hub' of these 'Hub + Spoke' conspiracies, were the offices occupied by Defendant Christie, and his battalion of attorney generals, with their white boards on twenty-four hour display.

314. The CAGTK RICO Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the CAGTK RICO Defendants

and their co-conspirators had to agree to conceal the fraudulent intent of the scheme, and its illegal tactics

315. The CAGTK RICO Defendants knew, and intended that Plaintiff's patients and business network, would rely on the material misrepresentations and omissions made by them and would cease communicating and engaging in healthcare commerce with the Plaintiff. Indeed, the Defendants knew that their only chance of eradicating their debt, and eliminating any future financial liability was to professionally and economically isolate the Plaintiff, with the expectation that he would leave the state.

316. As described herein, the CAGTK RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicated acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus eradicating their debt, and increasing the CAGTK RICO Defendants revenues, executive compensation and NYSE share price. The predicate acts also had the same or similar results, participants and methods of commission. The predicate acts were related and not isolated events.

317. During the CAGTK RICO Defendants' perpetration of their scheme, the true purpose of the fraudulent nature of their racket to increase revenues through the elimination of the Plaintiff from the practice of medicine, was revealed to the CAGTK RICO Defendants TD and Kothari. Nevertheless, in furtherance of their scheme, Defendants TD and Kothari continued to disseminate falsehoods that the Plaintiff had committed insurance fraud, Medicare fraud, bank fraud and was not qualified to perform minimally invasive spine surgery.

318. By reason of, and as a result of the conduct of the CAGTK RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his business and/or property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of monies earned, and the loss of future earnings.

319. The CAGTK RICO Defendants violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three

70

times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys'
fees pursuant to 18 U.S.C. § 1964(c)

## COUNT THREE
## VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)
## THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, ET SEQ
## (By Plaintiff against Defendants Christie + HUMC + AHS + Garrett + UH + Gonzalez + Chiesa)
## The CHE RICO Association-In-Fact Enterprise

320. Plaintiff incorporates by reference each preceding paragraph as though fully set forth
herein.

321. Plaintiff brings this Count against Defendants Christie + HUMC + AHS + Garrett + Rutgers +
Gonzalez + Chiesa (inclusively, for the purposes of this Count, the "CHE RICO Defendants")
At all relevant times the CHE RICO Defendants have been "persons" under 18 U.S.C. § 1961(3)
because they are capable of holding, and do hold, "a legal or beneficial interest in property."
Section 1962(c) makes it "unlawful for any person employed by or associated with any
enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to
conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through
a pattern of racketeering activity." 18 U.S.C. § 1962(c).

322. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c),
among other provisions. See 18 U.S.C. § 1962(d).

323. As explained in detail below, the CHE RICO Defendants sought, amongst other things, to
eliminate the Plaintiff from the practice of medicine, eliminate the competition he presented,
destroy his reputation in the field of minimally invasive spine surgery and destroy his economic
standing. The purpose of their scheme was to divert patients requiring minimally invasive spine
surgery away from the Plaintiff's surgical center, and towards their facilities and physicians. As
explained in detail below, the CAGTK RICO Defendants' years-long misconduct violated sections
1962(c) and (d).

### G. Description of the CHE RICO Enterprise

324. RICO defines an enterprise as "any individual, partnership, corporation, association, or
other legal entity, and any union or group of individuals associated in fact although not a legal

71

entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

325. For years the CHE RICO Defendants occupied the dominant role role in the delivery of spine care in New Jersey, that positioned them at the center of the political and business sectors, with a wide and deep network of middleman known as 'political lobbyists' and 'public relation gurus'. The CHE RICO Defendants market share in the minimally invasive spine surgery sector began to decrease in approximately 2004, with increased development of free standing, predominantly physician owned, surgical centers. The Plaintiff's performance in 2005 of the first outpatient minimally invasive spine fusion proved that the procedure could be done on a same day basis. As a consequence, the CHE RICO Defendant Hospitals lost business, and then engaged in a scheme of bribes and kickbacks, in which the CHE RICO Defendant politician used state agencies to revoke the Plaintiff's license, and cause his surgical center to file for bankruptcy. The CHE RICO Defendant politician vetoed a bill in approximately 2011, that would have permitted one operating room centers to apply for state licensure, the effect of which artificially reduced competition. The CHE RICO Defendants used similar strategies across the ambulatory surgical center community, that resulted in the closure of approximately fifty percent of facilities from 2004 to 2012. The effect of these changes has been to reduce the availability of minimally invasive spine surgery, a causative factor in the opiate epidemic. The CHE RICO Defendants monopolization of the minimally invasive spine surgery sector, has permitted them to engage in price gouging with private health insurers, the extra cost of which has been passed onto the consumer.

326. In the past five years, the CHE RICO Defendants monopolization of the minimally invasive spine surgery market has caused an exponential increase in revenues, increased political power and disproportionate leverage in negotiations with private insurance companies. The increased monies have resulted in aggressive expansion projects, that have focused on highly profitable outpatient spine centers. The reduced competition from surgical centers has given the CHE RICO Defendant Hospitals increased bargaining power with private health insurers, in which the CHE RICO Defendants have forced excessive reimbursement rates, under threat of boycott to

the private health insurer's clients. The Plaintiff's outpatient spine surgery model presented an enormous threat to the CHE RICO Defendant Hospitals, whose revenues would have been reduced if the Plaintiff's four operating room surgical center had opened.

327. Discussions occurred between the CHE RICO Defendants regarding the Plaintiff, during which the parties discussed the threat to their corporate profits, of the Plaintiff's expanding outpatient minimally invasive spine surgery practice.

328. In order to ensure that their corporate profits were not affected by the increasing commercial success of the Plaintiff's minimally invasive spine surgery practice, and the expanding number of minimally invasive spine surgeons being trained by the Plaintiff, the Defendant Hospitals co-orchestrated a scheme, with the other CHE RICO Defendants to have the Plaintiff's medical license revoked. As part of the scheme the Defendant Hospitals disseminated false information within the medico-legal community, that the Plaintiff had committed insurance fraud and was not qualified to perform minimally invasive spine surgery. This was done in order to discredit the Plaintiff and isolate him from his colleagues and patients.

329. The scheme to maintain and increase the profits of the Defendant Hospitals through the elimination of the Plaintiff's practice, benefited its corporate executives, and permitted increased monies to be funneled through the middleman to Defendant Christie.

330. At all relevant times the CHE RICO Defendants operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that their fraudulent scheme to have the Plaintiff's license revoked was perpetrated to its conclusion. A large majority of these meetings occurred behind closed doors in Morris County and Bergen County, many of which were attended by members of the Office of the New Jersey Attorney General, and in particular DAG Doreen Hafner. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4)

331. Alternatively, each of the CHE RICO Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the other Defendants conducted their pattern of racketeering activity. The CHE RICO Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the

73

other Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CHE Enterprise"

332. At all relevant times, the CHE RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated –in-fact for the common purpose of engaging in the CHE Defendants profit making scheme, and the fraudulent scheme to corrupt state agencies and actors to ensure the revocation of the Plaintiff's license.

333. The association-in-fact CHE Enterprise consisted of the following entities and individuals: (a) Defendant Christie; (b) Defendant HUMC; (c) Defendant AHS; (d) Defendant Garrett; (e) Defendant University Hospital; (f) Defendant Gonzalez; (f) Defendant Chiesa.

334. While each of the CHE Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CHE Enterprise's affairs, at all relevant times, the CHE Enterprise: (a) had an existence separate and distinct from each CHE Defendants; (b) was separate and distinct from the pattern of racketeering in which the CHE Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CHE Defendants, along with other individuals and entities, including unknown third parties.

335. The CHE Defendants and their co-conspirators, through their illegal CHE RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CHE Enterprise's activities by bribing the defendant politician to have the Plaintiff's license revoked. The purpose of the revocation was to eliminate the threat of his work, and of that associated with the non-hospital based minimally invasive spine surgeons he had both trained, and planned on training.

336. Defendant Christie orchestrated the CHE RICO Scheme, whereby he leveraged his dominant political position with the medical board to have the Plaintiff's medical license revoked. The purpose of the Scheme which was to eliminate the Plaintiff from the practice of medicine, and thus eradicate the commercial threat of the Plaintiff's minimally invasive spine surgery practice. The CHE RICO Defendants knew that the Plaintiff planned to open a four

74

operating room state licensed surgical center in New Jersey, and had plans to expand nationally.

337. Defendant Chiesa participated in the CHE RICO Scheme by providing the enterprise with the use of state agencies, personnel and resources necessary to revoke the Plaintiff's license. These services were provided in return for bribes and monies disguised as 'campaign donations' to the CHE RICO Defendant Politician. The monies were part of a quid pro quo scheme, not protected under Noerr Pennington, in which there was an explicit understanding that the bribes were payment for the revocation of the Plaintiff's license.

338. In furtherance of the scheme, the CHE RICO Defendants each affirmatively misrepresented or concealed from their corporate board members, the existence of bribes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. The Defendants understood that if the board members became aware of the scheme, they would have opposed it, realizing the liability it would incur. Specifically, the CHE RICO Defendants claimed that the monies paid to the defendant politician, were intended to assist them in their legislative efforts, when in fact, they were quid pro quo payments to the Defendant Politician in return for having the Plaintiff's license revoked.

## H. The CAGTK RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

339. Each CHE RICO Defendant benefited financially from the CHE RICO Enterprise. The Defendant Politician acquired funds for his political campaigns, while the Defendant Hospitals increased their revenues. The Defendant Hospital Presidents were rewarded with increased executive pay packages. Defendant Chiesa received legal work from the Defendant Hospitals when he left public office, and moved into private practice.

340. As part of a quid pro quo that existed within the CHE RICO Enterprise, Defendant Christie, vetoed legislation contrary to the commercial interests of the Defendant Hospitals. This resulted in vast profits, some of which was funneled back to the Defendant Politician through the middleman known as 'political lobbyists' and 'public relation gurus'.

341. At all relevant times, the CHE RICO Enterprise: (a) had an existence separate and distinct from each CHE RICO Defendant; (b) was separate and distinct from the pattern of racketeering

75

in which the CHE RICO Defendants engaged; and (c) was an ongoing and continuing
organization consisting of legal entities, including the CHE RICO Defendants, along with other
individuals and entities, including unknown third parties that operated an association-in-fact
enterprise. The CHE RICO Enterprise was formed for the purpose of bribing Defendant Christie,
in order to have him instruct the medical board to revoke the Plaintiff's license, veto legislation
contrary to the commercial interests of the Defendant Hospitals, and use the licensing
proceedings against the Plaintiff to mischaracterize the clinical significance of hospital
privileges. There is no evidence that connects clinical outcomes with the possession of hospital
privileges, and in fact hospitals have a far higher mortality and morbidity rate than outpatient
surgical centers. The Defendant Hospitals are able to conceal their complications because of the
bribes they pay to politicians, and the influence they have purchased with regulatory agencies.
The CHE RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in
a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for
the CHE RICO Defendants and other entities and individuals associated-in-fact with the
Enterprise's activities through their illegal scheme to have the Plaintiff's license revoked, and
profit from the increased revenues that flowed from the eradication of competition. The CHE
RICO Defendants, comprise a group of "persons" who simultaneously wield immense influence
with regulatory agencies, while trading in the market over which the regulatory agencies have
oversight. The fox and the chickens.

342. The CHE RICO Enterprise engaged in, and its activities affected, interstate and foreign
commerce because it involved commercial activities across state boundaries, such as national
marketing strategies and the treatment of patients from within the tri-state area, the
consequences of which have generated enormous profits.

343. Within the CHE RICO Enterprise, there was a common communication network by which
co-conspirators shared information on a regular basis. The CHE RICO Enterprise used this
common communication network for purposes of promoting false information that the Plaintiff
was not qualified to perform minimally invasive spine surgery, had committed insurance fraud,
Medicare fraud and bank fraud. The purpose of this propaganda campaign was to isolate the
Plaintiff from the medico-legal community and any source of capital.

76

344. Each participant in the CHE RICO Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CHE RICO Enterprise, the CHE RICO Defendants functioned as a continuing unit with the purpose of furthering the CHE RICO Scheme.

345. The CHE RICO Defendants participated in the operation and management of the CHE RICO Enterprise by directing its affairs, as described herein. While the CHE RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements. The CHE RICO Defendants exerted substantial control over the CHE RICO Enterprise, and participated in the affairs of the enterprise by: (a) deciding how monies were dispersed from the political action committees; (b) communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Defendant Christie, and members of both state and federal governments; (c) developing policies, guidelines and regulations that controlled where and by whom clinical care was delivered; (d) procuring appointments to regulatory state agencies, which they abused to further their personal economic agendas; (e) writing healthcare related legislation; (f) misrepresenting and/or concealing from the public the true nature of the relationship and agreements between the members of the enterprise and the scheme to bribe Defendant Christie in order to revoke the Plaintiff's medical license; (h) otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; (i) ensuring that the other CHE RICO Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

346. Without each CHE RICO Defendants' willing participation, the CHE RICO Scheme and common course of conduct would not have been successful.

347. The CHE RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

348. To carry out, or attempt to carry out, the scheme to defraud, the CHE RICO Defendants, each of whom is a person associated-in-fact with the CHE RICO Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CHE RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

349. Specifically, the CHE RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

350. The multiple acts of racketeering activity which the CHE RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CHE RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the CHE RICO Enterprise. The CHE RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

351. The CHE RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

352. In devising and executing the illegal scheme, the CHE RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public, the Plaintiff's patients and his professional colleagues, that the Plaintiff was not qualified to perform minimally invasive spine surgery and had committed insurance and bank fraud, materially false representations. For the purpose of executing the illegal scheme, the CHE RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

**Predicate Acts: Mail and Wire Fraud**

353. The CHE RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:

    (a) Mail Fraud: The CHE RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent and /or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of bribes and kickbacks, to have the Plaintiff's license improperly revoked, his reputation destroyed, and impede the growth of minimally invasive spine surgery in free standing outpatient surgical centers. These ends were pursued by means of false representations and omissions.

    (b) Wire Fraud: The CHE RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be received, materials by wire for the purpose of executing the unlawful scheme to defraud the Plaintiff of the property rights of his medical license, reputation and minimally invasive spine surgery business, based on false pretenses, misrepresentations that the Plaintiff was not qualified to perform minimally invasive spine surgery, and had committed insurance and bank fraud.

354. The CHE RICO Defendants' use of the mails and wires include, but are not limited to: (a) the transmission of letters, e-mails and other materials with Defendant Chiesa, regarding the scheme to eliminate the Plaintiff from the practice of medicine; (b) the transmission of letters, emails and other materials indicating that the CHE RICO Defendants had advised the medico-legal community not to support the Plaintiff in any litigation; (c) written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; (d) written, telephone, or electronic communications instructing the medico-legal community not to support the Plaintiff in any litigation; (e) written, telephone, or electronic communications regarding discussions between the CHE RICO Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; (f) the use of the mails or wires to further schemes to eradicate the Plaintiff's economic standing; (g) the use of the mails and

wires to communicate the illegal scheme with Defendants Washburn and North Jersey Media Group.

355. The CHE RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with every New Jersey hospital, surgical center, American state licensing board, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United Kingdom, and other healthcare related third-party entities in furtherance of the scheme, the purpose of which was to harm the Plaintiff's economic and reputational standing globally.

356. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the elimination of the competition presented by the Plaintiff and by those minimally invasive spine surgeons he had trained, and planned on training.

357. Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

358. The CHE RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CHE RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CHE RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct. The CHE RICO Defendants aided and abetted other in violations of the above laws

359. To achieve their common goals, the CHE RICO Defendants (i) fostered an environment in which they encouraged their staff to defame the Plaintiff; (ii) filed complaints with state and

80

federal healthcare regulatory authorities; (iii) instructed their members to discontinue communications with the Plaintiff and; (iv) encouraged the media to publish defamatory articles. The 'high command' or the 'hub' of these 'Hub + Spoke' conspiracies, were the offices occupied by Defendants Christie and Chiesa, with their battalions of attorney generals. The CHE RICO Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the CHE RICO Defendants and their co-conspirators had to agree to conceal the fraudulent intent of the scheme, and its illegal tactics. The CHE RICO Defendants knew, and intended that Plaintiff's patients and business network, would rely on the material misrepresentations and omissions made by them and would cease communicating and engaging in healthcare commerce with the Plaintiff. Indeed, the Defendants knew that their only chance of eliminating the Plaintiff from the practice of medicine was to professionally and economically isolate the Plaintiff, with the expectation that he would leave the state.

360. As described herein, the CHE RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicated acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus eradicating the competition, and increasing the CHE RICO Defendants revenues and executive compensation. The predicate acts also had the same or similar results, participants and methods of commission. The predicate acts were related and not isolated events.

361. During the CHE RICO Defendants' perpetration of their scheme, the true purpose of the fraudulent nature of their racket to increase revenues through the elimination of the Plaintiff from the practice of medicine, was revealed to CHE RICO Defendants Garrett and Gonzalez. Nevertheless, in furtherance of their scheme, Defendants Garrett and Gonzalez continued to disseminate falsehoods that the Plaintiff had committed insurance fraud, Medicare fraud, bank fraud and was not qualified to perform minimally invasive spine surgery.

362. By reason of, and as a result of the conduct of the CHE RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his business and/or property

81

in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of monies earned, and the loss of future earnings.

The CHE RICO Defendants violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c)

## COUNT FOUR
### VIOLATIONS OF 18 U.S.C. § 1962(C(p   (D)
### THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ
### (By Plaintiff against Defendants Christie + NJMG + Washburn + Stein)
### The CMS RICO Associationp  Inp   Fact Enterprise

363. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

364. Plaintiff brings this Count against Defendants Christie + NJMG + Washburn + Stein (inclusively, for the purposes of this Count, the "CMS RICO Defendants")

365. At all relevant times the CMS RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

366. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

367. As explained in detail below, the CMS RICO Defendants sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, eliminate the competition he presented to parties with whom they engaged in commerce, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing. The purpose of their scheme was to divert patients requiring minimally invasive spine surgery away from the Plaintiff's surgical center, and towards the facilities and physicians, with whom they engaged in commerce. As

82

explained in detail below, the CMS RICO Defendants' years-long misconduct violated sections 1962(c) and (d).

## I.   Description of the CMS RICO Enterprise

368. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural features: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

369. For years CMS RICO Defendants Washburn and NJMG occupied a critical role in deciding what stories it published about state government actions and politicians. The CMS RICO Defendant NJMG was a privately owned company, before it was sold to national media conglomerate, Gannet Media, in July 2016. It's business holdings extended way beyond the reporting of news, and it depended on state government permits and approvals to further these non-news economic ends. It's news cycles also depended on sources within the administration of the Defendant Christie. CMS Defendants NJMG and Washburn were not informed of the June 13, 2012 hearing, as was the Star Ledger, its competition. CME RICO Defendants were subsequently promised access to the administration of Defendant Christie, after having agreed to publish defamatory article about the Plaintiff, on which agents of Defendant Christie collaborated. These actions aligned the political and commercial interests of the Defendants from the CMS RICO Enterprise, the CAC RICO Enterprise, the CCB RICO Enterprise with the Defendants of the CMS RICO Enterprise, all of whom engaged directly or indirectly in commercial conduct.

370. In the past five years, the CMS Defendants experienced a decrease in their annual revenues, and came under extreme financial pressure, which caused an increased reliance on advertising revenue from the CAC RICO Defendants, the CCB RICO Defendants and the CHE RICO Defendants. These Defendants used their financial leverage with the CMS Defendants to publish defamatory stories to eliminate the commercial competitive threat presented by the Plaintiff, to the patrons and political corrupters of the CMS RICO Defendants. Journalistic

integrity became a victim to a media dubbed "Dishonest" by the people's President, Donald Trump.

371. Discussions occurred between the CMS RICO Defendants regarding the Plaintiff, during which the parties discussed the threat to their commercial interests, because the Plaintiff's expanding outpatient minimally invasive spine surgery practice, had diverted business away from their patrons and political corrupters.

372. In order to ensure that their corporate profits were not affected by the increasing commercial success of the Plaintiff's minimally invasive spine surgery practice, and the expanding number of minimally invasive spine surgeons being trained by the Plaintiff, Defendant NJMG co-orchestrated a scheme, with the other CMS RICO Defendants to have the Plaintiff's medical license revoked, and widely publicized and disseminated across the global internet. The purpose of destroying the Plaintiff's reputation, was that he would be prevented from finding work anywhere in the world. As part of the scheme the CMS RICO Defendants disseminated false information within the medico-legal community, that the Plaintiff had committed insurance fraud, bank fraud and was not qualified to perform minimally invasive spine surgery. This was done in order to discredit the Plaintiff and isolate him from his colleagues and patients.

373. The scheme to maintain and increase the profits of the Defendant NJMG through the elimination of the Plaintiff's practice, benefited its corporate executives, its non-media interests, and permitted increased monies to be funneled through the middleman to Defendant Christie.

374. At all relevant times the CMS RICO Defendants operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that their fraudulent scheme to have the Plaintiff's license revoked was perpetrated to its conclusion. A large majority of these meetings occurred behind closed doors in Morris County and Bergen County, many of which were attended by members of the Office of the New Jersey Attorney General, and in particular DAG Doreen Hafner. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4)

84

375. Alternatively, each of the CMS RICO Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the other Defendants conducted their pattern of racketeering activity. The CMS RICO Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the other Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CHE Enterprise"

376. At all relevant times, the CMS RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated –in-fact for the common purpose of engaging in the CMS Defendants profit making scheme, and the fraudulent scheme to corrupt state agencies and actors to ensure the revocation of the Plaintiff's license.

377. The association-in-fact CMS Enterprise consisted of the following entities and individuals: (a) Defendant Christie; (b) Defendant NJMG; (c) Defendant Washburn; (d) Defendant Stein. While each of the CMS Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CMS Enterprise's affairs, at all relevant times, the CMS Enterprise: (a) had an existence separate and distinct from each CMS Defendants; (b) was separate and distinct from the pattern of racketeering in which the CMS Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CMS Defendants, along with other individuals and entities, including unknown third parties.

378. The CMS Defendants and their co-conspirators, through their illegal CMS RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CMS Enterprise's activities by bribing the defendant politician to have the Plaintiff's license revoked, and conspiring to publish defamatory stories about the Plainitff. The purpose of the revocation and defamation was to eliminate the threat of his work, and of that associated with the non-hospital based minimally invasive spine surgeons he had both trained, and planned on training. The benefit of the revocation and defamation that inured to Defendant Stein, was that it facilitated litigation he had commenced against the Plaintiff, which Defendants NJMG and Washburn promoted in multiple articles.

379. Defendant Christie orchestrated the CMS RICO Scheme, whereby he leveraged his dominant political position with the medical board to have the Plaintiff's medical license revoked. The purpose of the Scheme was to eliminate the Plaintiff from the practice of medicine, and thus eradicate the commercial threat of the Plaintiff's minimally invasive spine surgery practice. The CMS RICO Defendants knew that the Plaintiff planned to open a four operating room state licensed surgical center in New Jersey, and had plans to expand nationally, acts that would have diverted revenue away from their patrons and political corrupters.

380. Defendant Christie participated in the CMS RICO Scheme by providing the enterprise with the use of state agencies, personnel and resources necessary to revoke the Plaintiff's license. These services were provided in return for bribes and monies disguised as 'campaign donations'. The monies were part of a quid pro quo scheme, not protected under Noerr Pennington, in which there was an explicit understanding that the bribes were payment for the revocation of the Plaintiff's license. Defendant NJMG was given preferential access to the state government information, in return for the publication of slanderous stories about the Plaintiff. In furtherance of the scheme, the CMS RICO Defendant NJMG affirmatively misrepresented or concealed from their corporate board members, the existence of bribes, quid pro quo schemes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. The Defendants understood that if the board members became aware of the scheme, they would have opposed it, realizing the liability it would incur. Specifically, CMS RICO Defendant NJMG, mischaracterized the nature of Kaul v Christie, when it was sold to Gannett Media in July 2016.

## J. The CMS RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

381. Each CMS RICO Defendant benefited financially from the CMS RICO Enterprise. The Defendant Politician acquired funds and publicity for his political campaigns, while Defendant NJMG increased its revenues, through the expedited issuance of state permits for it non-media, real estate based commercial interests. Defendant Stein was rewarded with publicity that assisted his litigation, and information about the Plaintiff's personal affairs that he received from Defendant Christie, and Defendant Washburn.

86

382. As part of a quid pro quo that existed within the CMS RICO Enterprise, Defendant Christie, in return for favorable political publicity from Defendant NJMG, and bribes from Stein, instructed his staff to provide personal and professional information about the Plaintiff to the Defendants.

383. At all relevant times, the CMS RICO Enterprise: (a) had an existence separate and distinct from each CMS RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the CMS RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CMS RICO Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise. The CMS RICO Enterprise was formed for the purpose of bribing and providing favorable publicity to Defendant Christie, in order to procure expedited and preferential state permits, and personal/professional information about the Plaintiff. The publication of the stories about the Plaintiff, increased website traffic and hard copy sales, which resulted in an increase in business referrals to the Defendant Hospitals and Carriers, that advertised on the site.

384. The CMS RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CMS RICO Defendants and other entities and individuals associated-in-fact with the Enterprise's activities, through their illegal scheme to have the Plaintiff's license revoked. The CMS RICO Defendants, comprise a group of "persons" who simultaneously weild regulatory business power, and influence public opinion, while engagaing in political and commercial activities, contrary to impartial news reporting and governmental regulation.

385. The CMS RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the internet marketing of legal services and news reporting, the consequences of which have generated enormous profits.

386. Within the CMS RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The CMS RICO Enterprise used this common communication network for purposes of promoting false information that the Plaintiff

87

was not qualified to perform minimally invasive spine surgery, had committed insurance fraud, Medicare fraud and bank fraud. The purpose of this propaganda campaign was to isolate the Plaintiff from the medico-legal community and any source of capital.

387. Each participant in the CMS RICO Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CMS RICO Enterprise, the CMS RICO Defendants functioned as a continuing unit with the purpose of furthering the CMS RICO Scheme.

388. The CMS RICO Defendants participated in the operation and management of the CMS RICO Enterprise by directing its affairs, as described herein. While the CMS RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements. The CMS RICO Defendants exerted substantial control over the CMS RICO Enterprise, and participated in the affairs of the enterprise by: (a) communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Defendant Christie, and members of both state and federal governments; (b) procuring appointments to regulatory state agencies and the board of Defendant HUMC, which they used to further their economic agendas; (e) misrepresenting and/or concealing from the public the true nature of the relationship and agreements between the members of the enterprise and the scheme to bribe Defendant Christie in order to revoke the Plaintiff's medical license; (f) otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; (g) ensuring that the other CMS RICO Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

389. Without each CMS RICO Defendants' willing participation, the CMS RICO Scheme and common course of conduct would not have been successful.

390. The CMS RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

### K.  Predicate Acts: Mail and Wire Fraud

391. To carry out, or attempt to carry out, the scheme to defraud, the CMS RICO Defendants, each of whom is a person associated-in-fact with the CMS RICO Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CMS RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

392. Specifically, the CMS RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

393. The multiple acts of racketeering activity which the CMS RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CMS RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the CMS RICO Enterprise. The CMS RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

394. The CMS RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

395. In devising and executing the illegal scheme, the CMS RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public, the Plaintiff's patients and his professional colleagues, that the Plaintiff was not qualified to perform minimally invasive spine surgery and had committed insurance and bank fraud, materially false representations. For the purpose of executing the illegal scheme, the CMS RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

89

396. The CMS RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:

      (a) Mail Fraud: The CMS RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent and /or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of bribes and kickbacks, to have the Plaintiff's license improperly revoked, his reputation destroyed, and impede the growth of minimally invasive spine surgery in free standing outpatient surgical centers. These ends were pursued by means of false representations and omissions.

      (b) Wire Fraud: The CMS RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be received, materials by wire for the purpose of executing the unlawful scheme to defraud the Plaintiff of the property rights of his medical license, reputation and minimally invasive spine surgery business, based on false pretenses, misrepresentations that the Plaintiff was not qualified to perform minimally invasive spine surgery, and had committed insurance and bank fraud.

397. The CMS RICO Defendants' use of the mails and wires include, but are not limited to: (a) the transmission of letters, e-mails and other materials with Defendant Chiesa, regarding the scheme to eliminate the Plaintiff from the practice of medicine; (b) the transmission of letters, emails and other materials indicating that the CMS RICO Defendants had advised the medico-legal community not to support the Plaintiff in any litigation; (c) written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; (d) written, telephone, or electronic communications instructing the medico-legal community not to support the Plaintiff in any litigation; (e) written, telephone, or electronic communications regarding discussions between the CMS RICO Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; (f) the use of the mails or wires to further schemes to eradicate the Plaintiff's economic standing; (g) the use of the mails and wires to communicate the illegal scheme with unnamed third party co-conspirators.

398. The CMS RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with New Jersey hospitals, surgical centers, American state licensing boards, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United Kingdom, New Jersey politicians, and other healthcare related third-party entities in furtherance of the scheme, the purpose of which was to harm the Plaintiff's economic and reputational standing globally.

399. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the elimination of the competition presented by the Plaintiff, and by those minimally invasive spine surgeons he had trained, and planned on training, who competed against the CMS RICO Defendants' patrons.

400. Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

401. The CMS RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CMS RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CMS RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct. The CMS RICO Defendants aided and abetted other in violations of the above laws

402. To achieve their common goals, the CMS RICO Defendants (i) fostered an environment in which they encouraged their staff to defame the Plaintiff; (ii) filed complaints with state and

federal healthcare regulatory authorities; (iii) encouraged other media outlets to publish defamatory articles and (iv) illegally recorded the Plaintiff in violation of state and federal law. The CMS RICO Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the CMS RICO Defendants and their co-conspirators had to agree to conceal the fraudulent intent of the scheme, and its illegal tactics. The CMS RICO Defendants knew, and intended that Plaintiff's patients and business network, would rely on the material misrepresentations and omissions made by them and would cease communicating and engaging in healthcare commerce with the Plaintiff. Indeed, the Defendants knew that their only chance of eliminating the Plaintiff from the practice of medicine was to professionally and economically isolate the Plaintiff, with the expectation that he would leave the state.

403. As described herein, the CMS RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicated acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus eradicating the competition, and indirectly increasing the CMS RICO Defendants revenues and executive compensation. The predicate acts also had the same or similar results, participants and methods of commission. The predicate acts were related and not isolated events.

404. During the CMS RICO Defendants' perpetration of their scheme, the true purpose of the fraudulent nature of their racket to increase revenues through the elimination of the Plaintiff from the practice of medicine, was revealed to CHE RICO Defendant Washburn. Nevertheless, in furtherance of their scheme, Defendant Washburn continued to disseminate falsehoods that the Plaintiff had committed insurance fraud, Medicare fraud, bank fraud and was not qualified to perform minimally invasive spine surgery.

405. By reason of, and as a result of the conduct of the CMS RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his business and/or property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of monies earned, and the loss of future earnings.

406. The CMS RICO Defendants violations of 18 U.S.C. §1962© and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c)

## ANTITRUST IMPACT

407. Subsequent to the downgrading in or about 2011, of the relative value units for endoscopic discectomy, the commercial potential of the Plaintiff's practice was harmed. The scheme was engineered by a group of neurosurgeons, led by Carmel, the 2011 president of the AME, and Przybylsi, the 2011 president of the North American Spine Society. The neurosurgeons, because of their influential positions within the professional societies, had the codes modified with the understanding that the majority of minimally invasive spine surgeons, from an interventional pain background, would be unable to perform open micro-discectomies. The neurosurgeons effectuated the change without publicizing it for comment from the Plaintiff or other similarly trained physicians.

408. This lowered the reimbursement rate for endoscopic discectomies, which caused a larger percentage of the insurance health fund to be diverted to the neurosurgeons and hospitals, who subsequently raised their fees for the same procedure (meadowlands is an example). The code change, however, did not apply if the endoscopic discectomy was performed in a hospital, as the fee remained the same. This benefited the neurosurgeons, who had hospital privileges to perform spinal procedures, and it benefitted the hospitals. It also benefitted the defendant carriers, whose clients had personal injury policies that most hospitals did not accept, which thus caused these patients to be deprived of access to minimally invasive spine surgery.

409. This translated into greater profits for the defendant carrier, as they paid less to the surgical centers and minimally invasive spine surgeons. The availability of endoscopic discectomies was reduced, because the majority of minimally invasive spine surgeons did not possess the skills to perform open discectomies. The reduction in the availability of minimally invasive spine services caused patients with auto accident related injuries to resort to the use of

93

opiate medications, as their policies did not cover the cost associated with having an endoscopic discectomy.

410. As a consequence, Plaintiff have sustained substantial losses and damage to their business and property because of the reduced reimbursement fees associated with outpatient endoscopic discectomy. The full amount and forms of components of such damages will be calculated after discovery and upon proof at trial.

411. General economic theory recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below. See Hovencamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRCATICE (1994) at 624. According to Professor Hovencamp, "every person at every stage in the chain will be poorer as a result of the monopoly price at the top." Professor Hovencamp also acknowledges that "theoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level.". The defendant neurosurgeons, hospitals and insurance carriers have through the bribing of politicians, effectuated legislation and regulatory changes, as evidenced in the CPT code downgrading, the veto of a bill designed to permit one room surgical centers to become state licensed, and the refusal of the insurance carriers to reimburse surgical centers for minimally invasive spine surgery, reduced the availability of outpatient minimally invasive spine surgery.

412. This has resulted in an increase of the fees charged by the neurosurgeons and hospitals, and has excluded patients with accident related injuries, most of whom have no secondary insurance, from receiving minimally invasive spine surgery. The defendant insurance companies stopped paying the surgical centers in 2012, and reduced the physician fees by more than eighty percent, with the majority of the physicians being minimally invasive spine surgeons. The neurosurgeons and the hospitals have monopolized the New Jersey minimally invasive spine market. The rise in opiate consumption is related to the reduction in the availability of minimally invasive spine surgery, as patients' options for pain relief became constricted, while the defendant hospitals, neurosurgeons and insurance companies reaped larger profits. Defendant Allstate's share price has risen almost four hundred percent since the implementation of the aforesaid changes, that were obtained through bribery.

413. The neurosurgeons and hospitals passed on their inflated prices to the private insurance companies, such as United, Aetna and Cigna, who passed on the increased costs to their customers. The defendant carriers increased profits were not shared with the New Jersey public, who have continued to incur annual increases in their auto premiums.

414. The Defendant's anticompetitive actions enable it to indirectly charge consumers and third-party payor prices in excess of what it otherwise would have been able to charge absent its unlawful actions individually and with the other defendants.

415. The prices were inflated as a direct and foreseeable result of the Defendant's anticompetitive conduct individually and with the hospitals.

The inflated prices the End-Payor i.e. the public and the private insurance companies are now forced to pay are traceable to, and the foreseeable result of the reduction in availability of minimally invasive spine services, and the consequent price gouging by the defendant neurosurgeons and hospitals.

## COUNT FIVE

### For Declaratory and Injunctive Relief Under Section 16 of the Clayton Act for Defendants' Violations of Sections 1 and 2 of the Sherman Act (By Plaintiff Against Defendants Kaufman + Staats + Przybylski + CNS + Wolfla + Peterson + UH + Heary + Lomazow + Mitchell + Cohen + HUMC + AHS)

416. Plaintiff incorporates by reference the preceding allegations

417. Defendants knowingly and intentionally engaged in an anticompetitive scheme designed to block the Plaintiff, his surgical center and similarly trained physicians, from incorporating minimally invasive spine surgery into their outpatient practices. This scheme included, inter alia (i) obtaining through fraud a downgrading of the relative value unit associated with outpatient endoscopic discectomy (ii) procuring through bribery the veto of a bill that would have permitted one operating room surgical centers to become licensed, the licensing of which would have removed the principal reason employed by the defendant insurance carriers to deny payment to the physician and outpatient facility (iii) procuring through bribery the introduction of a fee schedule in 2011 that denied payment for the performance of outpatient minimally invasive spine surgery (iv) encouraging patients to initiate civil litigation and medical board complaints against the Plaintiff and similarly trained physicians (v) obtaining through

95

bribery a moratorium in 2009 that prevented the issuance of licenses for free standing outpatient surgical centers, unless they were commercially partnered with a hospital (vi) neurosurgeons unlawfully agreeing with representatives of defendant ASIPP that the market for minimally invasive spine surgery would only be divided in such a way, that the physicians such as the Plaintiff would be limited to performing only discectomies and not fusions  and (vii) otherwise engaging in an overarching scheme to unlawfully monopolize, conspire to monopolize, and allocate the market for minimally invasive spine surgery.

481. Defendants conspired to monopolize, and did wrongfully and intentionally maintain monopoly power, with respect to minimally invasive spine surgery in violation of Section 2 of the Sherman Act. As a result of this unlawful maintenance of monopoly power, Plaintiff and his surgical center were excluded from the minimally invasive spine surgery market, as were similarly trained physicians and the New Jersey surgical center community.

By their agreements, Defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. As a result of this unreasonable restraint on competition, Plaintiff and his surgical center were excluded from the minimally invasive spine surgery market, as were similarly trained physicians and the New Jersey surgical center community.

419. Plaintiff and his surgical center were injured in their business or property by Defendants' antitrust violations. Their injury consists of being deprived of the ability to incorporate minimally invasive spine surgery into their commercial strategy. Such an injury of "exclusion" is of the type antitrust laws were designed to prevent, and flows from that which makes Defendants' conduct unlawful, and Plaintiff and his surgical center are the proper entities to bring a case concerning this conduct.

420. Plaintiff continues to suffer and will continue to suffer in the future from being excluded from the minimally invasive spine surgery market, more than he would have absent the Defendants' anticompetitive conduct.

421. Defendant's anticompetitive conduct, pursued in the context of bribery, kickbacks, obstruction of justice, fraud, and forged transcripts is not entitled to Noerr – Pennington immunity.

422. Plaintiff and his surgical center, pursuant to Fed. R. Civ. P. 57 and U.S.C. § 2201(a) hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described herein violate Sections 1 and 2 of the Sherman Act.

423. Plaintiff and his surgical center further seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, and other applicable law, to correct for the anticompetitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anticompetitive conduct does not occur in the future.

## COUNT SIX
### For Monopolization (By Plaintiff Against Defendants Przybylski + Kaufman + Staats + Cohen + Heary + Mitchell + HUMC + AHS + UH).

424. Plaintiff incorporates by reference the preceding allegations

423. described above, from at least 2002, the neurosurgeons and hospitals held a monopoly on the minimally invasive spine surgery market, and in particular minimally invasive spine fusions. This monopoly was threatened in 2005, when the Plaintiff performed the first minimally invasive outpatient lumbar fusion, having developed a technique that relied on fluoroscopic guidance and interpretation (FGI), the use of an expandable interbody fusion device, and percutaneous pedicle screws. The procedure was associated with almost no blood loss, or postoperative pain, which thus permitted the patient to be discharged the same day.

424. The Defendants willfully and unlawfully acquired and maintained thier monopoly power in the minimally invasive spine surgery market by engaging in an anticompetitive scheme to keep the Plaintiff and similarly trained physicians out of the market – not as a result of providing a superior product, business acumen, or historical accident. The Defendants engaged in a quid pro quo scheme with the Defendant politician, in which he received bribes, disguised as 'campaign donations', in return for having the medical board revoke the Plaintiff's medical license, an event that caused the economic collapse of six medium sized corporations.

425. The neurosurgical Defendants did not possess the skills of FGI, because it had not been provided in their residency training. FGI is the most critical component of MISS, because it requires the proper placement of tubular retractor systems, and operative instruments. The skills require the practitioner to rapidly convert 2-D video-endoscopic and fluoroscopic

97

information into a 3-D format, from which the practitioner adjusts the surgical instruments. The neurosurgeon Defendants had only been trained to operate on spines, after the skin, muscles, bones and ligaments had been removed. This aggressive approach was responsible for the exceedingly high failure rate, associated with operations performed by neurosurgeons.

426. The Defendants knowingly and intentionally engaged in an anticompetitive scheme to monopolize the minimally invasive spine surgery market. The Defendants accomplished this scheme by, inter alia, encouraging patients to file lawsuits against the Plaintiff, and filing complaints with regulatory authorities against the Plaintiff.

427. The goal, purpose and effect of the Defendants' scheme was to prevent the Plaintiff and similarly trained physicians from increasing the availability of outpatient minimally invasive spine surgery, and from increasing the number of physicians able to provide the service. The Plaintiff commenced training other similarly trained physicians in approximately 2007. The Defendants illegal scheme allowed them to continue to charge supracompetitive prices for minimally invasive spine surgery, reaping substantial unlawful monopoly profits, while reducing the availability of the service to patients, particularly those in lower socio-economic brackets, whose injuries were caused by auto accidents. This latter group rarely had secondary insurance, and were thus unable to procure minimally invasive spine care, which caused them to use opiates for pain control. The Plaintiff, because he owned his surgical center, provided free care to those patients with no insurance. The Defendant hospitals and neurosurgeons did not. These patients suffered abandonment after the revocation of the Plaintiff's license, and to the Plaintiff's knowledge, a number of them, unable to find a physician, turned to street grade heroin. A tragic and material consequence of the Defendants' anti-competitive misconduct.

428. The neurosurgical Defendants knowingly and intentionally participated in sham litigation against the Plaintiff, that included encouraging patients to file lawsuits and complaints with the medical board, and then providing fraudulent 'expert' testimony for the patients and the medical board. The Defendants repeatedly and fraudulently asserted that the Plaintiff was not qualified to perform minimally invasive spine surgery. The Defendants repeatedly and fraudulently asserted that the Plaintiff had deviated from the standard of care because he did not possess hospital or alternative privileges. The Defendants repeatedly and fraudulently

98

asserted that the Plaintiff had deviated from the standard of care because his training did not involve a neurosurgical residency. These claims were false and designed to protect and further the monopoly held by the neurosurgeons and hospitals on minimally invasive spine surgery. The Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon, to keep the Plaintiff and similarly trained physicians out of the minimally invasive spine surgery market.

429. The Defendants also knowingly and intentionally engaged in the sham litigation that resulted in the revocation of the Plaintiff's medical license. Defendant Przybylski provided knowingly false testimony that the Plaintiff had deviated from the standard of care for minimally invasive spine surgery, but then admitted under cross examination that no such standard existed. The Defendants perpetrated these falsehoods in multiple courts and in the public domain, for almost eight years, for the purpose of protecting their monopoly on minimally invasive spine surgery. The knowingly false testimony provided by Defendants Kaufman and Przybylski during the proceedings in the office of administrative law, fabricated a basis for the administrative law judge to revoke the Plaintiff's license. The revocation of the license caused the collapse of six medium sized corporations, the loss of jobs, the loss of tax revenue, the loss of healthcare to hundreds of patients with no insurance, and forced a number of these patients to seek pain relief through street grade heroin. The Defendants illegal anticompetitive conduct caused economic, emotional and psychological chaos to the lives of hundreds of the Plaintiff's patients, staff and family members. The public was materially harmed, not helped nor protected. The Defendants co-opted the Plaintiff's patients into their scheme to protect their 'turf', with the promise that their malpractice suits would be strengthened if the Plaintiff's license was revoked. The Plaintiff's patients willingly provided false testimony under oath.

430. The goal, purpose and effect of the Defendant's scheme was to prevent the Plaintiff, his surgical center and those of similarly trained physicians from continuing to provide outpatient minimally invasive spine surgery, and limit the availability of the service to the Defendant hospitals and neurosurgeons, which permitted them to artificially raise their prices, in the absence of competition. The Defendants knew that the Plaintiff had, in 2009, obtained one of

99

the last surgical center licenses issued by the state, and had plans to develop a thirty-six
thousand square foot, four operating room, multi-disciplinary surgical center, that was to
provide the template for a national, and then global expansion program in minimally invasive
spine surgery. The professional dispute between neurosurgeons and minimally invasive spine
surgeons has been an international issue, that came to a head in New Jersey in 2013.
431. The goal, purpose and effect of the Defendant's scheme was also to maintain and extend
its monopoly power in minimally invasive spine surgery. The Defendants' illegal scheme allowed
them to continue charging supracompetitive prices for minimally invasive spine surgery, while
causing harm to the public by reducing the availability of the service, and reaping substantial
unlawful monopoly profits.

432. The Defendants knowingly and intentionally engaged in sham litigation against the
Plaintiff's physician employees, and repeatedly and fraudulently asserted that the Plaintiff's
employees were not qualified to assist the Plaintiff perform minimally invasive spine surgery,
and had engaged in insurance fraud. Defendants Geico and Allstate filed these frivolous claims
in federal and state courts. The complaint filed by Geico on April 27, 2013 was dismissed with
prejudice on December 8, 2014, with no evidence produced to support the claims. Defendant
Allstate filed an almost identical action on February 15, 2015 in New Jersey Superior Court. The
purpose of the sham litigation was to manufacture an excuse not to pay the Plaintiff for the
minimally invasive spine surgery services he provided to the Defendant's clients. Defendants
Geico and Allstate conspire in the development and utilization of litigation strategies that
sequentially, and concurrently use New Jersey state and federal courts, against parties to whom
they owe substantial monies. The neurosurgeon Defendants participated in these sham
lawsuits for the purposes of using a governmental process as an anticompetitive weapon to
exclude the Plaintiff's employees and similarly trained physicians from the minimally invasive
spine surgery market.

433. The Defendants also knowingly and intentionally engaged in sham litigation against the
Plaintiff's employees' medical licenses, initiating medical board investigations that were
intended to ostracize the Plaintiff from his professional colleagues, the purpose of which was to
force the Plaintiff to leave the state, and forego the opportunity to seek legal redress. It did not

100

work. The Defendants knew at the time they filed the sham medical board investigations that they had no realistic likelihood of success, but abused governmental process to extend their monopoly.

434. As a result of Defendants' illegal conduct, Plaintiff and his physician employees were excluded from the minimally invasive spine surgery market, and were compelled to incur substantial legal fees in the defense of the sham board investigations. But for the Defendants' illegal conduct, the competitors would have continued to expand their scope of practice, increase the availability of minimally invasive spine surgery services, reduce the price of the service, and mitigate the severity of the opiate epidemic, as more patients would have had access to non-opiate modalities of spine care. The Defendants, as are the pharmaceutical executives who similarly engage in political corruption, are liable for the tragedy of biblical proportions, that is the New Jersey opiate epidemic. It is no coincidence that the most corrupt states are the most affected. Political corruption kills.

435. Had the Plaintiff and similarly trained physicians been allowed to continue expanding their scope of practice in minimally invasive spine surgery, and lawfully compete with the Defendants, then the public would not have been denied the benefits of competition.

436. By engaging in the foregoing conduct, the Defendants have violated the following state antitrust laws:

a. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Arizona Rev. Stat. §§ 44-1401, et seq., with respect to the availability of minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had plans to expand nationally.

b. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Cal. Bus. Code §§ 16700, et seq., and Code §§ 17200, et seq., with respect to the availability of minimally invasive spine surgery in California, and in the knowledge that the Plaintiff had plans to expand nationally.

101

c.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of D.C. Code Ann. §§ 28-45031, et seq., with respect to the availability of minimally invasive spine surgery in the District of Columbia, and in the knowledge that the Plaintiff had plans to expand nationally.

d.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Fla. Stat. §§ 501. Part II et seq., with respect to the availability of minimally invasive spine surgery in Florida, and in the knowledge that the Plaintiff had plans to expand nationally. This conduct constitutes a predicate act under the Florida Deceptive Practices Act.

e.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Kan. Stat Ann. §§ 50-101 et seq., with respect to the availability of minimally invasive spine surgery in Kansas, and in the knowledge that the Plaintiff had plans to expand nationally.

f.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Me. Rev. Stat. Ann. 10, § 1101, et seq., with respect to the availability of minimally invasive spine surgery in Maine, and in the knowledge that the Plaintiff had plans to expand nationally.

g.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to the availability of minimally invasive spine surgery in Michigan, and in the knowledge that the Plaintiff had plans to expand nationally.

h.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.52, et seq., with respect to the availability of minimally invasive spine surgery in Minnesota, and in the knowledge that the Plaintiff had plans to expand nationally.

i.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Miss. Code Ann. §§ 59-801, et seq., with respect to the availability of minimally invasive spine surgery in Mississippi, and in the knowledge that the Plaintiff had plans to expand nationally.

j.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Neb. Code Ann. §§ 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nebraska, and in the knowledge that the Plaintiff had plans to expand nationally.

k.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Nev. Ret. Stat. Ann. § 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nevada, and in the knowledge that the Plaintiff had plans to expand nationally.

l.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to the availability of minimally invasive spine surgery in New Mexico, and in the knowledge that the Plaintiff had plans to expand nationally.

m.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of New York General Business Law § 340, et seq., with respect to the availability of minimally invasive spine

surgery in New York, and in the knowledge that the Plaintiff had plans to expand nationally.

n.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-1, et seq., with respect to the availability of minimally invasive spine surgery in North Carolina, and in the knowledge that the Plaintiff had plans to expand nationally.

o.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.D. Cent. Code § 51-08.1-01, et seq., with respect to the availability of minimally invasive spine surgery in North Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

p.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Or. Rev. Stat. §§ 646.705, et seq., with respect to the availability of minimally invasive spine surgery in Oregon, and in the knowledge that the Plaintiff had plans to expand nationally.

q.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of S.D. Codified Laws Ann. § 37-1, et seq., with respect to the availability of minimally invasive spine surgery in South Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

r.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, et seq., with respect to the availability of minimally invasive spine surgery in Tennessee, and in the knowledge that the Plaintiff had plans to expand nationally.

s.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully

maintained monopoly power in the relevant market in violation of Utah Code Ann. §§ 76-10-911, et seq., with respect to the availability of minimally invasive spine surgery in Utah, and in the knowledge that the Plaintiff had plans to expand nationally.

t.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Vt. Stat. Ann. 9, § 2453, et seq., with respect to the availability of minimally invasive spine surgery in Vermont, and in the knowledge that the Plaintiff had plans to expand nationally.

u.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-1, et seq., with respect to the availability of minimally invasive spine surgery in West Virginia, and in the knowledge that the Plaintiff had plans to expand nationally.

v.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Wis Stat. § 133.01, et seq., with respect to the availability of minimally invasive spine surgery in Wisconsin, and in the knowledge that the Plaintiff had plans to expand nationally.

437. Plaintiff has been injured in his business and property by reason of Defendants' anti-trust violations alleged in this Claim. The injuries consist of: (1) the revocation of the Plaintiff's New Jersey medical license and the loss to his patients of their ability to receive minimally invasive spine care and, (2) exclusion of the Plaintiff from the minimally invasive spine surgery market which permitted the Defendants to raise their prices, and (3) the loss into bankruptcy of the Plaintiff's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license, real estate, and (4) loss of the Plaintiff's professional reputation built over thirty years. These injuries are of the type the antitrust laws of the above States and the District of Columbia were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

Plaintiff seek damages and treble damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

## COUNT SEVEN
### For Conspiracy to Monopolize under State Law
### (By Plaintiff Against Defendants Przybylski + Kaufman + Staats + Lomazow + Cohen + Heary + Mitchell + HUMC + AHS)

438. Plaintiff incorporates by reference the preceding allegations

439. As described above, from at least 1980 to March 2005, the Defendants possessed monopoly power in the market for traditional inpatient 'open' spine surgery. This changed in March 2005 when the Plaintiff performed the first minimally invasive outpatient spinal fusion. Defendants willfully and unlawfully engaged in a continuing illegal conspiracy from at least 2008 to 2016 to ensure that their monopoly extended to the outpatient minimally invasive spine surgery market. To achieve this goal, they engaged in an anticompetitive scheme intended to exclude the Plaintiff and similarly trained physicians from commercially incorporating minimally invasive spine surgery into their practices – not as a result of providing a superior product, business acumen, or historical accident.

440. Defendants knowingly and intentionally conspired to monopolize the minimally invasive spine surgery market. Defendants accomplished this scheme by, inter alia, (i) (i) obtaining through fraud a downgrading of the relative value unit associated with outpatient endoscopic discectomy (ii) procuring through bribery the veto of a bill that would have permitted one operating room surgical centers to become licensed, the licensing of which would have removed the principal reason employed by the defendant insurance carriers to deny payment to the physician and outpatient facility (iii) procuring through bribery the introduction of a fee schedule in 2011 that denied payment for the performance of outpatient minimally invasive spine surgery (iv) encouraging patients to initiate civil litigation and medical board complaints against the Plaintiff and similarly trained physicians (v) obtaining through bribery a moratorium in 2009 that prevented the issuance of licenses for free standing outpatient surgical centers, unless they were commercially partnered with a hospital (vi) neurosurgeons unlawfully agreeing with representatives of defendant ASIPP that the market for minimally invasive spine

106

surgery would only be divided in such a way, that the physicians such as the Plaintiff would be limited to performing only discectomies and not fusions and (vii) otherwise engaging in an overarching scheme to unlawfully monopolize, conspire to monopolize, and allocate the market for minimally invasive spine surgery.

441. The goal, purpose and effect of the Defendants' scheme was to maintain and extend monopoly power with respect to the minimally invasive spine surgery market. Defendants' illegal scheme allowed them to artificially raise their prices due simply to the suppressed competition, and not due to increased costs. This allowed the Defendants to reap substantial unlawful monopoly profits.

442. The agreements between the Defendants are overt acts between separate economic entities-actual and potential competitors-and are illegal per se under state antitrust laws. The agreements made between the defendant neurosurgeons, hospitals and insurance companies were that payment for minimally invasive spine surgery, would be made only for cases performed in hospitals or their attached surgical centers, and not to independently owned surgical centers. The defendant neurosurgeon's agreement with the defendant hospitals was that they would not credential minimally invasive spine surgeons, such as the Plaintiff, for minimally invasive spine surgery. The effect of these agreements was to arbitrarily exclude the Plaintiff and his surgical center from participating commercially in the provision of minimally invasive spine surgery, to patients with insurance policies issued by the Defendant insurance companies. Thus the defendant insurance companies, neurosurgeons and hospitals profited, but the surgical centers and minimally invasive spine surgeons incurred losses.

443. Alternatively, this Complaint alleges that the agreements and conspiracy to monopolize are a violation of state antitrust law under a "quick look" or "rule of reason" analysis. The neurosurgical Defendants knowingly and intentionally participated in sham litigation against the Plaintiff, that included encouraging patients to file lawsuits and complaints with the medical board, and then providing fraudulent 'expert' testimony for the patients and the medical board. The Defendants repeatedly and fraudulently asserted that the Plaintiff was not qualified to perform minimally invasive spine surgery. The Defendants repeatedly and fraudulently asserted that the Plaintiff had deviated from the standard of care because he did

107

not possess hospital or alternative privileges. The Defendants repeatedly and fraudulently asserted that the Plaintiff had deviated from the standard of care because his training did not involve a neurosurgical residency. These claims were false and designed to protect and further the monopoly held by the neurosurgeons and hospitals on minimally invasive spine surgery.

444. The Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon, to keep the Plaintiff and similarly trained physicians out of the minimally invasive spine surgery market.

445. The Defendants also knowingly and intentionally engaged in the sham litigation that resulted in the revocation of the Plaintiff's medical license. The Defendants provided false testimony that the Plaintiff had deviated from the standard of care for minimally invasive spine surgery, but then admitted under cross examination that no such standard existed. The Defendants perpetrated these falsehoods in multiple courts and in the public domain, for almost eight years, for the purpose of protecting their monopoly on minimally invasive spine surgery. The knowingly false testimony provided by Defendants Kaufman and Przybylski during the proceedings in the office of administrative law, fabricated a basis for the administrative law judge to revoke the Plaintiff's license. The revocation of the license caused the collapse of six medium sized corporations, the loss of jobs, the loss of tax revenue, the loss of healthcare to hundreds of patients with no insurance, and forced a number of these patients to seek pain relief through street grade heroin. The Defendants illegal anticompetitive conduct caused economic, emotional and psychological chaos to the lives of hundreds of the Plaintiff's patients, staff and family members. The public was harmed, not helped nor protected. The Defendants coopted the Plaintiff's patients into their scheme to protect their 'turf', with the promise that their malpractice suits would be strengthened if the Plaintiff's license was revoked. The Plaintiff's patients willingly provided false testimony under oath.

446. The goal, purpose and effect of the Defendant's scheme was to prevent the Plaintiff, his surgical center and those of similarly trained physicians from continuing to provide outpatient minimally invasive spine surgery, and thus reduce the availability of the service to the Defendant hospitals and neurosurgeons, which then permitted them to artificially raise their prices, in the absence of competition. The Defendants knew that the Plaintiff had, in 2009,

obtained one of the last surgical center licenses issued by the state, and had plans to develop a thirty-six thousand square foot, four operating room, multi-disciplinary surgical center, that was to provide the template for a national, and then global expansion program in minimally invasive spine surgery. The professional dispute between neurosurgeons and minimally invasive spine surgeons has been an international issue, that came to a head in New Jersey in 2013.

447. The goal, purpose and effect of the Defendant's scheme was also to maintain and extend its monopoly power in minimally invasive spine surgery. The Defendants' illegal scheme allowed them to continue charging supracompetitive prices for minimally invasive spine surgery, while causing harm to the public by reducing the availability of the service, and reaping substantial unlawful monopoly profits.

448. The Defendants knowingly and intentionally engaged in sham litigation against the Plaintiff's physician employees, and repeatedly and fraudulently asserted that the Plaintiff's employees were not qualified to assist the Plaintiff perform minimally invasive spine surgery, and had engaged in insurance fraud. The Carrier Defendants filed these frivolous claims in federal and state courts. The claims filed by Geico on April 27, 2013 were dismissed with prejudice on December 8, 2014, with no evidence produced to support the claims. Defendant Allstate filed an almost identical action on February 15, 2015 in New Jersey Superior Court. The purpose of the sham litigation was to manufacture an excuse not to pay the Plaintiff for the minimally invasive spine surgery services he provided to the Carrier Defendant's clients. The Carrier Defendants conspire in the development and utilization of litigation strategies that sequentially, and concurrently use New Jersey state and federal courts, against parties to whom they owe substantial monies. The neurosurgeon Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon to exclude the Plaintiff's employees and similarly trained physicians from the minimally invasive spine surgery market.

449. The Defendants also knowingly and intentionally engaged in sham litigation against the Plaintiff's employees' medical licenses, initiating medical board investigations that were intended to ostracize the Plaintiff from his professional colleagues, the purpose of which was to force the Plaintiff to leave the state, and forego the opportunity to seek legal redress. It did not

109

work. The Defendants knew at the time they filed the sham medical board investigations that their claims were false, but abused governmental process to extend their monopoly.

450. As a result of Defendants' illegal conduct, Plaintiff and his physician employees were excluded from the minimally invasive spine surgery market, and were compelled to incur substantial legal fees in the defense of the sham board investigations. But for the Defendants' illegal conduct, the competitors would have continued to expand their scope of practice, increase the availability of minimally invasive spine surgery services, reduce the price of the service, and mitigate the severity of the opiate epidemic, as more patients would have had access to non-opiate modalities of spine care. The Defendants, as are the pharmaceutical executives who similarly engaged in political corruption, liable for the tragedy that is the New Jersey opiate epidemic. It is no coincidence that the most corrupt states are the most affected. Political corruption kills. Had the Plaintiff and similarly trained physicians been allowed to continue expanding their scope of practice in minimally invasive spine surgery, and lawfully compete with the Defendants, then the public would not have been denied the benefits of competition.

451. The Defendants anticompetitive scheme succeeded in monopolizing the minimally invasive spine surgery market, the consequences of which have been a reduction in the availability of services, an artificial elevation of price, reduced competition and a reduction in the rate of innovation. The last five years have witnessed a decrease in the development of new spinal techniques, with the majority of innovations originating outside of the United States. These are the exact problems for which the antitrust laws were designed, and which the Defendants' violations have made evident. The reduced availability of service has contributed to the opiate epidemic.

452. By engaging in the foregoing conduct, the Defendants have violated the following state antitrust laws:

   a. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Arizona Rev. Stat. §§

110

44-1401, et seq., with respect to the availability of minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had plans to expand nationally.

b. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Cal. Bus. Code §§ 16700, et seq., and Code §§ 17200, et seq., with respect to the availability of minimally invasive spine surgery in California, and in the knowledge that the Plaintiff had plans to expand nationally.

c. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of D.C. Code Ann. §§ 28-45031, et seq., with respect to the availability of minimally invasive spine surgery in the District of Columbia, and in the knowledge that the Plaintiff had plans to expand nationally.

d. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Fla. Stat. §§ 501. Part II et seq., with respect to the availability of minimally invasive spine surgery in Florida, and in the knowledge that the Plaintiff had plans to expand nationally. This conduct constitutes a predicate act under the Florida Deceptive Practices Act.

e. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Kan. Stat Ann. §§ 50-101 et seq., with respect to the availability of minimally invasive spine surgery in Kansas, and in the knowledge that the Plaintiff had plans to expand nationally.

f. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Me. Rev. Stat. Ann.

111

10, § 1101, et seq., with respect to the availability of minimally invasive spine surgery in Maine, and in the knowledge that the Plaintiff had plans to expand nationally.

g.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to the availability of minimally invasive spine surgery in Michigan, and in the knowledge that the Plaintiff had plans to expand nationally.

h.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.52, et seq., with respect to the availability of minimally invasive spine surgery in Minnesota, and in the knowledge that the Plaintiff had plans to expand nationally.

i.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Miss. Code Ann. §§ 59-801, et seq., with respect to the availability of minimally invasive spine surgery in Mississippi, and in the knowledge that the Plaintiff had plans to expand nationally.

j.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Neb. Code Ann. §§ 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nebraska, and in the knowledge that the Plaintiff had plans to expand nationally.

k.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Nev. Ret. Stat. Ann. § 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nevada, and in the knowledge that the Plaintiff had plans to expand nationally.

l.  Defendants, because of their immense political influence within the state chapters and
    national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
    maintained monopoly power in the relevant market in violation of N.M. Stat. Ann. §§
    57-1-1, et seq., with respect to the availability of minimally invasive spine surgery in
    New Mexico, and in the knowledge that the Plaintiff had plans to expand nationally.

m.  Defendants, because of their immense political influence within the state chapters and
    national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
    maintained monopoly power in the relevant market in violation of New York General
    Business Law § 340, et seq., with respect to the availability of minimally invasive spine
    surgery in New York, and in the knowledge that the Plaintiff had plans to expand
    nationally.

n.  Defendants, because of their immense political influence within the state chapters and
    national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
    maintained monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-
    1, et seq., with respect to the availability of minimally invasive spine surgery in North
    Carolina, and in the knowledge that the Plaintiff had plans to expand nationally.

o.  Defendants, because of their immense political influence within the state chapters and
    national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
    maintained monopoly power in the relevant market in violation of N.D. Cent. Code § 51-
    08.1-01, et seq., with respect to the availability of minimally invasive spine surgery in
    North Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

p.  Defendants, because of their immense political influence within the state chapters and
    national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
    maintained monopoly power in the relevant market in violation of Or. Rev. Stat. §§
    646.705, et seq., with respect to the availability of minimally invasive spine surgery in
    Oregon, and in the knowledge that the Plaintiff had plans to expand nationally.

q.  Defendants, because of their immense political influence within the state chapters and
    national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
    maintained monopoly power in the relevant market in violation of S.D. Codified Laws

113

Ann. § 37-1, et seq., with respect to the availability of minimally invasive spine surgery
in South Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

r.  Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of Tenn. Code Ann. §§
47-25-101, et seq., with respect to the availability of minimally invasive spine surgery in
Tennessee, and in the knowledge that the Plaintiff had plans to expand nationally.

s.  Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of Utah Code Ann. §§
76-10-911, et seq., with respect to the availability of minimally invasive spine surgery in
Utah, and in the knowledge that the Plaintiff had plans to expand nationally.

t.  Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of Vt. Stat. Ann. 9, §
2453, et seq., with respect to the availability of minimally invasive spine surgery in
Vermont, and in the knowledge that the Plaintiff had plans to expand nationally.

u.  Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-
1, et seq., with respect to the availability of minimally invasive spine surgery in West
Virginia, and in the knowledge that the Plaintiff had plans to expand nationally.

v.  Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of Wis Stat. § 133.01, et
seq., with respect to the availability of minimally invasive spine surgery in Wisconsin,
and in the knowledge that the Plaintiff had plans to expand nationally.

453. Plaintiff has been injured in his business and property by reason of Defendants' anti-trust
violations alleged in this Claim. The injuries consist of: (1) the revocation of the Plaintiff's New

114

Jersey medical license and the loss to his patients of their ability to receive minimally invasive spine care and, (2) exclusion of the Plaintiff from the minimally invasive spine surgery market which permitted the Defendants to raise their prices, and (3) the loss into bankruptcy of the Plaintiff's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license, real estate, and (4) loss of the Plaintiff's professional reputation built over thirty years. These injuries are of the type the antitrust laws of the above States and the District of Columbia were designed to prevent, and flow from that which makes Defendants' conduct umlawful.

454. Plaintiff seek damages and treble damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

**COUNT EIGHT**

**For Conspiracy and Combination in Restraint of Trade Under State Law (By Plaintiff Against Defendants Przybylski + Kaufman + Staats + Cohen + Lomazow + Heary + Mitchell + HUMC + AHS + UH).**

455. Plaintiff incorporates by reference the preceding allegations.

456. Defendants willfully and unlawfully engaged in a continuing illegal contract, combination, and conspiracy to restrain trade in the minimally invasive spine surgery market by engaging in an anticompetitive scheme to exclude the Plaintiff and similarly trained physicians from the market and to allocate the market between horizontal competitors.

457. Defendants accomplished this scheme by, inter alia, (i) (i) obtaining through fraud a downgrading of the relative value unit associated with outpatient endoscopic discectomy (ii) procuring through bribery the veto of a bill that would have permitted one operating room surgical centers to become licensed, the licensing of which would have removed the principal reason employed by the defendant insurance carriers to deny payment to the physician and outpatient facility (iii) procuring through bribery the introduction of a fee schedule in 2011 that denied payment for the performance of outpatient minimally invasive spine surgery (iv) encouraging patients to initiate civil litigation and medical board complaints against the Plaintiff and similarly trained physicians (v) obtaining through bribery a moratorium in 2009 that prevented the issuance of licenses for free standing outpatient surgical centers, unless they

were commercially partnered with a hospital (vi) neurosurgeons unlawfully agreeing with representatives of defendant ASIPP that the market for minimally invasive spine surgery would be divided in such a way, that physicians such as the Plaintiff would be limited to performing only discectomies and not fusions and (vii) otherwise engaging in an overarching scheme to unlawfully monopolize, conspire to monopolize, and allocate the market for minimally invasive spine surgery.

458. The goal, purpose and effect of the Defendants' scheme was to maintain and extend monopoly power with respect to the minimally invasive spine surgery market. Defendants' illegal scheme allowed them to artificially raise their prices due simply to the suppressed competition, and not due to increased costs. This allowed the Defendants to reap substantial unlawful monopoly profits.

459. The goal, purpose and effect of the Defendant's scheme was also to prevent the Plaintiff, his surgical center and those of similarly trained physicians from continuing to provide outpatient minimally invasive spine surgery, and thus reduce the availability of the service to the Defendant hospitals and neurosurgeons, which then permitted them to artificially raise their prices, in the absence of competition. The Defendants knew that the Plaintiff had, in 2009, obtained one of the last surgical center licenses issued by the state, and had plans to develop a thirty-six thousand square foot, four operating room, multi-disciplinary surgical center, that was to provide the template for a national, and then global expansion program in minimally invasive spine surgery. The professional dispute between neurosurgeons and minimally invasive spine surgeons has been an international issue, that came to a head in New Jersey in 2013.

460. The agreements between the Defendants are horizontal market allocation and price fixing agreements between actual or potential competitors and are illegal per se under state antitrust laws. The defendant neurosurgeons and interventional pain physicians agreed that the latter would limit their practice to minimally invasive endoscopic discectomies. The defendant insurance carriers conspired with defendants Przybylski, Staats, and Kaufman, in their capacities as presidents and senior members of NASS and ASIPP, to limit payment for minimally invasive spine surgery to hospitals or to surgical centers owned by hospitals. The aforementioned defendants engage in healthcare business with hospitals, and through their controlling

116

positions on the credentialing committees, were able to effectuate the illegal horizontal market allocation agreement. Alternatively, this Complaint alleges that these agreements are an unreasonable restraint of trade, in violation of state antitrust law, under a "quick look" or "rule of reason" analysis. The consequence of these improper agreements was the exclusion from the minimally invasive spine fusion market of the Plaintiff and his surgical center, with regards to patients who possessed insurance issued by the defendant insurance carriers.

461. The neurosurgical Defendants knowingly and intentionally participated in sham litigation against the Plaintiff, that included encouraging patients to file lawsuits and complaints with the medical board, and then providing fraudulent 'expert' testimony for the patients and the medical board. The Defendants repeatedly and fraudulently asserted that the Plaintiff was not qualified to perform minimally invasive spine surgery. The Defendants repeatedly and fraudulently asserted that the Plaintiff had deviated from the standard of care because he did not possess hospital or alternative privileges. The Defendants repeatedly and fraudulently asserted that the Plaintiff had deviated from the standard of care because his training did not involve a neurosurgical residency. These claims were false and designed to protect and further the monopoly held by the neurosurgeons and hospitals on minimally invasive spine surgery. The Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon, to keep the Plaintiff and similarly trained physicians out of the minimally invasive spine surgery market.

462. The Defendants also knowingly and intentionally engaged in the sham litigation that resulted in the revocation of the Plaintiff's medical license. The Defendants provided false testimony that the Plaintiff had deviated from the standard of care for minimally invasive spine surgery, but then admitted under cross examination that no such standard existed. The Defendants perpetrated these falsehoods in multiple courts and in the public domain, for almost eight years, for the purpose of protecting their monopoly on minimally invasive spine surgery. The knowingly false testimony provided by Defendants Kaufman and Przybylski during the proceedings in the office of administrative law, fabricated a basis for the administrative law judge to revoke the Plaintiff's license. The revocation of the license caused the collapse of six medium sized corporations, the loss of jobs, the loss of tax revenue, the loss of healthcare to

117

hundreds of patients with no insurance, and forced a number of these patients to seek pain relief through street grade heroin. The Defendants illegal anticompetitive conduct caused economic, emotional and psychological chaos to the lives of hundreds of the Plaintiff's patients, staff and family members. The public was harmed, not helped nor protected. The Defendants coopted the Plaintiff's patients into their scheme to protect their 'turf', with the promise that their malpractice suits would be strengthened if the Plaintiff's license was revoked. The Plaintiff's patients willingly provided false testimony under oath.

463. The goal, purpose and effect of the Defendant's scheme was to prevent the Plaintiff, his surgical center and those of similarly trained physicians from continuing to provide outpatient minimally invasive spine surgery, and thus reduce the availability of the service to the Defendant hospitals and neurosurgeons, which then permitted them to artificially raise their prices, in the absence of competition. The Defendants knew that the Plaintiff had, in 2009, obtained one of the last surgical center licenses issued by the state, and had plans to develop a thirty-six thousand square foot, four operating room, multi-disciplinary surgical center, that was to provide the template for a national, and then global expansion program in minimally invasive spine surgery. The professional dispute between neurosurgeons and minimally invasive spine surgeons has been an international issue, that came to a head in New Jersey in 2013.

464. The goal, purpose and effect of the Defendant's scheme was also to maintain and extend its monopoly power in minimally invasive spine surgery. The Defendants' illegal scheme allowed them to continue charging supracompetitive prices for minimally invasive spine surgery, while causing harm to the public by reducing the availability of the service, and reaping substantial unlawful monopoly profits.

465. The Defendants knowingly and intentionally engaged in sham litigation against the Plaintiff's physician employees, and repeatedly and fraudulently asserted that the Plaintiff's employees were not qualified to assist the Plaintiff perform minimally invasive spine surgery, and had engaged in insurance fraud. The Carrier Defendants filed these frivolous claims in federal and state courts. The claims filed by Geico on April 27, 2013 were dismissed with prejudice on December 8, 2014, with no evidence produced to support the claims. Defendant Allstate filed an almost identical action on February 15, 2015 in New Jersey Superior Court. The

purpose of the sham litigation was to manufacture an excuse not to pay the Plaintiff for the minimally invasive spine surgery services he provided to the Carrier Defendant's clients. The Carrier Defendants conspire in the development and utilization of litigation strategies that sequentially, and concurrently use New Jersey state and federal courts, against parties to whom they owe substantial monies. The neurosurgeon Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon to exclude the Plaintiff's employees and similarly trained physicians from the minimally invasive spine surgery market.

466. The Defendants also knowingly and intentionally engaged in sham litigation against the Plaintiff's employees' medical licenses, initiating medical board investigations that were intended to ostracize the Plaintiff from his professional colleagues, the purpose of which was to force the Plaintiff to leave the state, and forego the opportunity to seek legal redress. It did not work. The Defendants knew at the time they filed the sham medical board investigations that they had no realistic likelihood of success, but abused governmental process to extend their monopoly.

467. As a result of Defendants' illegal conduct, Plaintiff and his physician employees were excluded from the minimally invasive spine surgery market, and were compelled to incur substantial legal fees in the defense of the sham board investigations. But for the Defendants' illegal conduct, the competitors would have continued to expand their scope of practice, increase the availability of minimally invasive spine surgery services, reduce the price of the service, and mitigate the severity of the opiate epidemic, as more patients would have had access to non-opiate modalities of spine care. The Defendants, as are the pharmaceutical executives who similarly engaged in political corruption, liable for the tragedy, that is the New Jersey opiate epidemic. It is no coincidence that the most corrupt states are the most affected. Political corruption kills.

468. Had the Plaintiff and similarly trained physicians been allowed to continue expanding their scope of practice in minimally invasive spine surgery, and lawfully compete with the Defendants, then the public would not have been denied the benefits of competition.

119

469. By engaging in the foregoing conduct, the Defendants have violated the following state
antitrust laws:

a.  Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of Arizona Rev. Stat. §§
44-1401, et seq., with respect to the availability of minimally invasive spine surgery in
Arizona, and in the knowledge that the Plaintiff had plans to expand nationally.

b.  Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of Cal. Bus. Code §§
16700, et seq., and Code §§ 17200, et seq., with respect to the availability of minimally
invasive spine surgery in California, and in the knowledge that the Plaintiff had plans to
expand nationally.

c.  Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of D.C. Code Ann. §§ 28-
45031, et seq., with respect to the availability of minimally invasive spine surgery in the
District of Columbia, and in the knowledge that the Plaintiff had plans to expand
nationally.

d.  Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of Fla. Stat. §§ 501. Part
II et seq., with respect to the availability of minimally invasive spine surgery in Florida,
and in the knowledge that the Plaintiff had plans to expand nationally. This conduct
constitutes a predicate act under the Florida Deceptive Practices Act.

e.  Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of Kan. Stat Ann. §§ 50-

101 et seq., with respect to the availability of minimally invasive spine surgery in Kansas, and in the knowledge that the Plaintiff had plans to expand nationally.

f.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Me. Rev. Stat. Ann. 10, § 1101, et seq., with respect to the availability of minimally invasive spine surgery in Maine, and in the knowledge that the Plaintiff had plans to expand nationally.

g.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to the availability of minimally invasive spine surgery in Michigan, and in the knowledge that the Plaintiff had plans to expand nationally.

h.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.52, et seq., with respect to the availability of minimally invasive spine surgery in Minnesota, and in the knowledge that the Plaintiff had plans to expand nationally.

i.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Miss. Code Ann. §§ 59-801, et seq., with respect to the availability of minimally invasive spine surgery in Mississippi, and in the knowledge that the Plaintiff had plans to expand nationally.

j.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Neb. Code Ann. §§ 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nebraska, and in the knowledge that the Plaintiff had plans to expand nationally.

k.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Nev. Ret. Stat. Ann. § 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nevada, and in the knowledge that the Plaintiff had plans to expand nationally.

l.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to the availability of minimally invasive spine surgery in New Mexico, and in the knowledge that the Plaintiff had plans to expand nationally.

m.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of New York General Business Law § 340, et seq., with respect to the availability of minimally invasive spine surgery in New York, and in the knowledge that the Plaintiff had plans to expand nationally.

n.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-1, et seq., with respect to the availability of minimally invasive spine surgery in North Carolina, and in the knowledge that the Plaintiff had plans to expand nationally.

o.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.D. Cent. Code § 51-08.1-01, et seq., with respect to the availability of minimally invasive spine surgery in North Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

p.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Or. Rev. Stat. §§

646.705, et seq., with respect to the availability of minimally invasive spine surgery in Oregon, and in the knowledge that the Plaintiff had plans to expand nationally.

q. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of S.D. Codified Laws Ann. § 37-1, et seq., with respect to the availability of minimally invasive spine surgery in South Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

r. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, et seq., with respect to the availability of minimally invasive spine surgery in Tennessee, and in the knowledge that the Plaintiff had plans to expand nationally.

s. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Utah Code Ann. §§ 76-10-911, et seq., with respect to the availability of minimally invasive spine surgery in Utah, and in the knowledge that the Plaintiff had plans to expand nationally.

t. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Vt. Stat. Ann. 9, § 2453, et seq., with respect to the availability of minimally invasive spine surgery in Vermont, and in the knowledge that the Plaintiff had plans to expand nationally.

u. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-1, et seq., with respect to the availability of minimally invasive spine surgery in West Virginia, and in the knowledge that the Plaintiff had plans to expand nationally.

v. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully

maintained monopoly power in the relevant market in violation of Wis Stat. § 133.01, et

seq., with respect to the availability of minimally invasive spine surgery in Wisconsin,

and in the knowledge that the Plaintiff had plans to expand nationally.

470. Plaintiff has been injured in his business and property by reason of Defendants' anti-trust violations alleged in this Claim. The injuries consist of: (1) the revocation of the Plaintiff's New Jersey medical license and the loss to his patients of their ability to receive minimally invasive spine care and, (2) exclusion of the Plaintiff from the minimally invasive spine surgery market which permitted the Defendants to raise their prices, and (3) the loss into bankruptcy of the Plaintiff's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license, real estate, and (4) loss of the Plaintiff's professional reputation built over thirty years. These injuries are of the type the antitrust laws of the above States and the District of Columbia were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

471. Plaintiff seek damages and treble damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

## COUNT NINE

### For Unfair and Deceptive Trade Practices Under State Law (By Plaintiff Against Defendants ASIPP + Kaufman + Staats + Przybylski + CNS + Peterson + Heary + Lomazow + Mitchell + Cohen + HUMC + AHS)

472. Plaintiff incorporates by reference the preceding allegations.

473. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

474. As a direct and proximate result of the Defendants' anticompetitive, deceptive, unfair, unconscionable and fraudulent conduct, the Plaintiff was prevented from nationally developing his outpatient minimally invasive spine surgery business, and the American public has been deprived of the opportunity to purchase minimally invasive spine surgery at a lower price, because the market has been monopolized by the neurosurgeons and hospitals. The Plaintiff, a recognized innovator in the field, commenced training other minimally invasive spine surgeons in approximately 2007, and had plans to develop a fellowship and standards, that would have

124

increased the number of minimally invasive surgeons in the national market. The Defendants'
racketeering and illegal anticompetitive conduct, derailed the Plaintiff's plans for global
economic and educational expansion. The Defendants' suppression of competition has
restricted the public's access to minimally invasive spine surgery, has caused a reduction in
innovation, an elevation in price and contributed to the opiate epidemic, with the most
severely affected states, being those recognized as having the most corrupt state governments.
The revocation of the Plaintiff's license was disseminated nationally to every state medical
board, and was widely publicized on the internet, with stories that commenced in April 2012
and persisted into October 2015. These events have prevented the Plaintiff from obtaining a
medical license or permit in any state, have permanently extended the damage to his
reputation, and caused the regulatory bodies and public in all of the states, to be deceived by
the Defendants' fraudulent and anticompetitive scheme against the Plaintiff.
475. By engaging in the foregoing conduct, Defendants have violated the following state Unfair
and Deceptive Trade Practices and Consumer Fraud laws:

- (a) Defendants have engaged in unfair competition or unfair or deceptive acts or practices
  in violation of Ariz. Rev. Stat. § 44-1522, et seq., with respect to the availability of
  minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had
  plans to expand nationally.
- (b) Defendants have engaged in unfair competition or unfair or deceptive acts or practices
  in violation of Ark. Code § 4-88-101, et seq., with respect to the availability of minimally
  invasive spine surgery in Arkansas, and in the knowledge that the Plaintiff had plans to
  expand nationally.
- (c) Defendants have engaged in unfair competition or unfair or deceptive acts or practices
  in violation of Cal. Bus. & Prof. Code § 17200, et seq., with respect to the availability of
  minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had
  plans to expand nationally.
- (d) Defendants have engaged in unfair competition or unfair or deceptive acts or practices
  in violation of Colo. Rev. Stat. § 6-1-105, et seq., with respect to the availability of

125

minimally invasive spine surgery in Colorado, and in the knowledge that the Plaintiff had plans to expand nationally.

(e) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110h, et seq., with respect to the availability of minimally invasive spine surgery in Connecticut, and in the knowledge that the Plaintiff had plans to expand nationally.

(f) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, et seq., with respect to the availability of minimally invasive spine surgery in Florida, and in the knowledge that the Plaintiff had plans to expand nationally.

(g) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, et seq., with respect to the availability of minimally invasive spine surgery in Idaho, and in the knowledge that the Plaintiff had plans to expand nationally.

(h) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, et seq., with respect to the availability of minimally invasive spine surgery in Illinois, and in the knowledge that the Plaintiff had plans to expand nationally.

(i) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, et seq., with respect to the availability of minimally invasive spine surgery in Kansas, and in the knowledge that the Plaintiff had plans to expand nationally.

(j) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, et seq., with respect to the availability of minimally invasive spine surgery in Maine, and in the knowledge that the Plaintiff had plans to expand nationally.

(k) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, et seq., with respect to the availability of

minimally invasive spine surgery in Maryland, and in the knowledge that the Plaintiff had plans to expand nationally.

(l) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, § et seq., with respect to the availability of minimally invasive spine surgery in Massachusetts, and in the knowledge that the Plaintiff had plans to expand nationally.

(m) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, et seq., with respect to the availability of minimally invasive spine surgery in Michigan, and in the knowledge that the Plaintiff had plans to expand nationally.

(n) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, et seq., with respect to the availability of minimally invasive spine surgery in Minnesota, and in the knowledge that the Plaintiff had plans to expand nationally.

(o) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Missouri Stat. § 407.010 , et seq., with respect to the availability of minimally invasive spine surgery in Missouri, and in the knowledge that the Plaintiff had plans to expand nationally.

(p) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 598.0903, et seq., with respect to the availability of minimally invasive spine surgery in Nebraska, and in the knowledge that the Plaintiff had plans to expand nationally.

(q) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, et seq, with respect to the availability of minimally invasive spine surgery in Nevada, and in the knowledge that the Plaintiff had plans to expand nationally.

(r) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat § 358-A: 1, et seq., with respect to the availability of

minimally invasive spine surgery in New Hampshire, and in the knowledge that the Plaintiff had plans to expand nationally.

(s) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat § 57-12-1, et seq., with respect to the availability of minimally invasive spine surgery in New Mexico, and in the knowledge that the Plaintiff had plans to expand nationally.

(t) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, et seq., with respect to the availability of minimally invasive spine surgery in New York, and in the knowledge that the Plaintiff had plans to expand nationally.

(u) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, et seq., with respect to the availability of minimally invasive spine surgery in North Carolina, and in the knowledge that the Plaintiff had plans to expand nationally.

(v) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. 15 § 751, et seq., with respect to the availability of minimally invasive spine surgery in Oklahoma, and in the knowledge that the Plaintiff had plans to expand nationally.

(w) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, et seq., with respect to the availability of minimally invasive spine surgery in Rhode Island, and in the knowledge that the Plaintiff had plans to expand nationally.

(x) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, et seq., with respect to the availability of minimally invasive spine surgery in South Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

(y) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, et seq., with respect to the availability of

128

minimally invasive spine surgery in Tennessee, and in the knowledge that the Plaintiff
had plans to expand nationally.

(z) Defendants have engaged in unfair competition or unfair or deceptive acts or practices
in violation of Utah Code § 13-11-1, et seq., with respect to the availability of minimally
invasive spine surgery in Utah, and in the knowledge that the Plaintiff had plans to
expand nationally.

(aa) Defendants have engaged in unfair competition or unfair or deceptive acts or practices
in violation of Va. Code § 59.1-196, et seq., with respect to the availability of minimally
invasive spine surgery in Virginia, and in the knowledge that the Plaintiff had plans to
expand nationally.

(bb) Defendants have engaged in unfair competition or unfair or deceptive acts or practices
in violation of Wash. Rev. Code § 19.86.010, et seq., with respect to the availability of
minimally invasive spine surgery in Washington, and in the knowledge that the Plaintiff
had plans to expand nationally.

(cc) Defendants have engaged in unfair competition or unfair or deceptive acts or practices
in violation of West Virginia Code § 46A-6-101, et seq., with respect to the availability of
minimally invasive spine surgery in West Virginia, and in the knowledge that the Plaintiff
had plans to expand nationally.

476. Plaintiff has been injured in his business and property by reason of Defendants' anti-trust
violations alleged in this Claim. The injuries consist of: (1) the revocation of the Plaintiff's New
Jersey medical license and the loss to his patients of their ability to receive minimally invasive
spine care and, (2) exclusion of the Plaintiff and similarly trained physicians from the minimally
invasive spine surgery market, which reduced competition and has permitted the Defendants to
raise their prices, and (3) the loss into bankruptcy of the Plaintiff's healthcare corporations, to
which were attached $45 million in accounts receivable, a surgical center license, real estate,
and (4) loss of the Plaintiff's professional reputation built over thirty years. These injuries are of
the type the antitrust laws of the above States and the District of Columbia were designed to
prevent, and flow from that which makes Defendants' conduct unlawful.

477. Plaintiff seek damages and treble damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

## COUNT TEN
### Unjust enrichment
### (By Plaintiff Against Defendants ASIPP + Kaufman + Przybylski + CNS + Peterson + UH + Heary + Lomazow + Mitchell + Cohen + HUMC + AHS)

478. Plaintiff incorporates by reference the preceding allegations

479. Defendants have benefited from the monopoly profits on the increased revenues that have flowed from the elimination of the competition presented by the Plaintiff and similarly trained physicians, the elimination of which resulted from the unlawful and inequitable acts alleged in this Complaint.

480. Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to the price gouging, in which they have engaged, since the elimination of the competition presented by the Plaintiff and similarly trained physicians.

Plaintiff and similarly trained physicians have conferred upon the Defendants an economic benefit, in the nature of profits resulting from price gouging and monopoly profits, that has been to the economic detriment of the Plaintiff and similarly trained physicians.

It would be futile for the Plaintiff to seek a remedy from any party with whom they had privity of contract. Defendants have paid no *legal* consideration to anyone for any benefits received indirectly from the Plaintiff. Defendants did, however, engage in the bribing of public officials, in order to further their illegal anticompetitive scheme.

481. It would be futile for the Plaintiff to seek to exhaust any remedy against any person or regulatory body whose predisposition, because of the Defendants' wrongful conduct, has or might be opposed, to permitting the Plaintiff the right to provide minimally invasive spine surgical services, as they are not liable and would not compensate the Plaintiff for the unlawful conduct of the Defendants.

482. The economic benefit of price gouging and unlawful monopoly profits derived by Defendants charging supracompetitive and artificially elevated prices for minimally invasive

130

spine surgery, is a direct and proximate result of the unlawful elimination of the competition that the Plaintiff and similarly trained physicians presented.

483. The financial benefits derived by Defendants rightfully belongs to the Plaintiff, because the monies were a consequence of the increased revenues that flowed from the provision of minimally invasive spine surgery to patients, who either belonged to the Plaintiff's practice, or who would, in all likelihood have sought treatment from the Plaintiff, with the continued expansion of his practice and reputation.

484. It would be inequitable under the laws of all states and jurisdictions within the United States for the Defendants to be permitted to retain any of the monies that derived from their unfair and unconscionable methods, acts and trade practices alleged in this Complaint. Defendants should be compelled to disgorge in a common fund for the benefit of the Plaintiff all unlawful or inequitable proceeds received by them.

485. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff.

### COUNT ELEVEN
### Deprivation of Right under Color of Law
**(By Plaintiff against Defendants Christie in both his personal and official capacity + Chiesa in his personal capacity + Roeder in his personal and official capacity + Lomazow in his personal capacity + Kaufman in his personal capacity + Przybylski in his personal capacity )**

486. Plaintiff hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth.

487. The Defendants deprived the Plaintiff of his right to due process by:

   (a) Forging, altering and tampering with court transcripts

   (b) Failing to have an independent analysis and comparison of the state authored transcripts, the independent transcripts and the court audio recordings.

   (c) Failing to respond to the Plaintiff's written pleas for an investigation of the forged transcripts.

   (d) Failing to acknowledge the impartiality of the medical board, in adjudicating the Plaintiff's complaint of forged transcripts, in violation of the Plaintiff's Fourteenth Amendment right to an impartial tribunal. The Defendants acted with malicious and

131

reckless disregard for the Plaintiff's due process rights, despite knowing that the Plaintiff
had on June 7, 2012, requested the appointment of a special prosecutor and ad hoc
medical board. The latter request was submitted as a consequence of Defendant
Chiesa's prejudicial comments to the media on May 9, 2012, and the illegal suspension
of the Plaintiff's CDS prescribing license on May 22, 2012 by Defendant Chiesa's
subordinate, and acting director of the Division of Consumer Affairs, Eric Kanefsky.

(e) Failing to exclude DAG Hafner from any involvement in the proceedings, in light of the
ethics complaint, filed by the Plaintiff in September 2013.

(f) Failing to suspend the legal proceedings, until DAG Hafner, had recused herself from the
matter. Hafner's personal animus towards the Plaintiff, and her personal relationship
with Defendant Kaufman, violated the Plaintiff's right to an impartial tribunal, that was
magnified due to the unconstitutional configuration of the mechanism of physician
regulation.

488. The Defendants committed and conspired to commit perjury. The Defendants knew that
the Plaintiff was qualified, credentialed and licensed to perform minimally invasive spine
surgery. The Defendants abused their positions of public authority, to mislead the public into
believing their lies, and thus violated the Plaintiff's right to substantial due process. The Plaintiff
was, however, afforded the charade of due process. The Defendants have enough experience in
the art of deceit, to know that they must, at the very least, put on a "show". The entire process
of physician regulation in New Jersey, requires an independent watchdog, that has no
connections to the local community. This principle of conflict-free justice is common sense, and
is one of the reasons for the existence of international civil and criminal courts.

489. The Defendants committed and conspired to commit a knowingly dishonest interpretation
of the alternative privileges regulation. The Defendants knew the regulation was not required
for the performance of minimally invasive spine surgery. In fact, during the OAL proceedings,
when DAG Hafner was unable to articulate an argument in support of her contention,
Defendant Solomon interjected with his own interpretation, albeit flawed. It was
prosecutorial/judicial misconduct, the likes of which Plaintiff had never witnessed.

The Defendants committed and conspired to commit a knowingly dishonest interpretation of the rights afforded to the Plaintiff by his plenary medical license, that permitted him to practice both **medicine and SURGERY.**

490. The Defendants committed and conspired to commit a concealment of the truth of the clinical effectiveness of the Plaintiff's minimally invasive spine surgery practice, by refusing with ill intent, the Plaintiff's suggestion to have his practice independently analyzed and monitored. The CARRIERS are "persons" under 42 U.S.C. § 1983. The CARRIERS established and fund the Office of the Insurance Fraud Prosecutor, the Office of the Attorney General, and draft healthcare legislation for the state, a function that is governmental in nature.

491. In 2009, the Seventh Circuit summarized the US Supreme Court's criteria, to determine whether the actions of private parties constituted governmental functions. The tests were (1) the symbiotic relationship test (Burton v Wilmington Parking Suth., 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed2d 45 (1961), (2) the state command and encouragement test (Moose Lodge No. 107, 407 U.S. at 176-77, 92 S.Ct (1965), (3) the joint participation doctrine (Lugar v Edmonton Oil Co., 1982), (4) the public function test (Jackson v Metro Edison Co., 419 U.S. 345, 353 95 S.Ct 449, 42 L.Ed2d 477 (1974).

492. The State Actor Tests that confirm the CARRIERS 1983 "person" status are the (i) symbiotic test, (ii) joint participation doctrine, (iii) state command and encouragement test, (iv) public function test, (v) pervasive entwinement.

493. State action is found when a private corporation or actor provides a "public function" i.e. the drafting of healthcare legislation, as in Marsh v Alabama, 326 U.S. 501 (1946). See also Terry v Adams 345 U.S. 461 (1953); Evans v Newton, 382 U.S. 296 (1966) ("That is to say, when private individuals or groups are endowed by the State with powers or function governmental in nature, they become agencies or instrumentalities of the State and subject to Constitutional limitations."). State action is found when the private corporation is heavily regulated by the state i.e. the Department of Banking and Insurance, thereby giving the state control of the corporations acts. Defendant Christie used this control to "squeeze the orange" for as much campaign juice as possible, and in return the CARRIER "oranges' got to hold on to the monies/juice, they owed the Plaintiff.

494. The Plaintiff alleges, upon information and belief, that lawyers for the Defendant CARRIERS assisted in the drafting of Defendant Solomon's opinion.

495. The Defendants abused their official public positions to advance their private commercial interests, at the expense of the Plaintiff's Constitutional right to due process.

496. Defendants Przybylski and Kaufman abused the power of their public functions for personal gain. These Defendants, in the knowledge that they were local business competitors of the Plaintiff, knew that their testimony was conflicted, but failed to recuse themselves from the provision of 'expert' testimony. In fact, Defendant Przybylski, devoted four days to providing false testimony against the Plaintiff, that was founded on a standard, that he admitted on cross examination did not exist.

### COUNT TWELVE
### Commercial disparagement
### (By Plaintiff against Defendants ASIPP + Kaufman + Przybylski + Peterson + Allstate + Geico + UH + Lomazow + Mitchell + Cohen + HUMC + AHS)

497. Plaintiff hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth.

498. Commencing in 2005 the Defendant knowingly and with malice made false statements to patients, physicians, medical device suppliers and lawyers that the Plaintiff was not qualified to perform minimally invasive spine surgery

499. The false statements were intended to cause financial damage to the Plaintiff and his business, and did in fact cause immense harm to the Plaintiff's reputation and business.

500. The Defendants knew that the Plaintiff was qualified to perform minimally invasive spine surgery, but acted with reckless disregard of its truth.

501. The Defendant encouraged patients to file lawsuits against the Plaintiff, and criticized the Plaintiff's work, the purpose of which was to attack the Plaintiff's reputation and economic standing, and to have the Plaintiff's medical license revoked.

501. The Defendants' wrongful acts caused immense harm to the Plaintiff's economic standing and reputation.

## COUNT THIRTEEN
### Intentional Interference with prospective economic advantage
**(By Plaintiff Against Defendants ASIPP + Kaufman + Staats + Przybylski + CNS + Peterson + Allstate + Geico + UH + Lomazow + Mitchell + Cohen + HUMC + AHS)**

502. Plaintiff hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth herein.

503. In or about May 1995 the Plaintiff applied for a plenary license to practice medicine and surgery in the state of New Jersey. The application was based on the Plaintiff having graduated from medical school, passed parts 1 and 2 of the Foreign Medical Graduate Examination for Medical Sciences, passed parts 1 and 2 of the Federal Licensing Examination, and having completed six years of post- graduate clinical training, and a residency program accredited by the accreditation council for graduate medical education.

504. The Plaintiff's application for medical licensure was granted on or about August 1996.

505. From 2003 to 2008 the Plaintiff applied for clinical privileges at at least six (6) state licensed surgical centers to perform minimally invasive spine surgery. The applications were granted on the Plaintiff's post-graduate education, training and experience in general surgery, anesthesiology, interventional pain and minimally invasive spine surgery, that commenced in 1988. Training in the latter discipline, due to its emergence in 1999 and continuing evolution, was procured on an ongoing basis through mini-fellowships and courses in continuing medical education, and hands on cadaver training.

506. On or about March 2005 the Plaintiff performed the first outpatient minimally invasive spinal fusion.

507. In April 2005 the Plaintiff obtained privileges for minimally invasive spine surgery, at the North Jersey Center for Surgery, a Medicare certified one operating room facility in Newton, New Jersey. The privileges were granted after the administrator, Kevin Earle, had analyzed the alternative privileges regulations regarding minimally invasive spine surgery. Earle had been the executive director of the medical board from approximately 1998 to 2002, and was instrumental in the drafting of the alternative privileges regulations.

508. In 2005, upon information and belief, members of the New Jersey neurosurgical community, filed a complaint against the Plaintiff with the medical board.

135

509. On or about 2005, board certified orthopedic spine surgeon, Dr. Victor Katz, submitted a letter to the medical board, in which he rendered an opinion about the Plaintiff's surgical skills in the performance of minimally invasive spine surgery.

510. On or about April 2008, Defendant Heary encouraged patient FK to file a lawsuit and a complaint with the medical board against the Plaintiff.

511. In 2007, defendant Cohen filed a complaint against the Plaintiff with the medical board.

512. In October 2009 a board certified orthopedic spine surgeon submitted a letter to the medical board, in which he rendered an opinion about the care that the Plaintiff had delivered to patient FK, and the expanding scope of practice within the specialties of interventional pain and physiatry.

513. From 2002 to the 2012 the Plaintiff performed eight hundred minimally invasive spine surgeries, with good to very good outcomes in 90-95 % of cases, and complication rate of O.1%.

514. In April 2012 the Plaintiff's practice was evaluated by a neurosurgeon, who sent a letter to the medical board, in which he opined that the Plaintiff's clinical outcomes were "rather good". The medical board ignored the letter.

515. From 2008 to 2012 the Defendant encouraged spine device representatives to cease supplying the Plaintiff with the devices necessary to perform minimally invasive spine surgery.

516. From 2005 to 2012 the Defendant encouraged physicians not to refer patients to the Plaintiff, and slandered the Plaintiff's reputation, by staying that he was not qualified to perform minimally invasive spine surgery.

517. On March 3, 2011 the Plaintiff opened the NJSR Surgical Center, at which he became accredited by Medicare and AAAHC to perform minimally invasive spine surgery.

518. On or about August 2011 the Plaintiff performed the first outpatient correction of an adolescent spondylolisthesis.

519. On or about September 2011 the Plaintiff performed the first outpatient correction of a multi-level lumbar degenerative scoliosis.

520. Upon information and belief, it is alleged that the Defendant neurosurgeons, met with the Defendant politician on multiple occasions, the purpose of the meetings being the revocation of the Plaintiff's medical license.

136

521. Upon information and belief, it is alleged that on or about 2011 the Defendant conspired with members of the medical board to evoke the Plaintiff's license

522. The Defendant's aforesaid actions constituted knowing, intentional and voluntary interference with the Plaintiff's minimally invasive spine surgery practice.

523. The Defendant's aforesaid actions constituted negligent interference with the Plaintiff's minimally invasive spine surgery practice.

524. The Defendant's interference with the Plaintiff's practice was a malicious eight -year multi-pronged campaign that involved efforts to deprive the Plaintiff's practice of patient referrals, medical devices, encourage patients to file lawsuits, and resulted in the revocation of the Plaintiff's license.

525. The Defendant actions constituted unjustified and wrongful interference with the Plaintiff's minimally invasive spine surgery, and reasonable expectation of economic advantage as aforesaid, and did not rest upon a legitimate interest, or have a legitimate purpose.

526. As a result of the Defendant's actions, the Defendant is liable for the damages caused by their interference with the Plaintiff's minimally invasive spine surgery practice.

527. The Plaintiff had a reasonable expectation of economic advantage or benefit flowing from the revenues of his minimally invasive spine surgery practice.

528. The Defendants knew or should have known of the expectancy of the aforesaid economic advantage of the Plaintiff's minimally invasive spine surgery practice.

529. In the absence of the Defendant's wrongful acts as foresaid, it is reasonably probable that the Plaintiff would have realized its aforesaid economic advantage or benefit with respect to his ongoing minimally invasive spine surgery practice.

530. As a result of the Defendant's aforesaid wrongful acts, the Plaintiff has suffered damages.

### COUNT FOURTEEN
### Aid in the Commission of Tort
### (Against all Defendants)

531. Dr. Kaul repeats and re-alleges the allegations set forth in the preceding paragraphs and incorporates same as if set forth fully herein

137

532. The Defendants pursued a common plan or design to commit a series of torts upon Dr. Kaul, through their active participation, encouragement, or ratification of the harm done to Dr. Kaul, which inured to Defendants' collective benefit

533. The Defendants are jointly and severally liable to Dr. Kaul for his damages suffered as a consequence of all of the aforementioned torts, claims and counts.

## VII. DEMAND FOR JUDGMENT

**WHEREFORE,** Plaintiff seeks judgment against the Defendants jointly and severally, as follows:

(a) Compensatory damages from all Defendants in their individual capacities.

(b) Consequential damages from all Defendants in their individual capacities.

(c) Punitive damages from all Defendants in their individual capacities.

(d) Declaring that the mechanism of physician regulation in New Jersey, as described herein, is unconstitutional, and violated the Plaintiff's right to due process.

(e) Declaring that the revocation of the Plaintiff's medical license was procured through illegal means, and was an illegal act.

(f) Declaring that the continued revocation of the Plaintiff's medical license is illegal, and is a consequence of fraudulent legal proceedings, and an unconstitutional mechanism of physician regulation.

(g) Declaring that the May 22, 2012 suspension of the Plaintiff's CDS Registration was procured illegally.

(h) Ordering the immediate reinstatement of the Plaintiff's plenary license to practice medicine and surgery in New Jersey.

(i) Ordering the immediate reinstatement of the Plaintiff's CDS Registration.

(j) Declaring that the conduct alleged herein is in violation of Sections 1 and 2 of the Sherman Act, of the other statutes set forth above, and of the common law of unjust enrichment under the laws of all states and jurisdictions within the United States.

(k) Enjoining Defendants from continuing the illegal activities alleged herein.

(l)  Granting Plaintiff equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment.

(m) Awarding the Plaintiff treble, multiple, punitive and/or other damages, in the amount to be determined at trial.

(n)  Awarding the Plaintiff costs of suit, including reasonable attorneys' fees as provided by law.

(o)  Granting such other relief as is necessary to correct for the anti-competitive effects caused by the unlawful conduct of Defendants, and as the Court deems just.

(p)  Expunging the prior revocation of Plaintiff's medical license from the public record.

## VIII.  JURY DEMAND

Plaintiff demands trial by jury on all issues so triable

## IX.   DEMAND FOR INSURANCE

Demand is hereby made for all insurance policies, which may cover the damages alleged in this Complaint

RESPECTFULLY SUBMITTED this 9th day of August, 2017

By:   _____

Richard Arjun Kaul, MD
Propria Persona
120 Temple Terrace
Palisades Park, NJ 07650
201 989 2299
drrichardkaul@gmail.com

139

# REFERENCES

1. Hoy D, Brooks P, Blyth F, Buchbinder R – The Epidemiology of low back pain - Best Pract Res Clin Rheumatol 2010 Dec;24(6):769-81. doi: 10.1016/j.berth.2010.10.002.
Found at: **https://www.ncbi.nlm.nih.gov/pubmed/21665125**

2. Darrell J. Gaskin, Ph.D and Patrick Richard Ph.D., M.A. – The Economic Costs of Pain in The United States – Institute of Medicine (US) Committee on Advancing Pain Research -
Found at: **https://www.ncbi.nlm.nih.gov/books/NBK92521/**

3. Oppenheimer JH, Decastro I, McDonnell DE – Minimally Invasive spine technology and minimally invasive spine surgery: a historical review - Neurosurgical Focus 2009 Sep;27(3):E9. doi: 10.3171/2009.7.FOCUS09121
Found at: **https://ncbi.nlm.nih.gov/pubmed/19722824**

4. Nasser R, Yadia S et al., - Complications in spine surgery – J. Neurosurg. Spine 2010 Aug; 13(2): 144-57. doi: 10.3171/2010.3. SPINE09369
Found at: **https://www.ncbi.nlm.nih.gov/pubmed/20672949**

5.Eric Eckholm – The Nation; As Doctors Become More Specialized, and Numerous, Turf Wars Erupt Over Body Parts – The New York Times 1991 July
Found at: **https://www.nytmes.com/1991/07/07/weekinreview/nation-doctors**

6.Laura Dryda – 5 Observations on Spinal Fusion Market Analysis – Becker's Spine Review 2014 June 16
Found at: **https://beckersspine.com/spine/item/21206-5-observations-on …**

7.Janet K. Freburger, PT, PHD, George Holmes, PhD et al., - The Rising Prevalence of Chronic Low Back – Arch. Intern. Med 2009 Feb 9; 169(3): 251-258
Found at: **https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4339077/**

8.William Maixner, MD – How do we decrease addiction to opioids but still treat millions with chronic pain – STAT 2016 November 18
Found at **https://www.statnews.com/2016/11/18/opioids-addiction-chronic -pain/**

9.Ron Pawl, Department of Neurosurgery – "when the pain won't wane, it's mainly in the brain" – Surg Neurol. Int 2013; 4(Supp5): S330-S333
Found at: **https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3717530/**

10. Richard Barbetta surveillance video November 19, 2009
Found at: **https://www.youtube.com/watch?v=PyOPYqo5QDs**

11. Frances Kuren surveillance video August 2012.
Found at: **https://www.youtube.com/watch?v=Dy7FLaETlHM&t=8s**

12. Steven Lomazow interview January 2014.
Found at: **https://www.youtube.com/watch?v=sFtE8EvEMsU**

13. The Spine Africa Project November 2011
Found at: **https://www.youtube.com/watch?v=Zu50ik2l2Sc**

14. Transforaminal epidural injection March 2011
Found at: **https://www.youtube.com/watch?v=9NjJV7XhBB0**

15. First outpatient minimally invasive correction of adolescent spondylolisthesis August 2011
Found at: **https://www.youtube.com/watch?v=q_HBzqfggrg&t=5s**

16. First outpatient minimally invasive correction of four level degenerative scoliosis August 2011
Found at: **https://www.youtube.com/watch?v=oxaV5IJuZ7c&t=15s**

17. First outpatient minimally invasive lumbar fusion March 2005 (video posted 2011)
Found at: **https://www.youtube.com/watch?v=JX4bnRPPucl**

18. The DAG Hafner video June 2012
**Found at: https://www.youtube.com/watch?v=guwx5kuBiEg**

19. The Human Cost of Political Corruption August 2013
Found at: **https://www.youtube.com/watch?v=OGxHDp04twQ**

20. Patients of Dr. Richard Kaul respond to Lindy Washburn and the Bergen Record
Found at: **https://www.youtube.com/watch?v=XQK-nquMfJ0**

21. Sham Peer Review – Association of American Physicians and Surgeons
Found at: **https://www.youtube.com/watch?v=JABqsXEG1OA**

22. Dr. Kaul lectures about minimally invasive spine surgery
Found: **https://www.youtube.com/watch?v=AObxnXGmQkk**