www.drrichardkaul.com
October 27, 2017

Honorable Steven C. Mannion
United States District Court
District of New Jersey
UNITED STATES DISTRICT COURT

Re: Kaul v Christie, et al.,
    Docket No. 16-CV-02364
    Revised Second Amended Complaint

Dear Judge Mannion,

Please find submitted an original and one (1) copy, of the revised Second Amended Complaint.
The document consists of one hundred and forty-six (146) pages, exclusive of the four (4)
exhibit dividers.

Yours sincerely

$\mathcal{R}k_{-1}$

Richard Arjun Kaul, MD

cc: All Counsel via e-mail
    Judge Kevin McNulty

Richard Arjun Kaul, MD
PROPRIA PERSONA
120 Temple Terrace
Palisades Park, NJ 07650
Tel: (201) 989 -2299

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RICHARD ARJUN KAUL, MD, | Civil Action No. 16-cv-02364 |
| Plaintiff, | |
| v. | SECOND AMENDED COMPLAINT<br>DEMAND FOR JURY TRIAL |
| GEICO, AMERICAN SOCIETY OF INTERVENTIONAL PAIN PHYSICIANS, ANDREW KAUFMAN, MD (in his individual capacity + official capacity), PETER STAATS, MD, GREGORY PRZYBYLSKI, MD (in his individual capacity + official capacity), CONGRESS OF NEUROLOGICAL SURGEONS, CHRISTOPHER WOLFLA, MD, THOMAS PETERSON, MD, ALLSTATE NEW JERSEY INSURANCE COMPANY, GEICO, GEICO INDEMNITY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY, TD BANK, NA, DIVYESH KOTHARI, UNIVERSITY HOSPITAL, JAMES GONZALEZ, ROBERT HEARY, MD, WILLIAM MITCHELL, MD, MARC COHEN, MD, NORTH JERSEY MEDIA GROUP, INC, LINDY WASHBURN, LEWIS STEIN, ESQ, HACKENSACK UNIVERSITY MEDICAL CENTER, ROBERT GARRETT, ATLANTIC HEALTH SYSTEM, JOHN ROE 1-50, JOHN DOE 1-50, ABC CORP. 1-50, AND/OR XYZ, P.C. 1-50 | |
| Defendants | |

Richard Arjun Kaul, MD
Propria Persona
120 Temple Terrace
Palisades Park, NJ 07650
Tel: (201) 989 2299

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| RICHARD ARJUN KAUL, MD | |
| | Civil Action No. 16-cv-02364 |
| Plaintiff, | |
| | CERTIFICATION OF PLAINTIFF |
| CHRISTOPHER J. CHRISTIE, ESQ, et al., | |
| | |
| Defendants | |

Richard Arjun Kaul, of full age, certifies and says:

I am the Propria Persona Plaintiff

I make this certification in support of the Plaintiff's Second Amended Complaint

Attached as Exhibits 1 – 4 are true and accurate copies of the following documents:

1. Exhibit 1 – Deposition transcript of patient FK – June 11, 2012.

2. Exhibit 2 – Certification of patient KS – July 12, 2017.

3. Exhibit 3 – Vitals physician online opinion – November 20, 2010 to May 6, 2012.

4. Exhibit 4 – JZ Certification – August 6, 2017.

1

I certify that the foregoing statements made by me are true to the best of my knowledge. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: October 27, 2017

_____

Richard Arjun Kaul, MD

2

## TABLE OF CONTENTS

I.    PARTIES.................................................................................................................................................. vi

II.   JURISDICTION AND VENUE ................................................................................................................ viii

III.  PRELIMINARY STATEMENT ................................................................................................................. 1

      A.  Political Corruption + The Opiate Epidemic............................................................................... 1

      B.  The GEICO + Allstate Complaints ............................................................................................... 1

      C.  Reasons for Defendants' Professional Jealousy......................................................................... 2

IV.   FACTUAL ALLEGATIONS ...................................................................................................................... 4

      A.  Unconstitutional Configuration of the Mechanism of Physician Regulation.............................. 4

      B.  Fraudulent OAL Proceedings ...................................................................................................... 6

      C.  The Coburn Opinion..................................................................................................................... 6

      D.  Santos v Kaul.............................................................................................................................. 7

      E.  Superior patient outcomes.......................................................................................................... 7

          1.  RB................................................................................................................................... 12

          2.  FK ................................................................................................................................... 17

          3.  LM .................................................................................................................................. 21

          4.  GH .................................................................................................................................. 22

          5.  HS................................................................................................................................... 23

          6.  SS ................................................................................................................................... 24

          7.  TZ ................................................................................................................................... 26

          8.  PM.................................................................................................................................. 26

          9.  KS ................................................................................................................................... 28

          10. JZ.............................................................i ....................................................................... 29

11. JJ ...................................................................................................................................... 31

D.  Minimally Invasive Spine Surgery Qualifications ........................................................ 32

E.  State Misconduct + Forged Transcripts + Fraudulent OAL opinion. .............................. 33

V.      CLAIMS FOR RELIEF ................................................................................................................. 38

COUNT ONE – VIOLATIONS OF 18 U.S.C. § 1962(C)K (D) THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ* (Against Defendants Kaufman + Przybylski + Heary + Mitchell +
Staats + CNS + ASIPP) ..................................................................................................................... 38

A.  Description of the CAC RICO Enterprise ....................................................................... 39

B.  The CAC RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues ....... 42

C.  Predicate Acts: Mail and Wire Fraud ........................................................................... 44

COUNT TWO – VIOLATIONS OF 18 U.S.C. § 1962(C)K (D) THE RACKATEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT, 18 U.S.C. §1961, *ET SEQ* (Against Defendants + Allstate + Geico
+ TD + Kothari) ............................................................................................................................. 48

A.  Description of the CAGTK RICO Enterprise ................................................................... 49

B.  The CAGTK RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues .. 52

C.  Predicate Acts: Mail and Wire Fraud ........................................................................... 55

COUNT THREE – VIOLATIONS OF 18 U.S.C. § 1962(C)K (D) THE RACKETEER INFLUENCED AND CORRUPT ACT,
18 U.S.C. § 1961, *ET SEQ* (Against Defendants + HUMC + AHS + Garrett + UH + Gonzalez ) ............................ 59

A.  Description of the CHE RICO Enterprise ....................................................................... 60

B.  The CHE RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues ...... 63

C.  Predicate Acts: Mail and Wire Fraud ........................................................................... 66

COUNT FOUR – VIOLATIONS OF 18 U.S.C. 1962(C)K (D) THE RACKETEER INFLUENCED CORRUPT
ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ (Against Defendants + NJMG + Washburn+ Stein) ............... 69

   A.  Description of the CMS RICO Enterprise ...................................................................................... 70

   B.  The CMS RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues ..... 73

   C.  Predicate Acts: Mail and Wire Fraud............................................................................................ 75


COUNT FIVE – FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTIONS 16 OF THE CLAYTON ACT FOR
DEFENDANTS' VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT
(Against Defendants Kaufman + Staats + Przybylski + CNS + Wolfla + Peterson + UH + Heary + Mitchell +
Cohen + HUMC + AHS).................................................................................................................................. 81

COUNT SIX – FOR MONOPOLIZATION (Against Defendants Przybylski + Kaufman + Staats + Cohen + Heary +
Mitchell + HUMC + AHS + UH) ...................................................................................................................... 83

COUNT SEVEN – FOR CONSPIRACY TO MONOPOLIZE UNDER STATE LAW (Against Defendants Przybylski +
Kaufman + Staats + Lomazow + Cohen + Heary + Mitchell + HUMC+ AHS) ..................................................... 91

COUNT EIGHT – FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAW (Against
Defendants Przybylski + Kaufman + Staats + Cohen + Lomazow + Heary + Mitchell + HUMC +AHS + UH) .... 100

COUNT NINE – FOR UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (Against Defendants ASIPP
+ Kaufman + Staats + Przybylski + CNS + Peterson + Heary + Mitchell + Cohen + HUMC+ AHS) ................... 107

COUNT TEN – UNJUST ENRICHMENT (Against Defendants ASIPP + Kaufman + Przybylski + CNS + Peterson +
UH + Heary + Mitchell + Cohen + HUMC + AHS)........................................................................................... 112

COUNT ELEVEN – DEPRIVATION OF RIGHT UNDER COLOR OF LAW (Against Defendants Kaufman in his official
capacity + Przybylski in his official capacity).............................................................................................. 113

COUNT TWELVE – COMMERCIAL DISPARAGEMENT (Against Defendants ASIPP + Kaufman + Przybylski +
Peterson + Allstate + Geico + UH + Heary + Lomazow + Mitchell + Cohen + HUMC+ AHS).......................... 116

COUNT THIRTEEN – INTENTIONAL INTERFERENCE WITH PROPSPECTIVE ECONOMIC ADVANTAGE (Against
Defendants ASIPP + Kaufman + Staats + Przybylski + CNS + Peterson + Allstate + Geico + UH + Heary + Mitchell
+ Cohen + HUMC + AHS)......................................................................................................................... 117

COUNT FOURTEEN – AID IN THE COMMISSION OF TORT (Against all Defendants)......................................... 118

VI.     DEMAND FOR JUDGMENT .................................................................................................................... 119

VII.    JURY FOR DEMAND.............................................................................................................................. 120

VIII.   DEMAND FOR INSURANCE.................................................................................................................... 120

IX.     REFERENCES ........................................................................................................................................ 121

Plaintiff Richard Arjun Kaul, MD brings this action against Defendants American Society of
Interventional Pain Physicians ("ASIPP"), Andrew Kaufman, MD ("Kaufman"), Peter Staats, MD
("Staats"), William Mitchell, MD ("Mitchell"), Marc Cohen, MD ("Cohen"), Robert Heary, MD
("Heary"), Gregory Przybylski, MD ("Przybylski"), the Congress of Neurological Surgeons
("CNS"), Christopher Wolfla, MD ("Wolfla"), Thomas Peterson, MD ("Peterson"), Allstate New
Jersey Insurance Company ("ANJ"), GEICO ("GEICO"), TD Bank, N.A. ("TD"), Divyesh Kothari
("Kothari"), Hackensack University Medical Center ("HUMC"), Atlantic Health System ("AHS"),
Robert Garrett ("Garrett"), James Gonzalez ("Gonzalez"), North Jersey Media Group, Inc.
("NJMG"), Lindy Washburn ("Washburn"), Lewis Stein, Esq ("Stein"), and University Hospital
("UH") (collectively, "Defendants") to redress Plaintiff's economic and reputational injuries due
to the Defendants' scheme to permanently eliminate Plaintiff from the practice of medicine
anywhere in the world. Plaintiff's allegations are based on his own experiences and personal
knowledge, his research, publicly available articles, studies, reports and other sources, a
reasonable inquiry under the circumstances, and on information and belief. Plaintiff's
allegations are likely to have further evidentiary support after a reasonable opportunity for
further investigation and discovery.

v

## II. PARTIES

1.    Plaintiff, **RICHARD ARJUN KAUL, MD**, was a resident of the State of New York when this cause of action accrued and was formerly a Medical Doctor licensed to practice medicine in the State of New Jersey. Kaul's residence when this cause of action accrued was 69 West 83rd Street, New York, New York.

2.    Defendant, **LEWIS STEIN, ESQ,** is a New Jersey, Morris County based medical malpractice attorney.

3.    Defendant, **ALLSTATE NEW JERSEY INSURANCE COMPANY (hereinafter "ANJ")** is the New Jersey subsidiary of Allstate Insurance Company.

4.    Defendants, **GOVERNMENT EMPLOYEES INSURANCE CO, GEICO INDEMNITY, GEICO GENERAL INSURANCE COMPANY** and **GEICO CASUALTY (hereinafter "GEICO")** are the largest providers of auto insurance in New Jersey.

5.    Defendant, **TD BANK, NA**, is a Canadian bank, whose US headquarters are in Cherry Hill, New Jersey.

6.    Defendant, **ATLANTIC HEALTH SYSTEM (AHS)**, is private healthcare company whose headquarters are in Morristown, New Jersey. It is the parent company for Morristown Memorial Hospital, Overlook Hospital, Chilton Memorial Hospital and Hackettstown Hospital. It's business covers Morris, Sussex and Passaic counties. Defendants, **COHEN, HEARY, LOMAZOW** and **KAUFMAN** engage in healthcare business with AHS.

7.    Defendant, **UNIVERSITY HOSPITAL (UH)**, is the teaching hospital for The University of Medicine and Dentistry of New Jersey **(UMDNJ)** which is the state-run health sciences institution for New Jersey. Defendants, **HEARY,** and **KAUFMAN** engage in healthcare business with the defendant.

8.    Defendant, **HACKENSACK UNIVERSITY MEDICAL CENTER (HUMC)**, is 900-bed private hospital seven miles west of New York City. Defendant neurosurgeons, **PETERSON** and **HEARY**, engage in healthcare business with the defendant.

9.    Defendant, **DR. ROBERT HEARY**, is the Director of the Neurological Institute of the New Jersey Spine Center and Neurosurgical Intensive Care Unit located in Newark, Essex County,

**Deleted: ,**

**Deleted: CARMEL,**

**Deleted: CARMEL**

**Deleted:**

vi

New Jersey. The latter is part of defendant Rutgers. The defendant is also an attending at HUMC and Overlook Hospital in Summit, New Jersey, which is part of Atlantic Health System.

10.     Defendant, **DR. GREGORY PRZYBYLSKI**, is the director of neurosurgery at the New Jersey Neuroscience Institute at JFK Medical Center located in Edison, Middlesex County, New Jersey. He was also the 2011 President of defendant NASS and is a member of defendant CNS.

11.     Defendant, **DR. WILLIAM MITCHELL** is an attending neurosurgeon at JFK Medical

12.     Center, which is located in Edison, New Jersey.

13.     Defendant, **THOMAS PETERSON**, is a neurosurgeon who engages in healthcare business with defendant **HUMC.**

14.     Defendant, **DR. PETER STAATS**, was the 2015 President of defendant ASIPP, and is editor of Pain Medicine News.

15.     Defendant, **DR. MARC COHEN**, is an orthopedic spine surgeon with a medical office at 221 Madison Avenue, Morristown, New Jersey 07960. He is a member of defendant NASS, and engages in healthcare business with defendant **AHS.**

16.     Defendant, **THE AMERICAN SOCIETY OF INTERVENTIONAL PAIN PHYSICIANS, (ASIPP)** is a professional medical society with a business address at 2831 Lone Oak Road, Paducah, Kentucky, 42003. Defendant, **DR. PETER STAATS**, was the 2015 President.

17.     Defendant, the **CONGRESS OF NEUROLOGICAL SURGEONS, (CNS)** is a professional medical society with a business address located at 725 Fifteenth Street, NW, Suite 500, Washington, DC 20005. Defendants, **HEARY, PRZYBYLSKI, MITCHELL, MOORE** and **PETERSON** are members.

**Deleted: CARMEL,**

18.     Defendant, **CHRISTOPHER WOLFLA**, is a neurosurgeon located at 725 Fifteenth Street, NW, Suite 500, Washington, DC 20005. He is the Chairman of the Professional Conduct Committee for defendant, **CNS.**

19.     Defendant, **DR. ANDREW KAUFMAN**, is an individual with a business located at 90 Bergen Street #3400, Newark, New Jersey 07103, and is a senior member of defendant **ASIPP.**

20.     Defendant, **LINDY WASHBURN**, is an individual located at 1 Garret Mountain Plaza, Woodland Park, New Jersey 07424. Defendant, NORTH JERSEY MEDIA, INC, employs her as a journalist.

**Deleted:** She is employed as a journalist by defendant, NORTH JERSEY MEDIA, INC

21.    Defendant, **NORTH JERSEY MEDIA, INC** is a corporation located at 1 Garret Mountain Plaza, Woodland Park, New Jersey 07424. It publishes The Bergen Record.

22.    Defendant, **JAMES GONZALEZ**, is an individual located at 150 Bergen Street, Newark, New Jersey 07103. He was the president of Rutgers University Hospital.

23.    Defendant, **DIVYESH KOTHARI**, is the Vice-President of TD Bank, N.A.

24.    Defendant, **ROBERT GARRETT**, is an individual located at 30 Prospect Avenue, Hackensack, New Jersey 07601. He is the president of defendant, HUMC.

25.    Defendants, **JOHN ROE 1-50**, and **JOHN DOE 1-50** are as yet unidentified individuals who have assisted the named defendants in the commission of their crimes.

26.    Defendants, **ABC CORP. 1-50, AND/OR XYZ, P.C. 1-50** are as yet unidentified corporations that have assisted the named Defendants in the commission of their crimes.

### III.    JURISDICTION AND VENUE

27.    Subject Matter Jurisdiction. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, and under 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1337 because this action alleges violations of an Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies. And 15 U.S.C. § 4 and § 16 confer subject matter jurisdiction on this Court over claims brought under the Sherman Act. This Court also has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), (5), because Plaintiff is a citizen of a different state to certain Defendants, the aggregate amount in controversy exceeds seventy-thousand dollars.

28.    Personal Jurisdiction. The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the

United States, including in this district. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4)k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in New Jersey.

## IV.    PRELIMINARY STATEMENT

### A.    Political Corruption + The Opiate Epidemic

29.    The Defendant Carriers bribed New Jersey politicians to introduce fees schedules in 2005 and 2009, that curtailed funding for outpatient surgical services. A large percentage of auto accident victims have no secondary or private insurance, and were unable to procure care at hospitals. These individuals were forced to resort to opiate medications, and when they became unaffordable or unobtainable, they resorted to street grade heroin.

30.    The reduction in the availability of minimally invasive spine care has contributed to the opiate epidemic in New Jersey, because patients became unable to receive care for their chronic spinal pain. Subsequent to the fee schedule modifications and legislative changes, the number of clinical facilities and physicians that provided minimally invasive spine care dropped by almost fifty percent (Ref. #1).

31.    The Defendant Carriers and Hospitals bribed New Jersey politicians to introduce legislation that restricted minimally invasive spine surgery to hospitals, and the surgical centers owned by hospitals. All three Defendant Hospitals are registered as not-for-profit centers

### B.    The GEICO + Allstate Complaints

32.    From approximately 2006 to 2012 the Plaintiff successfully treated thousands of patients who had sustained spinal injuries consequent to car accidents. Hundreds of these individuals had purchased expensive personal injury protection policies from Defendants GEICO and Allstate, with the understanding that should they require medical attention for traumatic injuries, the costs would be covered. New Jersey has a no-fault system that over the last decade has incorporated a fee arbitration system that ensures healthcare providers and facilities are compensated for the provision of clinical services. The arbitrators are lawyers, well versed in healthcare law, and render payment decisions based on the medical evidence presented.

Deleted: ,

1

33.    From 2006 to 2012 the Plaintiff prevailed on almost ninety-nine percent (99%) of all claims presented for arbitration. Defendant GEICO employed their legions of lawyers to contest each and every claim, and lost almost ninety-nine percent (99%) of all claims. When the Defendant CARRIERS are unable to prevail in the state sanctioned arbitration forums, they resort to filing frivolous lawsuits in federal and state courts, in the knowledge that the majority of providers are unable to match their legal resources.

34.    The Defendant CARRIERS pattern of racketeering is that Defendant GEICO runs into federal court, while its racketeering comrade, Allstate, runs into the Union County state court. Defendant GEICO, unable to defeat the Plaintiff in the arbitration forums, filed a one hundred and eight page (108), three hundred and thirty-nine paragraph complaint against the Plaintiff, his corporations, and three of his employee physicians, on April 23, 2017.

Deleted: ,

35.    The matter was dismissed with prejudice on December 8, 2014, with absolutely no evidence ever having been presented to support any of the eleven (11) causes of action.

36.    On February 15, 2015 Defendant Allstate filed an almost identical lawsuit against the Plaintiff in the New Jersey Superior Court, Union County Court.

37.    As with GEICO, Defendant Allstate has not presented a scintilla of evidence in support of its one hundred and eleven (111) page, three hundred and sixty-four paragraph, seventeen (17) count complaint. It is simply Defendant Allstate's avenue to re-litigate claims it lost against the Plaintiff in state sanctioned arbitration forums.

C.    **Political corruption + Reasons for Defendants' Professional Jealousy**

38.    In 2005 Kaul performed the first outpatient lumbar spinal fusion at the Market Street Surgical Center, Saddlebrook, New Jersey. Kaul's innovative work caused overt hostility within the New Jersey neurosurgical community, whose members frequently slandered Kaul. One such example occurred in late 2013, when Defendant Peterson publicly called Kaul a "murderer", to one of Kaul's employees, Linda Reyes, on whose brother Peterson had just operated.

39.    In 2005 neurosurgeons used their influence within the hospital credentialing committee, to prevent Kaul from obtaining clinical privileges at Meadowlands Hospital.

2

**40.**     Between 2010 to 2012 multiple articles were published about Kaul's work in minimally invasive spine surgery and in 2011 it was reported in the Bergen Record, that NJSR Surgical Center had a zero (0) % post-operative infection rate

**41.**     On March 3, 2011 Kaul opened the NJSR Surgical Center, a Medicare certified, AAAHC accredited facility in Pompton Lakes, New Jersey. It is a four-thousand square foot facility, in which Kaul performed interventional spinal procedures, and outpatient minimally invasive fusions and discectomies.

**42.**     Kaul came to know through conversations with spine device representatives, patients and physicians, that his professional and commercial success had caused immense jealousy within the medical community. Further examples of this included defamatory comments made by Defendant Heary to Kaul's patient, Frances Kuren in 2008, by Defendant Kaufman to Kaul's patients Corey Johnson in 2010, and John Zerbini in 2012.

**43.**     Kaul's commercial success presented an economic threat to the insurance carriers, who used their purchased political leverage with the Christie administration, to have Kaul's license revoked. The purpose was to negate their statutory economic obligation to pay Kaul for clinical services that he had legitimately rendered to their customers.

**44.**     Kaul's practice grew three hundred percent from March 2011 to April 2012, and he performed cases on an outpatient basis, that although termed 'complex' by neurosurgeons, proved to be simple, because of the surgical techniques employed by Kaul. Many neurosurgeons do not have good hand-eye coordination skills, and Kaul observed during many of the CME courses, that their ability to maneuver minimally invasive spine instruments was clumsy.

**45.**     In the US the completion of a residency and board certification, do not require the graduate to pass a technical skills test, but simply a written and oral examination. That would be akin to issuing a driver's license without the road test. Thus the only way that one could compare the abilities of two surgeons, as for example with two baseball players, is to observe them in action. Kaul's videos demonstrate him in action, while no video evidence exists to support the technical abilities, or lack thereof, of any of the other physician defendants. In fact, many of Kaul's colleagues observed him operating, and submitted letters that attested to his

Deleted: ,

3

surgical skills. When Kaul's license was suspended in April 2012, he suggested to the medical board that he be independently observed. This common sense suggestion was ignored.

46.    Kaul's reputation in the field of minimally invasive spine surgery grew steadily from 2002, and he frequently taught his technique to other physicians, who observed him in the operating room and attended hands-on cadaver training courses (Ref # 2).

47.    Defendant Kaufman publically defamed Kaul on multiple occasions from at least 2010 onwards, and made highly derogatory remarks to two of Kaul's patients, Corey Johnson and John Zerbini. The latter testified for the State in the 2012-2013 licensure proceedings.

48. . Commencing in 2010 Kaul's philanthropic and professional work received extensive media coverage. A segment on Channel 12 news in August 2011 apparently caused members of the New Jersey neurosurgical community to tell Spineology representative, Robert McGann that "it was the last straw".



Deleted: ,

Deleted: t

Deleted: who

Deleted: s

Deleted: ,

## V. FACTUAL ALLEGATIONS

### A.    Unconstitutional configuration of the mechanism of physician regulation

49.    The Division of Consumer Affairs controls the medical board. Its members are political appointees, with no senate approval, that occupy their position at the pleasure of the Governor.

50.    The Office of the Attorney General is controlled by the Department of Law and Public Safety, and assigns lawyers who simultaneously prosecute cases against physicians, while acting as internal counsel to the board. The Governor controls the DLPS. There is an unconstitutional, and illegal, merger of investigative, prosecutorial and adjudicative functions.

51.    The Office of Administrative Law is part of the executive branch of state government, and its members are politically appointed. The executive is the Governor.



Deleted: The medical board is controlled by

Deleted: t

Deleted: , and

Deleted: i

Deleted: The DLPS is controlled by

Deleted: t

52.    The unconstitutional configuration of physician regulation permitted the Governor to exercise complete control of the legal proceedings that caused the revocation of Kaul's license. At best it was a charade, at worst a 'kangaroo' court, that dispensed a politically motivated judgment based on false expert and patient testimony. The Defendants have many decades of experience in 'kangaroo' justice, and went to immense lengths to ensure that there was an appearance of the "full panoply" of due process. The earliest indication that the outcome had

4

been pre-ordained was when AG Chiesa, on May 9, 2012, broadcast to the media, that the

Plaintiff was not qualified to perform minimally invasive spine surgery. These comments were

made before the commencement of any evidentiary proceedings.

53.      The Defendants exercised control of the aforementioned process by funneling bribes to

Governor Christie, that were disguised as 'campaign donations', and fees to lobbyists and

public relation companies.

54.      The process is not independent, is purely political and is in violation of the due process

clause of the Fourteenth Amendment that requires an impartial tribunal, when life, liberty and

property are at stake. Simply by virtue of the fact that the mechanism of physician regulation is

unconstitutional, none of these protections/rights were afforded to the Plaintiff.

55.      However, to add insult to injury, the Defendants forged court transcripts to fit their

fraudulent narrative. The Defendants have not denied this claim, and Defendant Washburn

discussed this fact with the Plaintiff on August 13, 2013, and with the Plaintiff's public relations

officer, Kelley Blevins, two weeks earlier at a meeting in Manhattan. The medical board

admitted that differences existed between the two transcripts, and ought to have referred the

matter for an independent analysis.

56.      The medical board's opinion that the difference was "insignificant" is worthless, as the

medical board was central to the criminal conspiracy, and could not, nor would have offered a

truthful opinion. The quasi-criminal nature of these proceedings, as with criminal convictions

that are the result of prosecutorial/procedural misconduct, must be re-examined, and the

evidence analyzed by independent forensic experts. The Defendants well-rehearsed pattern of

misconduct had been in existence for many years, prior to the Plaintiff's case.

57.      Physician, Kenneth Zahl, described to the Plaintiff in 2016, how members of the Office

of the Attorney General had engaged in the illegal shredding of critical pieces of evidence, in

other cases. In Kenneth Zahl v Warhaftig (Docket No. 13-CV-01345), Zahl filed a motion on

August 6, 2013 that sought access to the OAL servers, based on a digital forensics expert report,

that raised the issue of evidence tampering. The expert, Robert Gezelter, stated in ¶ 29 of his

report, *"I can conclude, with a high degree of professional certitude, based upon my*

*professional experience and familiarity with Microsoft Word that, assuming that ALJ Gerson*

Deleted: ,

Deleted: the

Deleted: as

Deleted: ,

Deleted: ere

Deleted:

Deleted: a

Deleted: g

Deleted: 's office

5

*correctly dated his signature on Exhibit "3" before the close of court (4:00 PM EST) on December 17, 2008, that one or more of the individuals made changes to Exhibit "3" which are recorded as having been made after ALJ Gerson purportedly executed the subject Initial Decision".* Zahl asserted, *"There is clear evidence of an altered administrative law court decision, a cover-up of the tampering, and missing evidence."*

### B.    Fraudulent OAL Proceedings

**58.**    From April 9, 2013 to June 28, 2013, there were twenty-three days of testimony in the Matter of the Suspension or Revocation of the License of Richard Kaul, MD, Docket No.: BDS 08959-2012 N

**59.**    On October 15, 2013 Kaul submitted a post-hearing trial brief, and on December 13, 2013 Solomon submitted his decision, a decision that bore little resemblance to the evidence REFERENCE SOLOMON CRITIQUE

**60.**    The two main issues litigated in the hearing pertained to patient outcomes, and whether Kaul was qualified to perform minimally invasive spine surgery.

**Deleted:** presented between April 9, 2013 to June 28, 2013.

**61.**    Defendants Przybylski and Kaufman, who competed locally with Kaul, provided knowingly false testimony, on June 13, 2012, when they testified against Kaul in a hearing before the medical board in Trenton. Defendants Przybylski and Kaufman repeated their false testimony in April 2013, when they testified against Kaul in the OAL proceedings in Newark. The latter proceeding resulted in the revocation of Kaul's license. Defendants Kaufman and Przybylski took an oath, and then lied, REFERENCE SOLOMON CRITIQUE

**Deleted:** with impunity

**Deleted:** .

### C.    The Coburn Opinion

**62.**    On January 24, 2012, at the conclusion of Jarrell v Kaul (MRS-L-2634-07) Judge Coburn, sitting in the Morris County Superior Court, Morristown New Jersey rendered an opinion, the substance of which is detailed in paragraph xxx, The opinion directly contradicts the testimony given on June 13, 2012 and in April 2013, by Defendant Przybylski, regarding what constitutes the standard of care.



**Deleted:** ,

**Deleted:**

**Deleted:** 74

**Deleted:**

6

### D.   Santos v Kaul

63.   The Third Party Claims in this matter were dismissed without prejudice on July 21, 2017, pursuant to NJ. Court Rules 1:13-7 or 4:43-2, for lack of prosecution. However, the Court in December 2016 and February 2017, quashed deposition and document subpoenas issued by the Plaintiff to Third Party witnesses, on the basis, incorrectly, of the res judicata and collateral estoppel effect of the federal action. The Plaintiff explained to the Court that there had been no judgment in the federal matter, and that the preclusion doctrines were inapplicable. The argument was met with silence,

64.   The subpoenas were directed to multiple neurosurgeons and a member of the medical board, Jacqueline Degregorio, who had voted on June 13, 2012 against the rescinding of the consent agreement into which the Plaintiff and the medical board had entered on May 9, 2012. The State Court, or rather Judge Kenneth Grispin, blocked the Plaintiff's efforts to gather further evidence, and deferred the claims to the federal court. The dismissal of the claims for lack of prosecution means that the Defendants cannot summon the Colorado River Abstention Doctrine.

Deleted: --

Deleted: --

Deleted: nes were thus inapplicable.

Deleted: indment

Deleted: ,

Deleted: ,

Deleted: d

Deleted: <#>Details of the actual outcomes for patients, whose clinical histories were misrepresented in the OAL proceedings, and other facts pertinent to these patients Testified

Formatted: Font color: Red

Formatted: Font color: Red

7

**Kaul's qualifications for, and successful outcomes in, Minimally Invasive Spine Surgery**

95.  Dr. Richard Arjun Kaul is a minimally invasive spine surgeon, who graduated in 1988 from the Royal Free Hospital School of Medicine in London, after which he underwent eight years of post-graduate training in the US and UK, in the fields of general surgery, anesthesiology, interventional pain and minimally invasive spine surgery.

96.  In August 1996 Kaul became licensed to practice medicine and surgery in New Jersey.

97.  In September 1996 Kaul became board certified by the American Board of Anesthesiology.

98.  From 2002 to 2012 performed eight hundred (800) minimally invasive spine surgeries and a total of six thousand spine procedures, with good to very good outcomes in 90--95% of case and a complication rate of 0.1%.

99.  From 1992 to 2001 Kaul administered approximately ten thousand anesthetics, with one mortality.

100.  In 2005 Kaul performed the first outpatient minimally invasive lumbar fusion (Ref # 5), and in 2011 Kaul performed the first outpatient corrections of an adolescent spondylolisthesis (Ref # 8) and a multi---level degenerative scoliosis (Ref # 9).

101.  From 2003 to 2012 Kaul was credentialed by at least six state licensed surgical centers to perform minimally invasive spine surgery.

102.  From 2002 to 2012 Kaul attended approximately eighty spinal hands on cadaver training courses, and educated numerous physicians in the minimally invasive spinal technique.

103.  Defendant Przybylski commenced performing minimally invasive spine surgery in 2005, three years after Kaul.

104.  In 2004 Kaul became board certified by the American Academy of Minimally Invasive Medicine and Surgery.

105.  None of the Physician Defendants are board certified by the American Academy of Minimally Invasive Spinal Medicine and Surgery

106.  In 2008 Kaul established the Spine Africa Project, a 501 (c) 3 US based charity whose mission is to provide free healthcare and education to impoverished communities in Africa, India and the US (Ref. # 6).

8

107. On June 22, 2009 an independent arbitrator entered a judgment (NJSR a/s/o Frances
Kuren v Palisades Ins.-Forum File No. NJ1232047) against Palisades Ins. and awarded Kaul his fee
for having performed a minimally invasive spinal fusion on patient FK. The arbitrator found that
Kaul was properly licensed, the procedure was properly performed and was medically
necessary. Significantly the arbitrator found, after a review of all of the clinical evidence, *"Dr.
Kaul recommended pain management intervention followed by surgical intervention. The
course of treatment performed by Dr. Kaul was consistent with the clinically supported
symptoms, diagnosis and indications of the patient. Dr. Kaul's treatment plan was the most
appropriate level of service that is in accordance with the standards of good practice and
standard professional treatment protocols"*. Kaul utilized the same treatment algorithms on all
of his patients.

108. On March 3, 2011 Kaul opened NJSR Surgical Center, a Medicare certified, AAAHC
accredited facility in Pompton Lakes, New Jersey, in which Kaul was credentialed to perform
interventional spinal procedures and outpatient minimally invasive fusions and discectomies.

109. Kaul's practice grew three hundred percent from March 2011 to April 2012, and he
increasingly performed cases on an outpatient basis, that although termed 'complex' by
neurosurgeons, proved to be simple because of the surgical techniques employed by Kaul

110. Kaul's reputation in the field of minimally invasive spine surgery grew steadily from 2002,
and he frequently taught his technique to other physicians, who observed him in the operating
room and attended hands---on cadaver training courses he tutored. The referenced video [Ref #
7] was presented at the medical board hearing on June 13, 2012 by DAG Hafner, as evidence,
incredulously, of Kaul's alleged malfeasance. A procedure is done perfectly, the patient gets
better, and the Plaintiff is criticized.

#### State Misconduct + Forged Transcripts + Fraudulent OAL Opinion

111. In early January 2012 two inspectors from the state made an unannounced visit to NJSR
Surgical Center, the purpose of which they concealed from Dr. Kaul, as they interviewed Dr.
Kaul's staff and collected evidence. The inspectors presented no warrants. The Court is correct

Deleted: --

Deleted: o

9

in asserting that the proceedings were quasi-criminal, but the investigators did not inform Kaul
or his staff of their rights, before they commenced their interviews and gathering of evidence.

112. On April 2, 2012 the defendant medical board filed a complaint to suspend or revoke
Kaul's license.

113. On May 9, 2012 Kaul signed an interim consent order with the board, in which he agreed,
pending the outcome of a full hearing, to limit his practice to interventional spinal procedures.
The order permitted Kaul to apply for minimally invasive spine privileges at a hospital, and on,
or about May 16, 2012, Kaul submitted an application to a local hospital.

114. On May 9, 2012 AG Chiesa made prejudicial comments to the media that Kaul was not
qualified to perform minimally invasive spine surgery.

115. On May 22, 2012 the Acting Director of the Division of Consumer Affairs, Eric Kanefsky,
unilaterally and without due process suspended Kaul's CDS prescribing privileges, an act that
prevented Kaul from practicing medicine entirely.

116. Kaul indicated that unless the CDS license was reinstated, he would initiate legal action.
Kanefsky retaliated by filing a motion on May 29, 2012 to rescind the consent order, based on
false allegations that Kaul had not modified his website and complied with a subpoena request.

117. Kaul filed an application on June 7, 2012 in the Mercer County Superior Court that
requested the appointment of a special prosecutor and ad hoc medical board. The application
was denied, as was the subsequent appeal.

118. On June 13, 2012 Kanesfsky's motion to rescind the consent order was granted by the
medical board, and Kaul's license was suspended. The suspension occurred after a hearing in
Trenton at the medical board, and was based on false allegations that Kaul had not changed his
website or responded to a request for documents. DAG Hafner played a video of a patient, who
had improved after Kaul performed a successful minimally invasive outpatient lumbar fusion.
[Ref # 10]. Hafner considered the video evidence that Dr. Kaul had deviated from Defendant
Przybylski's fictitious standard of care, a standard that he admitted on May 6, 2013 did not
exist. However, it mattered not to Hafner that the patient improved, because she must have
held the same view that Defendant Lomazow expressed at the end of his 2014 video interview,
which is that patients *"know nothing"* [Ref # 11].



10

119. On December 20, 2012 the state issued a cease and desist letter to Kaul that ordered him to close the NJSR Surgical Center. Subsequent to the suspension of Kaul's license, other physicians had been performing procedures at the facility. Kaul appealed the order, which was stayed pending the outcome of the licensure proceedings.

120. On April 9, 2013 the hearing commenced in the New Jersey Office of Administrative Law.

121. On the days that Defendant Przybylski testified, Kaul requested that an independent transcriptionist record the proceedings.

122. In support of their case, the state relied on eleven (11) patients, whom they alleged had sustained complications consequent to surgeries performed by Kaul. Only six (6) patients actually testified, but the administrative court permitted defendant Przybylski's testimony about the other five patients to be entered onto the record. This testimony was subsequently used by the court as part of the basis for the revocation of Kaul's license. Kaul was denied the opportunity to examine these five patients.

123. There were twenty-three (23) days of testimony that concluded on June 28, 2012.

124. Kaul, upon becoming aware that the attorney general had forged court transcripts, sent a series of letters in September 2013 to numerous parties (ECF # 179-1 + 179-2).

125. On September 16, 2013 Kaul filed an ethics complaint against Hafner, which he brought to Keating's attention in 2014, when he suggested that Hafner should have no involvement in Kaul's application for license reinstatement. Keating dismissed Kaul's concerns, despite the fact that Hafner had used prejudicial and perjorative terms in her opposition to Kaul's application.

126. On September 23, 2013, one of Kaul's patients, Corey Johnson, filed a complaint against Defendant Kaufman with Defendant Gonzalez, who was then the president of Rutgers University Hospital. Johnson described how Kaufman had publicly slandered and defamed Kaul in an operating room at the hospital, just before he performed a spinal procedure on Johnson.

127. On Sunday November 17, 2013 the Bergen Record published a six thousand (6000) word article, written by defendant Washburn, in which Kaul's appearance was defamed with references to his *"frayed wallet ... lace less shoes"*, and his *"upper crust British accent"*.

128. Within the last eight (8) months, the Defendants have removed these articles from the internet.

Deleted: –
Deleted: ,
Deleted: ,
Deleted: –
Deleted: –
Deleted: four

129. After the Washburn article a number of Dr. Kaul's patients provided a video response (Ref # 12).

130. On December 13, 2013 the Administrative Law Judge issued an opinion, in which he recommended Kaul's license be revoked.

131. On December 26, 2013 Kaul sent a letter to the Administrative Law Judge in regards, to the story published on November 17, 2013 in the Bergen Record.

132. On January 5, 2014 Kaul sent a letter to President Obama that sought the assistance of the federal government to investigate the forged transcripts.

133. On January 9, 2014 Kaul sent a letter to Defendant Washburn that requested a copy of the audio recording of the interview she had conducted with Kaul on August 13 2013, at the commencement of which she acknowledged that the transcripts had been forged.

134. On or about January 22, 2014, senior medical board member, Steven Lomazow gave an interview, in which he discussed the events of his eight-year tenure at the New Jersey Board of Medical Examiners. During the interview he suggested that Dr. Kenneth Zahl was responsible for the death in 2006 of Deputy Attorney General, Paul Kenny, and described his interactions with Zahl. The interview concludes with Lomazow's scathing description of the patients who had come to support Zahl (time segment 2:10 – 2:18) (Ref # 11)

135. On February 6, 2014 Kaul sent a letter to the medical board, in which he stated that he would not attend its hearing on February 12, 2014, and in which he raised the issue of forged transcripts and Defendant Kaufman's defamatory conduct. The medical board failed to have an independent investigation conducted, and on March 24, 2014 revoked Kaul's license. The medical board attempted to minimize the issue of forged court transcripts, and did not investigate Defendant Kaufman's defamatory conduct.

136. On January 29, 2015 Kaul filed a complaint with the US Attorney for the District of New Jersey that sought an investigation into the forged transcripts. Two weeks after Kaul had filed the complaint, he telephoned the office of the US Attorney to ascertain the status of the complaint and was told, *"We are not an investigative agency"*. Kaul had initially approached the FBI, but had been referred to the US Attorney.

Deleted: administrative law court issued an opinion, in which it revoked Kaul's license.

Deleted: a

Deleted: l

Deleted: j

Deleted: ,

Deleted: d

Deleted: Defendant

Deleted: --

Deleted: the

Deleted: defendant

Deleted: defendant

Deleted: defendant

Deleted: ,

12

137. In 2015 Kaul submitted multiple letters to the New Jersey Attorney General, the US Attorney and insurance carriers, that sought their assistance in retrieving a copy of his medical board file, and investigating the forged transcripts and illegal audio recording.

138. A letter was also sent on November 11, 2015 to the International Criminal Court, regarding the Governor of New Jersey and ex US Attorney, Christopher J. Christie. Kaul received a response from the Chief Prosecutor on August 15, 2017, a copy of which was sent to NJ Gubenatorial candidate, Philip Murphy, as part of a request to initiate an official investigation, pursuant to Section 2C:38K 3 of the NJ Code of Criminal Justice, should Murphy become the next Governor. The letter was sent on October 16, 2017.

139. The Defendants are accused of funding Governor Christie's political activities, through a pattern of racketeering.

140. In May 2016, Christie's administration, after having been named as a defendant in Kaul v Christie, filed a retaliatory action against Kaul in Mercer Country Court regarding alleged unpaid state taxes.

141. On September 15, 2016 Kaul made an unannounced visit to J. H. Buhrer, the company employed by the state to transcribe the 2013 OAL licensure proceedings. Kaul interviewed its owner.

142. On September 21, 2016 Kaul was arrested at 1:30 am by eight (8) armed officers from the Somerset County Probation Department, on a warrant for unpaid child support.

143. In October 2016 Kaul submitted a request with the Court that sought permission to file a TRO and injunction against the state, pending the outcome of the federal proceedings.

144. The Court's opinion of June 30, 2017, on page 48, footnote 38, references three cases that pertain to the intersection of RICO allegations, and the doctrines of absolute and qualified immunity. Cullinan v Abramson, 128 F.3d 301 (6th Cir. 1997), Van Beek v AgK Credit Bonus Ptnrs., 316 F. App'x 554 (9th Cir. 2008) and Parette v Virden, 173 F App'x 534, 536 (8th Cir. 2006). Two of the citations are in the Federal Appendix, and all three are devoid of any allegations that the Defendants **forged, tampered with, and altered court transcripts.**

145. None of the State Defendants ever denied these allegations, but Defendant Geico did in their supplemental brief. The fact that Defendant Geico, a private corporation, stated as fact,

Deleted: ,

Deleted: ,

13

that the transcripts had not been altered, has raised the question of how they came to know. It

is also, the Plaintiff suggests, evidence of the hand-in-glove relationship with the government,

the corrupt nature of which, underpins the subject matter of this case.

146.   Commencing in approximately August 2017, Kaul initiated a detailed analysis of the

opinion issued on December 13, 2013 by OAL Judge Howard Solomon, in which he cross

referenced the document with the trial transcript. The analysis is contained within 'The

Solomon Critique', and proves that there were two hundred and seventy-eight (278) separate

instances of perjury, misrepresentation, evidential omissions and gross mischaracterizations

collectively committed by New Jersey Administrative Law Judge, Jay Howard Solomon and

Defendants Przybylski and Kaufman.

## VI.    CLAIMS FOR RELIEF

**COUNT ONE**
**VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)**
**THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ.**
**(By Plaintiff against Defendants Kaufman + Przybylski + Heary + Mitchell + Staats + CNS +**
**ASIPP)**
**The CAC RICO Association–in–fact–Enterprise**

147. Plaintiff incorporates by reference each preceding paragraph as though fully set forth

herein.

148. Plaintiff brings this Count against Defendants Kaufman + Przybylski, + Heary + Mitchell +

Staats + CNS + ASIPP (inclusively, for the purpose of this count, the "CAC RICO Defendants').

At all relevant times each of the CAC RICO Defendants has been a "person" under 18 U.S.C. §

1961(3), because each is capable of holding, and does hold, "a legal or beneficial interest in

property." Section 1962(c) makes it "unlawful for any person employed by or associated with

any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

a pattern of racketeering activity." See 18 U.S.C. § 1962(c).

149. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c),

among other provisions. See 18 U.S.C. § 1962(d).

14

150. As explained in detail below, the CAC RICO Defendants sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing.

151. The CAC RICO Defendants pursued these ends through a fraudulent scheme designed to secure increased revenues and market share, increase their political power within the medical community and secure their commercial relationships with each other. As explained in detail below, the CAC RICO Defendants years-long misconduct violated sections 1962(c) and (d).

**A. Description of the CAC RICO Enterprise**

152. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural fe (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

153. For years ASIPP played a small but meaningful role in the emerging field of minimally invasive spine surgery. It entered into verbal agreements with the neurosurgical members' of Defendant CNS, from whom its members were referred patients. The horizontal agreement required that members of Defendant ASIPP would artificially limit their members' scope of practice to percutaneous discectomies.

154. In the past decade, however, Defendant ASIPP began to exert influence in their role as the arbiters of who was qualified to perform minimally invasive spine surgery, to influence the success or failure of high profile interventional pain physicians who did not contribute financially to ASIPP, but who had expanded their scope of practice. Defendant ASIPP, because of its horizontal agreements with Defendant CNS and other spine societies, sought to control who entered the interventional pain and minimally invasive spine surgery sector.

Formatted: Font:12 pt

Formatted: Normal, No bullets or numbering

Deleted: and for Defendant Kaufman, a desire to satisfy a bizarre personal animus towards the Plaintiff

Deleted: eatures:

Deleted: wanted

15

155. Negotiations between Defendants ASIPP and CNS regarding the division of the spine market, took place in complex, closed-door meetings, during which the parties discussed the threat of the Plaintiff's expanding outpatient minimally invasive spine surgery practice. In order to ensure that their members continued to receive referrals from the neurosurgeons who had become concerned that the Plaintiff's practice would expand nationally, Defendant ASIPP agreed to participate in a scheme with the neurosurgeons to have the Plaintiff's medical license revoked, and stop him from performing minimally invasive spine surgery. The Defendant Neurosurgeons had become aware that the Plaintiff was training other minimally invasive spine surgeons, and that his work was being widely publicized.

156. At all relevant times, the CAC RICO Defendants operated an ongoing association-in-fact enterprise, which was formed for the purpose of ensuring that that the horizontal agreements and market share distributions of the other CAC RICO Defendants continued to grow, by fraudulently excluding the Plaintiff, monopolizing the market and then artificially increasing their prices. Most of these meetings occurred behind closed doors in Morris County, NJ and Washington, D.C. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4)

157. Alternatively, each of the CAC RICO Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the CAC RICO Defendants conducted their pattern of racketeering activity. The CAC RICO Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the CAC RICO Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CAC RICO Enterprise"

158. At all relevant times, the CAC RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated- in-fact for the common purpose of engaging in the CAC RICO Defendants profit making scheme, and the fraudulent scheme to provide 'experts' to ensure the revocation of the Plaintiff's license.

16

159. The association-in-fact CAC RICO Enterprise consisted of the following entities and individuals: (a) Defendants ASIPP, Kaufman and Staats; (b) Defendants CNS, Heary, Przybylski and Mitchell.

160. While each of the CAC RICO Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CAC RICO Enterprise's affairs, at all relevant times, the CAC RICO Enterprise: (a) had an existence separate and distinct from each CAC RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the CAC RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CAC RICO Defendants, along with other individuals and entities, including unknown third parties.

161. The CAC RICO Defendants and their co-conspirators, through their illegal CAC RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CAC RICO Enterprise's activities by illegally conspiring to have the Plaintiff's license revoked, protecting their illegal horizontal 'fusion-percutaneous' agreements, monopolizing the markets, artificially elevating their prices, and illegally reducing competition.

162. Defendants Staats, Kaufman, Przybylski, Heary and Mitchell orchestrated the CAC RICO Scheme, whereby they leveraged their dominant political position to have the Plaintiff's medical license revoked. The purpose of the Scheme which was to eliminate competition and facilitate the Defendant Neurosurgeons monopolization of the minimally invasive spine surgery market, from which Defendants Kaufman and Staats profited through increased referrals from the Defendant Neurosurgeons.

163. The CAC RICO Enterprise was provided with the use of state agencies, personnel and resources, which they illegally used to revoke the Plaintiff's license. These services were provided in return for bribes and 'campaign donations' paid by the CAC RICO Defendants.

164. In furtherance of the scheme, Defendants Kaufman, Staats, Heary, Przybylski and Mitchell each affirmatively misrepresented or concealed from their members, the existence of bribes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. These Defendants understood that if the general members became aware of the scheme, they would have passed a vote against it, realizing the liability it would incur. Specifically, these Defendants

**Deleted: ,**

**Deleted: ere**

17

claimed that the monies paid to Governor Christie, were intended to assist them in their efforts to counter pending fee reductions from the Defendant Insurance Carriers, when, in fact, they were quid pro quo payments to Governor Christie to have the Plaintiff's license revoked. The majority of ASIPP and CNS members were not direct commercial competitors of the Plaintiff, as were defendants Kaufman, Staats, Heary, Przybylski and Mitchell, all of whom competed for patients from the same pool. i.e. New Jersey.

### B. The CAC RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

165. Each CAC RICO Defendant benefited financially from the CAC RICO Enterprise, as they took on the treatment of patients that had been under the care of the Plaintiff. In addition, Kaufman and Staats, for their cooperation with the scheme, received more referrals from Heary, Przybylski and Mitchell. The increased patient flow led to increased revenues, and the perception within the medical community of their increased political power, which caused an increase in referrals from community physicians.

166. In exchange for the bribes paid by Defendants Staats and ASIPP, one of Staats's partners was appointed to the medical board, a position he used to block the Plaintiff's application in 2014 for license reinstatement.

167. At all relevant times, the CAC RICO Enterprise: (a) had an existence separate and distinct from each CAC RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the CAC RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CAC RICO Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise, which was formed for the purpose of bribing Governor Christie, in order to have the medical board revoke the Plaintiff's license. The revocation led to an increase in revenue to the CAC RICO Defendants, but not necessarily to the general members of ASIPP and CNS.

168. The CAC RICO Defendants, as well as Defendant Staats's partner, Metzger, all consult for the insurance industry, and regularly provide opinions that deny payment to other physicians, for services for which they themselves are reimbursed.

18

169. The CAC RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries. These activities included the marketing, promotion, advertisement and delivery of minimally invasive spine surgery throughout the country, and the receipt of monies from the provision of such services.

170. Within the CAC RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The CAC RICO Enterprise used this network for the purpose of promoting the revocation of the Plaintiff's license, in order to intimidate other minimally invasive spine surgeons into not performing minimally invasive spinal fusions. The network was also used to attack the Plaintiff's character, and disseminate false allegations that he had engaged in insurance fraud. The falsity of these latter claims was proved when Defendant Geico's lawsuit filed in the DNJ on April 27, 2013, was dismissed with prejudice on December 8, 2014.

171. Each participant in the CAC RICO Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CAC RICO Enterprise, the CAC RICO Defendants functioned as a continuing unit with the purpose of furthering the CAC RICO Scheme. The CAC RICO Defendants participated in the operation and management of the CAC RICO Enterprise by directing its affairs, as described herein. While the CAC RICO Defendants participated in, and are members of the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

172. The CAC RICO Defendants exerted substantial control over the CAC RICO Enterprise, and participated in the affairs of the enterprise by: (a) deciding how monies were dispersed from the political action committees; (b) communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Governor Christie, and members of both state and federal governments; (c) developing policies and guidelines for clinical care, that were consistent with the horizontal agreements and market share plans; (d) procuring appointments to regulatory boards and insurance panels, which they used to further their personal economic agendas; (e) procuring positions on hospital credentialing committees, which they used to

19

exclude competition from the hospital; (f) procuring positions on medical expert panels, which they used to testify against their competition in medical malpractice suits; (g) misrepresenting and/or concealing from the general members the true nature of the relationship and agreements between the members of the enterprise and the scheme in their conspiracy to have the Plaintiff's license revoked ; (h) otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; (i) ensuring that the other CAC RICO Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

173. Without each CAC RICO Defendants' willing participation, the CAC RICO Scheme and common course of conduct would not have been successful. The CAC RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

### C. Predicate Acts: Mail and Wire Fraud

174. To carry out, or attempt to carry out, the scheme to defraud, the CAC RICO Defendants, each of whom is a person associated-in-fact with the CAC RICO Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CAC RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

175. Specifically, the CAC RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

176. The multiple acts of racketeering activity which the CAC RICO Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CAC RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the CAC RICO Enterprise. The CAC

20

RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

177. The CAC RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

178. In devising and executing the illegal scheme, the CAC RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public and the Plaintiff's patients, that the Plaintiff was not qualified to perform minimally invasive spine surgery, a materially false representation. For the purpose of executing the illegal scheme, the CAC RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

179. The CAC RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:

(a) Mail Fraud: The CAC RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to revoke the Plaintiff's medical license by means of misrepresentations and omissions.

(b) Wire Fraud: The CAC RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

180. The CAC RICO Defendants' use of the mails and wires include, but are not limited to: (a) the transmission of letters, e-mails and other materials negotiating the horizontal agreements and market share distributions; (b) the transmission of letters, emails and other materials indicating that the CAC RICO Defendants had instructed their members not to support the Plaintiff in any litigation; (c) written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; (d) written, telephone, or electronic communications instructing its members not to support the Plaintiff in any litigation; (e)

21

written, telephone, or electronic communications regarding discussions between the CAC RICO
Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license;
(f) the use of the mails or wires to bill for or collect the increased revenues that flowed from the
elimination of the Plaintiff from the practice of medicine.

181. The CAC RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by
interstate electronic mail with every state licensing board, the Federation of State Medical
Boards, the American Board of Anesthesiology, the General Medical Council of the United
Kingdom, and other healthcare related third-party entities in furtherance of the scheme.
The mail and wire transmissions described herein were made in furtherance of Defendants'
scheme and common course of conduct designed to increase the revenues that flowed from
the elimination of the Plaintiff from the practice of medicine.

182. Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities
have been deliberately hidden, and cannot be alleged without access to the Defendants'
servers and digital records. However, Plaintiff has described the types of, and in some
instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They
include thousands of communications to perpetuate and maintain the scheme, including the
things and documents described above.

183. The CAC RICO Defendants have not undertaken the practices described herein in isolation,
but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CAC
RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other
persons, firms, and corporations, including third-party entities and individuals not named as
defendants in this Complaint, have participated as co-conspirators with the CAC RICO
Defendants in these offenses. They have performed acts in furtherance of the conspiracy to
increase revenues, increase market share, and or minimize losses for the Defendants and their
unnamed co-conspirators, through the illegal scheme and their common course of conduct.
The CAC RICO Defendants aided and abetted others in violation of the above laws

184. To achieve their common goals, the CAC RICO Defendants encouraged patients to file
lawsuits against the Plaintiff, filed complaints with state and federal healthcare regulatory

22

authorities, instructed their members to discontinue communications with the Plaintiff and encouraged the media to publish defamatory articles.

185. The CAC RICO Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the CAC RICO Defendants and their co-conspirators had to agree to conceal their fraudulent scheme and illegal tactics. The CAC RICO Defendants knew, and intended that Plaintiff's patients and business network, would rely on the material misrepresentations and omissions made by them and would cease treating and engaging in healthcare commerce with the Plaintiff.

186. The CAC RICO Defendants engaged in this pattern of related and continuous predicate acts against the Plaintiff for eight years. The predicated acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus eliminating the competition he presented, and increasing the CAC RICO Defendants revenues. The predicate acts were related and not isolated events.

187. During the CAC RICO Defendants' perpetration of their scheme, the true purpose of the fraudulent nature of their racket, to increase revenues through the elimination of the Plaintiff from the practice of medicine, was revealed to each of the CAC RICO Defendants. Nevertheless, in furtherance of their scheme, the CAC RICO Defendants continued to disseminate falsehoods that the Plaintiff was not qualified to perform minimally invasive spine surgery.

188. By reason of, and as a result of the misconduct of the CAC RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his medical practice and/or property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of his children's home and the fracturing of his relationship with his children.

189. The CAC RICO Defendants' violations of 18 U.S.C. §1962(c) and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c)

Deleted: ©

23

**COUNT TWO**
**VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)**
**THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961 ET SEQ**
**(By Plaintiff against Defendants Allstate + Geico + TD + Kothari)**
**The CAGTK RICO Association-in-Fact Enterprise**

190. Plaintiff incorporates by reference each preceding paragraph as though fully set forth
herein.

191. Plaintiff brings this Count against Defendants Allstate + Geico + TD + Kothari (inclusively,
for the purposes of this Count, the "CAGTK RICO Defendants")

192. At all relevant times the CAGTK Defendants have been "persons" under 18 U.S.C. §1961(3)
because they are capable of holding, and do hold, "a legal or beneficial interest in property."
Section 1962(c) makes it "unlawful for any person employed by or associated with any
enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to
conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through
a pattern of racketeering activity." 18 U.S.C. § 1962(c).

193. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c),
among other provisions. See 18 U.S.C. § 1962(d).

194. As explained in detail below, the CAGTK Defendants sought, amongst other things, to
eliminate the Plaintiff from the practice of medicine, destroy his reputation in the field of
minimally invasive spine surgery and destroy his economic standing. The purpose of their
scheme was to manufacture an excuse to avoid paying the Plaintiff's bills for the minimally
invasive spine surgeries he had performed on customers of CAGTK Defendants, Allstate and
Geico. The CAGTK RICO Defendants sought to achieve these ends, so that that the Plaintiff
would leave the country, and not litigate the CAGTK RICO Defendants wrongful conduct. The
CAGTK RICO Defendants pursued these ends through a fraudulent scheme of bribes and
kickbacks that were designed to secure increased revenues, an increased NYSE share price,
increased political power over state legislators, increased market-share of the banking and
insurance sector, and the manufacture of anticompetitive case law advantageous to their
commercial agendas. As explained in detail below, the CAGTK RICO Defendants' years-long
misconduct violated sections 1962(c) and (d).

24

### D. Description of the CAGTK RICO Enterprise

195. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural 㐀 (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

196. The CAGTK RICO Defendants have, through the increased revenue generated through their decades old scheme of kickbacks and bribery, increased their control of the state government, its agencies, its legislature and certain members of its judiciary. This permitted them to exert control over the mechanism of physician regulation, to revoke the Plaintiff's medical license. The excuse given by the medical board to revoke the Plaintiff's license was that he had, according to Defendants Przybylski and Kaufman, deviated from a standard of care, a standard that they ultimately admitted did not exist. The real reason for the revocation was their desire to avoid their financial obligations to the Plaintiff. Discussions between the CAGTK RICO Defendants regarding the Plaintiff's invoices for minimally invasive spine surgery, took place in complex, closed-door meetings, during which the parties discussed the threat to their corporate profits, of the Plaintiff's expanding outpatient minimally invasive spine surgery practice.

197. In order to ensure that their corporate profits were not affected by the increasing commercial success of the Plaintiff's minimally invasive spine surgery practice, and the expanding number of minimally invasive spine surgeons being trained by the Plaintiff, the Defendant insurance carriers co-orchestrated a scheme, with the other CAGTK RICO Defendants to have the Plaintiff's medical license revoked. As part of the scheme the defendant insurance carriers disseminated false information within the medico-legal community, that the Plaintiff had committed insurance fraud. This was done in order to discredit the Plaintiff and isolate him from his colleagues and patients. The clinical and commercial success of the Plaintiff's practice was a consequence of his ability to operate efficiently, due to his advanced skills in the use of Fluoroscopic Guidance and Interpretation (FGI), which permitted him to place needles, probes,

25

dilators and surgical instruments more precisely than his competitors. Similarly, the Plaintiff's practice grew through word of mouth, and the success was directly related to his low complication rate (0.1%) and above average outcomes (good to very good in 90-95% cases). The scheme to maintain and increase the profits of the defendant insurance carriers through the elimination of the Plaintiff's practice, benefited the shareholders, the corporate executives, corrupted members of the political and legal establishment, and the middle men, through whom the CAGTK Defendants funneled bribes.

198. At all relevant times the CAGTK Defendants operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that the fraudulent scheme to have the Plaintiff's license revoked was perpetrated to its conclusion. A large majority of these meetings occurred behind closed doors in Newark and Trenton, many of which were attended by members of the Office of the New Jersey Attorney General, and most frequently DAG Doreen Hafner. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4)

199. Alternatively, each of the CAGTK Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the other Defendants conducted their pattern of racketeering activity. The CSAGTK Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the other Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CAGTK Enterprise"

200. At all relevant times, the CAGTK RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated –in-fact for the common purpose of engaging in the CAGTK Defendants profit making scheme, and the fraudulent scheme to corrupt state agencies and actors to ensure the revocation of the Plaintiff's license.

201. The association-in-fact CAGTK Enterprise consisted of the following entities and individuals: (a) Defendant Allstate New Jersey Insurance Company; (b) Defendant GEICO; (c) Defendant TD Bank; (d) Defendant Divyesh Kothari

26

202. While each of the CAGTK Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CAGTK Enterprise's affairs, at all relevant times, the CAGTK Enterprise: (a) had an existence separate and distinct from each CAGTK Defendant; (b) was separate and distinct from the pattern of racketeering in which the CAGTK Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CAGTK Defendants, along with other individuals and entities, including unknown third parties.

203. The CAGTK Defendants and their co-conspirators, through their illegal CAGTK RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CAGTK Enterprise's activities by conspiring to have the Plaintiff's license illegally revoked, in order to manufacture an excuse to not pay the Plaintiff monies for the provision of minimally invasive spine surgery. The CAGTK RICO insurance carrier Defendants used the revocation of the Plaintiff's license as a basis to deny payment to other similarly trained minimally invasive spine surgeons.

204. Allstate and Geico orchestrated the CAGTK RICO Scheme, whereby they leveraged their dominant political position with the medical board to have the Plaintiff's medical license revoked. The purpose of the Scheme which was to eliminate the Plaintiff from the practice of medicine, and thus eradicate their debt and eliminate any future financial liability that would have developed had the Plaintiff continued to practice minimally invasive spine surgery. The CAGTK RICO Defendants knew that the Plaintiff planned to open a four operating room state licensed surgical center in New Jersey, and had plans to expand nationally.

205. AG Chiesa provided the CAGTK RICO Enterprise with the use of state agencies, personnel and the resources necessary to revoke the Plaintiff's license. These services were provided in return for bribes and monies disguised as 'campaign donations' to the Governor Christie. The monies were part of a quid pro quo scheme, not protected by Noerr Pennington, in which there was an explicit understanding that the bribes were payment for the revocation of the Plaintiff's license.

206. In furtherance of the scheme, the CAGTK RICO Defendants each affirmatively misrepresented or concealed from their shareholders, the existence of bribes, and the

27

fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. The Defendants understood that if the shareholders became aware of the scheme, they would have passed a vote against it, realizing the liability it would incur. Specifically, the CAGTK RICO Defendants claimed that the bribes paid were intended to assist them in their legislative efforts, when in fact they were quid pro quo payments to Governor Christie to have the Plaintiff's license revoked.

Deleted: ,

### E. The CAGTK RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

**207.** Each CAGTK RICO Defendant benefited financially from the CAGTK RICO Enterprise. The Defendant Insurance Carriers eliminated past debt, and future liability. Defendants TD and Kothari were rewarded with regulatory favors, not offered to their banking competitors, that led to increased profits, increased executive compensation and an increased NYSE share price. Governor Christie acquired funds for his political campaigns

**208.** As part of a quid pro quo that existed within the CAGTK RICO Enterprise, Governor Christie, discouraged his department of banking and insurance from enforcing regulatory violations against Defendant TD. This was in return for Defendant TD and Kothari's acts of foreclosing in 2012, on the Plaintiff's surgical center loans, attempting in 2013 to impede the sale of his Manhattan townhouse, and causing in 2013 a receiver to seize control of his businesses. The latter event precipitated the filing by the Plaintiff on June 17, 2013, for Chapter 11 protection. This caused many of Dr. Kaul's employees, a large percentage of whom were single mothers, to become unemployed and lose their health insurance [Ref # 13].
This has resulted in vast profits for the CAGTK RICO Defendant, that, but for their involvement in the quid pro quo, would not have occurred.

**209.** At all relevant times, the CAGTK RICO Enterprise: (a) had an existence separate and distinct from each CAGTK RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the CAGTK RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CAGTK RICO Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise, which was formed for the purpose of bribing Governor Christie.

28

The purpose of the bribery was to have him order the medical board to revoke the Plaintiff's license, a consequence of which was an increase in revenue to the CAGTK RICO Defendants, that did not, however, result in lower insurance and banking fees to the public.

210. The CAGTK RICO Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CAGTK RICO Defendants and other entities and individuals associated-in-fact with the Enterprise's activities through their illegal scheme to have the Plaintiff's license revoked, and profit from the increased revenues that flowed from the eradication of past debt and the elimination of future liability. The CAGTK RICO Defendants, comprise a group of "persons" who simultaneously regulate and profit from the New Jersey Banking and Insurance Sector.

211. The CAGTK RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the commercialization of risk, the lending of capital and the sale of financial products, the consequences of which generated enormous profits.

212. The CAGTK RICO Enterprise used their common communication network to promote false information that the Plaintiff was not qualified to perform minimally invasive spine surgery, had committed insurance fraud. Medicare fraud and bank fraud. The purpose of this propaganda campaign was to isolate the Plaintiff from the medico-legal community and any source of capital.

213. The CAGTK Defendants filed a complaint in 2013 with www.checksystems.com that prevented the Plaintiff access to banking services. Their misconduct caused the Plaintiff to become homeless, with a compromised economic position that hindered his ability to litigate the ongoing legal matters, and collect monies owed from the CAGTK RICO Insurance Carrier Defendants.

214. The falsity of the claims of insurance fraud was proved when Defendant Geico's lawsuit filed in the DNJ on April 27, 2013 was dismissed with prejudice on December 8, 2014.

215. The network was used to disseminate these falsehoods to the minimally invasive spine surgery community, in order to dissuade them from pursuing their accounts receivable. This permitted the CAGTK RICO Insurance Carrier Defendants to improperly profit from a scheme polluted with bribes, fraud, kickbacks, obstruction of justice, perjury and forged transcripts.

29

216. Each participant in the CAGTK RICO Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CAGTK RICO Enterprise, the CAGTK RICO Defendants functioned as a continuing unit with the purpose of furthering the CAGTK RICO Scheme.

217. The CAGTK RICO Defendants participated in the operation and management of the CAGTK RICO Enterprise by directing its affairs, as described herein. While the CAGTK RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements. The CAGTK RICO Defendants exerted substantial control over the CAGTK RICO Enterprise, and participated in the affairs of the enterprise by: (a) deciding how monies were dispersed from the political action committees; (b) communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Governor Christie, and members of both state and federal governments; (c) developing policies, guidelines and fee schedules for clinical care, in which the CAGTK RICO insurance carrier Defendants colluded with other insurance market competitors to fix the prices of both auto insurance and the fees paid to healthcare providers; (d) procuring appointments to regulatory state agencies, which they abused to further their personal economic agendas; (e) writing healthcare related legislation; (f) funding state administered litigation against minimally invasive spine surgeons to whom they owed substantial monies; (g) misrepresenting and/or concealing from the public the true nature of the relationship and agreements between the members of the enterprise and the scheme to bribe Governor Christie in order to revoke the Plaintiff's medical license; (h) otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; (i) ensuring that the other CAGTK RICO Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

218. Without each CAGTK RICO Defendants' willing participation, the CAGTK RICO Scheme and common course of conduct would not have been successful.

30

**219.** The CAGTK RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

### F. Predicate Acts: Mail and Wire Fraud

**220.** To carry out, or attempt to carry out, the scheme to defraud, the CAGTK RICO Defendants, each of whom is a person associated-in-fact with the CAGTK RICO Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CAGTK RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

**221.** Specifically, the CAGTK RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

**222.** The multiple acts of racketeering activity which the CAGTK RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CAGTK RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the CAGTK RICO Enterprise. The CAGTK RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

**223.** The CAGTK RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

**224.** In devising and executing the illegal scheme, the CAGTK RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public, the Plaintiff's patients and his professional colleagues, that the Plaintiff was not qualified to perform minimally invasive spine surgery and had committed insurance and bank fraud,

31

materially false representations. For the purpose of executing the illegal scheme, the CAGTK RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

225. The CAGTK RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:

(a) Mail Fraud: The CAGTK RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent and /or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of bribes and kickbacks, to have the Plaintiff's license improperly revoked, his reputation destroyed, eradicate debt, eliminate future financial liability and prevent other minimally invasive spine surgeons from collecting monies that they were owed. These ends were pursued by means of false representations and omissions.

(b) Wire Fraud: The CAGTK RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be received, materials by wire for the purpose of executing the unlawful scheme to defraud the Plaintiff of monies he was owed for the provision of minimally invasive spine surgery, based on false pretenses, misrepresentations that the Plaintiff was not qualified to perform minimally invasive spine surgery, and had committed insurance and bank fraud.

(c) The CAGTK RICO Defendants' use of the mails and wires include, but are not limited to: (a) the transmission of letters, e-mails and other materials regarding the price fixing of auto insurance policies and physician fee schedules; (b) the transmission of letters, emails and other materials indicating that the CAGTK RICO Defendants had advised the medico-legal community not to support the Plaintiff in any litigation; (c) written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; (d) written, telephone, or electronic communications instructing the medico-legal community not to support the Plaintiff in any litigation; (e) written, telephone, or electronic communications regarding discussions between the CAGTK RICO Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; (f) the use of the mails or wires to further

32

schemes to eradicate the CAGTK RICO Defendants' debt to the Plaintiff, and eliminate future liability; (g) the use of the mails and wires to instruct the Chapter 7 trustee not to pursue the monies owed to the Plaintiff's corporations, and creditors.

226. The CAGTK RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with every American state licensing board, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United Kingdom, and other healthcare related third-party entities in furtherance of the scheme, the purpose of which was to harm the Plaintiff's economic and reputational standing. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the elimination of the debt owed to the Plaintiff, and the eradication of future financial liability. Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

227. The CAGTK RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CAGTK RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CAGTK RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

228. The CAGTK RICO Defendants aided and abetted other in violations of the above laws

**Formatted:** Body Text, Right: 1.02", No bullets or numbering, Tabs:Not at 0.42"

**Deleted:** The CAGTK RICO carrier defendants did not refund the customers, who purchased personal injury protection, but whose bills were not paid to the Plaintiff by the CAGTK RICO Insurance Carrier Defendants.

33

To achieve their common goals, the CAGTK RICO Defendants encouraged their clients to file lawsuits against the Plaintiff, filed complaints with state and federal healthcare regulatory authorities, instructed their members to discontinue communications with the Plaintiff and encouraged the media to publish defamatory articles. The CAGTK RICO Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the CAGTK RICO Defendants and their co-conspirators had to agree to conceal the fraudulent intent of the scheme, and its illegal tactics

**229.** The CAGTK RICO Defendants knew, and intended that Plaintiff's patients and business network, would cease communicating and engaging in healthcare commerce with the Plaintiff, consequent to the material misrepresentations and omissions made by them. Indeed, the Defendants knew that their only chance of eradicating their debt, and eliminating any future financial liability was to professionally and economically isolate the Plaintiff, with the expectation that he would leave the country.

**230.** The CAGTK RICO Defendants engaged in a pattern of related and continuous predicate acts for eight years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus eradicating their debt, and increasing the CAGTK RICO Defendants revenues, executive compensation and NYSE share price. The predicate acts also had the same or similar results, participants and methods of commission.

**231.** During the CAGTK RICO Defendants' perpetration of their scheme the true purpose of the fraudulent racket was revealed to the CAGTK RICO Defendants, TD and Kothari. Nevertheless, in furtherance of their scheme, Defendants TD and Kothari continued to disseminate falsehoods that the Plaintiff had committed insurance fraud, Medicare fraud, bank fraud and was not qualified to perform minimally invasive spine surgery.

**232.** By reason of, and as a result of the conduct of the CAGTK RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his business and/or

34

property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of monies earned, and the loss of future earnings.

233. The CAGTK RICO Defendants violations of 18 U.S.C. §1962© and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c)

**COUNT THREE**
**VIOLATIONS OF 18 U.S.C. § 1962(C)-(D)**
**THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1961, ET SEQ**
**(By Plaintiff against Defendants HUMC + AHS + Garrett + Rutgers + UH + Gonzalez)**
**The CHE RICO Association-in-Fact Enterprise**

234. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

235. Plaintiff brings this Count against Defendants HUMC + AHS + Garrett + Rutgers + Gonzalez (inclusively, for the purposes of this Count, the "CHE RICO Defendants")

At all relevant times the CHE RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property." Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

236. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

237. As explained in detail below, the CHE RICO Defendants sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, eliminate the competition he presented, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing. The purpose of their scheme was to divert patients requiring minimally invasive spine surgery away from the Plaintiff's surgical center, and towards their facilities and physicians. As

35

explained in detail below, the CAGTK RICO Defendants' years-long misconduct violated sections 1962(c) and (d).

### G. Description of the CHE RICO Enterprise

**238.** RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural fea (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

**239.** For years the CHE RICO Defendants occupied the dominant role in the delivery of spine care in New Jersey, that positioned them at the center of the political and business sectors, with a wide and deep network of middleman known as 'political lobbyists' and 'public relation gurus'. The CHE RICO Defendants market share in the minimally invasive spine surgery sector began to decrease in approximately 2004, with increased development of free standing, predominantly physician owned, surgical centers. The Plaintiff's performance in 2005 of the first outpatient minimally invasive spine fusion proved that the procedure could be done on a same day basis. As a consequence, the CHE RICO Defendant Hospitals lost business, and then engaged in a scheme of bribes and kickbacks, in which Governor Christie used state agencies to revoke the Plaintiff's license, an event that caused his surgical center to file for bankruptcy. As a consequence of the CHE RICO Defendants bribing Governor Christie, he vetoed a bill in approximately 2011 that would have permitted one operating room surgical centers to apply for state licensure. The effect of the veto was to artificially reduce competition. The CHE RICO Defendants also engineered legislative changes that reduced surgical center funding, and restricted the performance of minimally invasive spinal fusions to the Defendant Hospitals. This caused the closure of approximately fifty percent of facilities from 2004 to 2012. The effect of these changes has been to reduce the availability of minimally invasive spine surgery, an etiological factor in the opiate epidemic. The CHE RICO Defendants monopolization of the minimally invasive spine surgery sector has permitted them to engage in price gouging with private health insurers, the extra cost of which has been passed onto the public.

**Deleted:** ,

**Deleted:** ,

36

240. In the past five years, the CHE RICO Defendants monopolization of the minimally invasive spine surgery market has caused an exponential increase in revenues, increased political power and disproportionate leverage in negotiations with private insurance companies. The increased monies have resulted in aggressive expansion projects that have focused on highly profitable outpatient spine centers. The reduced competition from surgical centers has given the CHE RICO Defendant Hospitals increased bargaining power with private health insurers, in which the CHE RICO Defendants have forced excessive reimbursement rates, under threat of boycott to the private health insurer's clients. The Plaintiff's outpatient spine surgery model presented an enormous threat to the CHE RICO Defendant Hospitals, whose revenues would have been reduced if the Plaintiff's four operating room surgical center had opened.

**Deleted: ,**

241. Discussions occurred between the CHE RICO Defendants regarding the Plaintiff, during which the parties discussed the threat to their corporate profits, of the Plaintiff's expanding outpatient minimally invasive spine surgery practice.

242. In order to ensure that their corporate profits were not affected by the increasing commercial success of the Plaintiff's minimally invasive spine surgery practice, and the expanding number of minimally invasive spine surgeons being trained by the Plaintiff, the Defendant Hospitals co-orchestrated a scheme, with the other CHE RICO Defendants to have the Plaintiff's medical license revoked. As part of the scheme the Defendant Hospitals disseminated false information within the medico-legal community, that the Plaintiff had committed insurance fraud and was not qualified to perform minimally invasive spine surgery. This was done in order to discredit the Plaintiff and isolate him from his colleagues and patients.

243. The CHE RICO Defendants fraudulent scheme to eliminate the Plaintiff's practice and increase the profits of the Defendant Hospitals, benefited their corporate executives, and permitted increased monies to be funneled through the middlemen to Governor Christie.

244. At all relevant times the CHE RICO Defendants operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that the fraudulent scheme to have the Plaintiff's license revoked was perpetrated to its conclusion. A large majority of these meetings occurred behind closed doors in Morris County and Bergen

37

County, many of which were attended by members of the Office of the New Jersey Attorney General, and most frequently, DAG Doreen Hafner. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4)

245. Alternatively, each of the CHE RICO Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the other Defendants conducted their pattern of racketeering activity. The CHE RICO Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the other Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CHE Enterprise"

246. At all relevant times, the CHE RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated –in-fact for the common purpose of engaging in the CHE Defendants profit making scheme, and the fraudulent scheme to corrupt state agencies and actors to ensure the revocation of the Plaintiff's license.

247. The association-in-fact CHE Enterprise consisted of the following entities and individuals: (a) Defendant HUMC; (b) Defendant AHS; (c) Defendant Garrett; (d) Defendant University Hospital; (e) Defendant Gonzalez.

248. While each of the CHE Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CHE Enterprise's affairs, at all relevant times, the CHE Enterprise: (a) had an existence separate and distinct from each CHE Defendants; (b) was separate and distinct from the pattern of racketeering in which the CHE Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CHE Defendants, along with other individuals and entities, including unknown third parties.

249. The CHE Defendants and their co-conspirators, through their illegal CHE RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CHE Enterprise's activities by bribing Governor Christie to have the Plaintiff's license revoked.

38

250. AG Chiesa provided the CHE RICO Enterprise with the use of state agencies, personnel and resources necessary to revoke the Plaintiff's license. These services were provided in return for bribes and monies disguised as 'campaign donations' to Governor Christie. The monies were part of a quid pro quo scheme, not protected under Noerr Pennington, in which there was an explicit understanding that the bribes were payment for the revocation of the Plaintiff's license.

251. In furtherance of the scheme, the CHE RICO Defendants each affirmatively misrepresented or concealed from their corporate board members, the existence of bribes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. The Defendants understood that if the board members became aware of the scheme, they would have opposed it, realizing the liability it would incur. Specifically, the CHE RICO Defendants claimed that the monies paid to the defendant politician, were intended to assist them in their legislative efforts, when in fact, they were quid pro quo payments to Governor Christie in return for having the Plaintiff's license revoked.

### H. The CAGTK RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

252. At all relevant times, the CHE RICO Enterprise: (a) had an existence separate and distinct from each CHE RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the CHE RICO Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CHE RICO Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise. The CHE RICO Enterprise was formed for the purpose of bribing Governor Christie, in order to have him instruct the medical board to revoke the Plaintiff's license, to veto legislation contrary to the commercial interests of the Defendant Hospitals, and to use the licensing proceedings against the Plaintiff to mischaracterize the clinical significance of hospital privileges. In fact, there is no evidence that connects clinical outcomes with the possession of hospital privileges, and hospitals have a far higher mortality and morbidity rate than outpatient surgical centers. The Defendant Hospitals are able to conceal their complications because of the influence they have purchased with regulatory agencies and the media. The in-house counsel for Defendant NJMG is on the board of Defendant HUMC. The CHE RICO Defendants comprise

Deleted: ,

39

a group of "persons" who simultaneously wield immense influence with regulatory agencies, while trading in the market over which the regulatory agencies have oversight.

253. The CHE RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as national marketing strategies and the treatment of patients from within the tri-state area, the consequences of which have generated enormous profits.

254. Within the CHE RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The CHE RICO Enterprise used this common communication network for purposes of promoting false information that the Plaintiff was not qualified to perform minimally invasive spine surgery, had committed insurance fraud, Medicare fraud and bank fraud. The purpose of this propaganda campaign was to isolate the Plaintiff from the medico-legal community and any source of capital.

255. Each participant in the CHE RICO Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CHE RICO Enterprise, the CHE RICO Defendants functioned as a continuing unit with the purpose of furthering the CHE RICO Scheme.

256. The CHE RICO Defendants participated in the operation and management of the CHE RICO Enterprise by directing its affairs, as described herein. While the CHE RICO Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements. The CHE RICO Defendants exerted substantial control over the CHE RICO Enterprise, and participated in the affairs of the enterprise by: (a) deciding how monies were dispersed from the political action committees; (b) communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Governor Christie, and members of both state and federal governments; (c) developing policies, guidelines and regulations that controlled where and by whom clinical care was delivered; (d) procuring appointments to regulatory state agencies, which they abused to further their personal economic agendas; (e) writing healthcare related legislation; (f) misrepresenting and/or concealing from the public the true nature of the

40

relationship and agreements between the members of the enterprise and the scheme to bribe Governor Christie in order to revoke the Plaintiff's medical license; (h) otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; (i) ensuring that the other CHE RICO Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

257. Without each CHE RICO Defendants' willing participation, the CHE RICO Scheme and common course of conduct would not have been successful.

258. The CHE RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

259. To carry out, or attempt to carry out, the scheme to defraud, the CHE RICO Defendants, each of whom is a person associated-in-fact with the CHE RICO Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CHE RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

260. Specifically, the CHE RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

261. The multiple acts of racketeering activity which the CHE RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CHE RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the CHE RICO Enterprise. The CHE RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

41

262. The CHE RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

263. In devising and executing the illegal scheme, the CHE RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public, the Plaintiff's patients and his professional colleagues, that the Plaintiff was not qualified to perform minimally invasive spine surgery and had committed insurance and bank fraud, materially false representations. For the purpose of executing the illegal scheme, the CHE RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

**Predicate Acts: Mail and Wire Fraud**

264. The CHE RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:

    (a) Mail Fraud: The CHE RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent and /or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of bribes and kickbacks, to have the Plaintiff's license improperly revoked, his reputation destroyed, and impede the growth of minimally invasive spine surgery in free standing outpatient surgical centers. These ends were pursued by means of false representations and omissions.

    (b) Wire Fraud: The CHE RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be received, materials by wire for the purpose of executing the unlawful scheme to defraud the Plaintiff of the property rights of his medical license, reputation and minimally invasive spine surgery business, based on false pretenses, misrepresentations that the Plaintiff was not qualified to perform minimally invasive spine surgery, and had committed insurance and bank fraud.

42

265. The CHE RICO Defendants' use of the mails and wires include, but are not limited to: (a) the transmission of letters, e-mails and other materials with AG Chiesa, regarding the scheme to eliminate the Plaintiff from the practice of medicine; (b) the transmission of letters, emails and other materials indicating that the CHE RICO Defendants had advised the medico-legal community not to support the Plaintiff in any litigation; (c) written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; (d) written, telephone, or electronic communications instructing the medico-legal community not to support the Plaintiff in any litigation; (e) written, telephone, or electronic communications regarding discussions between the CHE RICO Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; (f) the use of the mails or wires to further schemes to eradicate the Plaintiff's economic standing; (g) the use of the mails and wires to communicate the illegal scheme with Defendants Washburn and North Jersey Media Group.

266. The CHE RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with every New Jersey hospital, surgical center, American state licensing board, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United Kingdom, and other healthcare related third-party entities in furtherance of the scheme, the purpose of which was to harm the Plaintiff's economic and global reputation.

267. The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the elimination of the competition presented by the Plaintiff and by those minimally invasive spine surgeons he had trained, and planned on training.

268. Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

43

269. The CHE RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CHE RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CHE RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct. The CHE RICO Defendants aided and abetted other in violations of the above laws

270. To achieve their common goals, the CHE RICO Defendants (i) fostered an environment in which they encouraged their staff to defame the Plaintiff; (ii) filed complaints with state and federal healthcare regulatory authorities; (iii) instructed their members to discontinue communications with the Plaintiff and; (iv) encouraged the media to publish defamatory articles. The CHE RICO Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct, agreeing to conceal the fraudulent intent of the scheme, and its illegal tactics. The CHE RICO Defendants knew, and intended that Plaintiff's patients and business network, would rely on the material misrepresentations and omissions made by them and would cease communicating and engaging in healthcare commerce with the Plaintiff.

271. As described herein, the CHE RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the practice of medicine, and thus eradicating the competition, and increasing the CHE RICO Defendants revenues and executive compensation. The predicate acts also had the same or similar results, participants and methods of commission. The predicate acts were related and not isolated events.

272. During the CHE RICO Defendants' perpetration of their scheme the true purpose of the fraudulent racket was revealed to CHE RICO Defendants, Garrett and Gonzalez. Nevertheless, in furtherance of their scheme, Defendants Garrett and Gonzalez continued to disseminate

44

falsehoods, that the Plaintiff had committed insurance fraud, Medicare fraud, bank fraud and

was not qualified to perform minimally invasive spine surgery.

**Deleted: F**

273. By reason of, and as a result of the conduct of the CHE RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his business and/or property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of monies earned, and the loss of future earnings. The CHE RICO Defendants violations of 18 U.S.C. §1962© and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c)

**COUNT FOUR**
**VIOLATIONS OF 18 U.S.C. § 1962(C(-(D)**
**THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961, ET SEQ**
**(By Plaintiff against Defendants NJMG + Washburn + Stein)**
**The CMS RICO Association-in-Fact Enterprise**

274. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

275. Plaintiff brings this Count against Defendants NJMG + Washburn + Stein (inclusively, for the purposes of this Count, the "CMS RICO Defendants")

276. At all relevant times the CMS RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

277. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. See 18 U.S.C. § 1962(d).

278. As explained in detail below, the CMS RICO Defendants sought, amongst other things, to eliminate the Plaintiff from the practice of medicine, eliminate the competition he presented to

45

parties with whom they engaged in commerce, destroy his reputation in the field of minimally invasive spine surgery and destroy his economic standing. The purpose of their scheme was to divert patients requiring minimally invasive spine surgery away from the Plaintiff's surgical center, and towards the facilities and physicians, with whom they engaged in commerce. As explained in detail below, the CMS RICO Defendants' eight-year campaign of misconduct violated sections 1962(c) and (d).

I.    **Description of the CMS RICO Enterprise**

279. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise requires three structural 🔲 (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit those associates to pursue the enterprise's purpose.

280. For many years CMS RICO Defendants Washburn and NJMG occupied a critical role in deciding what stories they published about state government actions and politicians. The CMS RICO Defendant NJMG was a privately owned company, before it was sold to national media conglomerate, Gannet Media, in July 2016. Its business holdings extended way beyond the reporting of news, and it depended on state government permits and approvals to further these non-news economic ends. Its news cycles also depended on sources within the state administration.

281. CMS RICO Defendants NJMG and Washburn were not informed of the June 13, 2012 medical board hearing in Trenton, as was the Star Ledger, its competition. CMS RICO Defendants were subsequently promised access to the administration of Governor Christie, after having agreed to publish defamatory articles about the Plaintiff, articles on which agents of Governor Christie collaborated. These actions aligned the political and commercial interests of the Defendants from the CMS RICO Enterprise, the CAC RICO Enterprise, the CCB RICO Enterprise with the Defendants of the CMS RICO Enterprise, all of whom engaged directly or indirectly in conduct that furthered their commercial/political agendas.

46

282. In the past five years, the CMS Defendants experienced a decrease in their annual revenues, and came under extreme financial pressure, which caused an increased reliance on advertising revenue from the CAC RICO Defendants, the CCB RICO Defendants and the CHE RICO Defendants. These Defendants used their financial leverage with the CMS Defendants, to publish defamatory stories to eliminate the commercial competitive threat presented to them by the Plaintiff.

283. Discussions occurred between the CMS RICO Defendants regarding the Plaintiff, during which the parties discussed the threat to their commercial interests, because the Plaintiff's expanding outpatient minimally invasive spine surgery practice, had diverted business away from the CAC, CCB and CHE RICO Defendants.

284. In order to ensure that their corporate profits were not affected by the increasing commercial success of the Plaintiff's minimally invasive spine surgery practice, and the expanding number of minimally invasive spine surgeons being trained by the Plaintiff, Defendant NJMG co-orchestrated a scheme with the other CMS RICO Defendants, to have the revocation of the Plaintiff's medical license, widely publicized across the global internet. As part of the scheme the CMS RICO Defendants disseminated false information within the medico-legal community, that the Plaintiff had committed insurance fraud, bank fraud and was not qualified to perform minimally invasive spine surgery. This was done in order to discredit the Plaintiff and isolate him from his colleagues and patients.

285. The scheme to maintain and increase the profits of Defendant NJMG through the destruction of the Plaintiff's reputation and elimination of his practice, benefited the other Defendants, many of whom advertised with Defendant NJMG. The scheme also enriched its corporate executives, its non-media interests, and permitted increased monies to be funneled through the middleman to Governor Christie.

286. At all relevant times the CMS RICO Defendants operated an ongoing association-in-fact enterprise. This association-in-fact enterprise was formed for the purpose of ensuring that the fraudulent scheme to have the Plaintiff's license revoked was perpetrated to its conclusion. Many of the association-in-fact enterprise meetings occurred behind closed doors in Morris and Bergen County, a large percentage of which were attended by members of the Office of the

47

New Jersey Attorney General, and most frequently DAG Doreen Hafner. Defendants conducted a pattern of racketeering activity under § 18 U.S.C. 1961(4)

287. Alternatively, each of the CMS RICO Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the other Defendants conducted their pattern of racketeering activity. The CMS RICO Defendants' separate legal statuses facilitated the fraudulent scheme and provided a hoped-for shield from liability for the other Defendants and their co-conspirators. The enterprises, alleged in this and the previous paragraph, are referred to collectively as the "CMS RICO Enterprise"

288. At all relevant times, the CMS RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated –in-fact for the common purpose of engaging in the CMS Defendants profit making scheme, a fraudulent scheme that involved collusion with state agencies and actors, to ensure the revocation of the Plaintiff's license, destruction of his reputation and decimation of his economic standing.

289. The association-in-fact CMS Enterprise consisted of the following entities and individuals: (a) Defendant NJMG; (b) Defendant Washburn; (c) Defendant Stein. While each of the CMS Defendants acquired, maintained control of, were associated with, and conducted or participated in the conduct of the CMS Enterprise's affairs, at all relevant times, the CMS Enterprise: (a) had an existence separate and distinct from each CMS Defendants; (b) was separate and distinct from the pattern of racketeering in which the CMS Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the CMS Defendants, along with other individuals and entities, including unknown third parties.

290. The CMS Defendants and their co-conspirators, through their illegal CMS RICO Enterprise, engaged in a pattern of racketeering activity, which involved a fraudulent scheme to increase revenue for the CMS Enterprise's activities by bribing Governor Christie to have the Plaintiff's license revoked, and conspiring to publish defamatory stories about the Plaintiff. The purpose of the revocation and defamation was to eliminate the threat that his work presented to the Defendants who advertised with Defendant NJMG. The benefit to Defendant Stein of the

48

revocation and defamation, was that it facilitated litigation he had commenced against the Plaintiff. Defendants NJMG and Washburn publicized this litigation on multiple occasions.

291. The CMS RICO Defendants were provided with improper access to state agencies, resources and personnel, that were involved in the revocation of the Plaintiff's license, in return for bribes and monies disguised as 'campaign donations'. The monies were part of a quid pro quo scheme, not protected under Noerr Pennington, in which there was an explicit understanding that the bribes were payment for the revocation of the Plaintiff's license. Defendant NJMG was given preferential access to the state government information, in return for the publication of slanderous stories about the Plaintiff. In furtherance of the scheme, the CMS RICO Defendant NJMG affirmatively misrepresented or concealed from their corporate board members, the existence of bribes, quid pro quo schemes, and the fraudulent nature and purpose of the scheme to revoke the Plaintiff's license. The Defendants understood that if the board members became aware of the scheme, they would have opposed it, realizing the liability it would incur. Specifically, CMS RICO Defendant NJMG mischaracterized the nature of Kaul v Christie, when it was sold to Gannett Media in July 2016.

Deleted: ,

## II. The CMS RICO Enterprise Sought to Fraudulently Increase Defendants' Profits and Revenues

292. Each CMS RICO Defendant benefited financially from the CMS RICO Enterprise. Defendant NJMG increased its revenues, through the expedited issuance of state permits for it non-media, real estate based commercial interests. Defendant Stein was rewarded with publicity that assisted his litigation, and information about the Plaintiff's personal affairs that he indirectly received Defendant Washburn.

293. As part of a quid pro quo that existed within the CMS RICO Enterprise, Governor Christie, in return for favorable political publicity from Defendant NJMG, and bribes from Defendant Stein, instructed his staff to provide personal and professional information about the Plaintiff to the Defendants.

294. At all relevant times, the CMS RICO Enterprise: (a) had an existence separate and distinct from each CMS RICO Defendant; (b) was separate and distinct from the pattern of racketeering in which the CMS RICO Defendants engaged; and (c) was an ongoing and continuing

49

organization consisting of legal entities, including the CMS RICO Defendants, along with other individuals and entities, including unknown third parties that operated an association-in-fact enterprise. The CMS RICO Enterprise was formed for the purpose of bribing and providing favorable publicity to Governor Christie, in order to procure expedited and preferential state permits, and personal/professional information about the Plaintiff.

295. The CMS RICO Defendants comprise a group of "persons" who influence public opinion, while engaging in political and commercial activities, that are contrary to independent news reporting. They and their co-conspirators engaged in a pattern of racketeering activity, which involved a revenue enhancing fraudulent conspiracy, that was part of a wider scheme to have the Plaintiff's license revoked

296. The CMS RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce because it involved commercial activities across state boundaries, such as the internet marketing of legal services and news reporting, the consequences of which have generated enormous profits.

297. Within the CMS RICO Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The CMS RICO Enterprise used this common communication network for purposes of promoting false information that the Plaintiff was not qualified to perform minimally invasive spine surgery, had committed insurance fraud, Medicare fraud and bank fraud. The purpose of this propaganda campaign was to isolate the Plaintiff from the medico-legal community and any source of capital.

298. Each participant in the CMS RICO Enterprise had systematic linkages to each other through corporate ties, contractual relationships, financial ties, and a continuing coordination of activities. Through the CMS RICO Enterprise, the CMS RICO Defendants functioned as a continuing unit with the purpose of furthering the CMS RICO Scheme.

299. The CMS RICO Defendants participated in the operation and management of the CMS RICO Enterprise by directing its affairs, as described herein. While the CMS RICO Defendants participated in, and are members of the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

50

The CMS RICO Defendants exerted substantial control over the CMS RICO Enterprise, and participated in the affairs of the enterprise by: (a) communicating directly with lawyers, public relation agents and political lobbyists with direct connections to Governor Christie, and members of both state and federal governments; (b) procuring appointments to regulatory state agencies and the board of Defendant HUMC, which they used to further their economic agendas; (e) misrepresenting and/or concealing from the public the true nature of the relationship and agreements between the members of the enterprise and the scheme to bribe Governor Christie in order to revoke the Plaintiff's medical license; (f) otherwise misrepresenting and/or concealing the increased personal profits that inured to their benefit as a consequence of the illegal elimination of the Plaintiff from the practice of medicine; (g) ensuring that the other CMS RICO Defendants and unnamed co-conspirators complied with and concealed the fraudulent scheme.

**300.** Without each CMS RICO Defendants' willing participation, the CMS RICO Scheme and common course of conduct would not have been successful.

**301.** The CMS RICO Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the Defendants' and others' hands.

### K. Predicate Acts: Mail and Wire Fraud

**302.** To carry out, or attempt to carry out, the scheme to defraud, the CMS RICO Defendants, each of whom is a person associated-in-fact with the CMS RICO Enterprise, did knowingly, conduct or participate, directly or indirectly, in the affairs of the CMS RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

**303.** Specifically, the CMS RICO Defendants have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

51

304. The multiple acts of racketeering activity which the CMS RICO Defendants committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the CMS RICO Defendants' regular use of the facilities, services, distribution channels, and employees of the CMS RICO Enterprise. The CMS RICO Defendants participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailing and wires in interstate or foreign commerce.

305. The CMS RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions.

306. In devising and executing the illegal scheme, the CMS RICO Defendants devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiff of the property rights of his reputation, medical license and healthcare business, by communicating to the public, the Plaintiff's patients and his professional colleagues, that the Plaintiff was not qualified to perform minimally invasive spine surgery and had committed insurance and bank fraud, materially false representations. For the purpose of executing the illegal scheme, the CMS RICO Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

307. The CMS RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1) include, but are not limited to:

    (a) Mail Fraud: The CMS RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or causing to be sent and /or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme of bribes and kickbacks, to have the Plaintiff's license improperly revoked, his reputation destroyed, and impede the growth of minimally invasive spine surgery in free standing outpatient surgical centers. These ends were pursued by means of false representations and omissions.

    (b) Wire Fraud: The CMS RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be received, materials by wire for the purpose

**Deleted:**

**Deleted:**

52

> of executing the unlawful scheme to defraud the Plaintiff of the property rights
> of his medical license, reputation and minimally invasive spine surgery business,
> based on false pretenses, misrepresentations that the Plaintiff was not qualified
> to perform minimally invasive spine surgery, and that he had committed
> insurance and bank fraud.

**308.** The CMS RICO Defendants' use of the mails and wires include, but are not limited to: (a) the transmission of letters, e-mails and other materials with AG Chiesa, regarding the scheme to eliminate the Plaintiff from the practice of medicine; (b) the transmission of letters, emails and other materials indicating that the CMS RICO Defendants had advised the medico-legal community not to support the Plaintiff in any litigation; (c) written, telephone, or electronic communications regarding the events surrounding the revocation of the Plaintiff's license; (d) written, telephone, or electronic communications instructing the medico-legal community not to support the Plaintiff in any litigation; (e) written, telephone, or electronic communications regarding discussions between the CMS RICO Defendants and state and federal politicians about the scheme to revoke the Plaintiff's license; (f) the use of the mails or wires to further schemes to eradicate the Plaintiff's economic standing; (g) the use of the mails and wires to communicate the illegal scheme with unnamed third party co-conspirators.

**309.** The CMS RICO Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with New Jersey hospitals, surgical centers, American state licensing boards, the Federation of State Medical Boards, the American Board of Anesthesiology, the General Medical Council of the United Kingdom, New Jersey politicians, and other healthcare related third-party entities in furtherance of the scheme, the purpose of which was to globally harm the Plaintiff's economic and reputational standing.

**310.** The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct designed to increase the revenues that flowed from the elimination of the competition presented by the Plaintiff, and by those minimally invasive spine surgeons he had trained, and planned on training, who competed against the CMS RICO Defendants' patrons.

53

311. Many of the precise dates of the fraudulent uses of the mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to the Defendants' servers and digital records. However, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described above.

312. The CMS RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In Violation of 18 U.S.C. § 1962(d), the CMS RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the CMS RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase revenues, increase market share, and or minimize losses for the Defendants and their unnamed co-conspirators, through the illegal scheme and common course of conduct. The CMS RICO Defendants aided and abetted other in violations of the above laws

313. To achieve their common goals, the CMS RICO Defendants (i) fostered an environment in which they encouraged their staff to defame the Plaintiff; (ii) filed complaints with state and federal healthcare regulatory authorities; (iii) encouraged other media outlets to publish defamatory articles and (iv) illegally recorded the Plaintiff in violation of state and federal law. The CMS RICO Defendants and each member of the conspiracy, with knowledge and intent, agreed to the overall objectives of the conspiracy and participated in the common course of conduct. Indeed, for the conspiracy to succeed, each of the CMS RICO Defendants and their co-conspirators had to agree to conceal the fraudulent intent of the scheme, and its illegal tactics. The CMS RICO Defendants knew, and intended that Plaintiff's patients and business network, would rely on the material misrepresentations and omissions made by them and would cease communicating and engaging in healthcare commerce with the Plaintiff.

314. As described herein, the CMS RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of eliminating the Plaintiff from the

54

practice of medicine, and thus eradicating the competition, and indirectly increasing the CMS RICO Defendants revenues and executive compensation. The predicate acts also had the same or similar results, participants and methods of commission. The predicate acts were related and not isolated events.

315. During the CMS RICO Defendants' perpetration of their scheme the true purpose of the fraudulent racket was revealed to CMS RICO Defendant, Washburn. Nevertheless, in furtherance of their scheme, Defendant Washburn continued to disseminate falsehoods that the Plaintiff had committed insurance fraud, Medicare fraud, Bank fraud and was not qualified to perform minimally invasive spine surgery.

316. By reason of, and as a result of the conduct of the CMS RICO Defendants, and in particular, their pattern of racketeering activity, Plaintiff has been injured in his business and/or property in multiple ways, including but not limited to the loss of his medical license, the loss of his reputation, the loss of his livelihood, the loss of monies earned, and the loss of future earnings.

317. The CMS RICO Defendants violations of 18 U.S.C. §1962© and (d) have directly and proximately caused injuries and damage to Plaintiff who is entitled to bring this action for three times its actual damage, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## ANTITRUST IMPACT

318. Subsequent to the downgrading of the relative value units for endoscopic discectomy in 2011, the commercial potential of the Plaintiff's practice was harmed. The scheme was engineered by a group of neurosurgeons, led by Defendant Gregory Przybylski, the 2011 president of the North American Spine Society. These neurosurgeons, because of their influential positions within their professional societies, had the codes modified on the understanding that the majority of minimally invasive spine surgeons, from interventional pain backgrounds, would be unable to perform open micro-discectomies. The neurosurgeons effectuated the change without publicizing it for comment,

Deleted: b

Deleted: Peter Carmel, the 2011 president of the AMA, and

55

from the Plaintiff or other similarly trained physicians. This was in violation of both NASS and AMA bylaws and regulations.

319. These changes lowered the reimbursement rate for endoscopic discectomies, which caused a larger percentage of the insurance health fund to be diverted to the neurosurgeons and hospitals, who subsequently raised their fees for the same procedure. The code change, however, did not apply if the endoscopic discectomy was performed in a hospital, as the fee remained the same. This benefited the neurosurgeons who had hospital privileges to perform spinal procedures, and it benefitted the hospitals. It also benefitted the Defendant Insurance Carriers, whose clients had personal injury policies that most hospitals did not accept, which thus caused these patients to be deprived of access to minimally invasive spine surgery.

320. As a consequence, the Plaintiff sustained substantial losses and damage to his business and property because of the reduced reimbursement fees associated with outpatient endoscopic discectomy.

321. The defendant neurosurgeons, hospitals and insurance carriers have through the bribing of politicians, effectuated legislation and regulatory changes, as evidenced in the CPT code downgrading, the veto of a bill in 2011 by Governor Christie, that was designed to permit one room surgical centers to become state licensed, and the refusal of the insurance carriers to reimburse surgical centers for minimally invasive spine surgery. These acts have artificially reduced the availability of outpatient minimally invasive spine surgery.

322. The aforementioned acts have resulted in an increase of the fees charged by the Defendant Neurosurgeons and Hospitals, and have excluded patients with accident related injuries, most of whom have no secondary insurance, from receiving minimally invasive spine surgery. The Defendant Insurance Carriers stopped paying the surgical centers in 2012, and

**Deleted:** General economic theory recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below. See Hovencamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRCATICE (1994) at 624. According to Professor Hovencamp, "every person at every stage in the chain will be poorer as a result of the monopoly price at the top." Professor Hovencamp also acknowledges that "theoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level.".

56

reduced the physician fees by more than eighty percent, with the majority of the physicians affected, being outpatient minimally invasive spine surgeons, like the Plaintiff.

323.    The neurosurgeons and the hospitals have monopolized the New Jersey minimally invasive spine market. The rise in opiate consumption is related to the reduction in the availability of minimally invasive spine surgery, as patients' options for pain relief have became constricted, while the Defendant Hospitals, Neurosurgeons and Insurance Carriers reaped larger profits.

324.    Defendant Allstate's share price has risen almost four hundred percent (400%) since the implementation of the aforesaid changes, which were the products of nothing, but bribery and legal chicanery.

325. The Defendant Neurosurgeons and Hospitals passed on their inflated prices to private insurance companies, such as United, Aetna and Cigna, who have passed on the increased costs to their customers. The Defendant Insurance Carriers increased profits were not shared with the New Jersey public who have continued to incur annual increases in their auto premiums.

326. The Defendant's anticompetitive actions enable it to indirectly charge consumers and third-party payer prices in excess of what it otherwise would have been able to charge absent its unlawful actions individually and with the other defendants.

327. The prices were inflated as a direct and foreseeable result of the Defendants' anticompetitive conduct individually and with the hospitals. The inflated prices the End-Payor i.e. the public and the private insurance companies are now forced to pay are traceable to, and the foreseeable result of the reduction in availability of minimally invasive spine services, and the consequent price gouging by the defendant neurosurgeons and hospitals.

**COUNT FIVE**

**For Declaratory and Injunctive Relief Under Section 16 of the Clayton Act for Defendants' Violations of Sections 1 and 2 of the Sherman Act (By Plaintiff Against Defendants Kaufman + Staats + Przybylski + CNS + Wolfla + Peterson + UH + Heary + Mitchell + Cohen + HUMC + AHS)**

328. Plaintiff incorporates by reference the preceding allegations

329. Defendants knowingly and intentionally engaged in an anticompetitive scheme designed to block the Plaintiff, his surgical center and similarly trained physicians, from incorporating minimally invasive spine surgery into their outpatient practices. This scheme included, inter alia

57

Formatted: Numbered + Level: 1 + Numbering Style: 1, 2, 3, ... + Start at: 95 + Alignment: Left + Aligned at: -0.13" + Indent at: 0.06"

Deleted: ,

(i) obtaining through fraud a downgrading of the relative value unit associated with outpatient endoscopic discectomy; (ii) procuring through bribery the veto of a bill in 2009 by Governor Christie, that would have permitted one operating room surgical centers to become licensed, the licensing of which would have removed the principal reason employed by the defendant insurance carriers to deny payment to the outpatient facility and the physician; (iii) procuring through bribery the introduction of a fee schedule in 2011 that denied payment for the performance of outpatient minimally invasive spine surgery in free standing surgical centers; (iv) encouraging patients to initiate civil litigation and medical board complaints against the Plaintiff and similarly trained physicians; (v) obtaining through bribery a moratorium in 2009 that prevented the issuance of licenses for free standing outpatient surgical centers, unless they were commercially partnered with a hospital; (vi) neurosurgeons unlawfully agreeing with representatives of defendant ASIPP that the market for minimally invasive spine surgery would be divided in such a way, that physicians with similar training as the Plaintiff, would be limited to performing only discectomies and not fusions and; (vii) otherwise engaging in an overarching scheme to unlawfully monopolize, conspire to monopolize, and/or, allocate the market for minimally invasive spine surgery.

330. Defendants conspired to monopolize, and did wrongfully and intentionally maintain monopoly power, with respect to minimally invasive spine surgery in violation of Section 2 of the Sherman Act. As a result of this unlawful maintenance of monopoly power, Plaintiff and his surgical center were excluded from the minimally invasive spine fusion market, as were similarly trained physicians and the New Jersey surgical center community. By their agreements, Defendants intentionally and wrongfully conspired and combined in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. As a result of this unreasonable restraint on competition, Plaintiff and his surgical center were excluded from the minimally invasive spine surgery market, as were similarly trained physicians and the New Jersey surgical center community.

331. Plaintiff and his surgical center were injured in their business or property by Defendants' antitrust violations. Their injury consists of being deprived of the ability to incorporate minimally invasive spine surgery into their commercial strategy. Such an injury of "exclusion" is

58

of the type antitrust laws were designed to prevent, and flows from that which makes Defendants' conduct unlawful, and Plaintiff and his surgical center are the proper entities to bring a case concerning this conduct.

332. Plaintiff continues to suffer and will continue to suffer in the future from being excluded from the minimally invasive spine surgery market, more than he would have absent the Defendants' anticompetitive conduct.

333. Defendants' anticompetitive conduct, pursued in the context of bribery, kickbacks, obstruction of justice, fraud, and forged transcripts is not entitled to Noerr- Pennington immunity.

334. Plaintiff and his surgical center, pursuant to Fed. R. Civ. P. 57 and U.S.C. § 2201(a) hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described herein violates Sections 1 and 2 of the Sherman Act.

335. Plaintiff and his surgical center further seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, and other applicable law, to correct for the anticompetitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anticompetitive conduct does not occur in the future.

**COUNT SIX**
**For Monopolization (By Plaintiff Against Defendants Przybylski + Kaufman + Staats + Cohen + Heary + Mitchell + HUMC + AHS + UH).**

336. Plaintiff incorporates by reference the preceding allegations described above.

337. From at least 2002, the neurosurgeons and hospitals held a monopoly on the minimally invasive spine surgery market, and in particular minimally invasive spine fusions. This monopoly was threatened in 2005, when the Plaintiff performed the first minimally invasive outpatient lumbar fusion, which allowed patients to be discharged the same day.

338. The Defendants willfully and unlawfully acquired and maintained their monopoly power in the minimally invasive spine surgery market by engaging in an anticompetitive scheme to keep the Plaintiff and similarly trained physicians out of the market – not as a result of providing a superior product, business acumen, or historical accident. The Defendants engaged in a quid pro quo scheme with Governor Christie, in which he received bribes, disguised as 'campaign

Deleted: the

Deleted: the

59

donations', in return for having the medical board revoke the Plaintiff's medical license, an

event that caused the economic collapse of six medium sized corporations, and the

commencement of Chapter 11 proceedings on June 17, 2013.

339. The Defendants knowingly and intentionally engaged in an anticompetitive scheme to
monopolize the minimally invasive spine surgery market. The Defendants accomplished this
scheme by, inter alia, encouraging patients to file lawsuits against the Plaintiff, and filing
complaints with regulatory authorities against the Plaintiff.

340. The goal, purpose and effect of the Defendants' scheme was to prevent the Plaintiff and
similarly trained physicians from increasing the availability of outpatient minimally invasive
spine surgery, and from increasing the number of physicians able to provide the service. The
Defendants illegal scheme allowed them to continue to charge supra-competitive prices for
minimally invasive spine surgery, reaping substantial unlawful monopoly profits, while reducing
the availability of the service to patients, particularly those in lower socio-economic brackets,
whose injuries were caused by auto accidents. This latter group rarely had secondary insurance,
and was thus unable to procure minimally invasive spine care, which caused them to use
opiates for pain control. The Plaintiff, because he owned his surgical center, provided free care
to those patients with no insurance. The Defendant hospitals and neurosurgeons did not.

341. The Neurosurgeon Defendants knowingly and intentionally participated in sham litigation
against the Plaintiff, that included encouraging patients to file lawsuits and complaints with the
medical board, and then provided fraudulent 'expert' testimony for the patients and the
medical board. The Defendants repeatedly and fraudulently asserted that the Plaintiff was not
qualified to perform minimally invasive spine surgery. The Defendants repeatedly and
fraudulently asserted that the Plaintiff had deviated from the standard of care because he did
not possess hospital or alternative privileges. The Defendants repeatedly and fraudulently
asserted that the Plaintiff had deviated from the standard of care because his training did not
involve a neurosurgical residency. These claims were false and designed to protect and further
the monopoly held by the neurosurgeons and hospitals on minimally invasive spine surgery.
The Defendants participated in these sham lawsuits for the purposes of using a governmental

Deleted: ,

Deleted: This latter group rarely had
secondary insurance, and were

60

process as an anticompetitive weapon, to keep the Plaintiff and similarly trained physicians out
of the minimally invasive spine surgery market.

342. The Defendants also knowingly and intentionally engaged in sham litigation that resulted
in the revocation of the Plaintiff's medical license. Defendant Przybylski provided knowingly
false testimony that the Plaintiff had deviated from the standard of care for minimally invasive
spine surgery, but then admitted under cross-examination that no such standard existed. The
Defendants perpetrated these falsehoods in multiple courts and in the public domain, for
almost eight years, for the purpose of protecting their monopoly on minimally invasive spine
surgery. The knowingly false testimony provided by Defendants Kaufman and Przybylski during
the proceedings in the New Jersey Office of Administrative Law, fabricated a basis for the
administrative law judge to revoke the Plaintiff's license. The revocation of the license caused
the collapse of six medium sized corporations, the loss of jobs, the loss of tax revenue, the loss
of healthcare to hundreds of patients with no insurance, and forced a number of these patients
to seek pain relief through street grade heroin.    The Defendants co-opted the Plaintiff's
patients into their scheme to protect their 'turf', with the promise that their malpractice suits
would be strengthened if the Plaintiff's license was revoked.

343. The goal, purpose and effect of the Defendant's scheme was to prevent the Plaintiff, his
surgical center and those of similarly trained physicians from continuing to provide outpatient
minimally invasive spine surgery. This restricted the availability of the service to the
Defendant Hospitals and Neurosurgeons, which permitted them to artificially raise their
prices, in the absence of competition. The Defendants knew that the Plaintiff had, in 2009,
obtained one of the last surgical center licenses issued by the state, and had plans to develop
a thirty-six thousand square foot, four operating room, multi-disciplinary surgical center, that
was to provide the template for a national, and then global expansion program in minimally
invasive spine surgery.

344. The goal, purpose and effect of the Defendant's scheme were also to maintain and extend
its monopoly power in minimally invasive spine surgery. The Defendants' illegal scheme allowed

**Deleted:**

**Deleted:** the

**Deleted:** o

**Deleted:** a

**Deleted:** I

**Deleted:** The Defendants illegal
anticompetitive conduct caused
economic, emotional and psychological
chaos to the lives of hundreds of the
Plaintiff's patients, staff and family
members.

**Deleted:** , and

**Deleted:** was

61

them to continue charging supra-competitive prices for minimally invasive spine surgery. This caused harm to the public by reducing the availability of the service, and permitted the Defendants to reap substantial unlawful monopoly profits.

345. The Defendants knowingly and intentionally engaged in sham litigation against the Plaintiff's physician employees. The Defendants fraudulently asserted that the Plaintiff's employees were not qualified to assist the Plaintiff perform minimally invasive spine surgery, and that they had engaged in insurance fraud. Defendants Geico and Allstate filed these frivolous claims in federal and state courts. The complaint filed by Geico on April 27, 2013 was dismissed with prejudice on December 8, 2014, with no evidence submitted to support the claims. Defendant Allstate filed an almost identical action on February 15, 2015 in New Jersey Superior Court. The purpose of the sham litigation was to manufacture an excuse to not pay the Plaintiff for the minimally invasive spine surgery services he had provided to the Defendant's clients. The Neurosurgeon Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anti-competitive weapon to exclude the Plaintiff's employees and similarly trained physicians from the minimally invasive spine surgery market.

346. The Defendants also knowingly and intentionally engaged in sham litigation against the Plaintiff's employees' medical licenses, initiating medical board investigations that were intended to ostracize the Plaintiff from his professional colleagues, the purpose of which was to force the Plaintiff to leave the country, and forego the opportunity to seek legal redress. The Defendants abused governmental process to extend their monopoly.

347. As a result of Defendants' illegal conduct, Plaintiff and his physician employees were excluded from the minimally invasive spine surgery market, and were compelled to incur substantial legal fees in the defense of the sham board investigations. But for the Defendants' illegal conduct, the competitors would have continued to expand their scope of practice, increase the availability of minimally invasive spine surgery services, reduce the price of the service, and mitigate the severity of the opiate epidemic, as more patients would have had access to non-opiate modalities of spine care.

62

348. Had the Plaintiff and similarly trained physicians been allowed to continue expanding their scope of practice in minimally invasive spine surgery, and lawfully compete with the Defendants then the public would not have been denied the benefits of competition.

349. By engaging in the foregoing conduct, the Defendants have violated the following state antitrust laws:

a. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Arizona Rev. Stat. §§ 44-1401, et seq., with respect to the availability of minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had plans to expand nationally.

b. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Cal. Bus. Code §§ 16700, et seq., and Code §§ 17200, et seq., with respect to the availability of minimally invasive spine surgery in California, and in the knowledge that the Plaintiff had plans to expand nationally.

c. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of D.C. Code Ann. §§ 28-45031, et seq., with respect to the availability of minimally invasive spine surgery in the District of Columbia, and in the knowledge that the Plaintiff had plans to expand nationally.

d. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Fla. Stat. §§ 501. Part II et seq., with respect to the availability of minimally invasive spine surgery in Florida, and in the knowledge that the Plaintiff had plans to expand nationally. This conduct constitutes a predicate act under the Florida Deceptive Practices Act.

**Deleted:** ,

63

e. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Kan. Stat Ann. §§ 50-101 et seq., with respect to the availability of minimally invasive spine surgery in Kansas, and in the knowledge that the Plaintiff had plans to expand nationally.

f. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Me. Rev. Stat. Ann. 10, § 1101, et seq., with respect to the availability of minimally invasive spine surgery in Maine, and in the knowledge that the Plaintiff had plans to expand nationally.

g. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to the availability of minimally invasive spine surgery in Michigan, and in the knowledge that the Plaintiff had plans to expand nationally.

h. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.52, et seq., with respect to the availability of minimally invasive spine surgery in Minnesota, and in the knowledge that the Plaintiff had plans to expand nationally.

i. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Miss. Code Ann. §§ 59-801, et seq., with respect to the availability of minimally invasive spine surgery in Mississippi, and in the knowledge that the Plaintiff had plans to expand nationally.

j. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Neb. Code Ann. §§

64

598A, et seq., with respect to the availability of minimally invasive spine surgery in Nebraska, and in the knowledge that the Plaintiff had plans to expand nationally.

k. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Nev. Ret. Stat. Ann. § 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nevada, and in the knowledge that the Plaintiff had plans to expand nationally.

l. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to the availability of minimally invasive spine surgery in New Mexico, and in the knowledge that the Plaintiff had plans to expand nationally.

m. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of New York General Business Law § 340, et seq., with respect to the availability of minimally invasive spine surgery in New York, and in the knowledge that the Plaintiff had plans to expand nationally.

n. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-1, et seq., with respect to the availability of minimally invasive spine surgery in North Carolina, and in the knowledge that the Plaintiff had plans to expand nationally.

o. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.D. Cent. Code § 51-08.1-01, et seq., with respect to the availability of minimally invasive spine surgery in North Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

65

p. Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of Or. Rev. Stat. §§
646.705, et seq., with respect to the availability of minimally invasive spine surgery in
Oregon, and in the knowledge that the Plaintiff had plans to expand nationally.

q. Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of S.D. Codified Laws
Ann. § 37-1, et seq., with respect to the availability of minimally invasive spine surgery
in South Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

r. Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of Tenn. Code Ann. §§
47-25-101, et seq., with respect to the availability of minimally invasive spine surgery h
Tennessee, and in the knowledge that the Plaintiff had plans to expand nationally.

s. Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of Utah Code Ann. §§
76-10-911, et seq., with respect to the availability of minimally invasive spine surgery h
Utah, and in the knowledge that the Plaintiff had plans to expand nationally.

t. Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of Vt. Stat. Ann. 9, §
2453, et seq., with respect to the availability of minimally invasive spine surgery in
Vermont, and in the knowledge that the Plaintiff had plans to expand nationally.

u. Defendants, because of their immense political influence within the state chapters and
national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully
maintained monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-

66

1, et seq., with respect to the availability of minimally invasive spine surgery in West Virginia, and in the knowledge that the Plaintiff had plans to expand nationally.

v. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Wis Stat. § 133.01, et seq., with respect to the availability of minimally invasive spine surgery in Wisconsin, and in the knowledge that the Plaintiff had plans to expand nationally.

350. Plaintiff has been injured in his business and property by reason of Defendants' anti-trust violations alleged in this Claim. The injuries consist of: (1) the revocation of the Plaintiff's New Jersey medical license and the loss to his patients of their ability to receive minimally invasive spine care and, (2) exclusion of the Plaintiff from the minimally invasive spine surgery market which has permitted the Defendants to raise their prices, and (3) the loss into bankruptcy of the Plaintiff's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license, real estate, and (4) the loss of the Plaintiff's professional reputation developed over thirty years. These injuries are of the type the antitrust laws of the aboveStates and the District of Columbia were designed to prevent, and flow from that which makes Defendants' conduct unlawful. Plaintiff seeks damages and treble damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

## COUNT SEVEN
### For Conspiracy to Monopolize under State Law
### (By Plaintiff Against Defendants Przybylski + Kaufman + Staats + Lomazow + Cohen + Heary + Mitchell + HUMC + AHS)

351. Plaintiff incorporates by reference the preceding allegations

352. As described above, from at least 1980 to March 2005, the Defendants possessed monopoly power in the market for traditional inpatient 'open' spine surgery. This changed in March 2005 when the Plaintiff performed the first minimally invasive outpatient spinal fusion. Defendants willfully and unlawfully engaged in a continuing illegal conspiracy from at least 2008 to 2016 to ensure that their monopoly extended to the outpatient minimally invasive spine surgery market. To achieve this goal, they engaged in an anticompetitive scheme intended to

67

exclude the Plaintiff and similarly trained physicians from commercially incorporating minimally invasive spine surgery into their practices – not as a result of providing a superior product, business acumen, or historical accident.

353. Defendants knowingly and intentionally conspired to monopolize the minimally invasive spine surgery market. Defendants accomplished this scheme by, inter alia, (i) obtaining through fraud a downgrading of the relative value unit associated with outpatient endoscopic discectomy, (ii) procuring through bribery the veto of a bill that would have permitted one operating room surgical centers to become licensed, the licensing of which would have removed the principal reason employed by the Defendant Insurance Carriers to deny payment to physicians and one operating room outpatient facilities, (iii) procuring through bribery the introduction of a fee schedule in 2011 that denied payment for the performance of outpatient minimally invasive spine surgery, (iv) encouraging patients to initiate civil litigation and medical board complaints against the Plaintiff and similarly trained physicians, (v) obtaining through bribery a moratorium in 2009 that prevented the issuance of licenses for free standing outpatient surgical centers, unless they were commercially partnered with a hospital, (vi) Defendant Neurosurgeons unlawfully agreeing with representatives of Defendant ASIPP that the market for minimally invasive spine surgery would only be divided in a way, that physicians such as the Plaintiff would be limited to performing only discectomies and not fusions, and (vii) otherwise engaging in an overarching scheme to unlawfully monopolize, conspire to monopolize, and allocate the market for minimally invasive spine surgery.

354. The goal, purpose and effect of the Defendants' scheme was to maintain and extend monopoly power with respect to the minimally invasive spine surgery market. Defendants' illegal scheme allowed them to artificially raise their prices due simply to the suppressed competition, and not due to increased costs. This allowed the Defendants to reap substantial unlawful monopoly profits.

355. The agreements between the Defendants are overt acts between separate economic entities-actual and potential competitors-and are illegal per se under state antitrust laws. The agreements made between the Defendant Neurosurgeons, Hospitals and Insurance Companies were that payment for minimally invasive spine surgery, would be made only for cases

68

performed in hospitals or their attached surgical centers, and not to independently owned surgical centers. The Defendant Neurosurgeons' agreement with the Defendant Hospitals was that they would not credential minimally invasive spine surgeons, such as the Plaintiff, for minimally invasive spine surgery. The effect of these agreements was to arbitrarily exclude the Plaintiff and his surgical center from participating commercially in the provision of minimally invasive spine surgery, to patients with insurance policies issued by the Defendant Insurance Carriers. Thus the Defendant Insurance Carriers, Neurosurgeons and Hospitals profited, but the independent surgical centers and minimally invasive spine surgeons incurred losses.

356. Alternatively, this Complaint alleges that the agreements and conspiracy to monopolize are a violation of state antitrust law under a "quick look" or "rule of reason" analysis. The Neurosurgeon Defendants knowingly and intentionally participated in sham litigation against the Plaintiff that included encouraging patients to file lawsuits and complaints with the medical board, and then providing fraudulent 'expert' testimony for the patients and the medical board. The Defendants repeatedly and fraudulently asserted that the Plaintiff was not qualified to perform minimally invasive spine surgery. The Defendants repeatedly and fraudulently asserted that the Plaintiff had deviated from the standard of care because he did not possess hospital or alternative privileges. The Defendants repeatedly and fraudulently asserted that the Plaintiff had deviated from the standard of care because his training did not involve a neurosurgical residency. These claims were false and designed to protect and further the monopoly held by the neurosurgeons and hospitals on minimally invasive spine surgery.

357. The Defendants participated in these sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon, to keep the Plaintiff and similarly trained physicians out of the minimally invasive spine surgery market.

358. In furtherance of the scheme to monopolize the minimally invasive spine surgery market,Defendant Przybyiski committed thirty -(30) separate instances of witness perjury during his expert testimony in April 2013 IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF RICHARD A.KAUL, M.D. TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY.

359. The Defendants perpetrated these falsehoods in a coordinated campaign that lasted eight years. These claims were false and designed to protect and further the monopoly held by the neurosurgeons and hospitals on minimally invasive spine surgery. The Defendants participated in these sham lawsuits for the purposes of using a governmental

69

process as an anticompetitive weapon, to keep the Plaintiff and similarly trained physicians out of the minimally invasive spine surgery market. The Defendants coopted the Plaintiff's patients into their scheme to protect their 'turf', with the promise that their malpractice suits would be strengthened if the Plaintiff's license were revoked.

360. The goal, purpose and effect of the Defendants' scheme was to maintain and extend monopoly power with respect to the minimally invasive spine surgery market, and to prevent the Plaintiff, his surgical center and those of similarly trained physicians from continuing to provide outpatient minimally invasive spine surgery. This restricted availability and suppressed competition, entirely consequent to their illegal scheme, allowed the Defendants to artificially raise their prices, and reap substantial unlawful monopoly profits.

361. The goal, purpose and effect of the Defendant's fraudulent scheme was to maintain and extend its monopoly power in minimally invasive spine surgery. The scheme allowed them to continue charging supra-competitive prices for minimally invasive spine surgery, while causing harm to the public by reducing the availability of the service, and reaping substantial unlawful monopoly profits.

**Deleted: as**

**Deleted: also**

**Deleted: <#>The Defendants knowingly and intentionally engaged in sham litigation against the Plaintiff's physician employees, and repeatedly and fraudulently asserted that the Plaintiff's employees were not qualified to assist the Plaintiff perform minimally invasive spine surgery, and had engaged in insurance fraud. The Neurosurgeon Defendants participated in sham lawsuits for the purposes of using a governmental process as an anticompetitive weapon, to exclude the Plaintiff's employees and similarly trained physicians from the minimally invasive spine surgery market. .**

362. The Defendants also knowingly and intentionally engaged in sham litigation against the Plaintiff's employees' medical licenses, initiating medical board investigations that were intended to ostracize the Plaintiff from his professional colleagues, the purpose of which was to force the Plaintiff to leave the country, and forego the opportunity to seek legal redress. The Defendants abused governmental process to extend their monopoly.

363. As a result of Defendants' illegal conduct, Plaintiff and his physician employees were excluded from the minimally invasive spine surgery market, and were compelled to incur substantial legal fees in the defense of the sham board investigations. But for the Defendants' illegal conduct, the competitors would have continued to expand their scope of practice, increase the availability of minimally invasive spine surgery services, reduce the price of the service, and mitigate the severity of the opiate epidemic, as more patients would have had access to non-opiate modalities of spine care. The public was denied the benefits of competition.

364. The Defendants anticompetitive scheme succeeded in monopolizing the minimally invasive spine surgery market, the consequences of which have been a reduction in the availability of services, an artificial elevation of price, reduced competition and a reduction in the rate of innovation. The last five years have witnessed a decrease in the development of new spinal techniques, with the majority of innovations originating outside the United States. These are the exact problems for which the antitrust laws were designed, and which the Defendants' violations have made evident. The reduced availability of service has contributed to the opiate epidemic.

365. By engaging in the foregoing conduct, the Defendants have violated the following state antitrust laws:

a. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Arizona Rev. Stat. §§ 44-1401, et seq., with respect to the availability of minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had plans to expand nationally.

71

**Deleted:** knew at the time they filed the sham medical board investigations that their claims were false, but

**Deleted:** ere

b.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Cal. Bus. Code §§ 16700, et seq., and Code §§ 17200, et seq., with respect to the availability of minimally invasive spine surgery in California, and in the knowledge that the Plaintiff had plans to expand nationally.

c.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of D.C. Code Ann. §§ 28-45031, et seq., with respect to the availability of minimally invasive spine surgery in the District of Columbia, and in the knowledge that the Plaintiff had plans to expand nationally.

d.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Fla. Stat. §§ 501. Part II et seq., with respect to the availability of minimally invasive spine surgery in Florida, and in the knowledge that the Plaintiff had plans to expand nationally. This conduct constitutes a predicate act under the Florida Deceptive Practices Act.

e.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Kan. Stat Ann. §§ 50-101 et seq., with respect to the availability of minimally invasive spine surgery in Kansas, and in the knowledge that the Plaintiff had plans to expand nationally.

f.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Me. Rev. Stat. Ann. 10, § 1101, et seq., with respect to the availability of minimally invasive spine surgery in Maine, and in the knowledge that the Plaintiff had plans to expand nationally.

72

g. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to the availability of minimally invasive spine surgery in Michigan, and in the knowledge that the Plaintiff had plans to expand nationally.

h. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.52, et seq., with respect to the availability of minimally invasive spine surgery in Minnesota, and in the knowledge that the Plaintiff had plans to expand nationally.

i. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Miss. Code Ann. §§ 59-801, et seq., with respect to the availability of minimally invasive spine surgery in Mississippi, and in the knowledge that the Plaintiff had plans to expand nationally.

j. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Neb. Code Ann. §§ 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nebraska, and in the knowledge that the Plaintiff had plans to expand nationally.

k. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Nev. Ret. Stat. Ann. § 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nevada, and in the knowledge that the Plaintiff had plans to expand nationally.

l. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.M. Stat. Ann. §§

73

57-1-1, et seq., with respect to the availability of minimally invasive spine surgery h New Mexico, and in the knowledge that the Plaintiff had plans to expand nationally.

m.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of New York General Business Law § 340, et seq., with respect to the availability of minimally invasive spine surgery in New York, and in the knowledge that the Plaintiff had plans to expand nationally.

n.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-1, et seq., with respect to the availability of minimally invasive spine surgery in North Carolina, and in the knowledge that the Plaintiff had plans to expand nationally.

o.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.D. Cent. Code § 51-08.1-01, et seq., with respect to the availability of minimally invasive spine surgery in North Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

p.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Or. Rev. Stat. §§ 646.705, et seq., with respect to the availability of minimally invasive spine surgery in Oregon, and in the knowledge that the Plaintiff had plans to expand nationally.

q.  Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of S.D. Codified Laws Ann. § 37-1, et seq., with respect to the availability of minimally invasive spine surgery in South Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

74

r. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, et seq., with respect to the availability of minimally invasive spine surgery h Tennessee, and in the knowledge that the Plaintiff had plans to expand nationally.

s. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Utah Code Ann. §§ 76-10-911, et seq., with respect to the availability of minimally invasive spine surgery h Utah, and in the knowledge that the Plaintiff had plans to expand nationally.

t. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Vt. Stat. Ann. 9, § 2453, et seq., with respect to the availability of minimally invasive spine surgery in Vermont, and in the knowledge that the Plaintiff had plans to expand nationally.

u. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-1, et seq., with respect to the availability of minimally invasive spine surgery in West Virginia, and in the knowledge that the Plaintiff had plans to expand nationally.

v. Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Wis Stat. § 133.01, et seq., with respect to the availability of minimally invasive spine surgery in Wisconsin, and in the knowledge that the Plaintiff had plans to expand nationally.

366. Plaintiff has been injured in his business and property by reason of Defendants' anti-trust violations alleged in this Claim. The injuries consist of: (1) the revocation of the Plaintiff's New Jersey medical license and the loss to his patients of their ability to receive minimally invasive spine care and, (2) exclusion of the Plaintiff from the minimally invasive spine surgery market

which has permitted the Defendants to raise their prices, and (3) the loss into bankruptcy of the
Plaintiff's healthcare corporations, to which were attached $45 million in accounts receivable, a
surgical center license, real estate, and (4) loss of the Plaintiff's professional reputation
developed over thirty years. These injuries are of the type the antitrust laws of the above States
and the District of Columbia were designed to prevent, and flow from that which makes
Defendants' conduct unlawful.

367. Plaintiff seeks damages and treble damages as permitted by law for their injuries
by Defendants' violation of the aforementioned statutes.

### COUNT EIGHT

**For Conspiracy and Combination in Restraint of Trade Under State Law (By Plaintiff Against
Defendants Przybylski + Kaufman + Staats + Cohen + Heary + Mitchell + HUMC + AHS + UH).**

368. Plaintiff incorporates by reference the preceding allegations.

369. Defendants willfully and unlawfully engaged in a continuing illegal contract, combination,
and conspiracy to restrain trade in the minimally invasive spine surgery market, by engaging in
an anticompetitive scheme to exclude the Plaintiff and similarly trained physicians from the
market, and to allocate the market between horizontal competitors.

370. The agreements between the Defendants are horizontal market allocation and price fixing
agreements between actual or potential competitors, and are illegal per se under state
antitrust laws. The Defendant Neurosurgeons and Interventional Pain Physicians agreed that
the latter would limit their practice to minimally invasive endoscopic discectomies. The
Defendant Insurance Carriers conspired with Defendants Przybylski, Staats, and Kaufman, in
their capacities as presidents and senior members of CNS, NASS and ASIPP, to limit payment for
minimally invasive spine surgery to hospitals, or to surgical centers owned by hospitals. The
aforementioned Defendants engage in healthcare business with hospitals, and through their
controlling positions on the credentialing committees, were able to effectuate the illegal
horizontal market allocation agreement.

371. Alternatively, this Complaint alleges that these agreements are an unreasonable restraint
of trade, in violation of state antitrust law, under a "quick look" or "rule of reason" analysis. The
consequence of these improper agreements was the exclusion from the minimally invasive

76

spine fusion market of the Plaintiff and his surgical center, with regards to treating patients

who possessed insurance issued by the Defendant Insurance Carriers.

372. The Neurosurgical Defendants knowingly and intentionally participated in sham litigation

against the Plaintiff that included encouraging patients to file lawsuits and complaints with the

medical board, and then providing fraudulent 'expert' testimony for the patients and the

medical board. The Defendants repeatedly and fraudulently asserted that the Plaintiff was not

qualified to perform minimally invasive spine surgery. The Defendants repeatedly and

fraudulently asserted that the Plaintiff had deviated from the standard of care because he did

not possess hospital or alternative privileges. The Defendants repeatedly and fraudulently

asserted that the Plaintiff had deviated from the standard of care because his training did not

involve a neurosurgical residency. These claims were false and designed to protect and further

the monopoly held by the neurosurgeons and hospitals on minimally invasive spine surgery.

The Defendants participated in these sham lawsuits for the purposes of using a governmental

process as an anticompetitive weapon, to keep the Plaintiff and similarly trained physicians out

of the minimally invasive spine surgery market.

373. The goal, purpose and effect of the Defendant's scheme was to prevent the Plaintiff, his

surgical center and those of similarly trained physicians from continuing to provide outpatient

minimally invasive spine surgery, and thus restrict the availability of the service to the

Defendant Hospitals and Neurosurgeons. This permitted the Defendants to artificially raise

their prices, in the absence of competition.

374. The goal, purpose and effect of the Defendant's fraudulent scheme was to maintain and

extend its monopoly power in minimally invasive spine surgery. The Defendants' scheme

allowed them to continue charging supra-competitive prices for minimally invasive spine

surgery, while causing harm to the public by reducing the availability of the service, and reaping

substantial unlawful monopoly profits.

375. The Defendants knowingly and intentionally engaged in sham litigation against the

Plaintiff's physician employees, and repeatedly and fraudulently asserted that the Plaintiff's

employees were not qualified to assist the Plaintiff perform minimally invasive spine surgery,

and that the Plaintiff had engaged in insurance fraud.

Deleted: in

Deleted: ,

Deleted: , which then permitted them

Deleted: also

Deleted: he

77

376. The Defendants also knowingly and intentionally engaged in sham litigation against the Plaintiff's physician employees, initiating medical board investigations that sought to ostracize the Plaintiff from his professional colleagues, and to force the Plaintiff to leave the country and relinquish the opportunity to seek legal redress. The Defendants abused governmental process to extend their monopoly.

377. As a result of Defendants' illegal conduct, Plaintiff and his physician employees were excluded from the minimally invasive spine surgery market, and were compelled to incur substantial legal fees in the defense of the sham board investigations. Had it not been for the Defendants' illegal conduct, the Plaintiff and his employees would have continued to expand their scope of practice, increase the availability of minimally invasive spine surgery services, reduce the price of the service, and mitigate the severity of the opiate epidemic, as more patients would have had access to non-opiate modalities of spine care. The Defendants' eight-year campaign of greed motivated misconduct has contributed to the opiate epidemic in New Jersey.

378. Had the Plaintiff and similarly trained physicians been allowed to continue expanding their scope of practice in minimally invasive spine surgery, and lawfully compete with the Defendants, then the public would not have been denied the benefits of competition.

379. By engaging in the foregoing conduct, the Defendants have violated the following state antitrust laws:

(a) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Arizona Rev. Stat. §§ 44-1401, et seq., with respect to the availability of minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had plans to expand nationally.

(b) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.J. Stat. § 56:9-10, et seq., with respect to the availability of minimally invasive spine surgery in New Jersey.

78

(c) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Cal. Bus. Code §§ 16700, et seq., and Code §§ 17200, et seq., with respect to the availability of minimally invasive spine surgery in California, and in the knowledge that the Plaintiff had plans to expand nationally.

(d) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of D.C. Code Ann. §§ 28-45031, et seq., with respect to the availability of minimally invasive spine surgery in the District of Columbia, and in the knowledge that the Plaintiff had plans to expand nationally.

(e) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Fla. Stat. §§ 501. Part II et seq., with respect to the availability of minimally invasive spine surgery in Florida, and in the knowledge that the Plaintiff had plans to expand nationally. This conduct constitutes a predicate act under the Florida Deceptive Practices Act.

(f) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Kan. Stat Ann. §§ 50-101 et seq., with respect to the availability of minimally invasive spine surgery in Kansas, and in the knowledge that the Plaintiff had plans to expand nationally.

(g) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Me. Rev. Stat. Ann. 10, § 1101, et seq., with respect to the availability of minimally invasive spine surgery in Maine, and in the knowledge that the Plaintiff had plans to expand nationally.

79

(h) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to the availability of minimally invasive spine surgery in Michigan, and in the knowledge that the Plaintiff had plans to expand nationally.

(i) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Minn. Stat. §§ 325D.52, et seq., with respect to the availability of minimally invasive spine surgery in Minnesota, and in the knowledge that the Plaintiff had plans to expand nationally.

(j) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Miss. Code Ann. §§ 59-801, et seq., with respect to the availability of minimally invasive spine surgery in Mississippi, and in the knowledge that the Plaintiff had plans to expand nationally.

(k) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Neb. Code Ann. §§ 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nebraska, and in the knowledge that the Plaintiff had plans to expand nationally.

(l) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Nev. Ret. Stat. Ann. § 598A, et seq., with respect to the availability of minimally invasive spine surgery in Nevada, and in the knowledge that the Plaintiff had plans to expand nationally.

(m) Defendants, because of their immense political influence within the state chapters and national hierarchy of CN5, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.M. Stat. Ann. §§

80

57-1-1, et seq., with respect to the availability of minimally invasive spine surgery h New Mexico, and in the knowledge that the Plaintiff had plans to expand nationally.

(n) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of New York General Business Law § 340, et seq., with respect to the availability of minimally invasive spine surgery in New York, and in the knowledge that the Plaintiff had plans to expand nationally.

(o) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.C. Gen. Stat. §§ 75-1, et seq., with respect to the availability of minimally invasive spine surgery in North Carolina, and in the knowledge that the Plaintiff had plans to expand nationally.

(p) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of N.D. Cent. Code § 51-08.1-01, et seq., with respect to the availability of minimally invasive spine surgery in North Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

(q) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Or. Rev. Stat. §§ 646.705, et seq., with respect to the availability of minimally invasive spine surgery in Oregon, and in the knowledge that the Plaintiff had plans to expand nationally.

(r) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of S.D. Codified Laws Ann. § 37-1, et seq., with respect to the availability of minimally invasive spine surgery in South Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

81

(s) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Tenn. Code Ann. §§ 47-25-101, et seq., with respect to the availability of minimally invasive spine surgery h Tennessee, and in the knowledge that the Plaintiff had plans to expand nationally.

(t) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Utah Code Ann. §§ 76-10-911, et seq., with respect to the availability of minimally invasive spine surgery h Utah, and in the knowledge that the Plaintiff had plans to expand nationally.

(u) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Vt. Stat. Ann. 9, § 2453, et seq., with respect to the availability of minimally invasive spine surgery in Vermont, and in the knowledge that the Plaintiff had plans to expand nationally.

(v) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of W.Va. Code §§ 47-18-1, et seq., with respect to the availability of minimally invasive spine surgery in West Virginia, and in the knowledge that the Plaintiff had plans to expand nationally.

(w) Defendants, because of their immense political influence within the state chapters and national hierarchy of CNS, ASIPP, NASS and AMA, have intentionally and wrongfully maintained monopoly power in the relevant market in violation of Wis Stat. § 133.01, et seq., with respect to the availability of minimally invasive spine surgery in Wisconsin, and in the knowledge that the Plaintiff had plans to expand nationally.

380. Plaintiff has been injured in his business and property by reason of Defendants' anti-trust violations alleged in this Claim. The injuries consist of: (1) the revocation of the Plaintiff's New Jersey medical license and the loss to his patients of their ability to receive minimally invasive spine care and, (2) exclusion of the Plaintiff from the minimally invasive spine surgery market

82

which has permitted the Defendants to raise their prices, and (3) the loss into bankruptcy of the Plaintiff's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license, real estate, and (4) the loss of the Plaintiff's professional reputation developed over thirty years. These injuries are of the type the antitrust laws of the above States and the District of Columbia were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

381. Plaintiff seeks damages and treble damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

### COUNT NINE
**For Unfair and Deceptive Trade Practices Under State Law (By Plaintiff Against Defendants ASIPP + Kaufman + Staats + Przybylski + CNS + Peterson + Heary + Mitchell + Cohen + HUMC + AHS)**

382. Plaintiff incorporates by reference the preceding allegations.

383. Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.

384. As a direct and proximate result of the Defendants' anticompetitive, deceptive, unfair, unconscionable and fraudulent conduct, the Plaintiff was prevented from nationally developing his outpatient minimally invasive spine surgery business because the market has been monopolized by neurosurgeons and hospitals. The Plaintiff, a recognized innovator in the field, commenced training other minimally invasive spine surgeons in approximately 2007, and had plans to develop a fellowship and standards, that would have increased the number of minimally invasive surgeons in the national market. The Defendants' racketeering and illegal anticompetitive conduct derailed the Plaintiff's plans for global economic and educational expansion. The Defendants' illegal suppression of competition has restricted the public's access to minimally invasive spine surgery, has caused a reduction in innovation, an elevation in price and contributed to the opiate epidemic.

385. The revocation of the Plaintiff's license was disseminated nationally to every state medical board, and was widely publicized on the internet with stories that commenced in April 2012 and persisted until October 2015. These events have caused permanent damage to the Plaintiff's reputation, and caused the regulatory

83

bodies and public in all of the states, to be deceived by the Defendants' fraudulent and anticompetitive scheme against the Plaintiff.

386. By engaging in the foregoing conduct, Defendants have violated the following state Unfair and Deceptive Trade Practices and Consumer Fraud laws:

(a) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, et seq., with respect to the availability of minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had plans to expand nationally.

(b) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, et seq., with respect to the availability of minly invasive spine surgery in Arkansas, and in the knowledge that the Plaintiff had plans to expand nationally.

(c) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., with respect to the availability of minimally invasive spine surgery in Arizona, and in the knowledge that the Plaintiff had plans to expand nationally.

(d) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, et seq., with respect to the availability of minimally invasive spine surgery in Colorado, and in the knowledge that the Plaintiff had plans to expand nationally.

(e) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110h, et seq., with respect to the availability of minimally invasive spine surgery in Connecticut, and in the knowledge that the Plaintiff had plans to expand nationally.

(f) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, et seq., with respect to the availability of minimally invasive spine surgery in Florida, and in the knowledge that the Plaintiff had plans to expand nationally.

84

(g) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, et seq., with respect to the availability of minimally invasive spine surgery in Idaho, and in the knowledge that the Plaintiff had plans to expand nationally.

(h) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, et seq., with respect to the availability of minimally invasive spine surgery in Illinois, and in the knowledge that the Plaintiff had plans to expand nationally.

(i) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, et seq., with respect to the availability of minimally invasive spine surgery in Kansas, and in the knowledge that the Plaintiff had plans to expand nationally.

(j) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, et seq., with respect to the availability of minimally invasive spine surgery in Maine, and in the knowledge that the Plaintiff had plans to expand nationally.

(k) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, et seq., with respect to the availability of minimally invasive spine surgery in Maryland, and in the knowledge that the Plaintiff had plans to expand nationally.

(l) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, § et seq., with respect to the availability of minimally invasive spine surgery in Massachusetts, and in the knowledge that the Plaintiff had plans to expand nationally.

(m) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, et seq., with respect to the availability of minimally invasive spine surgery in Michigan, and in the knowledge that the Plaintiff had plans to expand nationally.

85

(n)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, et seq., with respect to the availability of minimally invasive spine surgery in Minnesota, and in the knowledge that the Plaintiff had plans to expand nationally.

(o)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Missouri Stat. § 407.010 , et seq., with respect to the availability of minimally invasive spine surgery in Missouri, and in the knowledge that the Plaintiff had plans to expand nationally.

(p)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 598.0903, et seq., with respect to the availability of minimally invasive spine surgery in Nebraska, and in the knowledge that the Plaintiff had plans to expand nationally.

(q)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, et seq, with respect to the availability of minimally invasive spine surgery in Nevada, and in the knowledge that the Plaintiff had plans to expand nationally.

(r)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat § 358-A: 1, et seq., with respect to the availability of minimally invasive spine surgery in New Hampshire, and in the knowledge that the Plaintiff had plans to expand nationally.

(s)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat § 57-12-1, et seq., with respect to the availability of minimally invasive spine surgery in New Mexico, and in the knowledge that the Plaintiff had plans to expand nationally.

(t)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, et seq., with respect to the availability of minimally invasive spine surgery in New York, and in the knowledge that the Plaintiff had plans to expand nationally.

110

(u) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, et seq., with respect to the availability of minimally invasive spine surgery in North Carolina, and in the knowledge that the Plaintiff had plans to expand nationally.

(v) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Okla. Stat. 15 § 751, et seq., with respect to the availability of minimally invasive spine surgery in Oklahoma, and in the knowledge that the Plaintiff had plans to expand nationally.

(w) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws § 6-13.1-1, et seq., with respect to the availability of minimally invasive spine surgery in Rhode Island, and in the knowledge that the Plaintiff had plans to expand nationally.

(x) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, et seq., with respect to the availability of minimally invasive spine surgery in South Dakota, and in the knowledge that the Plaintiff had plans to expand nationally.

(y) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, et seq., with respect to the availability of minimally invasive spine surgery in Tennessee, and in the knowledge that the Plaintiff had plans to expand nationally.

(z) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code § 13-11-1, et seq., with respect to the availability of minimally invasive spine surgery in Utah, and in the knowledge that the Plaintiff had plans to expand nationally.

(aa) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, et seq., with respect to the availability of minimally invasive spine surgery in Virginia, and in the knowledge that the Plaintiff had plans to expand nationally.

111

(bb) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wash. Rev. Code § 19.86.010, et seq., with respect to the availability of minimally invasive spine surgery in Washington, and in the knowledge that the Plaintiff had plans to expand nationally.

(cc) Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-101, et seq., with respect to the availability of minimally invasive spine surgery in West Virginia, and in the knowledge that the Plaintiff had plans to expand nationally.

387. Plaintiff has been injured in his business and property by reason of Defendants' anti-trust violations alleged in this Claim. The injuries consist of: (1) the revocation of the Plaintiff's New Jersey medical license and the loss to his patients of their ability to receive minimally invasive spine care and, (2) exclusion of the Plaintiff and similarly trained physicians from the minimally invasive spine surgery market, which has reduced competition and permitted the Defendants to raise their prices, and (3) the loss into bankruptcy of the Plaintiff's healthcare corporations, to which were attached $45 million in accounts receivable, a surgical center license, real estate, and (4) loss of the Plaintiff's professional reputation developed over thirty years. These injuries are of the type the antitrust laws of the above States and the District of Columbia were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

388. Plaintiff seeks damages and treble damages as permitted by law for their injuries by Defendants' violation of the aforementioned statutes.

**COUNT TEN**
**Unjust enrichment**
**(By Plaintiff Against Defendants ASIPP + Kaufman + Przybylski + CNS + Peterson + UH + Heary + Mitchell + Cohen + HUMC + AHS)**

389. Plaintiff incorporates by reference the preceding allegations

390. Defendants have benefited from the monopoly profits on the increased revenues that have flowed from the illegal elimination of the competition presented by the Plaintiff and similarly trained physicians

112

Deleted: has

391. Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to the price gouging, increased patient referrals and the charging of artificially elevated prices, consequent to the elimination of the competition presented by the Plaintiff and similarly trained physicians. The misconduct of the Defendants has conferred upon them an economic benefit attributable to monopoly profits that has been to the economic detriment of the Plaintiff and similarly trained physicians. It would be futile for the Plaintiff to seek a remedy from any party with whom they had privity of contract. Defendants have paid no *legal* consideration to anyone for any benefits received indirectly from the Plaintiff. Defendants did, however, engage in the bribing of public officials in order to further their illegal anticompetitive scheme.

392. The financial benefits derived by Defendants rightfully belongs to the Plaintiff, because the monies were a consequence of the increased revenues that flowed from the provision of minimally invasive spine surgery to patients, who either belonged to the Plaintiff's practice, or who would, in all likelihood have sought treatment from the Plaintiff with the continued expansion of his practice and reputation.

393. It would be inequitable under the laws of all states and jurisdictions within the United States for the Defendants to be permitted to retain any of the monies that derived from their unfair and unconscionable methods, acts and trade practices, as are alleged in this Complaint. Defendants should be compelled to disgorge in a common fund for the benefit of the Plaintiff, all unlawful or inequitable proceeds received by them.

394. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff.

**COUNT ELEVEN**
**Deprivation of Right under Color of Law**
**(By Plaintiff against Defendants Kaufman in his official capacity + Przybylski in his official capacity + Allstate + Geico)**

395. Plaintiff hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth.

396. The Defendants deprived the Plaintiff of his right to due process by:

113

(a) Forging, altering and tampering with court transcripts and the Opinion, issued on December 13, 2013, of New Jersey Administrative Law Judge, Jay Howard Solomon.

(b) Failing to have an independent analysis and comparison of the state authored transcripts, the independent transcripts and the court audio recordings.

(c) Failing to respond to the Plaintiff's written pleas for an investigation of the forged transcripts.

(d) Failing to acknowledge the impartiality of the medical board, in adjudicating the Plaintiff's complaint of forged transcripts, in violation of the Plaintiff's Fourteenth Amendment right to an impartial tribunal. The Defendants acted with malicious and reckless disregard for the Plaintiff's due process rights, despite knowing that the Plaintiff had on June 7, 2012, requested the appointment of a special prosecutor and ad hoc medical board. The latter request was submitted as a consequence of AG Chiesa's prejudicial comments to the media on May 9, 2012, and the illegal suspension of the Plaintiff's CDS prescribing license on May 22, 2012 by AG Chiesa's subordinate, and acting director of the Division of Consumer Affairs, Eric Kanefsky, Esq.

(e) Failing to exclude DAG Hafner from any involvement in the Plaintiff's application for license reinstatement, in light of the ethics complaint filed by the Plaintiff in September 2013.

(f) Failing to suspend the legal proceedings, until DAG Hafner, had recused herself from the matter. Hafner's personal animus towards the Plaintiff, and her personal relationship with Defendant Kaufman, violated the Plaintiff's right to an impartial tribunal, a violation that was magnified by the unconstitutional configuration of the mechanism of physician regulation.

95. The Defendants committed and conspired to commit perjury. The Defendants knew that the Plaintiff was qualified, credentialed and licensed to perform minimally invasive spine surgery. The Defendants abused their positions of public authority, to mislead the public into believing their lies, and thus violated the Plaintiff's right to substantial due process.

114

**397.** The Defendants committed and conspired to commit a knowingly dishonest interpretation of the alternative privileges regulation. The Defendants knew the regulation was not required for the performance of minimally invasive spine surgery. In fact, during the OAL proceedings, when DAG Hafner was unable to articulate an argument in support of her contention, OAL Judge Solomon interjected with his own interpretation, albeit flawed.

The Defendants committed and conspired to commit a knowingly dishonest interpretation of the rights afforded to the Plaintiff by his plenary medical license that permitted him to practice both medicine and SURGERY.

**398.** The Defendants committed and conspired to commit a concealment of the truth of the clinical effectiveness of the Plaintiff's minimally invasive spine surgery practice, by refusing with ill intent, the Plaintiff's suggestion to have his practice independently analyzed and monitored. The CARRIERS are "persons" under 42 U.S.C. § 1983. The CARRIERS established and fund the Office of the Insurance Fraud Prosecutor, the Office of the Attorney General, and draft healthcare legislation for the state, a function that is governmental in nature.

**399.** In 2009, the Seventh Circuit summarized the US Supreme Court's criteria, to determine whether the actions of private parties constituted governmental functions. The tests were (1) the symbiotic relationship test (Burton v Wilmington Parking Suth., 36S U.S. 715, 81 S.Ct. 856, 6 L.Ed2d 45 (1961), (2) the state command and encouragement test (Moose Lodge No. 107, 407 U.S. at 176—77, 92 S.Ct (196S), (3) the joint participation doctrine (Lugar v Edmonton Oil Co., 1982), (4) the public function test (Jackson v Metro Edison Co., 419 U.S. 345, 353 95 S.Ct 449, 42 L.Ed2d 477 (1974).

**400.** The State Actor Tests that confirm the CARRIERS 1983 "person" status are the (i) symbiotic test, (ii) joint participation doctrine, (iii) state command and encouragement test, (iv) public function test, (v) pervasive entwinement.

**401.** State action is found when a private corporation or actor provides a "public function" i.e. the drafting of healthcare legislation, as in Marsh v Alabama, 326 U.S. 501 (1946). See also

115

Terry v Adams 345 U.S. 461 (1953); Evans v Newton, 382 U.S. 296 (1966) ("That is to say, when private individuals or groups are endowed by the State with powers or function governmental in nature, they become agencies or instrumentalities of the State and subject to Constitutional limitations."). State action is found when the private corporation is heavily regulated by the state i.e. the Department of Banking and Insurance, thereby giving the state control of the corporations acts.

402. The Plaintiff alleges, upon information and belief, that lawyers for Defendants Allstate and Geico, assisted, in the drafting of Jay Howard Solomon's opinion that was issued on December 13, 2013.

403. The Defendants abused their official public and State Actor positions to advance their private commercial interests, at the expense of the Plaintiff's Constitutional right to due process. Defendants Przybylski and Kaufman jointly committed thirty-one (31) acts of perjury, when they provided 'expert' testimony in April and May 2013, in the MATTER OF THE SUSPENSION OR REVOCATION OF THE LICENSE OF RICHARD A. KAUL, M.D. TO PRACTICE MEDICINE AND SURGERY IN NEW JERSEY.

404. Defendants Allstate and Geico are alleged to have conspired with Jay Howard Solomon to issue a fraudulent opinion, that contains two hundred and seventy-eight (278) separate acts of misrepresentation, perjury, evidential omissions and gross mischaracterizations REFERENCE SOLOMON CRITIQUE

405. Defendants Przybylski and Kaufman abused the power of their public function for personal gain. These Defendants, in the knowledge that they were local business competitors of the Plaintiff, knew that their testimony was conflicted, but they failed to recuse themselves from the provision of 'expert' testimony. In fact, Defendant Przybylski, devoted four (4) days to providing false testimony against the Plaintiff, that was founded on a standard that he admitted on cross-examination did not exist.

**COUNT TWELVE**
**Commercial disparagement**
**(By Plaintiff against Defendants ASIPP + Kaufman + Przybylski + Peterson + Allstate + Geico +**
**UH + Mitchell + Cohen + HUMC + AHS)**

406. Plaintiff hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth.

407. Commencing in 2005 the Defendants knowingly and with malice made false statements

116

Deleted: the

Deleted: CARRIERS

Deleted: A

Deleted: o

Deleted: .

Deleted: s

Deleted: ,

Deleted: ,

Deleted:

to patients, physicians, medical device suppliers and lawyers that the Plaintiff was not qualified
to perform minimally invasive spine surgery

408. The false statements were intended to cause financial damage to the Plaintiff and his
business, and did in fact cause immense harm to the Plaintiff's reputation and business.

409. The Defendants knew that the Plaintiff was qualified to perform minimally invasive spine
surgery, but acted with reckless disregard of its truth.

117

410. The Defendant encouraged patients to file lawsuits against the Plaintiff, and criticized the Plaintiff's work, the purpose of which was to attack the Plaintiff's reputation and economic standing, and to have the Plaintiff's medical license revoked.

411. The Defendants' wrongful acts caused immense harm to the Plaintiff's economic standing and reputation.

### COUNT THIRTEEN
**Intentional Interference with prospective economic advantage**
**(By Plaintiff Against Defendants ASIPP + Kaufman + Staats + Przybylski + CNS + Peterson +**
**Allstate + Geico + UH + Mitchell + Cohen + HUMC + AHS)**

412. Plaintiff hereby repeats and incorporates by reference each and every one of the foregoing paragraphs as though fully set forth herein.

413. In 2005, upon information and belief, members of the New Jersey neurosurgical community, filed a complaint against the Plaintiff with the medical board.

414. On or about April 2008, Defendant Heary encouraged patient FK to file a lawsuit and a complaint with the medical board against the Plaintiff.

415. In 2007, Defendant Cohen filed a complaint against the Plaintiff with the medical board.

416. From 2008 to 2012 the Defendants encouraged spine device representatives to cease supplying the Plaintiff with the devices necessary to perform minimally invasive spine surgery.

417. From 2005 to 2012 the Defendants encouraged physicians not to refer patients to the Plaintiff, and slandered the Plaintiff's reputation by stating that he was not qualified to perform minimally invasive spine surgery.

418. Upon information and belief, it is alleged that the Defendant neurosurgeons, met with New Jersey politicians on multiple occasions, the purpose of the meetings being the revocation of the Plaintiff's medical license.

419. Upon information and belief, it is alleged that on or about 2011 the Defendants conspired with members of the medical board to revoke the Plaintiff's license

420. The Defendant's aforesaid actions constituted knowing, intentional and voluntary interference with the Plaintiff's minimally invasive spine surgery practice.

Deleted: Lomazow +

Deleted: d

Deleted: ,

Deleted: y

Deleted: the Defendant politician

118

421. The Defendant's aforesaid actions constituted negligent interference with the Plaintiff's minimally invasive spine surgery practice, and caused the revocation of the Plaintiff's license in 2014.

422. The Defendant actions constituted unjustified and wrongful interference with the Plaintiff's minimally invasive spine surgery, and a reasonable expectation of economic advantage as aforesaid, and did not rest upon a legitimate interest, or have a legitimate purpose.

423. As a result of the Defendant's actions, the Defendants are liable for the damages caused by their interference with the Plaintiff's minimally invasive spine surgery practice.

424. The Plaintiff had a reasonable expectation of economic advantage or benefit flowing from the revenues of his minimally invasive spine surgery practice.

425. The Defendants knew or should have known of the expectancy of the aforesaid economic advantage of the Plaintiff's minimally invasive spine surgery practice.

426. In the absence of the Defendant's wrongful acts as foresaid, it is reasonably probable that the Plaintiff would have realized its aforesaid economic advantage or benefit with respect to his ongoing minimally invasive spine surgery practice.

427. As a result of the Defendant's aforesaid wrongful acts, the Plaintiff has suffered damages.

**COUNT FOURTEEN**
**Aid in the Commission of Tort**
**(Against all Defendants)**

428. The Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs and incorporates same as if set forth fully herein

429. The Defendants pursued a common plan or design to commit a series of torts upon the Plaintiff, through their active participation, encouragement, or ratification of the harm done to the Plaintiff, which inured to Defendants' collective benefit

430. The Defendants are jointly and severally liable to the Plaintiff for his damages suffered as a consequence of all of the aforementioned torts, claims and counts.

Deleted: is

## VII. DEMAND FOR JUDGMENT

**WHEREFORE,** Plaintiff seeks judgment against the Defendants jointly and severally, as follows:

(a) Compensatory damages from all Defendants in their individual capacities.

(b) Consequential damages from all Defendants in their individual capacities.

(c) Punitive damages from all Defendants in their individual capacities.

(d) Declaring that the mechanism of physician regulation in New Jersey, as described
herein, is unconstitutional and violated the Plaintiff's right to due process.

(e) Declaring that the revocation of the Plaintiff's medical license was procured through
illegal means, and was an illegal act.

(f) Declaring that the continued revocation of the Plaintiff's medical license is illegal, and is
a consequence of fraudulent legal proceedings, and an unconstitutional mechanism of
physician regulation.

(g) Declaring that the May 22, 2012 suspension of the Plaintiff's CDS Registration was
procured illegally.

(h) Ordering the immediate reinstatement of the Plaintiff's plenary license to practice
medicine and surgery in New Jersey.

(i) Ordering the immediate reinstatement of the Plaintiff's CDS Registration.

(j) Declaring that the conduct alleged herein is in violation of Sections 1 and 2 of the
Sherman Act, of the other statutes set forth above, and of the common law of unjust
enrichment under the laws of all states and jurisdictions within the United States.

(k) Enjoining Defendants from continuing the illegal activities alleged herein.

(l) Granting Plaintiff equitable relief in the nature of disgorgement, restitution and the
creation of a constructive trust to remedy Defendants' unjust enrichment.

(m) Awarding the Plaintiff treble, multiple, punitive and/or other damages in the amount to
be determined at trial or through settlement.

(n) Awarding the Plaintiff costs of suit, including reasonable attorneys' fees as provided by
law.

120

(o) Granting such other relief as is necessary to correct for the anti-competitive effects

caused by the unlawful conduct of Defendants, and as the Court deems just.

(p) Expunging the prior revocation of Plaintiff's medical license from the public record.

## VIII. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable

## IX.    DEMAND FOR INSURANCE

Demand is hereby made for all insurance policies, which may cover the damages alleged in this
Complaint

RESPECTFULLY SUBMITTED this 27th day of October, 2017.

By:    _____

Richard Arjun Kaul, MD
Propria Persona
120 Temple Terrace
Palisades Park, NJ 07650
201 989 2299
drrichardkaul@gmail.com

120

# REFERENCES

1. William Maixner, MD – How do we decrease addiction to opioids but still treat millions with chronic pain – STAT 2016 November 18
Found at https://www.statnews.com/2016/11/18/opioids-addiction-chronic -pain/

2. Dr. Kaul lectures about minimally invasive spine surgery
Found: https://www.youtube.com/watch?v=AObxnXGmQkk

3. Richard Barbetta surveillance video November 19, 2009
Found at: https://www.youtube.com/watch?v=PyOPYqoSQDs

4. Frances Kuren surveillance video August 2012.
Found at: https://www.youtube.com/watch?v=Dy7FLaETIHM&t=8s

5. First outpatient minimally invasive lumbar fusion March 2005 (video posted 2011)
Found at: https://www.youtube.com/watch?v=JX4bnRPPucI

6. The Spine Africa Project November 2011
Found at: https://www.youtube.com/watch?v=Zu50Ik2l2Sc

7. Transforaminal epidural injection March 2011
Found at: https://www.youtube.com/watch?v=9NlJV7XhBB0

8. First outpatient minimally invasive correction of adolescent spondylolisthesis August 2011
Found at: https://www.youtube.com/watch?v=q_HBzqfggrg&t=5s

9. First outpatient minimally invasive correction of four level degenerative scoliosis August 2011
Found at: https://www.youtube.com/watch?v=oxaV5IJuZ7c&t=15s
10. The DAG Hafner video June 2012
Found at: https://www.youtube.com/watch?v=guwx5kuBiEg

11. Steven Lomazow interview January 2014.
Found at: https://www.youtube.com/watch?v=sFtE8EvEMsU

12. Patients of Dr. Richard Kaul respond to Lindy Washburn and the Bergen Record
Found at: https://www.youtube.com/watch?v=XQK-nquMfJ0

13. The Human Cost of Political Corruption August 2013
Found at: https://www.youtube.com/watch?v=OGxHDp04twQ

121

Exhibit 1

23

1 A    Repeat that, please.
2    Q    While you were treating with Dr.
3 Qureshi in March of 2009 did you determine that you
4 were going to get a second opinion in regards to
5 your pain management?
6 A    Yes.
7    Q    Okay. Why did you decide to go get a
8 second opinion regarding your pain management in
9 March of 2009?
10 A    Cause I felt I had a right to go for another
11 opinion.
12    Q    Was there any other reason besides it
13 being your right to get a second opinion?
14 A    Because I didn't feel I was getting better
15 and I went to see Winne.
16    Q    What did Winne do for you?
17 A    He evaluated me.
18    Q    Did he refer you to any other
19 physicians?
20 A    Dr. Heary.
21    Q    Any other physicians?
22 A    Dr. Kaufman but I did not go see Dr.
23 Kaufman.
24    Q    Did he also refer you to Dr. Morse?
25 A    He's the neurologist?

24

1    Q    I believe he is a neurologist.
2 A    Yes.
3    Q    What did Dr. Heary say to you at your
4 first appointment?
5 A    I think I just answered that. He spoke to me
6 about Dr. Kaul.
7    Q    Did he provide you any solutions or
8 options for dealing with your pain?
9 A    Surgery.
10    Q    What kind of surgery did he offer
11 you?
12 A    He gave me three options.
13    Q    Do you recall what the three options
14 were?
15 A    Well, in laymen's terms I'll tell you what
16 he said. The first one would be to literally
17 reconstruct my whole spine. Number two would be to
18 redo the fusion. And number three, implant a
19 spinal stimulator in my spine.
20    Q    Did you decide to undergo surgery
21 with Dr. Heary?
22 A    Presently at that time I was going to go
23 forward but I had complications with other medical
24 issues.
25    Q    Which of the three options did you

STATE SHORTHAND REPORTING SERVICE,   INC.

**Exhibit 2**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RICHARD ARJUN KAUL, MD                    CIVIL ACTION NO. 2:16-cv-02364-KM-SCM

       Plaintiff,

v.                                        CERTIFICATION OF KENNETH SABO

CHRISTOPHER J. CHRISTIE, ESQ, et al.,

       Defendants

Richard Arjun Kaul, MD
Propria Persona
120 Temple Terrace
Palisades Park, NJ 07650
201 989 2299

Kenneth Sabo hereby certifies to the Court as follows:

1. I am (insert age), a United States citizen, a US Veteran, and was a patient of Dr. Kaul
   from August 23, 2010 to June 1, 2012.

2. I make this statement in support of the claims that Dr. Richard Arjun Kaul has filed
   against the Defendants in the above matter.

3. On --- I initially consulted with Dr. Kaul, after having witnessed a segment on Channel 12
   News, in which he and a sixteen-year-old gymnast, whose spinal deformity he corrected,
   were both interviewed. I was impressed with what I saw, and made an appointment to
   see Dr. Kaul.

4. I initially consulted with Dr. Kaul on August 23, 2010, and he ordered a series of tests to
   diagnose the cause of the pain in my neck and lower back. Based on the results of these

Ken                                     157643140 103              p.3

tests, he implemented a series of spin al injections, which provided temporary pain
relief. However, due to the persistence of the pain, he performed minimally invasive
spine surgery on my neck and lower back. The surgeries were successful in reducing my
pain, and improving my ability to carry out my normal activities of daily living. I was
treated with compassion, respect and received excellent care, from Or. Kaul and his
staff. The facility at which the operations were performed was modern , efficient, well
organized and professionally operated, and on the days that I was at the NJSR Surgical
Center, I often heard other patients express high opinions of Or. Kaul. Both his patients
and his staff expressed immense respect for his abilities, and this was evident to me
from the professional, yet fr ie nd ly environment,  that I experienced while under the care
of Dr. Kaul.

S. On --- 1 came to learn that his New Jersey medical license had been suspended, and that
I would no longer be able to treat with him. This caused me great disappointment, and
since then, I have been unable to find a physician that provides the high level care I
received from Dr. Kaul

6. On - I received a phone call from an individual, who identified herself as Doreen
Hafner, a New Jersey deputy attorney general. Ms. Hafner explained that she was
investigating Dr. Kaul and that she wanted to interview me, because Dr. Kaul had
performed procedures on my spine. I agreed to an interview, and on - Ms. Hafner and
- of her associates came to my house.

7. The interview lasted approximately forty-five minutes and during the interview the
following exchanges occur red :

(a) Ms. Hafner requested that I testify against Or. Kaul - I refused, and explained to her that
I held Dr. Kaul in the highest regard, that he had reduced my pain, and improved the
quality of my life. I told her that I believed his surgery had been successful, and that I
was very disappointed when he left.

(b) Ms. Hafner attempted to character ize Dr. Kau l as dishonest, by stating that on his
website he described himself as a board certified minimally invasive spine surgeon, and
that he was not-I explained that I decided to consult with Dr. Kaul after having seen his

Ken

157043140103      p.4

interview  with Dr. Derek DaSilva on Channel 12 News, and was very impressed with how
he had helped a sixteen-year old gymnast return to gymnastics. I told her that I found
Dr. Kaul to be very forthright, an opinion that I he ard from many of his patients.

(c) Ms. Hafner asked me if I knew that Dr. Kaul had been arrested in Lo ndon and charged
with manslaughter, and she described in detail the events that had occurred in a dental
clinic - I explained that alt hough I didn't know these detail s, it did not change the fact
that 1 was t reate d well by Dr. Kaul, and that his procedures reduced my pain, and
improved my quality of life. I t old her that everybody I spoke to about Dr. Kaul,
described him as phenomena l.

(d) Ms. Hafner stated that the attorney general wanted to revoke Dr. Kaul's license. I asked
why they would want to do such a thing, and I suggested that it should just be
su spended for six mont hs, as he had dedicated his whole life to his car eer. Ms. Hafner's
response were words to the effect that suspension was not an option, and' 'what if he
hurts someone". I told her that I had heard nothing but good things from other patients
about Dr. Kaul

8.   After the interview Ms. Hafner telephoned me approximately six tim es, and on each
occasion attempted to have me testify against Dr. Kaul, and on each occasion I refused .

I hereby certi fy that the foregoing statement s mad e by m e are true. I am aware that if any of
the foregoing statements made by me are will fully false, I am sub ject to punish me nt

Dated: July 12, 2017

;enneth (place middle initial) Sabo

**Exhibit 3**





Patient Reviews
May 6, 2012

**AMAZING.**

Far and few between are the doctors that care as much as Dr. Kaul. He
goes above and beyond to ensure that you fully understand everything
about your condition and truly looks out for your best interest. In a
society where ego is huge - he puts you, his patient first. His top priority
is taking care of you. I trust him 100% with my health and well being.

View rating details
Mar 26, 2012

**GREAT, CARING, COMPASSIONATE, SINCERE AND HONEST - JUST A FEW
WORDS TO DESCRIBE DR. RICHARD KAUL.**

I highly recommend Dr. Kaul. He is amazingly kind, caring and
compassionate. I've seen him several times and have had several
procedures performed by him. He kept my best interests at heart.
Overall an outstanding doctor!

View rating details
Aug 8, 2011

**WONDERFUL CARING DOCTOR**

I went to Dr. Kaul for years and he would do ANYTHING to help you..
What a great doctor!!!

View rating details
May 11, 2011

**WHAT A GREAT DOCTOR!**

DR. RICHARD KAUL HAPPENS TO BE 1 OF THE MOST BRILLIANT AND
GIFTED DOCTOR I KNOW. HE IS UP TO DATE ON ALL THE NEWEST
TECHNICS OF SURGERY WITHOUT ALL THE BUTCHERING MOST OTHER
DOCTORS PROVIDE. HIS HEALING TIMES ARE SHORTER AND THE INCISIONS
ARE NEXT TO NOTHING.HE TRULY HAS BEEN BLESSED BY GOD WITH
HANDS OF GOLD AND HIS KNOWLEDGE OF MEDICINE. I HIGHLY
RECOMMEND HIM TO EVERYONE WITH SPINAL ISSUES.

View rating details
Feb 26, 2011

**A GREAT DR. AND HUMANITARIAN**
Reviewer: John Zerbini

If this is Dr. Richard Kaul who is also a spine surgeon, I have absolutely
nothing but great things to say about this Dr. He is in the middle of
helping me with a very difficult case which other Dr.s did not even want
to touch.He is a Godsend, I am a real person and not a fake review,
anyone that doubts that can email me at johnz616@yahoo.com and I will
tell you further about Dr.Kaul. As I said he is not only a phenomonal Dr.
but a humanitarian, he is one of only a handful of Drs. that is in it to help
people, not just for the money. He gets 5 stars all the way from me.And
as I said I invite you to emaal me if you have any doubts, as i have no
affiliation with the Dr. besides being his patient.

View rating details
Feb 21, 2011

**CALMED MY FEARS**

I first saw Dr. Kaul in March 2008. I had been to several Pain Management
doctors over the course of 3 years. None of whom would treat me. In my
first visits, Dr.Kaul had recomended a series of injections, I got scared
and didnt go back. The following year, in January 2009- I went back to
see him as the pain was unbelievable. Again Doctor Kaul had
recomemnded the injections for relief. I told him I was scared and this is
why I didnt come back originaly. Dr Kaul put me at ease, and today, I am
greatful he did! I recomend Dr. Kaul to anyone who was or is in my
situation. He has a way of comfort. Dr.Kaul, thank you for your patients,
Kindness, and help. Today I can run with both my grandchildren.
Something I missed out on for to long!

**Exhibit 4**

RICHARD ARJUN KAUL, MD                    CIVIL ACTION NO. 2:16-cv-02364-KM-SCM

          Plaintiff,

v. CERTIFICATION OF JOHN ZERBINI

CHRISTOPHER J. CHRISTIE, ESQ, et al.,

          Defendants

Richard Arjun Kaul, MD
Propria Persona
120 Temple Terrace
Palisades Park, NJ 07650
201 989 2299

John Zerbini hereby certifies to the Court as follows:

1.  I am forty-three (43) years old, a United States citizen and was a patient of Dr. Kaul from
    November 24, 2010 to July 21, 2011.

2.  I make this statement in support of the claims that Dr. Richard Arjun Kaul has filed
    against the Defendants in the above matter.

3.  In late July 2017 I spoke with Dr. Richard Kaul several times regarding various issues that
    pertain to the above matter. The following represents the essence of what was
    discussed. The information contained in this statement is a representation of the
    conversations that took place between March 2012 to late 2013, between myself, Dr.
    Kaufman and Deputy Attorney General, Doreen Hafner. Where the conversation is
    quoted verbatim it is marked in "". I have examined this record and signed it as

                                        1

representative of what was said in the conversations. I have organized the conversations
into 5 sections for ease of interpretation:

### (a)  Report of conversations between Dr. Kaufman and myself

I had several conversations with Dr. Kaufman in which he expressed his opinion of Dr. Kaul and
also his intention to destroy Dr. Kaul's medical career. Dr. Kaufman frequently directed these
opinions to me, and to the nurses who assisted him, after he had performed procedures on my
spine.

Dr. Kaufman was not interested in the care I had received from Dr. Kaul, but was obsessed with
how he was planning to cause harm to Dr. Kaul. It was obvious to me that he had no concern
for my welfare, as all of the time we spent together from March 2012 to November 2012, he
devoted to telling me and others how he was going to destroy Dr. Kaul. It was, to say the least,
extremely unprofessional and rather disturbing.

These conversations occurred mainly in a curtained consulting room in the pain management
lab, at Overlook Hospital New Jersey. The curtains of my cubicle were not always drawn, and
the area was an open space, in which at any one time, there were a least forty other people,
comprised of patients and staff. I would always sit in a cardiac chair, and Dr. Kaufman's
comments were loud enough for all patients and nurses to have clearly heard what was being
said.

Dr. Kaufman 'ranted' about Dr. Kaul, at great length. I felt that Dr. Kaufman was "bragging"
about his actions towards Dr. Kaul. He made it clear that he had instigated proceedings against
Dr. Kaul and said that he and "a few other doctors" were going after Dr. Kaul. I was not aware
of the names of the other doctors.

The first time that Dr. Kaufman discussed these things with me was in March 2012.

Dr. Kaufman seemed to have some kind of vendetta against Dr. Kaul, and made comments to
the effect that he was going to destroy Dr. Kaul's medical career, his reputation, and make sure
he never worked again as a doctor. He stated that he was going to make sure Dr. Kaul was
ostracized, and that he and a group of five other doctors had been working together since at
least 2011, to make sure Dr. Kaul's medical license was revoked. He mentioned that they were

2

going to have articles and stories published, that caused permanent damage to Dr. Kaul's
reputation, so that he would never be able to find work. Dr. Kaufman told me, "Dr. Kaul is a
criminal", and that he [Kaufman] had instigated the plan to have Dr. Kaul's license revoked. He
used words to the effect that he was going to come right after Dr. Kaul, that he was going to
tear him apart, and that Dr. Kaul would be left with nothing. He told me that he would not stop
until he had achieved these acts.

I recall that Kaufman said that he had found something about Dr. Kaul that "really pissed him
off which is why he acted in this way". Kaufman said, "Dr. Kaul has no business being a doctor",
he has no business practicing medicine. He told me that he would make sure Dr. Kaul never
practiced medicine again.

During my conversations with Dr. Kaul I told him that I could not understand why Dr. Kaufman
had such hatred towards him. I had never witnessed such venom, and he [Kaufman] seemed to
have the small man angry syndrome. Kaufman is about five foot six inches, and one hundred
and forty pounds.

Dr. Kaufman ranted about Dr. Kaul, in this way, at about two thirds of our consultations. I
consulted with Dr. Kaufman every six weeks over period of one year, from March 2012 to late
2013.

The comments that Kaufman made about Dr. Kaul were made directly to me, and frequently in
the presence of other staff and patients. My recollection of these comments was so vivid that I
even remember the clothes I was wearing at each consultation, and on one occasion it involved
a particularly bright stripped collared shirt.

In my opinion there was clear evidence for defamation of character, as when Dr. Kaufman was
ranting, there were approximately 14 other people within earshot.

I told Dr. Kaul, during our conversations, that Dr. Kaufman "went after you (Dr. Kaul) like fury".
"he was on fire. He was pretty vile with his words"

I recounted how, in my earlier conversations with Dr. Kaufman, he said, "Check up on this guy
(Dr. Kaul) on the internet and you will see that I and five other doctors have already taken
action against him". When I went home I checked the internet and found what Dr. Kaufman
had said, as well as the name of several other doctors who were involved.

3

During one of my conversations with Dr. Kaul, I told him, "I left Kaufman but I think he would tell you that he left me". I described to Dr. Kaul how Dr. Kaufman would not return my calls, when I telephoned his office, because my pain pump was not working, and I was in severe pain. This happened on multiple occasions. On one occasion, as a result of not having received a response from Dr. Kaufman after one week, and being in severe pain, I went to see my family physician. I subsequently told Dr. Kaufman that I had consulted with another doctor, and initially he said "no problem". However, 3 months later he became angry and told me that I had "violated his trust" and that he would no longer treat me. He started screaming at me, and I felt humiliated and began to cry. I pleaded with him not to suddenly stop prescribing my medications, but he didn't seem to care, and became very cold and callous. This was in October 2012.

After having been abandoned by Dr. Kaufman, I attempted to find another physician to manage my pain. However, it proved very difficult, because they all contacted Dr. Kaufman, who told them not to accept me. Dr. Kaufman would then call me and berate me on the phone for "violating his trust". I eventually went to see Dr. Sukdeb Datta.

### (b) My comments regarding my perception of the relationship between Dr. Kaufman and Deputy Attorney General, Doreen Hafner

During my conversation with Dr. Kaul I commented that "he [Kaufman] was "very chummy with that prosecutor". I observed that Dr. Kaufman's relationship with Doreen Hafner was "weirdly close" and that "it was really weird, moochy coochy, strange." I noted that Dr. Kaufman called the Deputy Attorney General by her first name, and went out to lunch with her. I observed that Dr. Kaufman was oddly "chummy" with Hafner, almost as if they were "in a relationship". Kaufman frequently asked me to ask Doreen Hafner questions, and vice versa.

### (c) My recollections of my meetings with Doreen Hafner

I recollect Dr. Kaufman saying on several occasions, "I'm going to see her [Hafner] later today or to have lunch with her".

I recollect at my first meeting with Hafner, she had two female investigators with her. The meeting occurred at my attorney's office. They inspected my back and how well I was able to

4

walk. After this first meeting, Hafner contacted me directly, and our communications from that point did not involve my attorney. She told me in the first interview that "they were going to take make sure that we who were hurt will be taken care of". However, Hafner honored none of the promises she made, and after I testified took no further interest in my welfare. I feel that she exploited me, and lied to me to get me to testify against Dr. Kaul.

Hafner told me that Dr. Kaul had a "$14 million condo in New York". She said she was going to take it. She told me Dr. Kaul had two Aston Martins, and that she was going to take them as well. She told me she was going to leave him and his family with nothing.

Hafner stated that Dr. Kaul had committed Medicaid and Medicare fraud, and asked me what insurance company had paid him for the procedure he performed on me. I told her that I had no insurance, and that Dr. kaul had provided his services and that of his facility for free. I told her that he never asked me for a dime. I also told her that he had been able to get the device company, Medtronic, to provide the spinal cord stimulator free of charge. I asked Hafner that if Dr. Kaul had committed the crime she described, whether his passport had been confiscated. She responded, "I can't comment on that". I thought it was bizarre that Hafner was readily telling me about crimes Dr. Kaul was supposed to have committed, but then refused to answer a simple question about the information she so willingly divulged. I believe she was trying to manipulate and exploit me, in order to have me testify against Dr. Kaul.

Hafner went into great detail about a case in London that occurred in 1999, in which a patient suffered a cardiac arrest at the end of a dental procedure. She told me that Dr. Kaul fled the country before the authorities had completed their investigation, and had been a fugitive. I asked her that if this was the case, then why had he not been extradited back to England. Again, her response was, "I can't comment on that", which I found to be as equally bizarre as her previous response. I asked her again why they had not confiscated his passport, and she once again responded with, "I can't comment on that". At this point in the proceedings, we communicated directly, without any involvement from my attorney, and Hafner would contact me directly. The things that Hafner was telling me about Dr. Kaul did not make any sense. I said to her, "If he is a criminal here from England and still on the streets, why wouldn't you arrest him?". Again her response was, "I can't comment on that".

5

Hafner told me that Dr. Kaul had been paid $350,000 by Medtronic to find volunteers. This, as I found out from Dr. Kaul during one of our conversations, was a lie. I explained to Hafner that I could not believe Dr. Kaul had committed Medicare fraud. I told her that he used his own money to establish a charity that helped people in Africa, and she told me that the charity was just a front, and that Dr. Kaul was "trying to line his pockets".

I believe that Hafner lied to me about Dr. Kaul, and about wanting to help me with my lawsuit, to make sure that I testified against Dr. Kaul. She told me that if I testified against Dr. Kaul, it would help me get money from my lawsuit. I feel that Hafner exploited my situation to serve her own purpose, which was to take away Dr. Kaul's livelihood, and destroy his reputation.

### (d) My opinion regarding the professional competence of Dr. Kaufman

My opinion of Dr. Kaufman is that he is an extremely unprofessional individual, a terrible doctor, and a man that seems to have nothing but hatred in his heart. He could not contain his anger towards Dr. Kaul, and I have never witnessed the outrageous public displays of unprofessionalism, that I had the misfortune to do so, with him. On one occasion he became so angry, his face turned red. I told Dr. Kaul, "He [Dr. Kaufman] fucked me up so badly I was going to sue him". Dr. Kaufman had installed a pain pump, which did not work, and despite me repeatedly telling him that I was not getting any pain relief, he kept telling me the pump was working. He did not know to program the pump, and always had a representative from Medtronic to do it for him. He never checked to see if there were any blockages in the catheter in my spine. The pain kept on increasing, and Dr. Kaufman did nothing, and never returned my calls. When I did see him the only thing he did was to increase the infusion rate of the medication, which did not reduce the pain. Eventually I went to another doctor, who performed an x-ray of my spine and found that the catheter tip was crushed, which was the reason that the medication was not getting into my spine. Dr. Kaufman failed to perform this simple test, which caused me to remain in agony for months. I told Dr. Kaul that Dr. Kaufman, "thinks he is hot shit but he didn't ever check what was wrong". Throughout the months of excruciating pain, Dr. Kaufman was very bad at responding to my calls, and on one occasion, because the pain was so severe, I was rushed to Overlook Hospital. I was experiencing such extreme pain

6

and was shaking uncontrollably, with profuse sweating, all of which exacerbated my angina. I thought I was going to die. When I was admitted to the hospital, the staff were not able to contact Dr. Kaufman for three days. This was the episode that caused me to find another doctor.

### (e) Comments made by Dr. Kaufman regarding Dr. Kaul, during the hearing in the office of administrative law, in April 2013.

On or about April 17, 2013 I testified against Dr. Kaul in the proceedings in the office of administrative law. I was driven to the hearing by an armed female agent from the Attorney General's office, who made sure her badge was exposed. While I was sitting outside the hearing room, with the 'special' agent, who did not leave my side for one moment, Dr. Kaufman came out of the hearing room. He looked very agitated and made the following comments:

(1) "Kaul is sitting there, pretending he cannot afford to hire an attorney"

(2) "Kaul is wearing a suit that is worn out with trousers that are frayed at the bottom as if he is poor and no money to buy a decent suit".

(3) "Kaul is trying to pretend that he has no money"

The 'special' agent and the court security guard heard Kaufman's outburst.

I feel like I was exploited by Doreen Hafner and Dr. Kaufman, with lies that were intended to have me testify against Dr. Kaul. My clinical care with Dr. Kaufman was terrible, and he is a despicable human being.

I support Dr. Kaul in his quest for justice, and I hope, as do many of his patients, that he returns to the practice of medicine, and that those who caused him harm are severely punished.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment

Dated: August 6, 2017                    _____

                                         John Zerbini

7

I feel like I was exploited by Doreen Hafner and Dr. Kaufman, with lies that were intended to have me testify against Dr. Kaul. My clinical care with Dr. Kaufman was terrible, and he is a despicable human being.

I support Dr. Kaul in his quest for justice, and I hope, as do many of his patients, that he returns to the practice of medicine, and that those who caused him harm are severely punished.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment

Dated: August 6, 2017

John Zerbini

8