# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| RICHARD ARJUN KAUL, | Civ. No. 16-2364 (KM) (SCM) |
| **Plaintiff,** | |
| v. | **OPINION** |
| CHRISTOPER J. CHRISTIE, et al., | |
| **Defendants.** | |

### KEVIN MCNULTY, U.S.D.J.

Now before the Court are five motions to dismiss the Second Amended Complaint of Dr. Richard Arjun Kaul. Kaul brings fourteen causes of action against the 25 remaining defendants in this case. For the reasons set forth below, I grant the Omnibus Motion to Dismiss, and dismiss all federal claims with prejudice. The state law claims I dismiss on jurisdictional grounds, without prejudice. Two additional motions, one to further amend the Second Amended Complaint to add a defendant and the other for a default judgment against defendant Lewis Stein, Esq., are denied.

Dr. Richard A. Kaul, originally trained as an anesthesiologist, performed procedures known as minimally invasive spine surgeries. In March 2014, the New Jersey State Board of Medical Examiners (the "Board") revoked his medical license, finding that his performance of spine surgeries on 11 patients without proper training and experience constituted gross and repeated malpractice, negligence, and incompetence. From Dr. Kaul's perspective, a network of politically connected neurosurgeons were threatened by and jealous of his success. With the assistance of a cabal of politicians, the judiciary, lawyers, hospitals, insurance companies, and media figures, they engineered the revocation of his license. Dr. Kaul broadly asserts that he brings this action against all 25 remaining defendants, and a number of John and Jane Doe

1

defendants, to redress economic and reputational injuries caused by their "scheme to permanently eliminate [him] from the practice of medicine anywhere in the world." (2AC, vi).

# I. BACKGROUND[1]

In this section, I review the decision revoking Dr. Kaul's medical license that is the subject of the complaint (see Section I.A., *infra*); identify the parties (Section I.B); summarize the factual allegations (Section I.C); and review pertinent procedural history (Section I.D).

## A. Disciplinary Proceedings and Revocation of Medical License

The heart of this complaint is an attack on the disciplinary proceedings that culminated in the revocation of Dr. Kaul's license to practice medicine. Before delving into the allegations, I review those proceedings. This discussion is essentially adapted from my earlier opinion dismissing the First Amended Complaint. The decisions of the ALJ and the Board are cited

---

[1] "2AC" =  Second Amended Complaint of Dr. Richard Arjun Kaul, dated June 4, 2018 (DE 241)

"ALJ Op." = Initial Decision in the *Matter of the Suspension or Revocation of the License of Richard A. Kaul, M.D. License No. 25 MA 063281*, dated December 13, 2013, Ex. B to the Certification of Deputy Attorney General Shana B. Bellin (DE 128-4).

"Board Order" = Corrected Final Decision and Order in *Matter of the Suspension or Revocation of the License of Richard A. Kaul, M.D. License No. 25 MA 063281*, dated March 24, 2014, Ex. C to the Certification of DAG Bellin (DE 128-5).

The decisions of the ALJ and Board are cited in and fundamental to the allegations of the Second Amended Complaint. "'[A] document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion to dismiss into one for summary judgment.' " *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)); *accord In re Asbestos Products Liability Litigation (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016). The decisions of the ALJ and the Board are also rulings of tribunals, the authenticity of which is not questioned, which may be judicially noticed, not for their truth but for their existence and legal effect. *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999). *See generally* Fed. R. Evid. 201.

(a) because the allegations here are unintelligible without this background and (b) for their existence and legal effect. (*See* n.1, *supra.*)

On June 13, 2012, the AG initiated administrative disciplinary proceedings against Dr. Kaul.[2] The matter was referred to the Office of Administrative Law as a contested matter. ALJ Solomon presided over 23 days of hearings, running from April 9, 2013, to June 28, 2013. Drs. Kaufman and Przybylski testified on behalf of the Board. (ALJ Op. 1-44).

ALJ Solomon issued his initial decision on December 31, 2013. Here are a few of his findings of fact:

> 2.      [Dr. Kaul's] education, training, internships, residencies and fellowships were insufficient to prepare him for surgeries of the spine, whether minimally invasive or open.
>
> 3.      The CME courses he took were insufficient to provide such education and training. If hands-on training were offered, it was, in most instances, done on cadavers. In others, he was primarily an observer.
>
> 4.      In addition to his lack of sufficient education and training in spinal surgeries, he did not receive sufficient monitoring by a trained overseer. For instance, he was on his own the first time he inserted a pedicle screw in a live patient, without the presence of any trained monitor.
>
> 5.      Respondent's treatment included, but was not limited to, inserting pedicle screws into the spinal canal; failing to immediately remove a stimulator after the onset of infection, thereby risking paralysis; using OptiMesh[3] as an interbody structural device; and

---

[2]      The AG had been investigating Dr. Kaul since April 2012. A few days before the filing of the disciplinary action, on June 7, 2012, Dr. Kaul attempted to enjoin the State and various state agencies from suspending his controlled dangerous substance registration. That complaint was dismissed by the trial court, and then the appeal of that dismissal was dismissed by the Appellate Division in July 2012. (Def. Ex. E, F)

[3]      "OptiMesh is a three dimensional mesh bag to contain bone fragments. ' . . . mesh is simply a bag that contains bones and is not capable of maintaining the load of body weight and, therefore, it is not considered to be an appropriate prosthetic device for an interspace.'" (Order 2 n.1).

> performing a staged fusion, as well as other acts as
> discussed above.
>
> 6.     Some of his patient consents were unsigned. . . .
>
> 9.     He used allograft bone in patients who were
> smokers.[4]
>
> 10.    He failed to advise patients who were smokers of
> the risks associated with smoking and allograft bone.
>
> 11.    He misrepresented his qualifications, not only
> on his website, but also in discussions with his
> patients.
>
> 12.    None of his certifications were recognized by the
> American Board of Medical Specialties, with the
> exception of his board-certification in anesthesiology.
> Non-recognition included his certification by the
> American Board of Interventional Pain Management.

(ALJ Op. 80-81).

These infractions, the ALJ found, went far beyond mere puffery or resume-fudging. To the contrary, over the course of 94 pages, ALJ Solomon detailed the physical and emotional harm Dr. Kaul inflicted on 11 patients.

> Here is one example, patient T.Z.:
>
> > The next patient called by petitioner was T.Z., a forty-
> > year-old woman. In the latter part of 2009, she began
> > experiencing pain in her neck and back following an
> > automobile accident. A neighbor, who had been a
> > patient of respondent, recommended [Dr. Kaul]. T.Z.
> > then checked respondent's website, where he
> > represented that he was a board-certified minimally
> > invasive spine specialist. T.Z. was under the clear
> > impression that if she decided to treat with him, any
> > surgery, if one were required, would be minimal, and
> > nothing more . . . .
> >
> > He told her that he was going to insert two screws and
> > scrape a disc that appeared to be bulging, that the
> > surgery would last approximately forty-five minutes,
> > and would only involve a small incision, about one

---

[4]     "Allograft bone is obtained from a cadaver. Autograft bone is harvested from the patient's own body, often from the iliac crest." (Order17 n.5)

4

inch in length. The patient stated that it was her clear understanding was that this was going to be a minor procedure, nothing more, and that she would be discharged the same day, followed by a minimal recovery period of about a week or so. The patient stated that she made it very clear to respondent that she would not agree to anything more significant. Although she smoked a pack of cigarettes a day, she stated that respondent never mentioned anything about smoking or its risks associated with surgery.

On September 19, 2011, respondent performed a fusion at L3-L4 with the insertion of five screws. . . .

On the date of the surgery, she and her husband arrived at the surgical center early in the morning for what was thought to be a forty-five-minute procedure. Instead, she left the surgery center around 5:00 or 6:00 p.m. Her husband told her that she was in surgery for about six to seven hours. The ride home was excruciating—she was in extreme pain and felt nauseous. . . . Upon arriving home, she could not walk because the pain was so intense. Her husband called his father and together they placed her in a plastic chair and lifted her up the ten to twelve steps into her home. Once she was inside, she was placed in a recliner. . . .

On December 24, 2011, T.Z. was taken to Pocono Hospital, where she was admitted, because she had severe difficulty walking. The pain and numbness to the inside of her legs and buttocks was worsening. . . . [W]hile at Pocono Hospital, she was informed that the entire disc had been removed. She also learned that five screws, instead of two, had been inserted.

From Pocono Hospital, she was transferred by ambulance to Lehigh Valley Hospital . . . . It was then that she learned that respondent was not an orthopedist, as she had initially thought, but an anesthesiologist.

On October 14, 2011, after noticing oozing from one of the incisions left by respondent, she consulted Brian Morse, D.O., who performed nerve testing on her legs. They did not respond. He recommended that she see George Naseef, M.D., an orthopedic surgeon. She saw Dr. Naseef on November 17, 2011, complaining of

difficulty in walking, leg numbness, her right ankle giving out (going off to the side), and loss of balance, particularly on non-flat surfaces . . . Dr. Naseef told her that two screws had penetrated the nerve in her spine and that she needed surgery. . . .

On January 30, 2012, Dr. Naseef performed a revision surgery at Morristown Memorial Hospital.

During these proceedings, T.Z. was asked to display the scars left by respondent. One scar was vertical at the midline of the low back, and measured approximately eight inches. There was also a horizontal scar to the left of the eight-inch scar, which measured about two inches. . . .

As the result of respondent's surgery, she had to use a walker for about six months for balance, which she began using immediately following the surgery. After six months, she used a cane daily, also for balance. For months, her husband had to escort her to the bathroom, where she used a specially raised toilet seat. This lasted for several months. In addition, her feet have become positioned outward. The inner sides of her legs remain numb and she continues to have back pain. She stated that no day is a good day. Her pain starts upon awakening and worsens as the day progresses.

It was noted by the undersigned that when she approached and left the witness stand, she used a cane and ambulated very slowly. She also brought a pillow to sit on and was sobbing throughout most of her testimony.

Her husband, M.Z., also testified. He accompanied T.Z. to her initial consultation with respondent. He specifically recalled respondent telling them that the procedure would last about forty-five minutes and would involve a three-quarter-inch incision. . . .

He stated that T.Z. is now essentially confined to a recliner. She does not even sleep in bed. . . .

Petitioner called George S. Naseef III, M.D., a board-certified orthopedic surgeon, to testify. Dr. Naseef . . . performed corrective surgery on T.Z. . . .

Dr. Naseef determined that the L-3 screws were not in proper line and the right S-1 screw was in the S-1

6

> nerve root, not in the pedicle. Both L-3 screws and the right S-1 screw had perforated the bone and were in the nerve canal. . . .
>
> During surgery on January 30, 2012, Dr. Naseef noted that the right and left L-3 screws were in the canal, and the right S-1 screw was grossly malpositioned and in the canal. . . . Once the right S-1 screw was removed, nerve function immediately returned to the patient's leg. . . . He stated that of the five screws inserted, only one was positioned correctly.[5]

(ALJ Op. 53-57).

Assessing the evidence in the record,[6] ALJ Solomon concluded that the Attorney General "prove[d] [] well beyond a preponderance of the credible evidence" that Dr. Kaul "never should have performed any spinal surgeries, whether they were called minimally invasive or open, given his lack of education and training." "[T]hat he performed such surgeries, without the requisite education and training, and in disregard for the safety of several patients who testified on behalf of petitioner, . . . warrant[s] nothing less than the revocation of his medical license." (ALJ Op. 93).

On March 12, 2014, the Board adopted ALJ Solomon's opinion and order in its entirety. It then considered the appropriate penalty for Dr. Kaul's conduct. Observing that Dr. Kaul, rather than acknowledging wrongdoing or demonstrating contrition, had instead lobbed "broad allegations of altered

---

[5] The Board, in adopting the ALJ's findings of fact as to T.Z., quoted Dr. Naseef directly on this point:

> [Dr. Naseef testified that] they were in a place I have never seen before . . . this one completely missed the pedicle and went directly through the lamina and into the vertebral body which putting screws in that is a completed different field. When you are not in bone, it's grossly abnormal."

(Board Order 18-19).

[6] ALJ Solomon specifically found the "testimony of each and every witness produced by [the Attorney General] . . . extremely credible and compelling" while most of Dr. Kaul's witnesses lacked credibility or opined on irrelevant issues. (ALJ Op. 78-79).

7

court transcripts, interference with legal evidence and political influence," the Board struggled to "find any mitigating factors in this matter."[7] Indeed, the Board found Dr. Kaul's lack of remorse "disturbing."[8] (Board Order 22-23, 25)

The Board also considered that this was not Dr. Kaul's first offense. About ten years earlier, the Board had suspended Dr. Kaul's medical license based on his failure to disclose in various credentialing applications that he had been convicted of manslaughter based on the death of one of his patients in England.[9] Despite his failure to be forthright, the Board was lenient. The tragic incident in England, it reasoned, appeared to be no more than a regrettable mistake, the repetition of which could be avoided with the exercise of due care. It therefore "eschewed a more stringent penalty with the hope and expectation that respondent will resolve to practice with the vigilance that he has promised." Under the circumstances, the Board found a two-year

---

[7]    Over the objection of Dr. Kaul's counsel, the Attorney General admitted an independent (*i.e.*, not official) transcript from one day of the 23-day hearing. Dr. Kaul had apparently appended the transcript to a letter addressed to President Obama, which he had posted on a personal website. "It shows," the Board concluded, "that Respondent's transcript and the official transcript had only minor insubstantial inconsistencies." (Board Order 22). This seems to be the origin of Dr. Kaul's allegations regarding "forged" transcripts, *see* pp. 19–20, *infra.*

[8]    In videos posted to his website, Dr. Kaul claimed that he was "absolutely shocked" by the ALJ's decision and pledged to continue to perform spine surgeries and teach others his methods. The plan, he said, was to open minimally invasive spine surgery clinics in places where people lack access to affordable spine care, such as Africa, Mexico, and Colombia. (*Id.* 22-23).

[9]    The ALJ received evidence and found that in March 1999, while practicing medicine in England, a patient for whom Dr. Kaul had administered anesthesia died. About two years later, in February 2001, a jury convicted Dr. Kaul of gross negligence and manslaughter. From September 2000 to May 2001, Dr. Kaul made a number of false or misleading statements about those criminal proceedings, the related disciplinary proceedings, and later, the conviction, in a number of documents submitted to the Board and New Jersey hospitals. (ALJ Op. 90-92).

For example, on April 8, 2011, Dr. Kaul submitted an application for privileges at HUMC. He was asked the following question: "Please indicate if you have been ever been convicted of any criminal offense, excluding minor traffic violations, e.g., passing a stop sign, (if yes, give details on a separate sheet.)" Kaul checked the "NO" box, even though he had been convicted of manslaughter just a few months earlier.

suspension to be a sufficient sanction. But "[f]uture transgressions," it warned, would "not be deserving of leniency." (Board Order 23-24).

Against that backdrop—Dr. Kaul's lack of remorse, his intent to continue to perform spine surgeries, and his failure to "turn over a new leaf to practice medicine responsibly"—the Board adopted the ALJ's recommendation to revoke Dr. Kaul's license, effective February 12, 2014. It further imposed the statutory maximum fine of $20,000 for each of the 15 counts of malpractice and misconduct charged, as well as attorneys' fees and costs. All told, the Board imposed $475,422.32 in civil penalties, fees, and costs. (Board Order 28-29).

Dr. Kaul did not appeal the Board's final decision to the New Jersey Superior Court, Appellate Division. Instead, he filed this action alleging that there was a conspiracy against him involving the Governor, various state officials, the ALJ, the Board of Medical Examiners, various doctors, a lawyer, a bank, a professional association, hospitals, insurance carriers, and the media.

B.    The Parties

1.    *Dr. Kaul*

Dr. Kaul was formerly licensed to practice medicine in the State of New Jersey. (2AC ¶ 1). When this cause of action accrued, Dr. Kaul was a "resident of the State of New York." (*Id.*).

2.    *Defendants*

Defendant Allstate New Jersey Insurance Company ("**Allstate**") is the New Jersey subsidiary of Allstate Insurance Company. (2AC ¶ 3).

Defendant, TD Bank, N.A., is a Canadian bank with a United States headquarters located in Cherry Hill, New Jersey. (2AC ¶ 5). Divyesh Kothari, ("Kothari," and, collectively with TD Bank, N.A., the "**TD Bank Defendants**") is the Vice-President of TD Bank, N.A. (*Id.* ¶ 22).

Defendant Lindy Washburn ("Washburn") is an individual located in Woodland Park, New Jersey. (2AC ¶ 19). Defendant Fourth Edition Inc. f/k/a North Jersey Media Group Inc. ("Fourth Edition," and, collectively with

Washburn, the "**Newspaper Defendants**") employs Washburn as a journalist. (*Id.*). Fourth Edition, which publishes *The Record* of Bergen County, is a corporation located in Woodland Park, New Jersey. (*Id.* ¶ 20).

Defendant Dr. Robert Heary ("**Dr. Heary**") is the director of the Neurological Institute of the New Jersey Spine Center and Neurosurgical Intensive Care Unit in Newark, New Jersey. (2AC ¶ 9). Dr. Heary is also an attending at Hackensack University Medical Center ("Hackensack UMC"). (*Id.*).

Defendant Dr. William Mitchell ("**Dr. Mitchell**") is an attending neurosurgeon at JFK Medical Center in Edison, New Jersey. (2AC ¶ 11).

Defendant Lewis Stein, Esq. **("Stein")** is a medical malpractice attorney based in Morris County, New Jersey. (2AC ¶ 2).

Defendant Dr. Gregory Przyblski ("**Dr. Przyblski**") is the director of neurosurgery at the New Jersey Neuroscience Institute at JFK Medical Center in Edison, New Jersey. (2AC ¶ 10).

Defendant Dr. Marc Cohen ("**Dr. Cohen**") is an orthopedic spine surgeon with a medical office in Morristown, New Jersey. (2AC ¶ 14).

Defendant the American Society of Interventional Pain Physicians ("**ASIPP**") is a professional medical society with a business address in Paducah, Kentucky. (2AC ¶ 15).

Defendant Dr. Andrew Kaufman ("**Dr. Kaufman**") is an individual with a business located in Newark, New Jersey. He is a senior member of ASIPP. (2AC ¶ 18).

Defendant Dr. Peter Staats ("**Dr. Staats**") was the 2015 president of ASIPP and is the editor of Pain Medicine News. (2AC at 13).

Defendant **Hackensack UMC** is a "900-bed private hospital located seven miles west of New York City" (in New Jersey). (2AC ¶ 8).

Defendant Robert Garrett ("**Garrett**") is an individual located in Hackensack, New Jersey. (2AC ¶ 23). He is the president of Hackensack UMC. (*Id.*).

Defendant Thomas Peterson ("**Dr. Peterson**") is a neurosurgeon. (2AC ¶ 12). Dr. Peterson engages in healthcare business with Hackensack UMC. (*Id.*).

Defendant the Congress of Neurological Surgeons ("**CNS**") is a professional medical society with a business address in Washington, D.C. (2AC ¶ 16). Doctors Heary, Przybylski, Mitchell and Person are members of CNS. (*Id.*).

Defendant Christopher Wolfla ("**Dr. Wolfla**") is a neurosurgeon in Washington, D.C. (2AC ¶ 17). Dr. Wolfla is the Chairman of Professional Conduct Committee at CNS. (*Id.*).

Defendant Atlantic Health System ("**AHS**") is a private healthcare company with headquarters in Morristown, New Jersey. (2AC ¶ 6). Doctors Cohen, Heary, and Kaufman engage in healthcare business with AHS. (*Id.*).

Defendant James Gonzalez ("**Gonzalez**") is an individual located in Newark, New Jersey. (2AC ¶ 21). Gonzalez was the president of Rutgers University Hospital. (*Id.*).

Defendant **University Hospital** was the teaching hospital for the University of Medicine and Dentistry of New Jersey, the state-run health sciences institution for New Jersey. (2AC ¶ 7). I take judicial notice of the fact that University Hospital is now part of Rutgers, The State University. 18A:65-94(f) ("whenever, in any . . . judicial . . . proceeding . . . reference is made to the University of Medicine and Dentistry of New Jersey . . . the same shall mean and refer to Rutgers, The State University."). Doctors Heary and Kaufman engage in healthcare business with University Hospital. (*Id.*).

Defendants Government Employees Insurance Company, GEICO Indemnity, GEICO General Insurance Company, and GEICO Casualty (collectively, "**GEICO**"), provide auto insurance in New Jersey. (2AC ¶ 4).

Defendants **John Roe 1–50, John Doe 1–50, ABC Corp. 1–50** and/or **XYZ P.C. 1–50** are as yet unidentified individuals and companies who

have assisted the named defendants in the commission of their alleged crimes. (2AC ¶¶ 23, 24).

### C. Allegations of the Second Amended Complaint

I have attempted to organize the allegations of the Second Amended Complaint into five categories: (1) the "New Jersey Neurosurgical Community"; (2) the Professional Societies; (3) the Carriers; (4) the OAL and Medical Board proceedings; and (5) other events and correspondence.[10]

#### 1. *The "New Jersey Neurosurgical Community"*

Dr. Kaul identifies himself as a minimally invasive spine surgeon. (2AC ¶ 66). In August 1996, Dr. Kaul obtained his license to practice medicine and surgery in New Jersey. (*Id.* ¶ 67). In September 1996, he became board certified by the American Board of Anesthesiology. (*Id.*).

From 2002 to 2012, Dr. Kaul performed 800 minimally invasive spine surgeries and 6,000 spine procedures. (2AC ¶ 69). Beginning in 2002, he alleges, he developed an enviable reputation in the field of minimally invasive spine surgery and frequently taught his techniques to other physicians. (*Id.* ¶ 45).

In 2004, Dr. Kaul became board certified by the American Academy of Minimally Invasive Medicine and Surgery. (2AC ¶ 75). This organization, I note, is distinct from the American Academy of Minimally Invasive *Spinal* Medicine and Surgery.[11] Dr. Kaul points out none of the defendants are board certified

---

[10] I note at the outset that certain of Dr. Kaul's allegations pertain to defendants who are no longer in the case. The following defendants were dismissed from the First Amended Complaint with prejudice: The State of New Jersey, the New Jersey Board of Medical Examiners ("the Board"), the Honorable J. Howard Solomon, A.L.J., former Governor Christopher J. Christie, former Attorney General of the State of New Jersey Jeffrey Chiesa, and William Roeder, executive director of the Board. (DE 200).

[11] "Minimally invasive surgery" refers generally to techniques, representing alternatives to traditional open surgery, that may or may not be appropriately applied to a variety of conditions. https://www.mayoclinic.org/tests-procedures/minimally-invasive-surgery/about/pac-20384771. Different specialties may choose to found their own minimally invasive surgery institutions or organizations. *See, e.g.,* the Academy of Minimally Invasive Foot & Ankle Surgery, https://www.aafas.org/.

by this latter organization; neither, apparently, is he. (*See id.* ¶¶ 75–76). From 2003 to 2012, Dr. Kaul was credentialed by at least six state surgical centers to perform minimally invasive spine surgery. (2AC ¶ 72). Dr. Kaul alleges that, between 2010 and 2012, unidentified persons published multiple articles about Dr. Kaul's work in minimally invasive spine surgery. (2AC ¶¶ 39, 47).

In 2005, Dr. Kaul conducted the first outpatient lumbar spinal fusion ever performed at the Market Street Surgical Center in Saddle Brook, New Jersey. (2AC ¶¶ 37, 71). Dr. Kaul alleges that because this work was innovative it provoked hostility and envy within the New Jersey neurosurgical community. (*See id.* ¶ 37). That same year, he alleges, unidentified neurosurgeons influenced the credentialing committee at Meadowlands Hospital to deny Dr. Kaul clinical privileges. (2AC ¶ 38). Dr. Kaul came to learn through conversations with spine device representatives, patients, and physicians that his professional and commercial success had caused immense jealousy in the "medical community." (2AC ¶¶ 39, 41).

In 2005, Dr. Przybylski began performing minimally invasive spine surgeries. (2AC ¶ 74).

In 2008, Dr. Heary allegedly made defamatory comments to Frances Kuren, one of Dr. Kaul's patients. (2AC ¶ 41).

In 2010, Dr. Kaufman allegedly made defamatory comments to another of Dr. Kaul's patients, Corey Johnson. (2AC ¶ 41). In 2012, Dr. Kaufman also allegedly made defamatory comments to another of Dr. Kaul's patients, John Zerbini. (*Id.*). Mr. Zerbini later testified on behalf of the State in the 2012-2013 disciplinary proceedings against Dr. Kaul, discussed *supra*. (*See id.* ¶ 46).

On March 3, 2011, Dr. Kaul opened the NJSR Surgical Center, a Medicare certified, AAAHC (Accreditation Association for Ambulatory Health Care) accredited facility in Pompton Lakes, New Jersey. (2AC ¶ 40). The NJSR Surgical Center is the facility at which Dr. Kaul performed interventional spinal procedures and outpatient minimally invasive fusions and discectomies. (*Id.*).

NJSR allegedly received favorable publicity. In 2011, *The Record* (a newspaper serving Bergen County and Northern New Jersey) reported that NJSR Surgical Center had a zero percent post-operative infection rate. (*Id.* ¶ 39). In August 2011, Channel 12 News produced a segment on Dr. Kaul's work, which allegedly prompted unidentified members of the "New Jersey neurosurgical community" to tell non-party Robert McGann that this "was the last straw." (2AC ¶ 47).

From March 2011 to April 2012, Dr. Kaul's practice grew 300% (from some unspecified baseline). (2AC ¶ 43). Dr. Kaul summarizes his own skills thus:

> [Dr. Kaul] performed cases on an outpatient basis, that[,] although termed 'complex' by neurosurgeons, proved to be simple, because of the surgical techniques employed by Kaul. Many neurosurgeons do not have good hand-eye coordination skills, and Kaul observed during many of the CME courses, that their ability to maneuver minimally invasive spine instruments was clumsy. . . . In the US the completion of a residency and board certification, do not require the graduate to pass a technical skills test, but simply a written and oral examination. That would be akin to issuing a driver's license without the road test. Thus, the only way that one could compare the abilities of two surgeons, as for example with two baseball players, is to observe them in action. Kaul's videos demonstrate him in action, while no video evidence exists to support the technical abilities, or lack thereof, of any of the other physician defendants.

(2AC, ¶ 43–44).[12]

In April 2012, Dr. Kaul's medical license was suspended. (2AC ¶ 44). At that time, he suggested to the medical board that he be independently observed. This request was ignored. (*Id.*).

---

[12]   At the end of the Second Amended Complaint, Dr. Kaul inserts several links to youtube pages, which apparently contain the videos to which he refers. I decline to view the videos, but credit, as I must, his allegation that the videos exist and demonstrate him "in action," *i.e.*, performing surgery.

In late 2013, Dr. Peterson allegedly called Dr. Kaul a murderer. Peterson made that statement to one of Kaul's employees, Linda Reyes, whose brother Dr. Peterson had recently operated on. (2AC ¶ 37).

## 2. *Dr. Kaul and the Professional Societies*

The Second Amended Complaint also alleges that Dr. Przybylski, the President of the North American Spine Society ("NASS"), and a group of neurosurgeons acted together to cause professional societies, such as NASS and the American Medical Association ("AMA"), to change the codes assigned to minimally invasive spine surgery. (2AC at ¶ 287). For example, these defendants allegedly "downgraded" the Current Procedural Terminology ("CPT") code for endoscopic discectomies performed outside of a hospital. (*Id.* at ¶ 288–89). As a consequence, Dr. Kaul alleges, Dr. Kaul's reimbursement fees for outpatient endoscopic discectomies were lowered. (*Id.* at ¶ 289). As a further consequence, Dr. Kaul alleges, the defendants and their hospitals have increased their fees for minimally invasive spine surgeries, the insurance carriers have refused to reimburse outpatient surgical centers for minimally invasive spine surgeries, and patients have turned to opioids. (*Id.* at 291–96).

## 3. *Dr. Kaul and the Insurance Carriers*

Dr. Kaul alleges that, from 2006 to 2012, he successfully treated thousands of patients who had sustained spinal injuries from car accidents. (2AC ¶ 31). Hundreds of those patients had allegedly purchased personal injury insurance from the defendant Carriers (*Id.*). Dr. Kaul avers that, from 2006 to 2012, he prevailed on "almost ninety-nine percent (99%) of all [insurance] claims presented for arbitration." (*Id.* ¶ 32).[13]

Dr. Kaul claims that, upon losing an arbitration to Dr. Kaul, GEICO "runs into federal court, while its racketeering comrade, [Allstate], runs into the Union County State Court." (2AC ¶ 33).

---

[13]    It is unclear how many claims were presented for arbitration and how many involved the defendant Carriers.

15

On April 23, 2013,[14] Defendant GEICO filed a complaint in federal court against Dr. Kaul, his employees, and corporations. (2AC ¶ 33). Dr. Kaul does not describe the claims in that complaint, but it is a publicly-filed record of this Court. (*Id.*) *See Government Employees Insurance Co. et al. v. Kaul et al.*, Civ. No. 13-2597 (D.N.J. filed Apr. 23, 2013), DE 1 (the "GEICO Complaint").[15] The GEICO Complaint alleged the following against Dr. Kaul: violation of the New Jersey Insurance Fraud Prevention Act, several alleged violations of RICO 18 U.S.C. § 1962(c) and (d), common law fraud, and unjust enrichment. (*Id.*). That matter, Dr. Kaul alleges, was dismissed with prejudice on December 8, 2014, "with absolutely no evidence having been presented to support any of the [11] causes of action." (*Id.* ¶ 34). I take judicial notice that the action was dismissed because the parties reported that it had been settled. (Civ. No. 13-2597 DE 117, 118, 119, 120, 121).

On February 15, 2015, Allstate filed a lawsuit against Dr. Kaul in New Jersey Superior Court, Union County, which Dr. Kaul claims was almost identical to the GEICO suit. (*Id.* ¶ 35). This lawsuit, Dr. Kaul alleges, was simply "Allstate's avenue to re-litigate claims it lost against [Dr. Kaul] in state sanctioned arbitration forums." (*Id.* ¶ 36).[16]

Dr. Kaul alleges that his success posed an economic threat to insurance carriers. (2AC ¶ 42). The Carriers were motivated to avoid their obligation to reimburse Dr. Kaul for medical services he had rendered. (*Id.*). At an unidentified time, in an undisclosed manner, these Carriers allegedly "purchased political leverage" with former New Jersey Governor Christie's administration to have Dr. Kaul's medical license revoked. (*Id.*).

---

[14]    The complaint reports the date as April 23, 2017, which I take to be a typographical error.

[15]    These are public records of the court, cited in and relied on by the complaint. As such, I may consider them not for their truth but for their existence and legal effect. *See* n. 1, *supra.*

[16]    The reference may be to *Allstate Insurance Company, et al. v. Kaul, et al.*, Docket No. UNN-L-000322-15 (filed Jan. 29, 2015). The case filings were not conveniently available online.

#### 4. *Allegations regarding OAL and Medical Board proceedings*

The defendant State government officials and agencies have already been dismissed from this action with prejudice on immunity grounds. (DE 200 p.65). The allegations of a government conspiracy in connection with the OAL and Medical Board proceedings remain in the Second Amended Complaint, however. I briefly summarize them.

Dr. Kaul claims that the defendants controlled former Governor Christopher J. Christie by funneling bribes and fees. (2AC ¶ 52). Governor Christie, in turn, "exercised complete control" of the proceedings that resulted in the revocation of his medical license. (*Id.* at 51). The Division of Consumer Affairs, which controls the Board, serves at the pleasure of the Governor. (*Id.* ¶ 49). The Governor also controls the Department of Law and Public Safety, which controls Office of the Attorney General. (*Id.*). The Office of the Attorney General serves as counsel to Board and prosecutes cases against physicians. (*Id.*). The Office of Administrative Law is also controlled by the Governor. (*Id.* ¶ 50).

In early January 2012, two inspectors from "the state" made an unannounced visit to NJSR Surgical Center. There, they collected evidence and interviewed Dr. Kaul and his staff. (2AC ¶ 82). The inspectors did not present warrants and they concealed the purpose of their visit. (*Id.*).

On April 2, 2012, the Board filed a complaint to suspend or revoke Dr. Kaul's license. (2AC ¶ 83). On May 9, 2012 Dr. Kaul signed an interim consent order agreeing to limit his practice to interventional spinal procedures. (*Id.* ¶ 84). Under that order, Dr. Kaul was permitted to apply for minimally invasive spine privileges at a hospital, which he did on May 16, 2012. (*Id.*).

Dr. Kaul alleges that, on May 9, 2012, former New Jersey Attorney General Jeffrey Chiesa ("Chiesa") made prejudicial comments about Dr. Kaul to the media. (2AC ¶ 85).

On May 22, 2012, the Acting Director of the Division of Consumer Affairs, non-party Eric Kanefsky, suspended Dr. Kaul's CDS prescribing

privileges, which prevented Dr. Kaul from practicing medicine. (2AC ¶ 86). In response, Dr. Kaul threatened suit. (*Id.* ¶ 87). On May 29, 2012, Kanefsky responded by filing a motion to rescind Dr. Kaul's consent order. (*Id.* ¶ 87).

On June 7, 2012, Dr. Kaul filed with the Superior Court, Mercer County, an application for the appointment of a special prosecutor and ad hoc medical board. (2AC ¶ 88). Dr. Kaul's application and a subsequent appeal were both denied. (*Id.*).

On June 13, 2012, the Board granted the motion of Kanefsky (not a party here) to rescind the consent order. (2AC ¶ 89). Before suspending Dr. Kaul's license, the Board conducted a hearing. Dr. Kaul takes issue with the evidence presented at that hearing. (*Id.* ¶ 89). First, he alleges, the hearing was based on a false allegation that he "had not changed his website or responded to a request for documents." (*Id.*). At the hearing, another non-party, "DAG Hafner," whom Dr. Kaul does not otherwise identify, played a video of a patient as evidence that Dr. Kaul had deviated from "Dr. Przybylski's fictitious standard of care, a standard of care that he admitted on May 6, 2013 did not exist." (*Id.*). The patient in the video, Dr. Kaul alleges, had improved after Dr. Kaul performed a successful minimally invasive outpatient lumbar fusion. (*Id.*).

On December 20, 2012, the State of New Jersey issued a cease-and-desist letter ordering Dr. Kaul to close the NJSR Surgical Center. (2AC ¶ 90). Although Dr. Kaul's license had been revoked, other physicians were then performing medical procedures at the facility. (*Id.*). Dr. Kaul appealed the order, which eventually was stayed pending the outcome of Dr. Kaul's license proceedings described below. (*Id.*).

On April 9, 2013, the New Jersey Office of Administrative Law ("OAL") commenced a hearing related to Dr. Kaul's disciplinary proceedings. (*Id.*). In those proceedings, Dr. Przyblski was allowed to testify about five patients. (*Id.*). Dr. Kaul was not allowed to examine these five patients. (*Id.*). According to Dr.

18

Kaul, Dr. Przyblski's testimony was part of the OAL Judge's basis for revoking Dr. Kaul's license. (*Id.*).[17]

On September 16, 2013, Dr. Kaul filed an ethics complaint with Michael Keating ("Keating") against non-party Hafner.[18] (2AC ¶ 96). Keating dismissed Dr. Kaul's complaint. (*Id.*).

On December 13, 2013, ALJ Solomon issued an opinion recommending that Dr. Kaul's medical license be revoked. (2AC ¶ 101; *see* discussion at Section I.A, *supra*). In a document titled "The Solomon Critique," Dr. Kaul says, he "proves that there were two hundred and seventy-eight (278) separate instances of perjury, misrepresentation, evidential omissions and gross mischaracterizations collectively committed by [ALJ Solomon] and Defendants Przybylski and Kaufman." (*Id.* ¶ 117).

On March 24, 2014, the Board revoked Dr. Kaul's license. (2AC ¶ 106).

### 5. *Other events and correspondence*

In a separate action, on September 23, 2013, non-party Corey Johnson, one of Dr. Kaul's patients, filed a complaint against Dr. Kaufman and Gonzalez. In that complaint, Dr. Kaul alleges, "Johnson described how Kaufman had publicly slandered and defamed Kaul in an operating room at the hospital, just before he performed a spinal procedure on Johnson." (2AC ¶ 97).[19]

On November 17, 2013, *The Record* of Bergen County published an article written by a reporter named Lindy Washburn, describing Dr. Kaul's "frayed wallet," "lace less shoes," and "upper crust British accent." (2AC ¶ 98).

---

[17]     Dr. Kaul alleges that "the attorney general had forged court transcripts" of one of Dr. Kaul's proceedings. (2AC ¶ 95). In response, Dr. Kaul sent a "a series of letters to numerous parties." (*Id.*). On January 5, 2014, Dr. Kaul sent a letter to then-President Barack Obama requesting that the federal government investigate the allegedly forged transcripts used in Dr. Kaul's disciplinary proceedings. (2AC ¶ 103). The apparent origin of these allegations is discussed at n. 7, *supra.*

[18]     Keating is listed as a defendant in Count One of the First Amended Complaint, (DE 57), but has been dropped from the Second Amended Complaint. (2AC).

[19]     Dr. Kaul also alleges that a number of his patients have provided a video response. (DE 241 ¶ 100). I decline Dr. Kaul's invitation to watch those videos, which are not directly related to the substance of the motions before me.

Dr. Kaul alleges that defendants have now erased this article from the internet. (*Id.* ¶ 99). On December 26, 2013, Dr. Kaul sent a letter to ALJ Solomon regarding the *Record* story. (2AC ¶ 102). On January 9, 2014, Dr. Kaul sent a letter to Washburn requesting a copy of an alleged audio recording of her interview of Dr. Kaul on August 13, 2013. (2AC ¶ 104). Dr. Kaul alleges that at the commencement of this interview, Washburn "acknowledges that the transcripts are forged." (*Id.*).

On February 6, 2014, Dr. Kaul sent a letter to the medical board asserting that he would not attend a hearing that month. (2AC ¶ 106). In that same letter, Dr. Kaul raised the issues of the forged transcripts and Dr. Kaufman's remarks. (*Id.*).

On January 22, 2014, an unidentified senior medical board member, who allegedly spent eight years at the New Jersey Board of Medical Examiners, gave an interview to a second unidentified person. (2AC ¶ 105). In this alleged interview, the board member suggested that a physician, non-party Dr. Kenneth Zahl, was responsible for the death of an unidentified Deputy Attorney General. The anonymous board member allegedly harshly criticized patients who had come to support Dr. Zahl. (*Id.*). Dr. Zahl and Dr. Kaul are said to share a conviction that the Office of the Attorney General engages in evidence tampering. (*Id.* ¶ 56).

On January 29, 2015, Dr. Kaul lodged a complaint with the United States Attorney's Office for the District of New Jersey. (2AC ¶ 107).

In 2015, Dr. Kaul submitted multiple letters to the New Jersey Attorney General, the United States Attorney, and the Carriers seeking their assistance in obtaining a copy of Dr. Kaul's medical board file and investigating the allegedly forged transcripts and alleged Washburn audio recording. (2AC ¶ 108).

On November 11, 2015, Dr. Kaul filed a letter with the International Criminal Court. (2AC ¶ 109).

In May 2016, former Governor Christie's administration filed an action against Dr. Kaul in Superior Court, which Dr. Kaul argues was retaliatory. (2AC ¶ 111).

On September 15, 2016, Dr. Kaul made an unannounced visit to non-party J.H. Buhrer, the company employed by the state to transcribe Dr. Kaul's OAL disciplinary proceedings. (2AC ¶ 112). Dr. Kaul interviewed the company owner. (*Id.*).

At 1:30 am on September 21, 2016, Dr. Kaul was arrested by eight armed officers from the Somerset County Probation Department on a warrant for unpaid child support. (2AC ¶ 113).

D.    Procedural History

I assume familiarity with the convoluted procedural history of this matter, including my previous filed opinion (DE 200). I highlight here some items particularly pertinent to these motions.

On February 22, 2016, Dr. Kaul filed his original complaint in the United States District Court for the Southern District in New York. (DE 1). Because almost all of the defendants and events giving rise to the complaint were allegedly located in in New Jersey, on April 19, 2016, District Judge Richard Sullivan transferred venue of the case to this Court. (DE 1; DE 19).

On June 8, 2016, Dr. Kaul filed the First Amended Complaint asserting twelve causes of action. (DE 57).

On December 22, 2016, Dr. Kaul filed a motion for default judgement against defendant Lewis Stein, Esq. (DE 149). Later, on June 13, 2017, Dr. Kaul filed a second motion for default judgment against Stein. (DE 192).

On June 30, 2017, I dismissed the First Amended Complaint, in part for lack of jurisdiction under Fed. R. Civ. P 12(b)(1), but for the most part for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (DE 200; DE 201 (as amended on July 10, 2017 by DE 203)).[20]

---

[20]    For ease of reference, I summarize that order of dismissal here:
The following defendants were dismissed with prejudice:

On July 7, 2017, I filed a memorandum and order denying Dr. Kaul's motions for default judgment (DE 149, 192) against Stein. (DE 202).

On August 10, 2017, Dr. Kaul filed another proposed second amended complaint. (DE 204). On September 6, 2018, upon *sua sponte* review, the Honorable Steven C. Mannion, United States Magistrate Judge, filed a letter order vacating this amended complaint (DE 204) for several reasons. Among those reasons was that its unnecessary length placed an unjustified burden on the Court. (DE 208 p. 3).

---

(A) Doctors Carmel, Moore, the North American Spine Society, and the American Medical Association, on res judicata and entire controversy grounds;

(B) The State of New Jersey and the New Jersey Board of Medical Examiners on sovereign immunity grounds;

(C) The Honorable J. Howard Solomon, A.L.J, on absolute immunity grounds; and

(D) Governor Christopher J. Christie, Chiesa, ALJ Solomon, Roeder, and Dr. Lomazow on sovereign immunity and qualified immunity grounds.

Because further amendment would be futile, the following counts were also dismissed with prejudice for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6):

(A) Counts Three (alleging violations of the Hobbs Act, 18 U.S.C. § 1951), Four (alleging mail fraud, in violation of 18 U.S.C. § 1343), Five (alleging wire fraud, in violation of 18 U.S.C. § 1341), Six (alleging honest services fraud, in violation of 18 U.S.C., § 1346), Seven (alleging defamation, in violation of 28 U.S.C. § 4101), and Nine (alleging violations of Title VII of the Civil Rights Act, 42 U.S.C. 2000e, et. seq.), as to all defendants and

(B)     Count Eight (alleging violations of the Due Process Clause of Fourteenth Amendment under 42 U.S.C. § 1983 as to all non-state defendants (except Drs. Przybylski and Kaufman).

The following counts were dismissed without prejudice:

(A) Counts One (alleging violations of the Racketeer and Influenced Corruption Act ("RICO"), 18 U.S.C. § 1961), Two (alleging violations of the Sherman and Clayton Acts, 15 U.S.C. § 2), and Eight as to all such defendants for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and

(B)     Counts Ten (alleging Commercial disparagement), Eleven (alleging Intentional interference with prospective economic advantage), and Twelve (alleging aid in the commission of a tort) as to all such defendants, for lack of supplemental jurisdiction.

(DE 201; DE 203).

On September 26, 2017, Dr. Kaul filed a revised version of that proposed second amended complaint. (DE 209). On October 18, 2017, Magistrate Judge Mannion again rejected the submission. He ordered Dr. Kaul to file a "revised proposed amended complaint that omits claims already dismissed with prejudice and reduces the pages of exhibits." (DE 213).

On October 27, 2017, Dr. Kaul filed another, revised version of the proposed second amended complaint. (DE 214). By letter order, on February 8, 2018, Magistrate Judge Mannion filed a letter order striking this proposed amended complaint for failure to comply with the court's previous order. (DE 229, citing DE 213). Magistrate Judge Mannion further ordered that Dr. Kaul's next version of the amended complaint include red-lined changes to assist the Court in its review. (Id.).

On February 22, 2018, Dr. Kaul filed a red-lined version of the next version of his proposed revised amended complaint. (DE 231). This represented progress, but apparently was not yet satisfactory. On April 16, 2018, by letter order, Magistrate Judge Mannion ordered Dr. Kaul to provide the Court with "yet another proposed amended complaint in which changes are red-lined to assist the Court in its review." (DE 238). Magistrate Judge Mannion clarified that he did not expect or authorize a complete redrafting; Dr. Kaul, he ordered, "only has leave to make the changes necessary to comply with this Order and does not have leave to add any additional claims or defendants." (Id.).

On May 11, 2018, Dr. Kaul filed another version of the proposed second amended complaint. (DE 239) Magistrate Judge Mannion approved this version for filing on May 22, 2018. (DE 240). This version is the basis for the Second Amended Complaint that is the subject of this motion.

On June 4, 2018, Dr. Kaul filed the Second Amended Complaint now before this Court. (DE 241). The Second Amended Complaint asserts fourteen causes of action:

- Count One: Violations of 18 U.S.C. § 1962(c), (d) of the Federal RICO statute against Dr. Kaufman, Dr. Przybylski, Dr. Heary, Dr. Mitchell,

Dr. Staats, CNS, and ASIPP (together, the **"CAC RICO Defendants"**). (2AC ¶ 119);

- Count Two: Violations of 18 U.S.C. § 1962(c), (d) of the Federal RICO statute against Allstate, GEICO, and the TD Bank Defendants (together, the **"CAGTK RICO Defendants"**). (2AC ¶ 162);

- Count Three: Violations of 18 U.S.C. § 1962(c), (d) of the Federal RICO statute against Garrett, Gonzalez, Hackensack UMC, AHS, and University Hospital[21] (together, the **"CHE RICO Defendants"**). (2AC ¶ 204);

- Count Four: Violations of 18 U.S.C. § 1962(c), (d) of the Federal RICO statute against the Newspaper Defendants and Stein (together, the **"CMS RICO Defendants"**). (2AC ¶ 244);

- Count Five: Violations of the Sherman and Clayton Acts, 15 U.S.C. §§ 1, 2 against Dr. Kaufman, Dr. Staats, Dr. Pryzbylski, CNS, Dr. Wolfla, Dr. Peterson, University Hospital, Dr. Heary, Dr. Mitchell, Dr. Cohen, Hackensack UMC, and AHS. (2AC at p. 55);

- Count Six: Violations of the Sherman Act, 15 U.S.C. § 2 for monopolization against Dr. Pryzbylski, Dr. Kaufman, Dr. Staats, Dr. Cohen, Dr. Heary, Dr. Mitchell, Hackensack UMC, AHS, and University Hospital. (2AC at p. 57).

Within Count Six, Dr. Kaul also alleges to bring actions for monopolization under the laws and the state antitrust statutes of 22 states.[22] Count Six alleges, in reality, 22 individual state law causes of action, but for the sake of brevity, I will generally group those causes of action as the State Sub-Claims of Count Six.

- Count Seven: Dr. Kaul alleges to bring actions for conspiracy to monopolize under the laws and the state antitrust statutes of 22 states[23] against Dr. Pryzbylski, Dr. Kaufman, Dr. Staats, Dr. Cohen, Dr. Heary, Dr. Mitchell, Hackensack UMC, and AHS. (2AC at p. 65). Count Seven is, in reality, 22 individual state law causes of action,

---

[21]   Kaul also refers to University Hospital as "UH" or "Rutgers." (*See* Second Am. Cmplt. ¶¶ 7, 204).

[22]   Dr. Kaul alleges to bring an action for monopolization under the laws of the following states: Arizona, California, the District of Columbia, Florida, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. (2AC ¶ 318).

[23]   Dr. Kaul alleges to bring an action for conspiracy to monopolize under the laws of the same states listed *supra* n. 22. (*Id.* ¶ 334).

but for the sake of brevity, I will generally group the causes of action as <u>Count Seven</u>.

- <u>Count Eight</u>: Dr. Kaul alleges to bring actions for conspiracy and combination in restraint of trade under the laws and state antitrust states of 23 states, including New Jersey,[24] against Dr. Pryzbylski, Dr. Kaufman, Dr. Staats, Dr. Cohen, Dr. Heary, Dr. Mitchell, Hackensack UMC, and AHS, and University Hospital. (2AC at p. 73). Count Eight is, in reality, 23 individual state law causes of action, but for the sake of brevity, I will generally group the causes of action as <u>Count Eight</u>.

- <u>Count Nine</u>: Violations of the unfair or deceptive trade practices laws of 29 states[25] against ASIPP, Dr. Kaufman, Dr. Staats, Dr. Pryzbylski, CNS, Dr. Peterson, Dr. Heary, Dr. Mitchell, Dr. Cohen, Hackensack UMC, and AHS. (2AC at p. 80). Count Nine is, in reality, 29 individual state law causes of action, but for the sake of brevity, I will generally group the causes of action as <u>Count Nine</u>.

- <u>Count Ten</u>: Dr. Kaul alleges to bring unjust enrichment claims "under the laws of all states and jurisdictions within the United States," (2AC, ¶ 362), against ASIPP, Dr. Kaufman, Dr. Pryzbylski, CNS, Dr. Peterson, University Hospital, Dr. Heary, Dr. Mitchell, Dr. Cohen, Hackensack UMC, and AHS. (2AC at p. 85). Count Ten, in reality, brings an individual cause of action under the laws of each state and the District of Columbia, but I will generally group those causes of action as <u>Count Ten</u>;

- <u>Count Eleven</u>: Dr. Kaul brings an action for deprivation of right under color of law, under 42 U.S.C. § 1983 against defendants Dr. Kaufman and Dr. Przbyblski in their alleged official capacities, and against Allstate and GEICO. (2AC at p. 86);

- <u>Count Twelve</u>: Dr. Kaul brings an action for commercial disparagement against ASIPP, Dr. Kaufman, Dr. Pryzbylski, Dr. Peterson, Allstate, GEICO, University Hospital, Dr. Cohen, Hackensack UMC, and AHS. (2AC at p. 89).

---

[24]     In addition to 348 N.J. Stat. § 56:9-10, et seq., Dr. Kaul alleges to bring an action for conspiracy and combination in restraint of trade under the laws of the same states listed *supra* n. 22. (*Id.* ¶ 348).

[25]     Dr. Kaul brings sub-claims under the laws of Arizona, Arkansas, California, Colorado, Connecticut, Florida, Illinois, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, South Dakota, Tennessee, Utah, Virginia, Washington, and West Virginia. (DE 241 ¶ 355).

- Count Thirteen: Dr. Kaul brings an action for intentional interference with prospective economic advantage against ASIPP, Dr. Kaufman, Dr. Staats, Dr. Pryzbylski, CNS, Dr. Peterson, Allstate, GEICO, University Hospital, Dr. Mitchell, Dr. Cohen, Hackensack UMC, and AHS. (2AC at pp. 89–90); and

- Count Fourteen: Dr. Kaul brings an action for aid in the commission of a tort against all defendants. (2AC at p. 91). [26]

As to damages, Dr. Kaul generally requests: compensatory, consequential, and punitive damages; declarations from the Court that the acts alleged were illegal; the immediate reinstatement of Dr. Kaul's license to practice medicine and surgery; expungement of the revocation of Dr. Kaul's medical license from the public record; the reinstatement Dr. Kaul's CDS registration; injunctive relief against all defendants for any and all alleged illegal activities; disgorgement, restitution, and the creation of a constructive trust; an award of costs of suit, including reasonable attorneys' fees; and any other relief necessary. (2AC pp. 91–93). In his briefing, Dr. Kaul refers to a calculation of damages from the original complaint in the amount of "28,171,028.828568999213 trillion" dollars. Some supporting calculations are proffered. (See DE 1-2 at 80).

---

[26] Dr. Kaul, as the plaintiff, "bears the burden of showing that the case is properly before the court at all stages of the litigation." *Schneller ex rel. Schneller v. Crozer Chester Med. Ctr.*, 387 F. App'x 289, 292 (3d Cir.2010) (citing *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1045 (3d Cir.1993)).

Under 28 U.S.C. § 1331, "[f]ederal question jurisdiction arises where federal law creates the cause of action, or where the complaint, on its face, poses a federal question." *Schneller*, 387 F. App'x at 292 (citing *Club Comanche, Inc. v. Gov't of Virgin Islands*, 278 F.3d 250, 259 (3d Cir. 2002)). Dr. Kaul brings the following counts under federal law: Counts One through Five, the federal law component of Count Six, and Count Eleven. This Court thus has subject matter jurisdiction over those claims. *See* 28 U.S.C. § 1331.

The state-law claims, consisting of part of Count Six, Counts Seven through Ten, and Counts Twelve through Fourteen, do not fall under 28 U.S.C. § 1331. Jurisdiction over the state-law claims is discussed separately at Section IV.B, *infra.*

Five motions to dismiss now are before the Court: (1) the motion to dismiss of Doctor Mitchell filed on August 15, 2018, (DE 257);[27] (2) the motion to dismiss of Allstate filed on August 17, 2018, (DE 258);[28] (3) the motion to dismiss of Dr. Heary also filed on August 17, 2018, (DE 259);[29] (4) the Omnibus Motion to Dismiss of all remaining defendants filed on August 17, 2018 (DE 260); and (5) the motion to dismiss of the Newspaper Defendants, filed on August 17, 2018. (DE 263).[30] In addition, on August 17, 2018, the TD Bank Defendants filed a separate brief in support of the Omnibus Motion to Dismiss. (DE 261).

On November 6, 2018, Dr. Kaul filed the following: (1) an opposition to the Omnibus Motion to Dismiss (DE 268); (2) an opposition to the brief in support filed by the TD Bank Defendants (DE 272); and (3) an opposition to motion to dismiss of Dr. Heary (DE 276).

On November 7, 2018, Dr. Mitchell filed a reply brief in further support of his motion to dismiss. (DE 274). On November 19, 2018, Dr. Kaul filed an unauthorized surreply to Dr. Mitchell's reply. (DE 283). On November 26, 2018, counsel for Dr. Mitchell filed a letter requesting that the Court strike

---

[27]     In my previous filed Opinion, (DE 200), I dismissed several defendants from the action because of striking similarities between the First Amended Complaint and a state complaint already dismissed with prejudice. (DE 200 p. 42). Another state action presented similar allegations, but it was unclear whether that action had been dismissed with prejudice (*id.*); for that reason, I granted remaining defendants leave to file a motion to dismiss with updated information on the referenced action so that they may properly make an argument based on res judicata and the entire controversy rule. (*Id.*). Dr. Mitchell and Dr. Heary have done so. (DE 257; DE 259-1). Both have also joined the Omnibus Motion to Dismiss. (*Id.*).

[28]     Allstate's motion to dismiss supports the Omnibus Motion to Dismiss, but also argues that Dr. Kaul's claims against Allstate in particular should be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the litigation privilege doctrine, and the Insurance Fraud Act. (DE 258-1).

[29]     Dr. Heary argues that the claims against him in the Second Amended Complaint are barred by res judicata and the entire controversy doctrine, as discussed *supra* n. 27), and the New Jersey Tort Claims Act. (DE 259-1).

[30]     The Newspaper Defendants argue that the RICO claims of the Second Amended Complaint against them must be dismissed because the activity about which Dr. Kaul complains is protected by the First Amendment. (DE 263).

Dr. Kaul's surreply, citing D.N.J. L.R. 7.1(d)(6), and Dr. Kaul filed a response to that letter. (DE 285, 287). I will consider Dr. Kaul's surreply.

On November 13, 2018, the clerk of the court entered default against defendant Lewis Stein, Esq. (DE 280). On that same day, Dr. Kaul filed a motion for default judgment against Stein. (DE 281). On November 26, 2018, Stein filed a response in opposition to the motion for default judgment. (DE 282). On November 27, 2018, Dr. Kaul filed a letter reply. (DE 286). Two days later, on November 29, 2018, Dr. Kaul filed a second letter in support of a default judgment. (DE 288).

On December 6, 2018, Dr. Heary filed a response in support of dismissal. (DE 290). On December 7, 2018, the Newspaper Defendants (DE 291) and Allstate (DE 292) filed reply briefs in support of dismissal. On December 12, 2018, the defendants filed a reply brief in further support of the Omnibus Motion to Dismiss. (DE 294). On the same date, the TD Bank Defendants also filed a reply in further support of dismissal. (DE 295).

## II.    PRELIMINARY APPLICATIONS

In advance of the merits of the motion to dismiss, I here dispose of two preliminary applications: (a) Dr. Kaul's request to further amend the Second Amended Complaint to add the Gannett newspaper concern as a new defendant, *see* Section II.A; and (b) his motion for entry of a default judgment against defendant Stein, *see* Section II.B.

### A.    Request to further amend to add a defendant

Before addressing the defendants' motions substantively, I consider Dr. Kaul's letter request to amend the Second Amended Complaint so that he may add Gannett Co. Inc. ("Gannett") as a defendant should Gannett publish a story about Dr. Kaul. (DE 243).

The Second Amended Complaint is the product of four drafts submitted to this Court after the dismissal of the First Amended Complaint. (DE 57; DE 204; DE 209; DE 231; DE 239). On April 16, 2018, by letter order,

Magistrate Judge Mannion specifically ordered that Dr. Kaul "does not have leave to add any additional claims or defendants." (DE 240 p. 2). These allegations cannot remain a moving target forever. For that reason alone, I would not grant leave to amend.

In addition, the motion to add Gannett to the Second Amended Complaint is denied as futile, because the proffered claim against Gannett would not withstand a motion to dismiss. *Penn. Bus. Credit, LLC v. All Staffing, Inc.*, 597 Fed. Appx. 692, 694 (3d Cir. 2015) ("Amendment of the complaint is futile if the amendment will not cure the deficiency in the original [pleading] or if the intended [pleading] cannot withstand a renewed motion to dismiss."). Here, Dr. Kaul purports to sue Gannett based on a news story that he speculates may be published in the future. (DE 243). I would necessarily dismiss any such claim for damages on ripeness grounds. *Laird v. Tatum*, 408 U.S. 1, 14 (1972)) ("[T]he federal courts established pursuant to Article III of the Constitution do not render advisory opinions.") (internal citations omitted). And a prior injunctive restraint on publication is, of course, a quintessential First Amendment violation. *Near v. Minnesota*, 283 U.S. 697 (1931). Dr. Kaul's request to add Gannett as a defendant is denied.

B.    Motion for default judgment

Dr. Kaul has moved for entry of a default judgment against defendant Stein. In opposition, Stein filed a letter arguing that (1) the Second Amended Complaint fails to state a claim, and (2) default should be vacated for the same reasons I previously vacated default against Stein (DE 282; *see also* DE 202). Stein's letter also states that Stein has taken a medical leave and retired from his law firm. (DE 282). On November 27, 2018, Dr. Kaul filed a letter in further support of default. (DE 286). On November 29, 2018, Dr. Kaul filed a second letter in support of default in which he asserted that Stein is not actually retired; informed the Court that he will be filing an ethics complaint against Stein; and asked the Court to refer the Stein to the Ethics Committee of the New Jersey Supreme Court. (DE 288). These latter matters I set aside, because

they do not even purport to assert a cognizable cause of action against Stein. For the reasons stated below, Dr. Kaul's motion is denied, and I will vacate the clerk's entry of default against Stein.

Federal Rule of Civil Procedure 55(c) provides that relief from entry of default will be granted for "good cause." As a general matter, defaults are disfavored. *Gross v. Stereo Component Sys., Inc.*, 700 F.2d 120, 122 (1983). The district court, exercising its discretion to grant a motion to vacate default, considers: "(1) whether plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; (3) whether the default was the result of the defendant's culpable conduct and (4) the effectiveness of alternative sanctions." *Gold Kist, Inc. v. Laurinburg Oil Co.*, 756 F.2d 14, 19 (3d Cir. 1985) (internal citations omitted). In this case, Dr. Kaul will not be prejudiced if default is vacated. As discussed herein, the defenses to these claims are meritorious, and they would apply to Stein. Finally, given the confusing nature of Dr. Kaul's still quite prolix Second Amended Complaint, I cannot find that Stein's failure to appear and defend was willful. I add, by the way, that Stein seems to have belatedly joined issue; he is named as one of the movants on the Omnibus Motion to Dismiss.

The motion for a default judgment against Stein is therefore denied, both on the merits and because it is mooted by my dismissal of the Second Amended Complaint herein, on grounds that would apply equally to Stein.

## III. LEGAL STANDARD: MOTION TO DISMISS

Rule 12(b)(6), Fed. R. Civ. P., provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters*

& *the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also West Run Student Housing Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

However, a plaintiff alleging fraud or mistake must meet a heightened pleading standard under Federal Rule of Civil Procedure 9(b). Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). As the Third Circuit has explained, "[a] plaintiff alleging fraud must therefore support its allegations with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (citing *In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)) (citation and quotation marks omitted). In other words, a plaintiff may satisfy this requirement by pleading "the date, time and place" of the alleged fraud or deception, or by "otherwise injecting] precision or some measure of substantiation" into the allegation. *Frederico v. Home Depot*, 507

F.3d 188, 200 (3d Cir. 2007) (citing *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004).

The heightened specificity required by Rule 9(b) extends to the pleading of all claims that "sound in fraud." *See Giercyk v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 13–6272, 2015 WL 7871165, at *2 (D.N.J. Dec. 4, 2015); *Mladenov v. Wegmans Food Markets, Inc.*, 124 F. Supp. 3d 360, 372 (D.N.J. 2015). That category includes Dr. Kaul's claims of mail, wire, and honest services fraud. *See Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002).

Where a plaintiff, like Dr. Kaul here, is proceeding pro se, the complaint is to be "liberally construed," and, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). Nevertheless, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013).

"While a litigant's pro se status requires a court to construe the allegations in the complaint liberally, a litigant is not absolved from complying with Twombly and the federal pleading requirements merely because s/he proceeds pro se." *Thakar v. Tan*, 372 F. App'x 325, 328 (3d Cir. 2010) (citation omitted). Pro se plaintiffs are also not exempt from meeting the heightened pleading requirements of Rule 9(b) when alleging claims that sound in fraud. *See Kowalsky v. Deutsche Bank Nat'l Trust Co.*, No. 14–07856, 2015 WL 5770523, at *9 (D.N.J. Sept. 30, 2015).

## IV.  ANALYSIS

The Second Amended Complaint fails to state a claim under federal law. For the reasons set forth in Section IV.A, *infra*, the federal-law claims are dismissed under Fed. R. Civ. P. 12(b)(6). The associated state-law claims are also dismissed on jurisdictional grounds, for the reasons stated in Section IV.B, *infra.*

32

A.   Federal claims

Dr. Kaul brings the following federal causes of action: (1) four counts under RICO, (2) two counts alleging antitrust violations under the Sherman and Clayton Acts, and (3) one § 1983 claim for deprivation of rights under color of state law.

### 1.  RICO Claims (Counts One through Four)

The Second Amended Complaint asserts four counts under of the Federal RICO statute, 18 U.S.C. § 1962(c) & (d):

- Count One refers to Dr. Kaufman, Dr. Przybylski, Dr. Heary, Dr. Mitchell, Dr. Staats, CNS, and ASIPP as, collectively, the "**CAC RICO Defendants**." (2AC ¶ 119). Broadly, Count One alleges that ASIPP and CNS, acting in concert to preserve their alleged stronghold on the "spine market," became concerned over the threat of Dr. Kaul's "minimally invasive spine surgery practice expanding nationally," and conspired with the neurosurgeons to have Dr. Kaul's medical license revoked. (*Id.* ¶ 126); (*see generally id.* ¶¶ 118–160).

- Count Two refers to Allstate, GEICO, and the TD Bank Defendants as, collectively, the "**CAGTK RICO Defendants**." (2AC ¶ 162). Broadly, Count Two alleges that CAGTK RICO Defendants, in order to "manufacture an excuse to avoid paying [Dr. Kaul's] bills" (*id.* ¶ 165), and to protect corporate profits, also co-orchestrated a scheme to have Dr. Kaul's medical license revoked. (*Id.* ¶ 168; *see generally* ¶¶ 161–202).

- Count Three refers to Garrett, Gonzalez, Hackensack UMC, AHS, and University Hospital[31] as, collectively, the "**CHE RICO Defendants**." (2AC ¶ 204). Broadly, Count Three alleges that the CHE RICO Defendants, in an effort to divert Dr. Kaul's patients to their own

---

[31]    The complaint also refers to University Hospital as "UH" or "Rutgers." (*See* 2AC ¶¶ 7, 204).

facilities, (*Id.* ¶ 206), "engaged in a scheme of bribes and kickbacks, in which Governor Christie used state agencies to revoke [Dr. Kaul's] license, an event that caused his surgical center to file for bankruptcy." (*Id.* ¶ 208; *see generally id.* ¶¶ 202–242).

- Count Four refers to the Newspaper Defendants and Stein as, collectively, the "**CMS RICO Defendants**." (2AC ¶ 244). Broadly, Count Four alleges that the Newspaper Defendants, seeking to increase advertising revenue, and Stein, seeking to facilitate litigation he had commenced against Dr. Kaul, conspired to both bribe Governor Chris Christie to revoke Dr. Kaul's license and to publish defamatory stories about Dr. Kaul. (*Id.* ¶ 259; *see generally id.* ¶¶ 243–296).

Counts One, Two, Three, and Four of the Second Amended Complaint allege that the CAC RICO Defendants, the CAGTK RICO Defendants, the CHE RICO Defendants, and the CMS RICO Defendants, respectively, violated 18 U.S.C. § 1962(c) & (d). Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c); *see In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362–63 (3d Cir. 2010). Section 1962(d) makes it unlawful "for any person to conspire to violate" § 1962(c).

To establish a claim under § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 482–83 (1985); *see also District 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F.Supp.2d 508, 518–19 (D.N.J. 2011) (citation omitted).

The term "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Ins. Brokerage*, 618

F.3d at 362–63 (citing 18 U.S.C. § 1961(4)). With respect to the pattern of racketeering activity, the statute "requires at least two acts of racketeering activity within a ten-year period," which may include federal mail fraud under 18 U.S.C. § 1341. *Id.* (citations omitted). In addition, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima*, 473 U.S. at 496.

      i.     *Predicate acts*

Counts One, Two, Three, and Four allege nearly identical predicate acts of racketeering. The defendants are alleged to have committed, conspired to commit, or aided and abetted in the commission of, mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. (2AC ¶¶ 145–160, 189–202, 228–242, 271–286).

The offense of mail or wire fraud has two essential elements: "[1] a scheme to defraud, and (2) a mailing or wire in furtherance of that scheme." *Annulli v. Panikkar*, 200 F.3d 189, 200 n.9 (3d Cir. 1999). Use of the mails may be intrastate; use of the wires must be interstate. *Id.* Allegations of either offense as a predicate for a civil cause of action must meet the heightened standard for pleading fraud under Rule 9(b). *Warden*, 288 F.3d at 114; *Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc.*, 87 F. App'x 227, 231 (3d Cir. 2003) ("[T]he 'who, what, when, and where details of the alleged fraud' are required.") (quoting *Allen Neurosurgical Assoc., Inc. v. Lehigh Valley Health Network*, No. CIV-A-99-4653, 2001 WL 41143 (E.D. Pa. Jan. 18, 2001)); *see also Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) ("To satisfy [Rule 9(b)], the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.").

Counts One through Four fail to explain the who, what, where, and how of the alleged schemes to defraud. First, none of the counts allege that any specific defendant committed any particular act of either mail or wire fraud.

(2AC ¶¶ 145–160, 189–202, 228–242, 271–286). Instead, the counts for the most part posit the existence of a broad conspiracy and state that the defendants are members of it. (*Id.*). Second, even in the most detailed of the predicate act descriptions, the allegations of predicate acts are vague and conclusory. (*see e.g.*, 2AC ¶ 151) ("The CAC RICO Defendants' use of the mail and wires include, but are not limited to: (a) the transmission of letters, e-mails and other materials negotiating the horizontal agreements and market share distributions . . . (d) written, telephone, or electronic communications instructing its members not to support the Plaintiff in any litigation."). Although the complaint purports to specify some of the "occasions on which the predicate acts of mail and/or wire fraud occurred," it does not provide the dates, names, locations, and so forth, with the requisite specificity. (2AC ¶¶ 153, 195, 237, 280).

More broadly, Counts One through Four simply lack factual concreteness. They attempt to excuse their factual deficits by alleging that the precise dates of the fraudulent acts "have been deliberately hidden" by unidentified persons in an unspecified manner. (2AC ¶¶ 153, 195, 237, 280). In a proper case, some non-specificity can be excused pending discovery. *See* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §1298 (3d ed. 2009) ("[T]he rule regarding the pleading of fraud does not require absolute particularity or a recital of the evidence, especially when some matters are beyond the knowledge of the pleader and can only be developed through discovery."). Even so, this is not a case of allegations that merely lack "absolute particularity or a recital of the evidence." These RICO mail and wire fraud allegations are so utterly lacking in facts that they cannot satisfy Rule 9(b). If a conspiracy so vast and all-encompassing had existed, it surely would have left some trace in the form of facts that could be cited by the plaintiff. The pleading deficit here cannot be remedied by a circular, speculative allegation of "hidden" facts which, if we knew what they were, would support a cause of action. RICO cases, like the antitrust cases discussed in *Twombly*, "are 'big' cases and the defendant should not be put to the expense of big-case discovery on the basis

36

of a threadbare claim." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370 (3d Cir. 2010) (internal citations omitted).

The RICO claims' allegations of predicate acts of mail and wire fraud fail to meet the heightened pleading standard of Rule 9(b). For that reason, Counts One, Two, Three, and Four are dismissed.

### 2. Antitrust claims (Counts Five and Six)

Dr. Kaul brings two counts alleging antitrust claims. In Count Five, he seeks declaratory and injunctive relief under Section 16 of the Clayton Act for violations of Sections 1 and 2 of the Sherman Act. In Count Six, he brings monopolization claims against Dr. Pryzbylski, Dr. Kaufman, Dr. Staats, Dr. Cohen, Dr. Heary, Dr. Mitchell, Hackensack UMC, University Hospital, and AHS. (2AC ¶ 57).[32] While Count Six does not explicitly cite the Sherman Act, that is the evident intent. (*See* "Kaul's Elemental Chart," DE 268, 6–11).

Contracts, combinations, and conspiracies in restraint of trade are illegal. 15 U.S.C. § 1. To sustain such a claim, the plaintiff must prove:

> (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy.

*Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81-82 (3d Cir. 1977); *accord Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) ("A plaintiff asserting a Section 1 claim . . . must allege four elements: '(1) concerted action by the defendants; that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.'") (citing *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005)).

---

[32] CNS is not named as a defendant in this count. (2AC ¶ 57).

It is also illegal to monopolize, attempt to monopolize, or conspire to monopolize trade. 15 U.S.C. § 2. Claims under Sherman Act section 2 generally come in two flavors: monopoly abuse and attempted monopolization.

> The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 437 (3d Cir. 1997) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n. 19 (1985)). An attempted monopolization claim has three elements: "a plaintiff must prove that the defendant (1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power." *Id.* at 442.

### i.    *Relevant Market*

Under sections 1 and 2, the plaintiff bears the burden of pleading the relevant geographic and product markets. *See Queen City Pizza*, 124 F.3d at 436–37. Kaul has not done so.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962). *See also Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir.1991) (same). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a *motion to dismiss* may be granted." *Queen City Pizza*, 124 F.3d at 436–37 (emphasis in original).

Counts Five and Six do not properly define the relevant product market.[33] The Second Amended Complaint labels the product market as the "minimally invasive spine fusion market," or, more broadly, the "minimally invasive spine surgery market." (*See* 2AC ¶¶ 298–99, 316).[34] This does not really rise above the level of say-so. The Second Amended Complaint fails to plead facts in relation to reasonably interchangeable services, cross-elasticity of demand, or even mobility as between surgical specialties. (2AC). Here, Dr. Kaul argues that, because *Queen City Pizza* and *Brown Shoe* required market definitions for "product" markets, not "service" markets, the Second Amended Complaint's antitrust claims are not required to discuss reasonable interchangeability or cross-elasticity. (DE 268 p. 54–55). I disagree. *M.A.P. Oil Co. v. Texaco Inc.*, 691 F.2d 1303, 1306 (9th Cir. 1982) ("Market definition can be broadly characterized in terms of the cross-elasticity of demand for or reasonable interchangeability of a given set of products or *services*.") (emphasis added).

The geographical market is, if anything, even less well defined. No catchment area for patients is hazarded, either in relation to Dr. Kaul's own practice or those of his competitors. The Second Amended compliant does not plausibly allege the nature or geographical extent of the defendants' market power. Dr. Kaul's briefing, as opposed to the complaint, clarifies that the relevant market is intended to be nationwide: "outpatient and minimally invasive spine surgery within New Jersey and the other forty-nine states." (DE 236 p. 52 (citing 2AC ¶¶ 298–304)) The Second Amended Complaint has not pled plausible facts indicating that Dr. Kaul drew patients from, or participated in, any such nationwide market. Rather, he argues that he had a plan to

---

[33]    I ruled on this same primary defect in Dr. Kaul's First Amended Complaint. (*See* DE 200).

[34]    Dr. Kaul's briefing argues that the features of the minimally invasive spine surgery market are defined by a document titled the "Rule of Five." (*See* DE 268, 52) (citing "D.E. 5116 Page ID 5116") No such document is referenced in the Second Amended Complaint. ("DE 5116," a nonexistent entry, I assume to be a slip of the pen.)

dominate the minimally invasive spine surgery market nationally (or even globally), and that these defendants thwarted him. The allegation is speculative and vague.

ii.    *Count five*

In Count Five, Dr. Kaul alleges that the defendants engaged in an anticompetitive scheme to prevent him and his surgical center (and other similarly trained physicians) from engaging in minimally invasive spine surgery. (2AC ¶ 298). This scheme was allegedly pursued by means of the following anticompetitive practices: (1) influencing professional groups to downgrade the codes applicable to outpatient minimally invasive spine surgery; (2) bribing former Governor Christie to veto a bill; (3) bribing unidentified parties to publish a fee schedule that denies payment for outpatient minimally invasive spine surgery; (4) encouraging patients to initiate litigation against Dr. Kaul; (5) bribing unidentified parties to issue a moratorium denying licenses to outpatient surgical centers that performed minimally invasive spine surgeries; (6) agreeing that physicians with training similar to Dr. Kaul's should not perform fusions; and (7) otherwise engaging in an overarching scheme to monopolize.

The allegations of anticompetitive conduct fail to satisfy *Twombly* and *Iqbal*. First, under Section 1 of the Sherman Act, Dr. Kaul fails to plead plausible facts to demonstrate that an agreement was made between the defendants. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (holding that a well-pled antitrust complaint must allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement"). His pleading burden is not eased, as it might be, by the presence of some *per se* antitrust violation or very clear anticompetitive effect. Thus he must factually plead something well beyond a formulaic recitation of the elements of a cause of action. *Id.* at 555. Second, under Section 2 of the Sherman Act, Dr. Kaul fails to plausibly allege that the defendants held monopoly power or otherwise engaged in predatory or anti-competitive behavior. For example, I

look to the only allegation with any factual substance—that the defendants caused professional organizations to downgrade codes associated with minimally invasive spine surgery. Even that allegation, however, is merely that the defendants must somehow have controlled or influenced professional organizations. No factual circumstances are alleged. Dr. Kaul's actual grievance is that non-party professional organizations downgraded codes applicable to the procedures that are the core of his practice. Dr. Kaul believes that the defendants somehow influenced the modification of these codes, but he provides the Court with no insight into how that anticompetitive plan was executed.

Even if such facts were alleged, the complaint would still lack any plausible allegations of monopoly power. Nor is the allegedly predatory conduct—i.e., influencing these organizations—described in such a manner that the Court may determine if defendants' actions were anticompetitive in nature.[35] Of course, the plaintiff does not have to prove his case in his complaint, but he does have to describe it factually.

### iii. *Count six*

In Count Six, Dr. Kaul alleges that the defendants held monopolistic sway over the (largely undefined) minimally invasive spine surgery market by (1) bribing former Governor Christie to have the Board revoke Dr. Kaul's

---

[35] Participation by organizations and physicians in the CPT code assignment process, even if it were adequately alleged, would not be enough. It also would have to be plausibly alleged to have been predatory or anticompetitive. *See Neotonus, Inc. v. Am. Med. Ass'n.*, 554 F. Supp. 2d 1368, 1380 (N.D. Ga. 2007) (holding that the American Urological Association did not behave in an anticompetitive or predatory manner when it presented evidence to the AMA's CPT Editorial Board that a urinary technology device should not be granted a Category I CPT code), *aff'd*, 270 F. App'x 813 (11th Cir. 2008). Far from being anticompetitive on its face, proper professional standard setting is salutary and procompetitive. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 309 (3d Cir. 2007) ("The adoption of a standard does not eliminate competition among producers but, rather, moves the focus away from the development of potential standards and toward the development of means for implementing the chosen standard.").

medical license (2AC ¶ 307); (2) encouraging patients to sue Dr. Kaul (*id.* ¶ 308); (3) reporting Dr. Kaul to regulatory authorities (*id.*); (4) providing fraudulent testimony to the Board and ALJ Solomon (*id.* ¶¶ 310–11); and (5) filing sham litigation against Dr. Kaul's employees (*id.* ¶¶ 314–15). Factual allegations are again lacking; merely positing that official action unfavorable to the plaintiff must have resulted from bribery is not enough. Again, Dr. Kaul fails to plausibly allege an agreement between the parties and any *per se* antitrust violation; moreover, the alleged anticompetitive effects are, again, vague and conclusory.

*　　*　　*

Count Five and the federal antitrust claim in Count Six are both dismissed for failure to define the relevant market. They also fail to plead an antitrust claim in a plausible, factual manner. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558, 127 S. Ct. 1955, 1966–67, 167 L. Ed. 2d 929 (2007) (internal citations omitted) (while "it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, [it is] quite another to forget that proceeding to antitrust discovery can be expensive"). The motion to dismiss those counts is granted.

### 3. § 1983 Claim (Count Eleven)

Count Eleven asserts a claim under 42 U.S.C. § 1983 for deprivation of rights under color of state law. This count alleges that defendants Allstate and GEICO bear responsibility for the allegedly "fraudulent" opinion, issued on December 13, 2013, in which ALJ Solomon found that Kaul should be stripped of his medical license. That opinion, says Kaul, contains some 278 separate acts of misrepresentation, mischaracterization, perjury, and evidential omission. (2AC ¶¶ 272, 274). In addition, Count Eleven claims that Dr. Kaufman and Dr. Przbyblski jointly committed 31 acts of perjury when they provided expert testimony in April and May of 2013 (*id.* ¶ 373), and failed to

recuse themselves from testifying as experts despite their status as Dr. Kaul's business competitors. (DE ¶ 375).[36]

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: "(1) the conduct complained of must be 'committed by a person acting under color of state law'; and (2) this conduct must 'deprive[ ] a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Clark v. Punshon*, 516 F. App'x 97, 99 (3d Cir. 2013) (quoting *Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993) ); *accord Mitchell v. Mitchell*, 737 F. App'x 630, 631 (3d Cir. 2018) ("under Section 1983, a plaintiff must show she was deprived of a federal constitutional or statutory right by a state actor."); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).

Fundamentally, for a defendant to have acted under the color of state law, the defendant must have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West*, 487 U.S. at 49. Thus, the state-action element of a Section 1983 claim requires that "the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982). For the conduct to be "fairly attributable" to the State (1) the deprivation must be caused by (a) the exercise of some right or privilege created by the State or (b) by a rule of conduct imposed by it or by a person for whom the State is responsible, and (2) the defendant must be a person who may fairly be said to be a state actor, either because the person (a) is a state official, (b) acted together with or has obtained significant aid from state officials, or (c) performed conduct otherwise chargeable to the State. *See id.* at 936-39. Dr. Kaul's allegations against these defendants do not establish that they exercised any power under state law.

---

[36]     Section 1983 does not contain an exhaustion requirement. I note in passing, however, that Dr. Kaul did not file an appeal, the usual route to correction of such errors in a decision.

I first consider whether Dr. Kaufman and Dr. Przbyblski are alleged to be state actors. The allegations against these defendants relate to their testimony as witnesses in a hearing. Testifying in a state administrative law proceeding does not create a sufficient nexus between the defendants and the state. In an apparent attempt to portray Doctors Kaufman and Przbyblski as state actors, Dr. Kaul purports to sue them in their "official capacity." No such official position is identified, however.[37]

I next consider whether GEICO and Allstate are properly alleged to be state actors. Count Eleven alleges that those two Carriers assisted ALJ Solomon in fraudulently drafting his opinion. "[A] private party can qualify as a state actor when 'he [or she] is a willful participant in joint action with the State or its agents.'" *Clark*, 516 F. App'x at 99 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980)). It is not enough, however, to name a state actor and allege in conclusory terms that some private actor must have participated in his or her actions. The bare assertion that the Carriers "conspired with "[Administrative Law Judge] Jay Howard Solomon to issue [the allegedly] fraudulent opinion" (2AC ¶ 374) is a mere conclusion; it does not plausibly allege facts to suggest conspiracy or joint action between state and non-state actors. *Coulter v. Allegheny Cty. Bar Ass'n*, 496 F. App'x 167, 169 (3d Cir. 2012) ("Bare assertions of joint action or a conspiracy are not sufficient to survive dismissal at the pleading stage.").

Accordingly, Count Eleven is dismissed for failure to state a claim.

---

[37] I observe that if the defendants had acted as State officials, a suit for damages would generally be barred by the Eleventh Amendment. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (explaining that state officials, sued in their official capacities, are immune under the Eleventh Amendment and also are not "persons" under section 1983). That being said, a state official sued in his or her official capacity for prospective injunctive relief is deemed a "person" amenable to suit. *Hafer*, 502 U.S. at 27.

B.     State law claims

Under 28 U.S.C. § 1367(c)(3), a federal court "'may decline to exercise supplemental jurisdiction' over state law claims if it has 'dismissed all claims over which it has original jurisdiction . . .'" *Stone v. Martin*, 720 F. App'x 132, 136 (3d Cir. 2017). Indeed, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)) (emphasis in original). Here, I have dismissed all claims over which this Court has original jurisdiction. I have been directed to no considerations of judicial economy, convenience, fairness, or comity that would weigh in favor of retaining Dr. Kaul's state-law claims. I therefore would decline to exercise supplemental jurisdiction over the state-law component of Count Six, Counts Seven through Ten, and Counts Twelve through Fourteen.

Dr. Kaul alleges in addition, however, that there is an independent basis for this court to exercise jurisdiction over the state law claims, based on diversity of citizenship. "To establish diversity jurisdiction under 28 U.S.C. § 1332(a), the party asserting jurisdiction must show that there is complete diversity of citizenship among the parties and an amount in controversy exceeding $75,000." *Schneller*, 387 F. App'x at 292. "It is . . . well established that when jurisdiction depends upon diverse citizenship the absence of sufficient averments or of facts in the record showing such required diversity of citizenship is fatal and cannot be overlooked by the court, even if the parties fail to call attention to the defect, or consent that it may be waived." *Carlsberg Res. Corp. v. Cambria Sav. & Loan Ass'n*, 554 F.2d 1254, 1256 (3d Cir. 1977) (internal citations omitted).

Dr. Kaul alleges that the state law claims in the Second Amended Complaint fall within this Court's diversity jurisdiction "because [Dr. Kaul] is a

citizen of a different state to certain defendants." (2AC ¶ 26). It is not sufficient that the plaintiff's citizenship be diverse from that of "certain" defendants. Complete diversity means that "no plaintiff [may] be a citizen of the same state as any defendant." *Lincoln Ben. Life Co.*, 800 F.3d 99, 104 (3d Cir. 2017) (quoting *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 419 (3d Cir. 2010)); *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806).

Citizenship is more than mere residency. It "is synonymous with domicile, and 'the domicile of an individual is his true, fixed and permanent home and place of habitation. It is the place to which, whenever he is absent, he has the intention of returning.'" *McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 286 (3d Cir. 2006).[38] To plead diversity jurisdiction, Dr. Kaul must allege his own state citizenship (not just residence) and allege that *each and every* defendant is a citizen of some different state (not just residing or employed there). That he has failed to do. For example, Dr. Kaul brings certain state law claims against Dr. Staats (2AC at p. 57), but fails to allege his citizenship. (*See id.* at 13 (alleging that Dr. Staats is the President of ASIPP and the editor of Pain Medicine News)). He alleges state-law claims against Dr. Mitchell, but alleges no more than Mitchell's office location. (*Id.* ¶ 11). Similarly, as to Dr. Peterson the complaint alleges only that he engages in business with Hackensack UMC. (*Id.* ¶ 12).[39]

The state law claims are therefore dismissed, because the court declines to exercise supplemental jurisdiction and because adequate allegations of diversity are lacking. The grounds for dismissal of these state claims are

---

[38]     In determining an individual's domicile, a court may consider several factors: "declarations, exercise of political rights, payment of personal taxes, house of residence, and place of business . . . location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, and driver's license and vehicle registration." *McCann*, 458 F.3d at 286.

[39]     In the context of an LLC, where diversity depends on the citizenship of each member, the Court of Appeals has found sufficient a good-faith allegation of diversity made after reasonable inquiry—for example, the inspection of court filings and public records. *See Lincoln*, 800 F.3d at 104. Even assuming that the *Lincoln* rule is not confined to the context of an LLC, no such investigative efforts are apparent here.

jurisdictional, and the dismissal is therefore without prejudice. *Siravo v. Crown, Cork & Seal Co.*, 256 F. App'x 577, 580–81 (3d Cir. 2007) ("Where a district court lacks subject-matter jurisdiction, its 'disposition of such a case will . . . be without prejudice.") (citing *In re Orthopedic "Bone Screw" Prods. Liab. Litig.*, 132 F.3d 152, 155 (3d Cir. 1997)).

The defendants have also raised numerous substantive and procedural grounds for dismissal of the state claims. I do not reach those arguments.

## V.    CONCLUSION

For the reasons set forth above, the defendants' motions to dismiss are GRANTED, as follows.

- Counts One, Two, Three, and Four are dismissed with prejudice for failure to state a claim under Federal Rule of Civil Procedure 9(b).
- Count Five and the federal law claim of Count Six is dismissed with prejudice for failure to define the relevant market.
- Count Eleven is dismissed with prejudice for failure to state a claim upon which relief can be granted.
- The State Law component of Count Six, Counts Seven through Ten, and Counts Twelve through Fourteen are dismissed without prejudice for lack of subject matter jurisdiction.

An appropriate order follows.

Dated: February 22, 2019

**KEVIN MCNULTY**
**United States District Judge**