| | |
|---|---|
| **RICHARD ARJUN KAUL,** | Civ. No. 16-2364 (KM) (SCM) |
| **Plaintiff,** | |
| | **AMENDED OPINION** |
| **v.** | **(amending DE 200)** |
| **CHRISTOPER J. CHRISTIE, et al.,** | |
| **Defendants.** | |

## KEVIN MCNULTY, U.S.D.J.

Dr. Richard A. Kaul, an anesthesiologist by training, claims to be a minimally invasive spine surgeon. In March 2014, the New Jersey State Board of Medical Examiners (the "Board") said otherwise. Because his performance of spine surgeries on 11 patients without proper training and experience constituted gross and repeated malpractice, negligence, and incompetence, the Board revoked his medical license. From Dr. Kaul's perspective, the disciplinary proceedings were nothing but a sham. What really happened, he says, is that a network of politically connected neurosurgeons wanted to make an example of him. His high-quality medical practice was cutting into their margins, and so with the assistance of a cabal of lawyers, hospitals, insurance companies, and media figures, they importuned public officials to banish him from the practice of medicine in New Jersey. And so Dr. Kaul brought this action against some forty-odd defendants.

Now before the court are dozens of motions to dismiss, which in general will be granted. In part, the motions are granted under Rule 12(b)(1), on grounds of lack of subject matter jurisdiction. For the most part, however, dismissal is on 12(b)(6) grounds, because the amended complaint fails to allege plausibly any cause of action as to any defendant.

# I.    BACKGROUND

The gist of the amended complaint ("AC") is that the entire medical, legal, and political ("medico-legal", in Dr. Kaul's words) community of New Jersey conspired to revoke Dr. Kaul's license. No surprise, then, that Dr. Kaul's list of grievances contained in this 101-page AC is exhaustive. To begin to untangle the thick knot of private citizens, professional organizations, law firms, attorneys, administrators, politicians, and public officials alleged to have been in on the scheme to deprive Dr. Kaul of his license, this introductory section proceeds in five subparts.

Part I.A is a summary of the parties involved and the nature of the allegations against them. Part I.B summarizes the license revocation proceedings. Because it is relevant to res judicata and *Younger* abstention issues, Part I.C describes some actions related to this one. Part I.D concludes this background section with some information about the procedural history and claims asserted in this case.

## A.    The Parties

As I must, I accept as true Dr. Kaul's allegations for the purpose of these motions to dismiss.[1]

---

[1]     Abbreviations to documents I have relied on in deciding these motions to dismiss as follows:

"AC" — Amended Complaint Dr. Richard Arjun Kaul, dated June 9, 2016, ECF No. 57

"ALJ Op." — Initial Decision in the *Matter of the Suspension or Revocation of the License of Richard A. Kaul, M.D. License No. 25 MA 063281,* dated December 13, 2013, Ex. B to the Certification of Deputy Attorney ("DAG") General Shana B. Bellin, ECF No. 128-4

"Order" — Corrected Final Decision and Order in *Matter of the Suspension or Revocation of the License of Richard A. Kaul, M.D. License No. 25 MA 063281*, dated March 24, 2014, Ex. C to the Certification of DAG Bellin, ECF No. 128-5

"State Compl." — Complaint filed by Kaul with the Superior Court of New Jersey, Law Division – Bergen Vicinage, Dkt. No. BER-L-2256, dated March 22, 2013, Ex. G to the Certification of DAG Bellin, ECF No. 128-9

### 1. Dr. Kaul

Dr. Kaul went to medical school in London and completed his residency here, at Albert Einstein-Montefiore Medical Center in New York. He became a board-certified anesthesiologist. In 2003, the Board suspended Dr. Kaul's license to practice medicine; in 2012, they revoked it entirely and permanently. These incidents, and others, are discussed below, but the takeaway for now is this: The AC claims that the 2012 disciplinary proceedings were the result of a vast conspiracy between the Governor, hospitals, insurance companies, lawyers, and competitors to drive Dr. Kaul, a minimally invasive spine surgery pioneer, out of business. (*See generally* AC)

### 2. Defendants

For convenience, I group the defendants into eight categories.

#### i. *The State Defendants*

The New Jersey Attorney General's Office represents these nine defendants in this case:

- The **Board**, which is responsible for licensing and censuring New Jersey doctors. (AC ¶ 35)

- **Christopher J., Christie**, who is the Governor of the State of New Jersey. Allegedly, he was moved to revoke Dr. Kaul's medical license by a series of kickback and quid pro quo arrangements with the other defendants. (*Id.* ¶ 3, 54)

- **Jeffrey Chiesa** is the former Attorney General ("AG") of the State of New Jersey. Chiesa was AG when the Board revoked Dr. Kaul's license. As to Chiesa, the thrust of the AC is that he allowed the 2012 revocation hearings to unfold unfairly. Particularly distressing to Dr. Kaul is Chiesa's failure to investigate the alteration of unidentified portions of certain transcripts of the administrative proceedings. (*Id.* ¶ 4, 57, 210)

---

"State Orders" — Orders Dismissing Plaintiff's Complaint in the matter of *Richard A. Kaul, M.D. v. Robert F. Heary, M.D., et al.*, Dkt. No. BER-L-2256-13, dated March 7, 2014, Ex. H to the Certification of DAG Bellin ECF No. 128-10

- **Howard Solomon** is the Administrative Law Judge who presided over Dr. Kaul's 2012 disciplinary proceedings. Following a 23-day hearing, he issued a 94-page opinion. ALJ Solomon concluded that Dr. Kaul's performance of spine surgeries on 11 patients constituted gross malpractice and recommended that the Board revoke his medical license. An article he read about Dr. Kaul in a Bergen County newspaper, the Record, allegedly influenced his decision. (*See generally* ALJ Op.; AC ¶¶ 59-60, 97)

- **William Roeder** is executive director of the Board.[2] (*Id.* ¶ 36)

- **Dr. Steven Lomazow** is a neurologist and was a senior member of the Board in 2012. (*Id.* ¶ 15)

- **Dr. Gregory Przybylski** is a neurologist. He testified as an expert witness for the State in the 2012 disciplinary proceedings, falsely. (*Id.* ¶¶ 28, 85, 160)

- **Dr. Andrew Kaufman**, an anesthesiologist, also testified as an expert witness for the State in those proceedings. At some point, he made false statements that Dr. Kaul was not qualified to perform minimally invasive spine surgeries, perhaps during the 2012 disciplinary proceedings. (ALJ Op. 41-44; AC ¶¶ 34, 67, 85).

- Dr. Kaul is also suing the **State of New Jersey**. (AC ¶ 4)

ii.   *The Doctor Defendants*

The following seven defendants are surgeons (though the AC isn't always clear, I presume they are neurosurgeons) in New Jersey. For the most part, Dr. Kaul claims that they are his jealous competitors, and thus stood to benefit from his ruin.

- **Dr. Robert Heary** consulted with one of Dr. Kaul's patients and encouraged her to sue Dr. Kaul for medical malpractice. (*Id.* ¶ 13, 68)

---

[2]     The AC does not state specify the capacity in which the State Defendants are being sued. I therefore assume Dr. Kaul intends to advance both official and individual capacity claims against these defendants.

- **Dr. Frank Moore** is a professor of neurosurgery at Mount Sinai School of Medicine in New York. (*Id.* ¶ 17)[3]

- **Dr. Peter Carmel** is a co-director of neurosurgery at the Neurological Institute of New Jersey in Newark. Dr. Carmel used his authority as President of the American Medical Association ("AMA") to enact legislation that favored neurosurgeons and hospitals and downgrade the value of endoscopic discectomies. (*Id.* ¶¶ 18, 72, 80, 92)

- **Dr. William Mitchell** is the attending neurosurgeon at John F. Kennedy Medical Center in Edison, New Jersey. He, too, caused endoscopic discectomies to become less profitable, which reduced Dr. Kaul's revenues. (*Id.* ¶¶ 20, 73)

- **Dr. Thomas Peterson** is also a neurosurgeon and affiliated in some way with Hackensack University Medical Center ("HUMC"). Dr. Peterson once called Dr. Kaul a "murderer" in front of one of Dr. Kaul's employees. (*Id.* ¶¶ 21, 90, 176)

- **Dr. Peter Staats** is the President of The American Society of Interventional Pain Physicians ("ASIPP") and the editor of Pain Medicine News. He has "devoted a large percentage of career to medical politics." (*Id.* ¶¶ 22, 74)

- **Dr. Marc Cohen** sent a complaint about Dr. Kaul performing spine surgeries to the Board in 2007. (*Id.* ¶¶ 23, 75)

### iii. *The Hospital Defendants*

Dr. Kaul's allegations as to these five defendants, hospitals and their presidents, are generally similar, so I group them together. (*E.g.* AC ¶¶ 118, 147, 176, 205, 235, 260, 293) He claims that these defendants compete with

---

[3]     On December 22, 2016, Dr. Kaul moved for a default judgment against Dr. Moore, and then again on May 5, 2017. (ECF Nos. 146, 194) On June 16, 2016, Dr. Moore moved to vacate the clerk's entry of default, dismiss the motion for default judgment, and join the co-defendants' omnibus motion to dismiss. Dr. Moore claims that he was never served the original complaint, filed in the S.D.N.Y., or this amended complaint, an issue that many defendants have raised. (ECF No. 194) Dr. Kaul responded on June 29, 2017. (ECF No. 198) Because there exists good cause, because Dr. Moore has several meritorious defenses to Dr. Kaul's allegations, and because there is no prejudice to Dr. Kaul, who has responded to the omnibus motion, the motion is granted.

surgical centers, such as the one Dr. Kaul ran, and therefore had reason to divert business from him to themselves.

- **Atlantic Health System** ("AHS") is a healthcare company comprised of number of hospitals, including Morristown Medical Center, Overlook Medical Center, Chilton Medical Center, and Hackettstown Medical Center. Drs. Cohen, Heary, Carmel, Lomazow, and Kaufman "do business" with AHS. (AC ¶ 11)

- **Brian Gragnolati** became the president of AHS on May 4, 2015. (*Id.* ¶ 42, Def. Ex. V ¶ 14)

- **Hackensack University Medical Center** ("HUMC") is hospital. Drs. Peters and Heary "do business" with HUMC. (*Id.* ¶ 11)

- **Robert Garrett** is the president of HUMC. (*Id.* ¶ 41)

- **University Hospital**, incorrectly pled as Rutgers School of Biomedical and Health Sciences, is a hospital affiliated with Rutgers, The State University of New Jersey. Drs. Heary, Carmel, and Kaufman "do business" with University Hospital. (*Id.* ¶ 12)

- **James Gonzalez** is the president of University Hospital. Gonzalez allegedly failed to take appropriate action after Dr. Kaul sent Gonzalez a letter describing an incident in which Dr. Kaufman defamed him to one of his patients. (*Id.* ¶ 39)

iv.   *The Medical Organization Defendants*

The following four medical organizations (plus Dr. Wolfa, the chairman of one) are involved in this case. Dr. Kaul generally attributes the wrongful acts (*e.g.*, improper political influence, lobbying, defamation, etc.) of their members, the Doctor Defendants, to them.

- The **Congress of Neurological Surgeons** ("CNS") is a professional medical society. Drs. Heary, Przblyski, Carmel, Mitchell, Moore, and Peterson are all members. (*Id.* ¶¶ 30)

- **Christopher Wolfa** is the chairman of the professional conduct committee at CNS. He allegedly failed to take appropriate action after Dr. Kaul filed an ethics complaint against Dr. Przblyski, who is a CNS member. (*Id.* ¶¶ 31, 70)

- The **American Society of Interventional Pain Physicians** ("ASIPP") is a professional medical society. Dr. Staats is president; Dr. Kaufman is a senior member. (*Id.* ¶¶ 29, 34)

- The **American Medical Association** ("AMA") is a professional medical association. Dr. Carmel was its president in 2011. (*Id.* ¶ 19)

- The **North American Spine Society** ("NASS") is global medical society. Dr. Przybylski was its president in 2011; Dr. Cohen is a member. (*Id.* ¶¶ 28, 23)

    v.   *The Insurance Defendants*

The next five defendants allegedly stood to gain from the revocation of Dr. Kaul's license, and in some way bore responsibility for it:

- **Allstate New Jersey Insurance Company** ("Allstate") is the New Jersey subsidiary of Allstate Insurance Company. Allstate owes Dr. Kaul $10 million for clinical services rendered. (AC ¶¶ 7, 56, 62)

- **Richard Crist** was the CEO of Allstate. (*Id.* ¶ 6, Def. Ex. BB, ECF No. 128-30)

- **Government Employees Insurance Co., GEICO Indemnity Co., GEICO Insurance Company,** and **GEICO Casualty Co,** (collectively, "GEICO") provides auto insurance. GEICO used the revocation of Dr. Kaul's license as an excuse not to pay him fees owed. They also advanced legislation that favored it at the expense of surgical centers and interventional pain physicians such as Dr. Kaul. Sometime in 2013, GIECO filed an insurance fraud lawsuit against Dr. Kaul, and conspired with the Media Defendants to publish false stories about him. (*Id.* ¶¶ 9, 61, 98, 153)

- **Berkshire Hathaway** is the parent company GEICO. Dr. Kaul seeks to hold it liable for GEICO's conduct. (*Id.* ¶¶ 9, 62)

- **Warren Buffett** is the chairman and CEO of Berkshire Hathaway, and Dr. Kaul's seeks to hold him liable for GEICO and Berkshire Hathaway's conduct. (*Id.* ¶¶ 44, 63)

    vi.   *The Bank Defendants*

These two defendants allegedly illegally foreclosed on a $1 million loan they had given Dr. Kaul to construct a surgical center.

- **TD Bank, N.A.** is a bank. After obtaining a default judgment against Dr. Kaul, he had to declare bankruptcy. As a result of TD Bank's efforts to enforce that judgment, Dr. Kaul was unable to recover proceeds from the sale of his Manhattan townhouse. Dr. Kaul also says that TD Bank falsely told others in the banking community that he had committed insurance fraud. (*Id.* ¶¶ 10, 55, 64, 184)

- **Divyesh Kothari** is the Vice President of TD Bank. He used "false pretenses to obstruct . . . the townhouse and force it into foreclosure. (*Id.* ¶ 40, 185)

### vii.  *The Law Firm Defendants*

These five law firms and attorneys represented in Dr. Kaul in various capacities. He generally accuses them of ethical misconduct or incompetence, although it is not very clear what legal services or matters are involved.

- **Scarinci Hollenbeck LLC** ("S&H") is a New Jersey law firm, and **Kenneth Hollenbeck** is its Managing Partner. S&H and Hollenbeck attempted to extort $196,000 in legal fees from Dr. Kaul two weeks before the disciplinary hearing by threatening to withdraw from some representation unless Dr. Kaul paid up.[4] (AC ¶¶ 21, 25, 76, 77,135)

- **Brach Eichler LLC** is a New Jersey law firm, and **Joseph Gorrell** is a partner there. The firm has close ties to the Governor and, at some point, represented ASIPP. Had Dr. Kaul known either of these facts, he would have retained different counsel for some matter. The remainder of the allegations involving Brach Eichler and Gorrell are difficult to parse, though the firm seems to have played an important role in alleged conspiracy.[5] Gorrell "was motived by

---

[4]     Another lawyer, not Hollenbeck or a member of his firm, but Charles Shaw, Esq., represented Dr. Kaul in the disciplinary proceedings.

[5]     Here is an example, which purportedly ties Brach Eichler to ASIPP, Drs. Kaufman and Staats, and the Governor. It is representative of the approach of the AC:

> **The American Society of Interventional Pain Physicians** violated 18 U.S.C. § 1961 when it permitted its New Jersey chapter to conspire with the defendant governor, defendant state and defendant medical board to unlawfully obtain the plaintiff's property. Defendant Kaufman and Staats are senior board members of the defendant and its New Jersey chapter. Staats was appointed the defendant's president in 2015 and along with defendant Kaufman competed with the plaintiff in the same

the promise of increased revenues that he knew would be generated from other physicians seeking legal counsel, in the wake of the commencement of the plaintiff's revocation proceedings."[6] (*Id.* ¶¶ 26, 27, 78, 79 137, 165)

- **Dughi, Hewit & Domalewski, P.C.,** pled as "Dughi Hewitt LLC," is a New Jersey law firm. **Michael Keating** is partner at Dughi Hewit, and he represented Dr. Kaul in an unsuccessful December 2014 bid to reinstate his medical license. Way back when, Governor Christie was a partner at Dughi Hewit. Because of the firm and Keating's cozy relationship to the Governor and participants in the medical and legal community generally, Dr. Kaul claims that Keating and Dughi Hewit deliberately botched or slow-pedaled the reinstatement effort, and then overcharged him.[7] (*Id.* ¶¶ 32, 33, 83. 170, 229, 287)

viii.   *The Media Defendants*

Dr. Kaul seeks to hold these final two defendants, a reporter and a newspaper publisher, liable for publishing an allegedly libelous article in November 2013.

---

market. Kaufman and Staats both receive patients from and refer patients to the defendant neurosurgeons, and used their positions of power within the defendant's political action committees to give money to the defendant governor. The business partner of defendant Staats was appointed to the defendant medical board by the defendant governor in 2014, in return for the money that the defendant's New Jersey chapter gave to the defendant governor. The money was given to defendant Brach Eichler by way of inflated legal fees, which were then siphoned to the defendant governor through political lobbying firms. The defendant governor rewarded defendant Staats by appointing his partner to the defendant medical board and by using his executive power to revoke the plaintiffs medical license. The plaintiff, in contrast to many of the defendants, never sought political patronage.

(AC ¶ 81)

[6]   Gorrell's actions also "contributed to the opiate epidemic that now plagues the state, because patients with spinal pain had had to resort to the use of opiates, consequent to the reduced availability and increased cost of minimally invasive spine surgery." (*Id.* ¶ 109)

[7]   Dr. Kaul specifically faults Dughi Hewit for declining to file a motion to disqualify the Deputy Attorney General from his case after Dr. Kaul filed an ethics complaint against her. (*Id.* ¶ 287)

- **Lindy Washburn** is a journalist. She wrote a defamatory "six-thousand-word story" on Dr. Kaul that was published on the front page of The Record on November 17, 2013, just before ALJ Solomon rendered the initial decision to terminate his medical license. The goal was to influence the ALJ's decision. Dr. Kaul specifically takes issue with the statement that he had "an Upper crust British accent," which was intended "to malign the plaintiff's character by associating him with the British Aristocracy, towards whom the average American holds hostility, because of the recent War of Independence." She recorded Dr. Kaul without his permission. She also knew that official transcripts of the 2012 disciplinary proceedings were altered but she didn't report that in her story. (*Id.* ¶¶ 37, 89, 153, 175, 204, 234, 259)

- **North Jersey Media, Inc.** ("NJM") owns The Record, and employs Washburn. Its owners, "The Borg Family," have commercial interests which align with the co-defendants, and NJM acted as "a mouthpiece" for the Governor and his defendant donors. The quid for NJM's quo was preferential access to "state government news." (AC ¶¶ 37, 88)

B. The Disciplinary Proceedings

As Part I.A makes clear, the conduct and events at the heart of this dispute occurred during or immediately after disciplinary proceedings that concluded years ago. Here is a summary of those proceedings.

On June 13, 2012, the AG initiated administrative disciplinary proceedings against Dr. Kaul. The charges, in essence, were that Dr. Kaul did not possess the "accepted standard of surgical training, education, and experience to perform spinal surgical procedures" and the "flagrant disregard of his own lack of training and expertise . . . place[d] the public in clear and imminent danger." The AG sought an immediate suspension of Dr. Kaul's medical license.[8] (Def. Ex. A.)

---

[8] The AG had been investigating Dr. Kaul since April 2012. A few days before the AG initiating the disciplinary action, on June 7, 2012, Dr. Kaul attempted to enjoin the State and various state agencies from immediately suspending his controlled dangerous substance registration. That complaint was dismissed by the trial court, and then the appeal of that dismissal was dismissed by the Appellate Division in July 2012. (Def. Ex. E, F)

The matter was then referred to the Office of Administrative Law as a contested matter. ALJ Solomon presided over 23 days of hearings, running from April 9, 2013, to June 28, 2013. Drs. Kaufman and Przybylski testified on behalf of the Board. The record closed on October 28, 2013. (ALJ Op. 1-44)

ALJ Solomon issued his initial decision on December 31, 2013. Here are a few of his findings of fact:

> 2.  [Dr. Kaul's] education, training, internships, residencies and fellowships were insufficient to prepare him for surgeries of the spine, whether minimally invasive or open.
>
> 3.  The CME courses he took were insufficient to provide such education and training. If hands-on training were offered, it was, in most instances, done on cadavers. In others, he was primarily an observer.
>
> 4.  In addition to his lack of sufficient education and training in spinal surgeries, he did not receive sufficient monitoring by a trained overseer. For instance, he was on his own the first time he inserted a pedicle screw in a live patient, without the presence of any trained monitor.
>
> 5.  Respondent's treatment included, but was not limited to, inserting pedicle screws into the spinal canal; failing to immediately remove a stimulator after the onset of infection, thereby risking paralysis; using OptiMesh[9] as an interbody structural device; and performing a staged fusion, as well as other acts as discussed above.
>
> 6.  Some of his patient consents were unsigned. . . .
>
> 9.  He used allograft bone in patients who were smokers.[10]

---

9   "OptiMesh is a three[-]dimensional mesh bag to contain bone fragments. ' . . . mesh is simply a bag that contains bones and is not capable of maintaining the load of body weight and, therefore, it is not considered to be an appropriate prosthetic device for an interspace.'" (Order 2 n.1)

10  "Allograft bone is obtained from a cadaver. Autograft bone is harvested from the patient's own body, often from the iliac crest." (Order 17 n.5)

10.   He failed to advise patients who were smokers of the risks associated with smoking and allograft bone.

11.   He misrepresented his qualifications, not only on his website, but also in discussions with his patients.

12.   None of his certifications were recognized by the American Board of Medical Specialties, with the exception of his board-certification in anesthesiology. Non-recognition included his certification by the American Board of Interventional Pain Management.

(ALJ Op. 80-81)

These infractions, the ALJ found, went far beyond mere puffery or resume-fudging. To the contrary, over the course of 94 pages, ALJ Solomon detailed the physical and emotional harm Dr. Kaul inflicted on 11 patients who trusted that he was competent to do—and, on several occasions, that he would in fact do—what he told them he could do.

Here is just one example, patient T.Z.:

The next patient called by petitioner was T.Z., a forty-year-old woman. In the latter part of 2009, she began experiencing pain in her neck and back following an automobile accident. A neighbor, who had been a patient of respondent, recommended [Dr. Kaul]. T.Z. then checked respondent's website, where he represented that he was a board-certified minimally invasive spine specialist. T.Z. was under the clear impression that if she decided to treat with him, any surgery, if one were required, would be minimal, and nothing more . . . .

He told her that he was going to insert two screws and scrape a disc that appeared to be bulging, that the surgery would last approximately forty-five minutes, and would only involve a small incision, about one inch in length. The patient stated that it was her clear understanding was that this was going to be a minor procedure, nothing more, and that she would be discharged the same day, followed by a minimal recovery period of about a week or so. The patient stated that she made it very clear to respondent that she would not agree to anything more significant.

Although she smoked a pack of cigarettes a day, she stated that respondent never mentioned anything about smoking or its risks associated with surgery.

On September 19, 2011, respondent performed a fusion at L3-L4 with the insertion of five screws. . . .

On the date of the surgery, she and her husband arrived at the surgical center early in the morning for what was thought to be a forty-five-minute procedure. Instead, she left the surgery center around 5:00 or 6:00 p.m. Her husband told her that she was in surgery for about six to seven hours. The ride home was excruciating—she was in extreme pain and felt nauseous. . . . Upon arriving home, she could not walk because the pain was so intense. Her husband called his father and together they placed her in a plastic chair and lifted her up the ten to twelve steps into her home. Once she was inside, she was placed in a recliner. . . .

On December 24, 2011, T.Z. was taken to Pocono Hospital, where she was admitted, because she had severe difficulty walking. The pain and numbness to the inside of her legs and buttocks was worsening. . . . [W]hile at Pocono Hospital, she was informed that the entire disc had been removed. She also learned that five screws, instead of two, had been inserted.

From Pocono Hospital, she was transferred by ambulance to Lehigh Valley Hospital . . . . It was then that she learned that respondent was not an orthopedist, as she had initially thought, but an anesthesiologist.

On October 14, 2011, after noticing oozing from one of the incisions left by respondent, she consulted Brian Morse, D.O., who performed nerve testing on her legs. They did not respond. He recommended that she see George Naseef, M.D., an orthopedic surgeon. She saw Dr. Naseef on November 17, 2011, complaining of difficulty in walking, leg numbness, her right ankle giving out (going off to the side), and loss of balance, particularly on non-flat surfaces . . . Dr. Naseef told her that two screws had penetrated the nerve in her spine and that she needed surgery. . . .

On January 30, 2012, Dr. Naseef performed a revision surgery at Morristown Memorial Hospital.

During these proceedings, T.Z. was asked to display the scars left by respondent. One scar was vertical at the midline of the low back, and measured approximately eight inches. There was also a horizontal scar to the left of the eight-inch scar, which measured about two inches. . . .

As the result of respondent's surgery, she had to use a walker for about six months for balance, which she began using immediately following the surgery. After six months, she used a cane daily, also for balance. For months, her husband had to escort her to the bathroom, where she used a specially raised toilet seat. This lasted for several months. In addition, her feet have become positioned outward. The inner sides of her legs remain numb and she continues to have back pain. She stated that no day is a good day. Her pain starts upon awakening and worsens as the day progresses.

It was noted by the undersigned that when she approached and left the witness stand, she used a cane and ambulated very slowly. She also brought a pillow to sit on and was sobbing throughout most of her testimony.

Her husband, M.Z., also testified. He accompanied T.Z. to her initial consultation with respondent. He specifically recalled respondent telling them that the procedure would last about forty-five minutes and would involve a three-quarter-inch incision. . . .

He stated that T.Z. is now essentially confined to a recliner. She does not even sleep in bed. . . .

Petitioner called George S. Naseef III, M.D., a board-certified orthopedic surgeon, to testify. Dr. Naseef . . . performed corrective surgery on T.Z. . . .

Dr. Naseef determined that the L-3 screws were not in proper line and the right S-1 screw was in the S-1 nerve root, not in the pedicle. Both L-3 screws and the right S-1 screw had perforated the bone and were in the nerve canal. . . .

During surgery on January 30, 2012, Dr. Naseef noted that the right and left L-3 screws were in the canal, and the right S-1 screw was grossly malpositioned and in the canal. . . . Once the right S-1 screw was removed, nerve function immediately returned to the

patient's leg. . . . He stated that of the five screws inserted, only one was positioned correctly.[11]

(ALJ Op. 53-57)

Assessing the evidence in the record,[12] ALJ Solomon concluded that the Attorney General "prove[d] [] well beyond a preponderance of the credible evidence" that Dr. Kaul "never should have performed any spinal surgeries, whether they were called minimally invasive or open, given his lack of education and training." "[T]hat he performed such surgeries, without the requisite education and training, and in disregard for the safety of several patients who testified on behalf of petitioner, . . . warrant[s] nothing less than the revocation of his medical license[,]" the ALJ recommended. (ALJ Op. 93)

On March 12, 2014, the Board adopted ALJ Solomon's opinion and order in its entirety. It then considered the appropriate penalty for Dr. Kaul's conduct. Observing that Dr. Kaul, rather than acknowledging wrongdoing or demonstrating contrition after the ALJ's decision instead lobbed "broad allegations of altered court transcripts, interference with legal evidence and political influence," the Board struggled to "find any mitigating factors in this

---

[11]    The Board, in adopting the ALJ's findings of fact as to T.Z., quoted Dr. Naseef directly on this point:

> [Dr. Naseef testified that] they were in a place I have never seen before . . . this one completely missed the pedicle and went directly through the lamina and into the vertebral body which putting screws in that is a completed different field. When you are not in bone, it's grossly abnormal."

(Order 18-19)

[12]    ALJ Solomon specifically found the "testimony of each and every witness produced by [the Attorney General] . . . extremely credible and compelling" while most of Dr. Kaul's witnesses lacked credibility or opined on irrelevant issues. (ALJ Op. 78-79)

matter."[13] Indeed, the Board found Dr. Kaul's lack of remorse "disturbing."[14] (Order 22-23, 25)

The Board also considered that this was not his first offense. About ten years earlier, the Board had suspended Dr. Kaul's medical license based on his failure to disclose in various credentialing applications that he had been convicted of manslaughter for killing a patient in England.[15] Despite his failure to be forthright and honest in his dealings with the Board and others, the Board was lenient. The tragic incident in England, it reasoned, appeared to be just a mistake, and with due care similar incidents could be prevented. It therefore "eschewed a more stringent penalty with the hope and expectation that respondent will resolve to practice with the vigilance that he has promised." Under the circumstances, the Board found a two-year suspension to be a sufficient sanction. But "[f]uture transgressions," it warned, "will not be deserving of leniency." (Order 23-24)

---

[13] Over the objection of Dr. Kaul's counsel, the Attorney General admitted an independent (i.e., not official) transcript from one day of the 23-day hearing. Dr. Kaul had apparently appended the transcript to a letter addressed to President Obama, which he had posted on a personal website. "It shows," the Board concluded, "that Respondent's transcript and the official transcript had only minor insubstantial inconsistencies." (Order 22)

[14] In videos posted to his website, Dr. Kaul claimed that he was "absolutely shocked" by the ALJ's decision and pledged to continue to perform spine surgeries and teach others his methods. The plan, he said, was to open minimally invasive spine surgery clinics in places where people lack access to affordable spine care, such as Africa, Mexico, and Colombia. (Id. 22-23)

[15] In March 1999, while practicing medicine in England, a patient for whom Dr. Kaul had administered anesthesia died. About two years later, in February 2001, a jury convicted Dr. Kaul of gross negligence and manslaughter. From September 2000 to May 2001, Dr. Kaul made a number of false or misleading statements about those criminal proceedings, the related disciplinary proceedings, and later, the conviction, in a number of documents submitted to the Board and New Jersey hospitals. (ALJ Op. 90-92)

For example, on April 8, 2011, Dr. Kaul submitted an application for privileges at HUMC. He was asked the following question: "Please indicate if you have been ever been convicted of any criminal offense, excluding minor traffic violations, e.g., passing a stop sign, (if yes, give details on a separate sheet.)" Kaul checked the "NO" box, even though he had been convicted of manslaughter just a few months earlier.

Against that backdrop—Dr. Kaul's lack of remorse, his intent to continue to perform spine surgeries, and his failure to "turn over a new leaf to practice medicine responsibly"—the Board adopted the ALJ's recommendation to revoke Dr. Kaul's license, effective February 12, 2014. It further imposed the statutory maximum fine of $20,000 for each of the 15 counts of malpractice and misconduct charged, as well as attorneys' fees and costs. All told, the Board imposed $475,422.32 in civil penalties, fees, and costs. (Order 28-29)

Dr. Kaul did not appeal the Board's final decision to the New Jersey Superior Court, Appellate Division.

C.    Concurrent and Subsequent Litigation

Over the years, Dr. Kaul has sued, and has been sued, in several actions that bear some relation to this one. Two are particularly relevant to these motions to dismiss.

1.    *BER-L-2256-13 (suit against doctors)*

A couple weeks before the first ALJ hearing, on March 22, 2013, Dr. Kaul sued Drs. Heary, Moore, Carmel, Przybylski and Mitchell in New Jersey Superior Court, Bergen County. He alleged defamation, commercial disparagement, intentional interference with prospective economic advantage, unfair competition, conspiracy, and aid in the commission of a tort. On March 7, 2014 (about three months after the ALJ's initial decision and five days before the Board's final decision), the complaint was dismissed with prejudice as to Drs. Przybylski, Moore, and Carmel. (State Compl.; State Orders)

2.    *UNN-L332-15 (Santos malpractice)*

On September 24, 2015, Ana Santos filed a malpractice complaint against Dr. Kaul in New Jersey Superior Court, Union County. In June 2016, Dr. Kaul filed counterclaims and third-party claims against Governor Christie, the Board, Dr. Staats, and Dr. Carmel alleging the same causes of action asserted here: violations of RICO, the Sherman and Clayton Acts, the Hobbs Act, mail fraud, wire fraud, honest services fraud, defamation, section 1983,

17

Title VII, commercial disparagement, intentional interference with prospective economic advantage, and aid in the commission in the tort. That case appears to be ongoing. (Def. Ex. J, ECF No. 128-12)

D. This Case

Dr. Kaul filed his original complaint on February 22, 2016, in the United States District Court for the Southern District in New York. Because almost all of the defendants and events giving rise to the complaint were located in New Jersey, on April 19, 2016, Judge Richard Sullivan transferred venue of the case to this Court. (ECF Nos. 1, 19)

On June 8, 2016, Dr. Kaul filed the amended complaint, which is the subject of the current motions. It asserts 12 causes of action:

- Count One: Violations of the Racketeer and Influenced Corruption Act ("**RICO**"), 18 U.S.C. § 1961, against Governor Christie, New Jersey, Chiesa, ALJ Solomon, GEICO, Allstate, Berkshire Hathaway, Buffett, TD Bank, Kothari, Rutgers, Gonzalez, Dr. Heary, Dr. Lomazow, Dr. Przybylski, Dr. Wolfa, Dr. Moore, Dr. Carmel, Dr. Mitchell, Dr. Staats, Dr. Cohen, Scarinci Hollenbeck, Hollenbeck, Brach Eichler, Gorrell, NASS, ASIPP, CNS, Dughi Hewitt, Keating, Dr. Kaufman, the Board, Roeder, NJM, Washburn, HUMC, AHS, Gragnolati, Garrett, Dr. Peterson, and AMA;

- Count Two: Violations of the **Sherman and Clayton Acts**, 15 U.S.C. § 2, against Governor Christie, New Jersey, Chiesa, ALJ Solomon, GEICO, Allstate, TD Bank, Kothari, Rutgers, Gonzalez, Dr. Heary, Dr. Lomazow, Dr. Przybylski, Dr. Cohen, Hollenbeck, Brach Eichler, Gorrell, NASS, ASIPP, CNS, Dr. Kaufman, the Board, Roeder, NJM, Washburn, HUMC, AHS, Gragnolati, Garrett, and Dr. Peterson;

- Count Three: Violations the **Hobbs Act**, 18 U.S.C. § 1951, against Governor Christie, New Jersey, Chiesa, ALJ Solomon, GEICO, Allstate, TD Bank, Kothari, Rutgers, Gonzalez, Dr. Heary, Dr. Lomazow, Dr., Przybylski, Dr. Staats, Dr. Cohen, Scarinci Hollenbeck, Hollenbeck, Brach Eichler, Gorrell, NASS, ASIPP, CNS, Dr. Kaufman, the Board, Roeder, NJM, Washburn, HUMC, AHS, Gragnolati, Garrett, and Dr. Peterson;

- Count Four: **Mail fraud**, in violation of 18 U.S.C. § 1343, Governor Christie, New Jersey, Chiesa, ALJ Solomon, GEICO, Allstate, TD Bank, Kothari, Rutgers, Gonzalez, Dr. Heary, Dr. Lomazow, Dr.

Przybylski, Dr. Staats, Dr. Cohen, Scarinci Hollenbeck, Hollenbeck, Brach Eichler, Gorrell, NASS, ASIPP, CNS, Dughi Hewitt, Dr. Kaufman, the Board, Roeder, NJM, Washburn, HUMC, AHS, Gragnolati, Garrett, and Dr. Peterson;

- Count Five: **Wire fraud**, in violation of 18 U.S.C. § 1341, against the same parties as Count 4;

- Count Six: **Honest services fraud**, in violation of 18 U.S.C., § 1346, against the same parties as Count 4;

- Count Seven: **Defamation**, in violation of 28 U.S.C. § 4101, against Governor Christie, New Jersey, Chiesa, Solomon, GEICO, Allstate, TD Bank, Kothari, Rutgers, Gonzalez, Dr. Heary, Dr. Lomazow, Dr. Przybylski, Dr. Staats, Dr. Cohen, NASS, ASIPP, CNS, Dr. Kaufman, the Board, Roeder, NJM, Washburn, AHS, HUMC, Gragnolati, Garrett, and Dr. Peterson;

- Count Eight: Violations of the Due Process Clause of Fourteenth Amendment under **42 U.S.C. § 1983** against Governor Christie, New Jersey, Chiesa, Solomon, GEICO, Allstate, TD Bank, Kothari, Rutgers, Gonzalez, Dr. Heary, Dr. Lomazow, Dr. Przybylski, Dr. Staats, Dr. Cohen, Scarinci Hollenbeck, Hollenbeck, Brach Eichler, Gorrell, NASS, ASIPP, CNS, Dughi Hewit, Dr. Kaufman, the Board, Roeder, NJM, Washburn, AHS, HUMC, Gragnolati, Garrett, and Dr. Peterson;

- Count Nine: Violations of **Title VII** of the Civil Rights Act, 42 U.S.C. 2000e, et. seq., against Governor Christie, New Jersey, Chiesa, Solomon, GEICO, Allstate, Roeder, the Board, and Washburn;

- Count Ten: **Commercial disparagement** against Drs. Staats, Carmel, Heary, Przybylski, Mitchell, Cohen and Kaufman;

- Count Eleven: **Intentional interference with prospective economic advantage** against Drs. Staats, Carmel, Heary, Przybylski, Mitchell, Cohen and Kaufman; and

- Count Twelve: **Aid in the commission of a tort** against all of defendants.

For each count, Dr. Kaul requests the same relief: compensatory, consequential, and punitive damages, attorneys' fees and costs, and anything else that is just and equitable. (AC ¶¶ 92, 119, 148, 177, 206, 236, 261, 294, 308, 315, 318) Elsewhere in the AC, on the next-to-last page, Dr. Kaul asks for "the immediate reinstatement of an unrestricted plenary medical license" and

"expunge[ment] [of] the prior revocation of plaintiff's medical license from the public record." (*Id.* p. 101)

On November 23, 2016, defendants moved to dismiss the AC pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). To streamline motion practice, the defendants submitted an omnibus brief addressing facts and points of law common to all defendants. (ECF No. 128-1) Defendants individually submitted supplementary declarations. (ECF Nos. 128-12 through 32) Generally, the supplementary declarations amplify certain issues raised in the common brief (*e.g.*, the applicability of res judicata or collateral estoppel) or point out issues peculiar to a particular defendant (*e.g.*, lack of service of process or personal jurisdiction).[16] After a couple of false starts (ECF No. 139, 165), on March 20, 2017, Dr. Kaul filed an omnibus opposition brief. [17] (ECF Nos. 166) He also filed supplementary opposition briefs in response to number of the defendants' supplemental declarations. (ECF No. 167) On May 3, 2017, Defendants replied, again jointly, with supplementary declarations or briefs. (ECF Nos. 181, 182, 183, 184, 186, 187)

All told, nearly 2,000 pages of briefs, affidavits, and documents have been filed in connection with these motions to dismiss. Almost half of that total—around 940 pages—consists of a mishmash of unsponsored exhibits submitted by Dr. Kaul. (ECF No. 179)

## II.  STANDARDS OF REVIEW

### A.  Rule 12(b)(1) Standard

Based on the *Rooker-Feldman* and *Younger* doctrines, all defendants move to dismiss based on lack of subject matter jurisdiction. Certain State

---

[16]   Claiming inadequate service of process, GEICO, Berkshire Hathaway, Buffett, and Crist moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(4). Berkshire Hathaway, Buffett, and Crist also move to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).

[17]   A motion for leave to file a second amended complaint was denied without prejudice in January 2017 for failure to attach a proposed pleading. (ECF No. 156)

Defendants also move to dismiss based on sovereign immunity. A motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) may be raised at any time. *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 437-38 (D.N.J. 1999). Rule 12(b)(1) challenges are either facial or factual attacks. See 2 James W. Moore, Moore's Federal Practice § 12.30[4] (3d ed. 2007). The defendant may facially challenge subject matter jurisdiction by arguing that the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction. *Iwanowa*, 67 F. Supp. 2d at 438. Under this standard, a court assumes that the allegations in the complaint are true, and may dismiss the complaint only if it appears to a certainty that the plaintiff will not be able to assert a colorable claim of subject matter jurisdiction. *Id.*

All of the defendants' *Rooker-Feldman, Younger*, or immunity arguments are postured as facial challenges to the jurisdictional basis of the complaint. In considering them, the Court will take the allegations of the complaint as true. See *Gould Elecs., Inc. v. U.S.*, 220 F.3d 169, 178 (3d Cir. 2000).

### B.    Rule 12(b)(6) Standard

Rule 12(b)(6), Fed. R. Civ. P., provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n. 9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *New Jersey Carpenters & the Trustees Thereof v. Tishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also West Run Student Housing Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

However, a plaintiff alleging fraud or mistake must meet a heightened pleading standard under Federal Rule of Civil Procedure 9(b). Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). As the Third Circuit has explained, "[a] plaintiff alleging fraud must therefore support its allegations with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (citing *In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)) (citation and quotation marks omitted). In other words, a plaintiff may satisfy this requirement by pleading "the date, time and place" of the alleged fraud or deception, or by "otherwise injecting] precision or some measure of substantiation" into the allegation. *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (*citing Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004).

The heightened specificity required by Rule 9(b) extends to the pleading of all claims that "sound in fraud." *See Giercyk v. Nat'l Union Fire Ins. Co. of Pittsburgh,* No. 13-6272, 2015 U.S. Dist. LEXIS 162628, 2015 WL

7871165, at *2 (D.N.J. Dec. 4, 2015); *Mladenov v. Wegmans Food Markets, Inc.,* 124 F. Supp. 3d 360, 372 (D.N.J. 2015). This includes Dr. Kaul's claims of mail, wire, and honest services fraud. *See Warden v. McLelland,* 288 F.3d 105, 114 (3d Cir. 2002).

Where a plaintiff, like Dr. Kaul here, is proceeding *pro se,* the complaint is to be "liberally construed," and, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 93-94 (2007). Nevertheless, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.,* 704 F.3d 239, 245 (3d Cir. 2013). "While a litigant's *pro se* status requires a court to construe the allegations in the complaint liberally, a litigant is not absolved from complying with *Twombly* and the federal pleading requirements merely because s/he proceeds pro se." *Thakar v. Tan,* 372 F. App'x 325, 328 (3d Cir. 2010) (citation omitted). *Pro se* plaintiffs are also not exempt from meeting the heightened pleading requirements of Rule 9(b) when alleging claims that sound in fraud. See *Kowalsky v. Deutsche Bank Nat'l Trust Co.,* No. 14-07856 (CCC)(JBC), 2016 U.S. Dist. LEXIS 155256, 2015 U.S. Dist. LEXIS 133284, 2015 WL 5770523, at *9 (D.N.J. Sept. 30, 2015).

C.     Extrinsic Materials

In connection with these motions to dismiss, the parties have submitted reams of documents extrinsic to the complaint. Many, especially the documents submitted by Dr. Kaul, cannot be considered without converting these motions to dismiss into summary judgment motions. Others, however, are properly considered on a motion to dismiss, and I do consider them. I refer in particular to the records of the state administrative proceedings and other court records. I stress that I have considered these documents, not to establish contested factual matters, but to establish the nature and scope of prior proceedings between the parties, and the rulings of the Board and state courts.

Such records[18] are subject to judicial notice:

> [O]n a motion to dismiss, we may take judicial notice of another court's opinion—not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *United States v. Wood*, 925 F.2d 1580, 1582 (7th Cir. 1991); *see also Funk v. Commissioner*, 163 F.2d 796, 800-01 (3d Cir. 1947) (whether a court may judicially notice other proceedings depends on what the court is asked to notice and on the circumstances of the instant case).

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999). *See generally* Fed. R. Evid. 201.

Even setting aside judicial notice, many of these documents, such as the ALJ's initial decision and the Board's final order, are intrinsic to the allegations of the complaint and may be considered without converting a facial Rule 12(b)(1) challenge into a factual one, or a Rule 12(b)(6) motion into one for summary judgment. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) ("'[A] 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion to dismiss into one for summary judgment.'") (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)); *accord In re Asbestos Products Liability Litigation (No. VI)*, 822 F.3d 125, 134 n.7 (3d Cir. 2016).

## III.  SOME PRELIMINARY ISSUES

I first address a number of threshold, or threshold-ish, issues. Disposing of some preliminaries now will make it easier to discuss and analyze defendant-specific, or merits-oriented, issues later. Because all defendants raise the *Rooker-Feldman* and *Younger* doctrines, I discuss them first. I then

---

[18]     As it happens, records of Dr. Kaul's proceedings before the Board are posted on the Board's website. *See* http://www.njconsumeraffairs.gov/bme/Pages/actions.aspx.

turn my attention to a number of facial pleading defects. Section III concludes with an analysis of the potential preclusive effect of certain state court orders.

The upshot of my analysis of these preliminary issues is this: I have jurisdiction to hear this case, and I will not abstain from hearing it. The AC, however, will be dismissed as to Berkshire Hathaway, Buffett, Crist, and Gragnolati for failure to state a claim. Counts Three, Four, Five, Six, Seven, and Nine will also be dismissed as to all defendants for incurable pleading defects. And all claims will be dismissed as to Drs. Moore, Carmel, AMA, and NASS on res judicata and entire controversy grounds.

As to the defendants and claims remaining, in Sections IV and V I will analyze additional jurisdictional, immunity, and merits-based arguments.

A.    *Rooker-Feldman* and *Younger* Abstention

All defendants move to dismiss this case pursuant to Fed. R. Civ. P. 12(b)(1) under the *Rooker-Feldman* doctrine, *see generally Rooker v. Fidelty Co.*, 263 U.S. 413, 416 (1923), *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), or alternatively the federalism-based abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971). For the reasons set forth below, I decline to dismiss the AC on either ground.[19]

1.    *Rooker-Feldman*

The *Rooker-Feldman* doctrine prohibits federal courts from exercising jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). In the Third Circuit, *Rooker-Feldman* bars claims in federal court if: "(1) the federal plaintiff lost in state court; (2) the plaintiff 'complain[s] of injuries

---

[19]    No party has raised the applicability, or not, of *Colorado River* abstention in light of UNN-L332-15, which involves many of parties and all of the same causes of action in this case. 424 U.S. 800 (1976).

caused by [the] state-court judgments'; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010).

All defendants argue that the AC is a naked attempt to overturn and re-litigate the Board's Order revoking Dr. Kaul's license. That is correct as far as it goes; the AC, among other things, requests reinstatement of Dr. Kaul's medical license and expungement of the Board's decision from the public record. The problem, however, is that the Order, while a final administrative action, is not a state court judgment. Because Dr. Kaul never appealed the Order to the Appellate Division (though he could have), he is not, and was never, a state court loser. Without a state court judgment, *Rooker-Feldman* cannot apply.[20]

Citing *Ninal v. Evangelista*, Civ. Action No. 04-5718, 2005 U.S. Dist. LEXIS 25251, at *11 (D.N.J. Oct. 21, 2005), defendants suggest that administrative determinations that are "judicial in nature" may trigger *Rooker-Feldman*. That is not the law; the *Rooker-Feldman* doctrine is actually much narrower. "The Supreme Court has made clear . . . that the *Rooker-Feldman* doctrine only applies to state judicial proceedings, not administrative or legislative proceedings." *AMTRAK v. Pa. PUC*, 342 F.3d 242, 257 (3d Cir. 2003) (citing *Verizon Md., Inc. v. PSC*, 535 U.S. 635, 644 n.3 (2002)); *accord Stone v. N.J. Admin Office of the Courts*, 557 Fed. App'x 151, 153 (3d Cir. 2014) ("*Rooker-Feldman* does not bar review of claims never decided by the courts.") As the Court of Appeals for the Second Circuit has explained:

> While the *Rooker-Feldman* doctrine recognizes that the federal district courts may not review decisions by a state's courts, it does not preclude federal district court review of

---

[20]     That is also why the Santos case, UNN-L332-15, cannot be the basis of *Rooker-Feldman* dismissal. As far as the Court is aware, there was no final judgment entered in that case as of the time this action was commenced, and there does not appear to have been a final judgment even now.

'executive action, including determinations made by state administrative agencies.' This principle holds true even where the administrative agency acted in an adjudicative capacity, or plaintiff could have sought, but did not seek, review of the agency's determination in state court.

*Mitchell v. Fishbein*, 377 F.3d 157, 165 (2d Cir. 2004) (citations omitted).[21]

Dr. Kaul's failure to avail himself of state court remedies may have other consequences. This action, however, does not require this Court "to exercise appellate jurisdiction over a state-court judgment." *Verizon*, 535 U.S. at 644 n.3. *Rooker-Feldman* does not bar the Court from hearing this case.[22]

### 2. *Younger* abstention

Defendants' fallback position is that dismissal is appropriate based on the abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971). *Younger*

---

[21]   The only other case cited by defendants, *Harris v. N.Y. State Dep't of Health*, 202 F. Supp. 2d 143, 150-51 (S.D.N.Y. 2002), involved a doctor who actually appealed the revocation of his medical license to a New York state court.

[22]   The Bank defendants argue that *Rooker-Feldman* dismissal is appropriate on grounds unique to them. Around April 2009, TD Bank became the holder of a $1 million loan that another bank had made Dr. Kaul and his companies. In 2012, he defaulted on that loan; on March 22, 2013, TD Bank obtained a default judgment against Dr. Kaul and his businesses. Attempting to enforce the judgment, the Bank Defendants allegedly "defraud[ed] the plaintiff of his right to sell his Manhattan townhouse" and "used false pretenses to obstruct [] the townhouse and force it into foreclosure." (*E.g.* AC ¶¶ 184-85) Dr. Kaul, the Bank defendants conclude, is thus a state-court loser complaining of injuries caused by a state-court judgment rendered before this case was filed, which he invites me to review and reject.

Dr. Kaul, however, does not assert claims based on injuries caused by the state court judgment itself, but rather injuries traceable to the Bank Defendants' attempts to enforce that that judgment. *See, e.g.*, *B.S. v. Somerset County*, 704 F.3d 250, 260 (3d Cir. 2013) (holding that suits seeking redress for injuries traceable to defendants' actions, rather than the state court orders themselves, are not barred by *Rooker-Feldman*). Nor does Dr. Kaul explicitly ask this court to invalidate the judgment. Post-*Exxon*, a court must be cautious in applying *Rooker-Feldman* where the federal claims do not directly clash with the state claims, but are merely "intertwined" with them. *See, e.g.*, *Gary v. Braddock Cemetery*, 517 F.3d 195, 200 n.5 (3d Cir. 2008)) (advising caution in employing pre-*Exxon* Third Circuit precedent interpreting *Rooker-Feldman*). The *Rooker-Feldman* doctrine does not apply to the claims against the Bank defendants.

abstention is a closer call, but I find that abstention is not warranted under the circumstances of this case.

Younger requires federal courts to abstain from interfering with certain pending state proceedings. See Gonzalez v. Waterfront Comm'n of N.Y. Harbor, 755 F.3d 176, 180 (3d Cir. 2014). It applies rarely, "in only three 'exceptional' classes of cases: (1) 'state criminal prosecutions,' (2) 'civil enforcement proceedings,' and (3) 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'" Id. (citing Sprint Communications, Inc. v. Jacobs, 134 S. Ct. 584, 588 (2013)).

This case undeniably involves a state proceeding falling in the second category: a civil enforcement proceeding. The proceedings that resulted in the revocation of Dr. Kaul's license bear hallmarks of a quasi-criminal proceeding. The State, for example, was a party. Gonzalez, 755 F.3d at 181. The proceedings began with an "investigation that 'culminat[ed] in the filing of a formal complaint.'" Id. And they were initiated by the State "to sanction the federal plaintiff, i.e., the party challenging the state action, for some wrongful act." Id. Since the administrative proceedings here were "akin to a criminal prosecution," one prerequisite to Younger abstention is met.

That is just the beginning of the analysis, however. I must also consider the three factors identified in Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423 (1982). Condensing somewhat, those factors are that there be (1) an ongoing or pending state or administrative judicial proceeding (2) implicating important state interests (3) in which the plaintiff has an opportunity to raise the issues she seeks to litigate in federal court. Gonzalez, 755 F.3d at 182-83 (citing Sprint, 134 S. Ct. at 593). For the reasons stated below, factors (1) and (2) are met, but because the administrative proceedings did not afford Dr. Kaul the opportunity to raise most of the issues he seeks to litigate here, factor (3) is not satisfied.

As to the first factor, this case may technically interfere with an ongoing judicial proceeding. True, Dr. Kaul never asked a New Jersey state court to review the Board's Order, but that is not required for purposes of *Younger*. As the Third Circuit has held:

> [S]tate proceedings remain "pending," within the meaning of *Younger* abstention, . . . where a coercive administrative proceeding has been initiated by the State in a state forum, where adequate state-court judicial review of the administrative determination is available to the federal claimants, and where the claimants have chosen not to pursue their state-court judicial remedies, but have instead sought to invalidate the State's judgment by filing a federal action.

*O'Neill v. City of Philadelphia*, 32 F. 3d 785, 791 (3d Cir. 1994); *accord Zahl v. Harper*, 282 F.3d 204, 209 (3d Cir. 2002); *Williams v. Gov't of Virgin Islands*, No. 2005-97, 2008 U.S. Dist. LEXIS 99648 at *1, 3 (D.V.I. Dec. 8, 2008), *aff'd sub nom.*, 360 F. App'x. 297 (3d Cir.), *cert. denied*, 560 U.S. 965, 130 S. Ct. 3445 (2010) (concluding that the requirements of *Younger* had been met in a case involving a doctor attempting to enjoin a medical board that had suspended and revoked the doctor's medical license). Having lost in a coercive administrative proceeding initiated by the State, Dr. Kaul had the right to appeal the Board's final administrative decision to the New Jersey Superior Court, Appellate Division. *E.g.*, N.J. Appellate Ct. R. 2:2-3(a)(2); *In re Polk*, 90 N.J. 550, 560 (1982). While he chose not to do so, as far as *Younger* is concerned his case is ongoing.

The disciplinary hearings, moreover, clearly were judicial. ALJ Solomon presided over 23 days of hearings in which counsel for Dr. Kaul and the AG submitted evidence, cross-examined witnesses, and filed post-hearing briefs. The ALJ issued a formal, written recommendation. The Board considered and rejected Dr. Kaul's exceptions to ALJ Solomon's recommendation, adopted it, and then held a hearing to consider the appropriate punishment. Although not held in a court of law, these proceedings

were quintessentially judicial. Because the disciplinary proceedings are ongoing and judicial in nature, the first *Middlesex* factor is present here.

So too is the second *Middlesex* factor. The proceedings before the Board surely implicate important state interests. New Jersey has a strong interest in regulating the medical profession and censuring physicians who are a danger to public health and safety. *E.g. Zahl*, 282 F. 3d at 210 (recognizing the "obvious" interest states have in regulating the practice of medicine) (collecting cases)). On this factor, no further analysis is required.

The analysis of the third and final *Middlesex* factor—whether Dr. Kaul had an adequate opportunity to assert his federal claims in the state proceedings—is slightly more complicated. Dr. Kaul no doubt had an opportunity to raise his claims of procedural and substantive due process before the Board (and, had he exercised his right to state court judicial review, before the Appellate Division).[23] Dr. Kaul, however, asserts many other federal claims, some of which could not have heard before Board, against persons and entities that were not parties to the administrative proceedings.

Persuasive here is *Prevost v. Twp. of Hazlet*, 159 F. App'x 396 (3d Cir. 2005). There, a police officer in Hazlet, New Jersey, was subjected to disciplinary proceedings and eventually fired. He sued the Township of Hazlet and several of its employees under Section 1983. Even though the administrative disciplinary proceeding remained pending, and the federal case rested on the same facts, the Third Circuit found abstention unwarranted. It emphasized three factors: (1) the only opposing party in the administrative proceeding was the Township, not its employees, who were parties to only the federal proceeding; (2) the only question in the administrative proceeding was whether the officer's termination violated state statutes or regulations, not federal law; and (3) in the administrative proceedings, the officer could not

---

[23] At least with respect to allegations of altered transcripts, the Board noted that the single instance of such alteration provided by Dr. Kaul contained only "minor insubstantial inconsistencies." (Order 22)

obtain certain injunctive and monetary relief that he could obtain in federal court. *Id.* at 398.

Those *Prevost* considerations apply here as well. The only parties to the disciplinary proceedings were Dr. Kaul and the State, not the entire "medico-legal" community Dr. Kaul attempts to hold liable now. The only questions before the Board were whether Dr. Kaul had committed repeated instances of gross malpractice and professional misconduct. By contrast, the issues here concern allegedly collusive and anticompetitive conduct, and conspiracy to defraud and extort. Some of that alleged conduct, moreover, occurred at the same time as, or even after, the administrative proceedings. And the administrative proceedings would not provide for the punitive and treble damages that Dr. Kaul seeks here.

On balance, then, I do not think that the third *Middlesex* factor is met. Dr. Kaul could not have raised the federal claims central to the AC— specifically the RICO and antitrust claims—in the administrative disciplinary proceedings below; nor could he have obtained anything like the damages he seeks to impose against the multifarious defendants involved in this case. In these peculiar circumstances, I will not dismiss the AC on *Younger* grounds.

I note in passing a final consideration. "A federal court will consider Younger abstention when the requested *equitable relief* would constitute federal interference in state judicial or quasi-judicial proceedings." *Marran v. Marran*, 376 F.3d 143, 154 (3d Cir. 2004) (emphasis in original) (quoting *Marks v. Stinson*, 19 F.3 873, 883 (3d Cir. 1994)). Although, on the next-to-last page of the AC, Dr. Kaul requests an order reinstating his medical license and expunging the Board's Order "from the public record," the overall goal of this *pro se* complaint seems to an award of damages for violations of antitrust and organized crime laws. (AC ¶¶ 92, 119, 148, 177, 206, 236, 261, 294, 308, 315, 318 (requesting compensatory, consequential, and punitive damages). Abstention is most obviously appropriate in cases where a plaintiff asks a

federal court to enjoin some state judicial or quasi-judicial proceeding. *See, e.g., Younger*, 401 U.S. at 45.[24] The AC does not directly ask me to do that.

For these reasons, as well as those detailed above, this case is distinguishable from *Williams v. Gov't of the V.I. Bd. of Med. Examiners*, 360 F. App'x 297 (3d Cir. 2010). There, the Third Circuit upheld a district court's decision to abstain from hearing a case involving a doctor suing a medical board for alleged due process violations and violations of the antitrust laws. The board and members of the board were the only parties in that case, and the events giving rise to the plaintiff's federal claims stemmed from conduct that had transpired during the administrative proceedings. The plaintiff also requested emergent relief (which he actually received, a couple of times), a preliminary injunction, and a declaration "that Defendants must adopt reasonable rules and regulations in accordance with Virgin Islands law". Those circumstances, which are not present here, suggest a much stronger case for *Younger* abstention.[25]

---

[24]     Even if this reference to reinstatement and expungement were construed as a claim for equitable or declaratory relief, the law of this Circuit would mandate a stay, not outright dismissal, of the AC. *See, e.g., Marran*, 376 F.3d at 155.

To look at it another away, consider this. The central insight of *Younger* is that a federal court should not grind important and presumptively lawful state processes to a halt by granting discretionary equitable relief. To do otherwise would unduly interfere in a state's sovereign prerogatives, which is why the "normal thing to do" is to withhold the requested relief and dismiss the case. *E.g., New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989) (Or, where both an injunction and damages are requested, stay the case and let the state proceedings run their course.) In this case, the administrative proceedings, while technically still pending, have essentially concluded. The time for Dr. Kaul to appeal the Board's Order lapsed long ago. The primary objective of AC appears to be to obtain money damages. I am confident that, to the extent Dr. Kaul intended to plead it, the discretionary equitable relief requested here will not unduly interfere with any state proceedings or objectives.

[25]     Same reasoning applies to *Zahl v. Harper*, 282 F.3d 204 (3d Cir. 2002), in which a doctor tried to get a district court to enjoin the State from bringing disciplinary proceedings. The Third Circuit ruled that the district court appropriately dismissed the case on abstention grounds.

So, in short, holding this *pro se* complaint to the appropriate pleading standard and giving all due weight to the Court's "virtually unflagging" obligation to hear and decide cases that fall within its jurisdiction, *Sprint*, 134 S. Ct. at 584, I will not abstain from adjudicating the claims of the AC.[26]

B.    Berkshire Hathaway, Buffet, Crist, and Gragnolati

Changing gears, I will clear away four parties who are named as defendants, but against whom no substantive allegations can be found in the AC. These defendants—Berkshire Hathaway, Buffet, Crist, and Gragnolati—will be dismissed from the case.

No allegation is directed towards Crist. (AC ¶ 8) As to Berkshire Hathaway, its liability is based solely on the conduct of its subsidiary, GEICO. That, without more, is an insufficient allegation of RICO liability against Berkshire Hathaway. *See, e.g., Lorenz v. CSX Corp.*, 1 F.3d 1406, 1412 (3d Cir. 1993) ("[T]he plaintiff must plead facts which, if assumed to be true, would clearly show that the parent corporation played a role in the racketeering activity which is distinct from the activities of its subsidiary.") The sole allegation as to Buffett makes little sense, and thus fails to plausibly suggest any wrongdoing (let alone meet the heightened pleading requirements of Rule 9(b)).[27] Having been the President and CEO of AHS only since May 4, 2015,

---

26    The Bank Defendants claim that their default judgment against Dr. Kaul injects special jurisdictional considerations as to the claims against them. There is no analysis, however, why that may be the case. Because the Bank Defendants have failed to argue, let alone show, that *Younger* abstention is triggered by its March 22, 2013 default judgment or the subsequent foreclosure proceedings, I will not abstain from hearing the claims as to them.

27    AC ¶ 63 ("Warren Buffet[t] is the Chairman and CEO of Berkshire Hathaway, which is the parent company of GEICO. The defendant is liable for illegal acts to which there exists a nexus to the aforementioned corporations. The protections of the corporate veil become forfeited when the majority of shareholders are ignorant as to the existence of the illegal acts. The illegal act was the alteration of court transcripts by the defendant state, which deprived the plaintiff of his Constitutional right to due process and which caused damage to the plaintiff's estate and reputation. The defendant violated the Racketeer and Influenced Corruption Act when he conspired by

Gragnolati could not have conspired to revoke Dr. Kaul's license, an event which occurred on February 12, 2014.

For these reasons, Berkshire Hathaway, Buffet, Crist, and Gragnolati's motions to dismiss for failure to state a claim are granted.[28]

### C.   Counts Three, Four, Five, Six, Seven, and Nine

Several causes of action alleged in the AC are obvious non-starters, and I will weed them out now.

Counts Three, Four and Five allege violations of federal mail, wire, and honest services fraud statutes. Count Six alleges violations of the Hobbs Act, which essentially outlaws certain forms of extortion. Not one of these federal criminal statutes provides a private right of action, express or implied.[29] To the extent the AC purports to assert Counts Three, Four, Five, and Six as independent causes of action, they are dismissed as to all defendants. I will consider them as potential predicate acts on which to base RICO liability, however. *See infra* Part V.A.

---

willful ignorance with the defendant Governor to revoke the medical license of the plaintiff.")

[28]   Because I dismiss the AC pursuant to Rule 12(b)(6) as to Crist, Berkshire Hathaway, and Buffett, I do not reach these defendants' arguments that dismissal is warranted for lack of sufficient process and personal jurisdiction.

[29]   *See, e.g., Jones v. TD Bank*, 468 F. App'x 93, 94 (2012) (no private right of action under the mail fraud statute, 18 U.S.C. § 1341) (citing *Wisdom v. First Midwest Bank*, 167 F.3d 402, 408 (8th Cir. 1999) (collecting cases))), *accord Gross v. Cormack*, 586 Fed. App'x 899, 901 (3d Cir. 2014); *Obianyo v. Tennesse*, 518 Fed. App'x 71, 73 (3d Cir. 2013) (no private right of action under the wire fraud statute, 18 U.S.C. § 1343 (citing *Gonzaga Uni. v. Doe*, 536 U.S. 273, 283-84 (2002)); *Young v. Bishop Estate*, No. 09-00403 SOM-BMK, 2009 U.S. Dist. LEXIS 103915, at *28-30 (D. Haw. Nov. 6, 2009) (no private right of action under the honest services fraud statute, 18 U.S.C. § 1346), *accord Marfut v. City of N. Port, Fla.*, Civ. A. No. 8:08-cv-2006-T-27EAJ, 2009 U.S. LEXIS Dist. 24831 at *1 (M.D. Fla. March 25, 2009); *Drance v. Simpson Thacher & Bartlett*, 96 Civ. 5729, 1997 U.S. Dist. LEXIS 11361, at *18 (S.D.N.Y. Aug. 4, 1997); *Peterson v. Philadelphia Stock Exchange*, 717 F. Supp. 332, 336 (E.D. Pa. 1989) (no private action under the Hobbs Act, 18 U.S.C. § 1951), *accord Stanard v. Nygren*, 658 F. 792, 794 (7th Cir. 2011) (noting that a private claim under the Hobbs Act is "obviously frivolous").

Count Seven, which is pleaded as defamation in violation of 28 U.S. § 4104, is also defective. That statute addresses the recognition of foreign defamation judgments; the cited provision provides a definition for "defamation." Defamation is not a federal statutory cause of action. Count Seven is dismissed as to all defendants.

Count Nine alleges violations of Title VII of the Civil Rights Act of 1964. Title VII prohibits employers from taking adverse employment actions against their employees on the basis of protected characteristics. 42 U.S.C. § 2000e-2(a). An "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. § 2000e(b). An "employee" is defined as "an individual employed by an employer[.]" 42 U.S.C. § 2000e(f). To determine whether a person is an employee of an employer, courts look to common law master-servant agency principles. *E.g.*, *Clackmas Gastroenterology Assocs. v. P.C. Wells*, 538 U.S. 440, 445 (2003). Those principles include:

> the hiring party's right to control the manner and means by which the product is accomplished[;] . . . the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Pavlik v. In'l Excess Agency, Inc.*, 417 F. App'x 163, 166 (3d Cir. 2011) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992)).

None of these factors are present here, for any of the defendants, anywhere in the AC. No defendant acted as Dr. Kaul's employer. To the contrary, the record suggests that Dr. Kaul was self-employed and ran his own surgical center. There is no employer-employee relationship here that could

give rise to a Title VII violation. Count Nine is therefore dismissed as to all defendants. I will consider, however, that Dr. Kaul may have intended to advance a parallel disparate treatment claim under section 1983. *See infra* Part V.C.3.

### D.   Res Judicata and the Entire Controversy Rule

To round out this section, I consider the argument that some of Dr. Kaul's claims are barred by res judicata and New Jersey's entire controversy rule. Recall that, on March 22, 2013, Dr. Kaul sued Drs. Heary, Moore, Carmel, Przybylski, Mitchell, John Does 1-5, and ABC Associations 1-5 in New Jersey Superior Court (referred herein as "State Complaint" and cited as "State Compl.") As to Drs. Moore, Przybylski, and Carmel, that complaint was dismissed with prejudice on March 7, 2014. That disposition, virtually all defendants argue, precludes all or many of the claims advanced here. To some extent, I agree, but only as to Drs., Carmel, Moore, NASS, and AMA.[30]

Res judicata, though an affirmative defense, may be considered on a Rule 12(b)(6) motion where, as here, the necessary facts are apparent on the

---

[30]   H&S and Hollenbeck advance a res judicata argument based on orders from another action. The facts necessary to perform the appropriate analysis, however, are not apparent from the face of the complaint or other documents properly considered on a motion to dismiss.

On August 25, 2014, H&S obtained a default judgment against Dr. Kaul in the amount of $97,886.96 for unpaid legal services. Almost two years later, in June 2016, Dr. Kaul filed a motion to vacate the judgment and sought leave to file an answer, counterclaims, and third party complaint. The proposed counterclaims and third party complaint asserted RICO, Hobbs Act, mail fraud, wire fraud, honest services fraud, and violations of constitutional rights against the Governor, the Board, and Drs. Peterson and Heary. On October 6, 2016, the motion to vacate was denied. (Def. Ex. Q)

S&H and Hollenbeck do not identify which order—the August 2014 default judgment or the October 6, 2016 denial of the motion to vacate—they believe carries preclusive effect. Presumably they mean the default judgment; if so, I still cannot discern from the face of the complaint and the appropriate documents the relationship between the $97,886.96 worth of legal fees Dr. Kaul owed S&H and the $196,000 S&H allegedly "attempted to extort" from Dr. Kaul weeks before the August 2013 disciplinary hearings. The answer to that question would be best explored on a motion for summary judgment, not to dismiss.

face of the complaint and other documents properly considered on a motion to dismiss. Whether a state court judgment should have a preclusive effect in a subsequent federal action depends on the law of the state that adjudicated the original action. *See Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357 (3d Cir. 1999) ("To determine the preclusive effect of [the plaintiff's] prior state action we must look to the law of the adjudicating state."). *See also Allen v. McCurry*, 449 U.S. 90, 96 (1980) ("Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."). Here, that state is New Jersey.

Claim preclusion in the traditional sense tends to be subsumed by New Jersey's "entire controversy" rule. "In New Jersey, the entire controversy doctrine 'is an extremely robust claim preclusion device that requires adversaries to join all possible claims stemming from an event or series of events in one suit.'" *Chrystal v. N.J. Dept. of Law & Public Safety*, 535 F. App'x 120, 123 (3d Cir. 2013) (quoting *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 135 (3d Cir. 1999)). The doctrine precludes, not just claims actually decided by a prior judgment, but *all claims* that a party could and should have joined in a prior case based on the same transaction or occurrence.[31]

> We have described the entire controversy doctrine as "New Jersey's specific, and idiosyncratic, application of traditional res judicata principles." *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997). A mainstay of

---

[31] The doctrine rests on considerations of fairness and efficiency:

> Under the entire controversy doctrine, a party cannot withhold part of a controversy for separate later litigation even when the withheld component is a separate and independently cognizable cause of action. The doctrine has three purposes: (1) complete and final disposition of cases through avoidance of piecemeal decisions; (2) fairness to parties to an action and to others with a material interest in it; and (3) efficiency and avoidance of waste and delay. *See DiTrolio v. Antiles,* 142 N.J. 253, 662 A.2d 494, 502 (N.J.1995). As an equitable doctrine, its application is flexible, with a case-by-case appreciation for fairness to the parties.

*Paramount Aviation Corp. v. Augusta*, 178 F.3d 132, 137 (3d Cir. 1999).

> New Jersey civil procedure, the doctrine encapsulates the
> state's longstanding policy judgment that "the adjudication
> of a legal controversy should occur in one litigation in only
> one court[.]" *Cogdell v. Hosp. Ctr. at Orange*, 116 N.J. 7, 560
> A.2d 1169, 1172 (N.J. 1989); *see also* N.J. Const. art. VI, §
> 3, 4 ("[L]egal and equitable relief shall be granted in any
> cause so that all matters in controversy between the parties
> may be completely determined."); *Smith v. Red Top Taxicab
> Corp.*, 111 N.J.L. 439, 168 A. 796, 797 (N.J. 1933) ("No
> principle of law is more firmly established than that a single
> or entire cause of action cannot be subdivided into several
> claims, and separate actions maintained thereon."). . . .

*Ricketti v. Barry*, 775 F.3d 611, 613 (3d Cir. 2014).

There is no requirement that the claim as to which preclusion is
sought have been actually asserted in the prior action. Rather, the necessary
relation between the prior and present actions is a transactional one:

> In determining whether a subsequent claim should be barred
> under this doctrine, "the central consideration is whether the
> claims against the different parties arise from related facts or
> the same transaction or series of transactions." [citing
> *DiTrolio v. Antiles*, 142 N.J. 253, 268, 662 A.2d 494 (1995)].
> "'It is the core set of facts that provides the link between
> distinct claims against the same parties ... and triggers the
> requirement that they be determined in one proceeding.'" *Id.*
> at 267-68, 662 A.2d 494. There is no requirement that there
> be a "commonality of legal issues." *Id.* at 271, 662 A.2d 494.

*Wadeer v. New Jersey Mfrs. Ins. Co.*, 220 N.J. 591, 605, 110 A.3d 19, 27
(2015). So the entire controversy doctrine applies in federal court "when there
was a previous state-court action involving the same transaction." *Bennun v.
Rutgers State Univ.*, 941 F.2d 154, 163 (3d Cir. 1991).

The original version of Rule 4:30A applied to both claims and parties.
In its amended 1998 version, however, the Rule dropped the words "and
parties." It currently reads as follows: "Non-joinder of claims required to be
joined by the entire controversy doctrine shall result in the preclusion of the
omitted claims to the extent required by the entire controversy doctrine . . . ."
N.J. Ct. R. 4:30A (current ver.). *See Kent Motor Cars, Inc. v. Reynolds &*

*Reynolds, Co.*, 207 N.J. 428, 25 A.3d 1027, 1036 (2011) ("Rule 4:30A was amended to limit its scope to mandatory joinder of claims." (emphasis omitted)); *see also Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 135 n.1 (3d Cir. 1999) ("The party joinder aspect of the [entire controversy] doctrine ... has now been eliminated."). There is one caveat; a watered-down version of the party joinder component still arises from another rule, N.J. Ct. R. 4:5–1(b)(2). *See Ricketti v. Barry*, 775 F.3d 611, 614 (3d Cir. 2015) (dismissal appropriate "if the noncompliance [with the Rule's requirement of disclosure of all potentially liable parties] was 'inexcusable' and 'the right of the undisclosed party to defend' a successive action was 'substantially prejudiced.'" Because the privity rule suffices, I do not consider this watered-down party joinder rule.

The entire controversy doctrine as such, then, is no longer a party-joinder rule. It bars claims that were or could have been asserted against the *actual parties* to the prior litigation, or *those in privity* with them: "[T]he doctrine applies not only to actual or potential claims between the parties in the first suit, but also 'extends to all those in privity with the parties involved in the preceding litigation.'" *Wisniewski v. Travelers Cas. & Sur. Co.*, 390 F. App'x 153, 156 (3d Cir. 2010) (quoting *McNeil v. Legislative Apportionment Comm'n*, 177 N.J. 364, 396 (2003)).

All of the foregoing boils down to three requirements for application of the entire controversy doctrine:

> (1) the judgment in the prior action [is] valid, final, and on the merits; (2) the parties in the later action [are] identical to or in privity with those in the prior action; and (3) the claim in the later action [ ] grow[s] out of the same transaction or occurrence as the claim in the earlier one.

*McNeil*, 177 N.J. at 395 (quoting *Watkins v. Resorts Int'l Hotel & Casino. Inc.*, 124 N.J. 398, 412 (1991)).

Turning to the claims and parties involved in the State Complaint, we immediately see a number of striking similarities to the AC. The thrust of that

action was that Drs. Heary, Moore, Carmel, Przybylski, Mitchell, John Does 1-5, and ABC Associations 1-5 conspired to oust Dr. Kaul from competition through defamation, downgrading certain billing codes to make certain procedures performed by Dr. Kaul less profitable, and spurring the State to initiate disciplinary proceedings. (State Compl. ¶¶ 52-110) Indeed, some of the specific factual averments contained in AC seem to have been copied from the State Complaint. There, as here, Dr. Kaul alleged that Dr. Heary "encouraged" one of his patients to file an action with the Board. (*Compare* State Comp. ¶¶ 53-55 *with* AC ¶ 68) There, as here, Drs. Przybylski, Carmel, and Mitchell allegedly used the power of their positions at the NASS and AMA to lobby politicians, insurance companies, and professional organizations to make endoscopic discectomies less profitable. (*Compare* State Comp. ¶¶ 87-98 *with* AC ¶¶ 72, 80, 92, 103) And there, as here, Dr. Przyblyski allegedly testified before some tribunal "to ensure . . . permanent suspension of Dr. Kaul's medical license." (*Compare* State Comp. ¶ 62 *with* AC ¶ 85)

The State Complaint's specific legal claims, too, substantially overlap the claims asserted here. Four are identical: defamation, commercial disparagement, intentional interference with prospective economic advantage, and aid in the commission of a tort. A fifth, violations of New Jersey's antitrust law, is now pled under its federal counterpart, the Sherman and Clayton Antitrust Acts.[32] The sixth, a conspiracy claim, is analogous to the claim now pled under the federal RICO law, and involves essentially the same allegations (*i.e.*, conspiracy to defraud, defame, commercially disparage, and unlawfully interfere with legitimate business activities). Because the BER-L-2256-13 case is "a previous state-court action involving the same transaction"—a conspiracy to force Dr. Kaul from the minimally invasive spine surgery market—the necessary connection is present. *See, e.g. Printing Mart-Morristown v. Rosenthal*, 650 F. Supp. 1444, 1447 (D.N.J. 1987) ("[T]he entire controversy

---

[32]     New Jersey's Antitrust Act is essentially a replica of the federal Sherman Antitrust Act. *See, e.g.*, N.J. Stat. § 56:9-1, *et seq.*

doctrine applies both to subsequent actions asserting different legal theories and those requesting alternative relief.")

For at least some claims involved here, then, the entire controversy rule facially applies. The real question is as to whom and to which claims.

First, I consider the parties affected. The Doctor Defendants claim that the State Complaint was dismissed with prejudice as to every named defendant, *i.e.*, Drs. Heary, Moore, Carmel, Przybylski, and Mitchell. Therefore, the Doctor Defendants say, the AC should be dismissed as to each of them. Two of the Medical Organization Defendants, NASS and AMA, claim that dismissal is appropriate, even though they were not named as defendants. The rest of the defendants claim that they should be dismissed as well—especially the remaining Doctor Defendants (Drs. Cohen, Staats, Lomazow, Kaufman, and Peterson) and Medical Organization Defendants (ASSIP, CNS, and Wolfa)— because they are encompassed within the list of fictitious defendants, John Does 1-5 and ABC Associations 1-5.

Generally, I think these arguments go too far, but the entire controversy rule is clearly appropriate as to Drs. Moore, Carmel, and Przybylski. Contrary to defendants' suggestions, I do not have an order before me clearly dismissing the State Complaint with prejudice as to all named parties. I instead have three orders, each appearing to dismiss the case as to one of the moving defendants. (*See* State Orders.) Those defendants are Drs. Przybylski, Carmel, and Moore. As to those three, there is a prior final judgment: "[D]ismissal with prejudice constitutes an adjudication of the merits as fully and completely as if the order had been entered after trial." *Gambocz v. Yelencsics*, 468 F.2d 837, 840 (3d Cir. 1972); *see also* N.J. Ct. R. 4:37-2(d) (dismissal with prejudice "operates as an adjudication on the merits").

I am convinced, though, that the potential preclusive effect of these orders is not limited to Drs. Przybylski, Carmel, and Moore, but also applies to their privies, AMA and NASS. While not named as defendants in the State

Complaint, these two organizational defendants allegedly played some role in the conspiracy to drive Dr. Kaul from the market, mostly related to the billing code downgrading scheme. (State Compl. ¶¶ 87-90) The liability of NASS and AMA in both the federal and state actions is alleged to be based on the conduct of Dr. Przybylski, the president of NASS, and Dr. Carmel, the president of the AMA. NASS and AMA are therefore in privity with Drs. Przybylski and Carmel under the broad definition employed by the State of New Jersey.[33]

So Drs. Przybylski, Carmel, Moore, AMA, and NASS all may benefit from the preclusive effect of the March 2013 Orders dismissing the State Complaint with prejudice. Common sense suggests that the BER-L-2256-13 action has been dismissed entirely, but I have not been given clear evidence

---

[33] In comparison to federal preclusion principles, New Jersey has adopted a broader definition of "privity." *See Opdycke v. Stout*, 233 F. App'x 125, 129 n. 6 (3d Cir.2007). "In New Jersey, privity is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the res judicata." *Hamburg Music Corp. v. Winter*, No. 04–2738, 2005 WL 2170010, at *3 (3d Cir. Sept. 8, 2005) (citation and quotation omitted). Furthermore, New Jersey courts are more likely to find "privity" when a party to the first litigation attempts an end-run around the entire controversy doctrine by either bringing suit under a different name or naming related entities as defendants. *See Hamburg Music*, 2005 WL 2170010, at *3 ("Moreover, New Jersey courts are more willing to find that parties are in privity if the plaintiff had a full and fair opportunity to litigate its claims in the first action."); *Radovich v. YA Global Investments, L.P.*, No. 12–6723, 2013 WL 4012042, at *5 (D.N.J. Aug. 5, 2013) (dismissing suit by shareholder-plaintiff and two corporations he controlled when prior suit was brought by a corporation of which the shareholder-plaintiff was majority shareholder); Andriani v. City of Hoboken, No. 11–6707, 2012 WL 4442664, at *4 (D.N.J. Sept. 24, 2012) (Entire Controversy Doctrine applied to police officer Andriani's suit against the municipality, its police department, its police chief, its mayor, and a police captain because all were in privity with other police officers who had previously brought suit against Andriani); *Tagayun v. Citibank, N.A.*, No. 05–4302, 2006 WL 5100512, at *1 (D.N.J. June 9, 2006) (holding attorney to party in the first suit was in privity with that party); *see also Zahl v. Warhaftig*, No. 13–1345, 2015 WL 1197095, at *5–6 (D.N.J. Mar. 16, 2015); *Rodsan v. Borough of Tenafly*, No. 10–1923, 2011 WL 2621016, at *13–14 (D.N.J. June 30, 2011).

*Martucci v. Vitale*, No. CIV.A. 14-6311, 2015 WL 3465899, at *5 (D.N.J. May 29, 2015).

that this is so. I therefore deny, without prejudice, the motion to dismiss based on res judicata and entire controversy rule for any remaining defendants.

There is, however, a follow up question: Which *claims* against those five defendants are precluded? I conclude that all claims are barred.

In both actions, the alleged liability of Doctors Carmel and Moore, as well as the two Medical Societies, arises from a scheme to defame, disparage, and otherwise impair Dr. Kaul from competing freely in the marketplace. Prominently featured in both complaints is the scheme to downgrade endoscopic discectomies. While the AC attempts to tie them to other defendants' acts with generalized allegations of conspiracy and collusion, there are no plausible allegations suggesting their involvement in any conspiracy that extends beyond March 2013, when the State Complaint was filed. Those claims therefore could have been joined in the earlier action. Dismissal based on res judicata and the entire controversy doctrine of all of the claims against these defendants is therefore appropriate.

As to Dr. Przybylski, however, things are less certain. The AC addresses events and circumstances that occurred sometime after the filing of the March 2013 State Complaint. Dr. Przybylski allegedly had some role in schemes to defraud, defame, disparage, and exclude Dr. Kaul from the market, but he *also* is alleged to have perjured himself during the disciplinary proceedings, which occurred after the State Complaint was filed. That conduct, which occurred during sometime between April and June 2013, is not literally based on same facts or transactions as the State Court Complaint (although it may be related). No party has addressed the circumstances in which the entire controversy rule might bar claims related to a transaction or a series of transactions that had not yet occurred when the first action was filed.[34] I

---

[34]    Without further facts, I will not imply a duty to amend the prior Complaint. The case law seems to indicate that the question turns on when the plaintiff knew about the cause of action. *See Cafferata v. Peyser*, 251 N.J. Super 256, 260-61 (Super. Ct. App. Div. 1991).

therefore will deny Dr. Przybylski's motion to dismiss the complaint based on the entire controversy rule without prejudice to renewal, if necessary.

## IV.    JURISDICTION, AMENABILITY TO SUIT, IMMUNITY

I consider next a second bundle of threshold or quasi-threshold issues: the applicability of Eleventh Amendment immunity, whether defendants are "persons" liable under section 1983, and whether defendants may benefit from absolute or qualified immunity.

### A.    The State Defendants: Sovereign Immunity

The remaining State Defendants—New Jersey, the Governor, the Board, ALJ Solomon, Chiesa, Roeder, and Drs. Przybylski, Lomazow, and Kaufman—move to dismiss the complaint on jurisdictional grounds. All claim that they partake of the State's Eleventh Amendment sovereign immunity. As to New Jersey and the Board, I agree insofar as Dr. Kaul seeks damages; as to Chiesa, Roeder, Dr. Lomazow, ALJ Solomon, the Governor, I agree insofar as Dr. Kaul has sued them in their official capacities. As to Drs. Kaufman and Przybylski, the briefs lack the appropriate analysis or information for me to rule on the Eleventh Amendment issue at this time. As to those two defendants, I deny the motion without prejudice to renewal.

This is essentially a suit for damages. As to such suits, the Eleventh Amendment incorporates a general principle of sovereign immunity that bars citizens from suing any State in federal court. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984). The Eleventh Amendment, as a bar to suit, is of jurisdictional stature. *Id.* at 98 (*citing Hans v. Louisiana*, 134 U.S. 1 (1980)). That bar applies unless Congress has abrogated it, or the State has waived it, two exceptions that do not apply here.[35] *E.g., Pa Fedn. of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002).

---

[35]    Congress did not abrogate the States' sovereign immunity when it enacted section 1983, *e.g., Quern v. Jordan*, 440 U.S. 332, 342 (1979), the Sherman and Clayton Acts, *e.g., Jackson v. Conn. Dep't of Pub. Health*, 3:15-CV-750 (CSH), 2016

In general, Eleventh Amendment immunity extends to state agencies and state officials in their official capacities. Thus the Court clearly lacks jurisdiction to entertain damages claims against the State of New Jersey. In doubtful cases, the Court will analyze several factors to determine whether an entity is an agency of the State, *i.e.,* whether the State is the real party in interest. *See Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 659-60 (3d Cir. 1989). As to the Board and the Office of Administrative Law, the appropriate analysis has been performed elsewhere and is not subject to reasonable dispute. *E.g., Zahl v. N.J. Dep't of Law & Pub. Safety,* Civ. Action No. 06-3749, 2008 U.S. Dist. LEXIS 24022, *60-62 (D.N.J. Mar. 26, 2008) (holding that the New Jersey Department of Law and Public Safety, and its subdivisions, the Division of Consumer Affairs and the Board of Medical Examiners, are arms of the state for Eleventh Amendment purposes); *Rodrigues v. Fort Lee Bd. of Educ.,* 458 F. App'x 124, 127 (3d Cir. 2011) ("The Office of Administrative Law is a state agency, and is thus immune from suit under the Eleventh Amendment.") (internal citation omitted). I therefore adopt it here without further analysis, and hold that the Board and the Office of Administrative Law enjoy the State's Eleventh Amendment immunity.

Governor Christie, former AG Chiesa, ALJ Solomon, Roeder, and Dr. Lomazow are state officials sued in their official capacities. As such, they are immune from damages claims on Eleventh Amendment grounds.[36] It is not so clear that Drs. Kaufman and Przybylski are State officials. It seems the State

---

U.S. Dist. LEXIS 80672, at *40-42 (D. Conn. June 20, 2016), *Gebman v. State,* No. 07-cv-1226 (GLS-DRH), 2008 U.S. Dist. LEXIS 46125, at *11-13, 2008 WL 2433693 (N.D.N.Y. June 12, 2008), or the RICO statute, *Dianese v. Pennsylvania,* Civil Action No. 01-2520, 2002 U.S. Dist. LEXIS 10917, at *17 (E.D. Pa. June 19, 2002). The Third Circuit, and later the Supreme Court, held that Congress could abrogate state sovereign immunity with its commerce clause powers. *See United States v. Union Gas Co.,* 832 F.2d 1343, 1356 (3d Cir. 1987), *affirmed,* 491 U.S. 1 (1989). That decision, however, was overruled in *Seminole Tribe v. Florida,* 517 U.S. 544 (1996).

[36] They may remain potentially liable as persons in their individual capacities, however. *See Hafer v. Melo,* 502 U.S. 21, 25 (1991); *Estate of Lagano v. Bergen Cnty. Prosecutor's Office,* 769 F.3d 850, 856 (3d Cir. 2014).

may be picking up the tab for their defense only because they were state witnesses during the disciplinary proceedings. Their motions to dismiss based on the Eleventh Amendment will therefore be denied.[37]

I pause here to allude to a recurring issue. The Eleventh Amendment does not bar a suit for prospective injunctive relief. *Sportsmen's Clubs*, 297 F.3d at 323. Whether the AC actually requests injunctive relief, however, is something of an open question; as previously noted, each of the twelve counts seeks damages. At one point, however, Dr. Kaul requests that I reinstate his medical license and expunge the Board's Order from the public record. Broadly interpreted, this may be a request for an injunction to dissipate some kind of ongoing harm (*i.e.*, his inability to practice medicine in New Jersey). To the extent any injunctive claim survives the Eleventh Amendment analysis, however, it will be dismissed for failure to state a claim. *See infra* Part V.

B.      Section 1983 "Persons"

As to section 1983, Count Eight, there is another issue that is customarily analyzed together with, but is distinct from, Eleventh Amendment immunity. I refer to the issue of who or what is a suable "person" under section 1983. This issue affects not only the State Defendants, but also everyone else.

> Section 1983 provides:
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

As to most of the State Defendants, the "person" analysis is essentially the same as the Eleventh Amendment analysis. A state and its

---

[37]     To the extent they are private citizens, they probably lack "person" status to be sued under section 1983, however. *See infra* Part IV.B.

departments are not considered "persons" amenable to suit under section 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 67-70 (1989). Also barred are section 1983 suits for damages against "governmental entities that are considered 'arms of the state' for Eleventh Amendment purposes," which are "no different from a suit against the State itself." *Id.* at 70-71. State officials, sued in their official capacities, are likewise not "persons" subject to a damages suit under section 1983. *Will*, 491 U.S. at 71 n.10; *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). On the other hand, a state official sued in his or her personal capacity is a "person" amenable to suit under section 1983, and does not enjoy Eleventh Amendment protection. *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991). That means that an award of damages from an individual defendant, as opposed to the public treasury, is a "permissible remedy in some circumstances." *Scheuer v. Rhodes*, 416 U.S. 232, 238 (1974). And a state official sued in his or her official capacity for prospective injunctive relief is likewise a "person" amenable to suit. *Hafer*, 502 U.S. at 27.

These principles lead us to a series of now-familiar conclusions. New Jersey, a state, is not a "person" under section 1983. The Board, as an arm of the state, is not a "person" under section 1983. The Governor, ALJ Solomon, Chiesa, Roeder, and Lomazow are not "persons" under section 1983 to the extent they are sued in their official capacities for damages. Accordingly, and with these caveats in mind, defendants' motions to dismiss Count Eight based on lack of 1983 "person" status are granted.

Because they are not state actors, the non-State Defendants also move to dismiss Count Eight for lack of 1983 "person" status. "To establish a claim under § 1983, a plaintiff 'must establish that she was deprived of a federal constitutional or statutory right *by a state actor*.'" *Frierson v. St. Francis Med. Ctr.*, 525 F. App'x 87, 90 (3d Cir. 2013) (quoting *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009)) (emphasis added). Courts thus routinely dismiss Section 1983 claims brought against private parties. I cite just a few recent

examples. *See Neuman v. Ocean City Cnty. Democratic Cnty. Comm.*, Civ. Action No. 16-2701(FLW), 2017 U.S. Dist. LEXIS 12254, at *10-22 (D.N.J. Jan. 30, 2017) (dismissing section 1983 allegations that political organization conspired to select and to endorse certain candidates); *Dougherty v. Adams-Dougherty*, No. 15-cv-8541(JBS)(AMD), 2016 U.S. Dist. LEXIS 128725, at *21-22 (D.N.J. Sept. 21, 2016) (dismissing section 1983 allegations that ex-spouse's family members conspired with courts and police to deprive plaintiff of his rights in divorce proceedings); *Roy v. Cumberland Mut. Fire Ins. Co.*, Civ. Action No. 15-8171 (JBS/AMD), 2016 U.S. Dist. LEXIS 109065, at *5-6 (D.N.J. Aug. 2016) (finding insurance company alleged to have wrongfully denied a claim was not a state actor for purposes of section 1983).

Now it is true, as Dr. Kaul argues, that in rare circumstances a private party may be found to act for the State. For that to occur, a plaintiff must "show 'a sufficiently close nexus' between the actions of the private party and the State to warrant treating those actions as those of the State." *Munoz v. City of Union City*, 481 F. App'x 754, 761 (3d Cir. 2012) (quoting *Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993)). The required nexus may be found where "(1) the private party performed a function typically performed by the state; (2) the private party acted in concert with the State; or (3) the State has become interdependent with the private party." *Id.* (*citing Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009)). The AC contains no allegations that would establish such a nexus, however. The AC, to be sure, alleges that a number of conspiracies exist, but that is not the same thing as alleging facts sufficient to establish a plausible allegation of conspiracy. *E.g., Coulter v. Allegheny Cnty. Bar. Ass'n*, 496 F. App'x 167, 169 (3d Cir. 2012) (upholding dismissal of section 1983 claim against attorney, law firm, and bar associations where allegations of conspiracy relied on "vague inferences" and "[b]are assertions of joint action action"). The "conspiratorial relationship[s]" between the State Defendants and non-State Defendants alleged in the AC are amorphous; the alleged "improper connections" between them are loose and speculative. *Id.*

(*E.g.*, AC ¶¶ 54, 78, 88) There is no plausible allegation that the non-state defendants acted under the color of state of law.

Thus, I will grant the non-State Defendants' motions to dismiss Count 8 for lack of section 1983 "person" status.

C.    Absolute and Qualified Immunity

Dismissal of official-capacity claims, however, is not the end of the story. Individuals named as defendants in their personal capacities may assert individual defenses, such as absolute or qualified immunity.[38] ALJ Solomon claims absolute judicial immunity; many of the State Defendants claim qualified immunity. For the reasons stated herein, I find that ALJ Solomon enjoys absolute immunity, and the Governor, Chiesa, Roeder, and Lomazow enjoy qualified immunity.[39]

---

[38]    These defenses—especially qualified immunity—ordinarily parry alleged violations of constitutional rights; it is somewhat atypical for a public official to shield themselves from violations of federal statutes, such as the RICO or antitrust laws, with absolute or qualified immunity. Nevertheless, there is persuasive authority that absolute and qualified immunity applies to RICO claims, and none of it appears to be disputed. *See, e.g., Cullinan v. Abramson*, 128 F.3d 301, 308-312 (6th Cir. 1997) (applying qualified and absolute immunity to RICO claims); *Van Beek v. Ag-Credit Bonus Ptnrs.*, 316 F. App'x 554, 555-56 (9th Cir. 2008) (applying judicial and prosecutorial immunity to RICO claims); *Parette v. Virden*, 173 F. App'x 534, 536 (8th Cir. 2006) (applying absolute immunity analysis to RICO claims).

As to antitrust claims, there seems to be no authority directly on point. There is no reason to think, however, that the Sherman or Clayton acts abridged the common law immunity from damages suits "for all persons—governmental or otherwise—who were integral parts of the judicial process." *Briscoe v. Lahue*, 460 U.S. 325, 335-36 (1983). And while the qualified immunity analysis has been honed in the context of alleged violations of civil or constitutional rights, there is no obvious reason to think that it cannot be performed in the context of antitrust claims. The debate in any case is academic; the AC fails to state a claim under the antitrust laws, which is essentially the first step in the qualified immunity analysis.

[39]    The State does not assert that Drs. Przybylski and Kaufman are absolutely immune for claims arising from their testimony, or that Chiesa is entitled to prosecutorial immunity. I therefore do not reach those issues.

### 1. *Absolute Immunity*

ALJ Solomon argues that he enjoys absolute immunity as to all claims for damages. A judicial officer in the performance of his or her duties enjoys absolute immunity from suit. *Mireles v. Waco,* 502 U.S. 9, 12 (1991). Absolute judicial immunity applies to all claims, whether official-capacity or personal-capacity, that are based on judicial acts. *See Dongon v. Banar,* 363 F. App'x 153, 155 (3d Cir. 2010) ("[J]udges are entitled to absolute immunity from liability based on actions taken in their official judicial capacity.") (citing *Briscoe v. LaHue,* 460 U.S. 325, 334 (1983)). "A judge will not be deprived of immunity because the action [s]he took was in error, was done maliciously, or was in excess of [her] authority . . . ." *Stump v. Sparkman,* 435 U.S. 349, 356-57 (1978). The immunity is not vitiated by "allegations of malice or corruption of motive." *Gromek v. Maenza,* 614 F. App'x 42, 45 (3d Cir. 2015) (quoting *Gallas v. Supreme Ct. of Pa.,* 211 F.3d 760, 768 (3d Cir. 2000)). An ALJ is entitled to absolute immunity. *See Raffinee v. Comm'r of Soc. Sec.,* 367 F. App'x. 379, 381 (3d Cir. 2010) (citing *Butz v. Economu,* 438 U.S. 478, 514 (1978)).

There are two exceptions to absolute judicial immunity: (1) "a judge is not immune from liability for nonjudicial actions" and (2) "a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles,* 502 U.S. at 11-12. Neither exception applies. All of the allegations against ALJ Solomon focus on conduct that occurred during the course of the disciplinary hearings. He had jurisdiction to preside over those proceedings. *See generally,* N.J. Stat. Ann. § 52:14B-10. A conclusory, fact-free allegation of bribery or fraud is not sufficient to defeat ALJ Solomon's claim to absolute immunity. As all personal capacity damages claims asserted against him, the AC is dismissed.

---

Again, because it is not clear whether Drs. Przybylski or Lomazow are state officials, I do not reach the qualified immunity question as to them. To the extent the motion is denied, it is without prejudice as to them.

## 2. Qualified Immunity

The Governor, Chiesa, Dr. Lomazow and Roeder argue that they enjoy qualified immunity. Such immunity protects government officials from insubstantial claims in order to "shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To overcome qualified immunity, a plaintiff must plead facts "showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 735. The Court has discretion to analyze the steps in either order. *Pearson*, at 236 (partially overruling *Saucier v. Katz*, 533 U.S. 194, 201 (2001), in that courts are no longer required to analyze issues (1) and (2) in that order).

For the reasons stated in Part V below, I find that the AC fails to allege sufficient facts to make out a violation of any constitutional right, RICO violation, or violation of the antitrust laws. The first qualified immunity prong is really no different from finding, under the usual Rule 12(b)(6) standard, that the complaint does not sufficiently allege a constitutional or federal statutory cause of action as a matter of law. I therefore incorporate that reasoning here, and dismiss on this alternative ground.

\* \* \* \* \*

As we approach the merits analysis, it is useful to take stock of what has been decided. The AC is dismissed as to Berkshire Hathaway, Buffett, Crist, and Gragnolati for failure to state a claim. The AC is dismissed as to Carmel, Moore, NASS and AMA on res judicata and entire controversy grounds. Counts Three (Hobbs Act) Four (mail fraud), Five (wire fraud), Six (honest services fraud), Seven (defamation in violation of 28 U.S.C. § 4101), and Nine (Title VII) are dismissed as to all defendants for obvious legal defects. Count

Eight (section 1983) is dismissed as to all non-State Defendants, New Jersey, and the Board for lack of "persons" status. All official capacity damages claims against the State Defendants are dismissed (except for Drs. Kaufman and Przybylski) based on sovereign immunity.[40] All personal capacity damages claims against ALJ Solomon are dismissed based on absolute immunity. All personal capacity damages against the Governor, Chiesa, Dr. Lomazow, and Roeder will be dismissed on qualified immunity grounds, and for failure to state a claim, *see infra* Part V.

I turn now to the merits of the remaining claims against the remaining the defendants.

## V.   FAILURE TO STATE A CLAIM

There are three remaining federal claims: violations of RICO, the antitrust laws, and 42 U.S.C. § 1983. As to each, the AC fails to state a claim.

### A.   RICO

Count One alleges a violation of the RICO Act, 18 U.S.C. § 1961 *et seq.* Although the AC does not identify which of the four subparts of section 1962 defendants allegedly violated, it appears that a section 1962(c) violation is intended. (*E.g.*, AC ¶ 52) The particular subsection, however, doesn't matter, because the AC in fails to allege a pattern of racketeering acts. Since that is an essential element for any RICO claim,[41] I will dismiss the AC as to all defendants.

---

[40]     For the purposes of argument going forward, I assume that a plaintiff may obtain injunctive relief under RICO. *Curley v. Cumberland Farms Dairy*, 728 F. Supp. 1123, 1137-38 (D.N.J. 1989) (concluding that injunctive relief is unavailable under RICO); *but see Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris*, 171 F.3d 912, 935 n.20 (3d Cir. 1999) ("This court has yet to decide whether injunctive relief is available for a private party under RICO.").

[41]     Pursuant to 18 U.S.C. § 1964(c), by any person injured in her business or property by reason of a violation of section 1962. In order to state a claim under 1964(c), a plaintiff must plead "(1) a section 1962 violation and (2) an injury to business or property by reason of such injury." *Lightning Lube, Inc., v. Witco Corp.*, 4 F.3d 1153, 1187 (3d Cir. 1993). To establish a claim under 1962(a), "a plaintiff must

I interpret the AC as alleging essentially three predicate acts: fraud, extortion, and conspiracy. As to each, the AC fails to state a claim.

---

allege: (1) that the defendant has received money from a pattern of racketeering activity; (2) invested that money in an enterprise; and (3) that the enterprise affected interstate commerce." *Id.* at 1189 (citation omitted). Establishing a pattern of racketeering requires allegations of "at least two acts of racketeering activity within a ten-year period." 18 U.S.C. § 1961(5). Under section 1962(b), "a plaintiff must show injury from the defendant's acquisition or control of an interest in a RICO enterprise, in addition to injury from the predicate acts" of racketeering. *Lightning Lube,* 4 F.3d at 1190. To allege a claim under Section 1962(c), a plaintiff must plead conduct of an enterprise through a pattern of racketeering activity. *District 1199P Health & Welfare Plan v. Janssen, L.P.,* 784 F. Supp. 2d 508, 518-19 (D.N.J. 2011) (citation omitted). Section 1962(d) prohibits conspiring to violate sections (a)-(c). 18 U.S.C. § 1962(d).

1. *Mail-and-Wire Fraud*

The offense of mail or wire fraud has two essential elements: "[1] a scheme to defraud, and (2) a mailing or wire in furtherance of that scheme." *Annulli v. Panikkar*, 200 F.3d 189, 200 n.9 (3d Cir. 1999). Use of the mails may be intrastate; use of the wires must be interstate. *Id.* Allegations of either, as predicates for a civil cause of action, must meet the heightened pleading standard of Rule 9(b). *Warden*, 288 F.3d at 114; *Bonavitacola Elec. Contr., Inc. v. Boro Developers, Inc.*, 87 F. App'x 227, 231 (3d Cir. 2003) ("[T]he 'who, what, when, and where details of the alleged fraud' are required.") (quoting *Allen Neurosurgical Assocs. v. Lehigh Valley Health Network*, No. CIV-A-99-4653, 2001 U.S. Dist. LEXIS 284 (E.D. Pa. Jan. 18, 2011)).

Honest services fraud is just a variant of wire and mail fraud. "The honest-services statute, 18 U.S.C. § 1346, defines the "the term 'scheme or artifice to defraud'" . . . to include "a scheme or artifice to deprive another of the intangible right to honest services." *Skilling v. United States*, 130 S. Ct. 2896, 2908 n.1 (2010). Typically, honest services fraud is a bribery or kickback scheme involving a public official, *e.g.*, *United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011) although it can involve a private fraud scheme, *see Skilling*, at 2934 n.45.

Here, the AC fails to explain the who, what, when, where, and how of any scheme to defraud. There are many conclusory allegations of kickbacks and bribery (*e.g.*, AC ¶ 54 (Governor Christie "conspired with the other defendants to unlawfully obtain the plaintiff's property . . . through an elaborate scheme of kick backs")); improper influence (*e.g.*, *id.* ¶ 61 (GEICO "has a long history of bribing New Jersey politicians . . ., enabl[ing] it to advance legislation favorable to its business agenda)); abuses of power (*e.g.*, *id.* ¶ 69 (Dr. Lomazow, "through members of his family, had commercial ties to insurance companies" and has "abus[ed] his position [on the Board] for political and financial gain")); political patronage, (*e.g.*, *id.* ¶ 81 (Dr. Staats used his position as ASIPP "to give money to" Governor Christie who "rewarded . . .

Staats by appointing his partner to the defendant medical board")); and alternation of official transcripts, (e.g., ¶¶ 210, 211, 220). There is nothing, however, remotely approaching a factual or legal allegation of mail, wire, or honest services fraud.[42]

There are, in short, no credible allegations of wire, mail, or honest services fraud pled here.

### 2.    Extortion

Other crimes that could constitute racketeering activities include extortion under the Hobbs Act, 18 U.S.C. § 1951, and extortion chargeable under state law. 18. U.S.C § 1961(1)(A), (B). Under the Hobbs Act, "extortion means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, under color of official right." 18 U.S.C. § 1951(b)(2).[43] Under New Jersey law a person commits extortion if he or she purposefully threatens to:

> a. Inflict bodily injury on or physically confine or restrain anyone or commit any other criminal offense;

---

[42]    Nor does the AC very specifically really adequately allege the use of the mails or interstate wires. There are a handful of exceptions. (E.g., AC ¶¶ 200-206, 208) Nevertheless, the letters or wires element is pled only generally and without reference to the interstate/intrastate distinction. (E.g., ¶ 200 ("Dughi + Hewit, LLC violated 18 U.S.C. § 1341 when it schemed to defraud the plaintiff of his property with false representations of the work it had performed and for which the plaintiff had paid it $7500. The defendant committed wire fraud when it caused these false representations to be transmitted by phone and internet."); ¶ 201 ("Andrew Kaufman violated 18 U.S.C. § 1341 when he communicated via phone and the internet that the plaintiff was not qualified to perform minimally invasive spine surgery."). Nor is there is the relation, if any, of the use of wires or mails to the allegedly fraudulent scheme explained. At any rate, the substantive allegations of fraud for each of these allegations are far too thin and non-specific to state a claim for mail, wire, or honest services fraud.

[43]    There is also a jurisdictional element; the statute applies to one who "in any way degree obstructs, delays, or affects commerce or the movement of any article or commodity by robbery or extortion . . ." 18 § U.S.C. 1951(a). The AC only sometimes alleges that the attempted extortion was an effort to obstruct, delay, or affect commerce. That would be an independent reason to dismiss many of these extortion claims.

b. Accuse anyone of an offense or cause charges of an offense to be instituted against any person;

c. Expose or publicize any secret or any asserted fact, whether true or false, tending to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute;

d. Take or withhold action as an official, or cause an official to take or withhold action;

e. Bring about or continue a strike, boycott or other collective action, if the property is not demanded or received for the benefit of the group in whose interest the actor purports to act;

f. Testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or

g. Inflict any other harm which would not substantially benefit the actor but which is calculated to materially harm another person.

N.J. Stat. Ann. § 2C:20-5. Hobbs Act liability, however, does not depend on whether the state offense is labeled as extortion; any conduct alleged under state law "must be capable of being generically classified as extortionate," *i.e.,* the "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats." *Scheidler v. NOW*, 537 U.S. 393, 409-11 (2003) (quoting *United States. v. Nardello*, 393 U.S. 286, 290 (1969)).

The AC seems to allege two instances of extortion. The more prominent one is that defendants attempted to extract from Dr. Kaul the $300,000 in civil penalties and $175.422.21 in costs imposed by the Board by means of promises to reinstate his license. (*E.g.,* AC ¶¶ 174, 125, 131, 144, 181) That is not extortion in any meaningful or plausible sense, however. Dr. Kaul, of course, did not consent to having to pay the civil penalties and costs imposed by the Board. But he owed them as a result of an official, legally sanctioned process. Imposition of such penalties was no more "extortionate" than is this Court's imposition of fines and penalties. Likewise, conditioning the reinstatement of a license upon payment of a sanction is a common feature

of professional discipline, as familiar to attorneys as it is to physicians. It is not entirely clear why the payment (or non-payment, as it seems to be the case here) of the penalties would be in any way valuable to most or all of the defendants here. But more fundamentally, there is no factual indication that any wrongful tactic was employed in connection with collection of the penalty.

The second extortion allegation concerns H&S and Hollenbeck only. The AC alleges that the law firm threatened to withdraw from an unspecified representation if he did not come up with $196,000 two weeks before certain proceedings.[44] (E.g., ¶¶ 76, 77, 96, 136) Without any pertinent factual allegations, however, it is impossible to conclude that such a threat was plausibly made, and if it was, that it was wrongful.

In sum, no predicate act of extortion is pled.

### 3. Conspiracy

The final potential predicate act, although not clearly pled, might consist of a conspiracy to commit a predicate act. For such an unusual claim, the legal analysis is slightly more involved. Nevertheless, I have no difficulty finding that a conspiracy has not been pled factually.

The general federal conspiracy statute, 18 U.S.C. § 371, is not a listed RICO predicate under section 1961(1)(B), (C), or (D). Some listed statutory predicate offenses, however, contain their own conspiracy provisions, which may be cited as predicate offenses. Alternatively, sections 1961(A) and (D) both possess broad language (i.e., "any act or threat involving" or "any offense involving") in the description of potential indictable offenses. Certain courts,

---

[44] It is not clear whether the representation was related to the administrative proceedings. (AC ¶ 76 ("The defendant defrauded the plaintiff of approximately $200,000 with false representations that it had performed legal work in preparation for the plaintiffs OAL hearing. The defendant then attempted to extort $196,000 from the plaintiff two weeks before the OAL hearing was meant to commence with the threat that they would abandon the case if the plaintiff did not pay the money within 24 hours of the demand.")

primarily in the Second Circuit, have found that language broad enough to encompass a conspiracy to commit a section 1961(1)(A) or (D) offense.

Even under the broad view, conspiracy to commit mail or wire fraud is not a predicate RICO act. *See Volmar Distribs. v. New York Post*, 825 F. Supp. 1153, 1167 (S.D.N.Y. 1993). The mail and wire fraud statutes do not fall under the general language of § 1961(1)(A) and (D). Rather, 18 U.S.C. §§ 1341 and 1343 are specifically listed as predicates under § 1961(1)(B). Although mail and wire fraud are subject to their own, dedicated conspiracy provision, 18 U.S.C. § 1349, that provision is omitted from the § 1961(1)(A) or (D) list.

The Hobbs Act, 18 U.S.C. § 1951, is different. That statute is specifically cited under subsection 1961(1)(B) as a predicate offense. And embedded within that very statutory provision is the Hobbs Act's own, dedicated conspiracy provision. *See* 18 U.S.C. § 1951(a) (" . . . or conspires to do so . . . . "). Thus, conspiracy to commit extortion in the violation of the Hobbs Act may constitute a predicate act. *See Volmar*, 825 F. Supp. at 1167 n.23; *cf. Odesser v. Vogel*, Civil Action. No. 85-6931, 1986 U.S. Dist. LEXIS 18085, at *25 n.17 (E.D. Pa. Nov. 5, 1986).

State law extortion is generically described as a predicate act under section 1961(1)(A). As noted above, some courts have found the 1961(1)(A) language ("any act or threat involving" the enumerated offense) to be broad enough to encompass a conspiracy to commit an offense chargeable under that subsection. *See, e.g. United States v. Ruggeriero*, 726 F.2d 913, 918 (2d Cir.) (murder), *cert. denied*, 469 U.S. 831, 83 (1984).

Under federal and New Jersey law, the elements of conspiracy are generally same: a conspiracy is an agreement jointly entered into between two or more persons to obtain an unlawful objective. *See* N.J. Stat Ann. § 2C:5-2; *United States v. Bansal*, 663 F.3d 634, 669-70 (3d Cir. 2011) (essential elements of conspiracy are "(1) a mutual agreement or understanding, (2) knowingly entered by the defendant, with (3) an intent to jointly commit a

crime"). There is a one key distinction, however. Conspiracies under the Hobbs Act do not require allegations of an overt act. *United States v. Salahuddin*, 765 F.3d 329, 340 (3d Cir. 2014). But, under New Jersey law, extortion is a second degree crime, N.J. Stat. Ann. § 2C-20-2(b)(1)(b), and so an overt act must be alleged. *Id.* § 2C:5-2(d).

Not much, in the end, really turns on these distinctions. The AC is devoid of any credible allegations of conspiracies, agreements, or combinations to extort. As stated above, there are many generalized, sketchy allegations of conspiracy but no concrete factual averments to lend them a hue of plausibility.[45] Without some facts tending to show agreement and some circumstantial evidence of concerted action, there is simply no way to find a conspiracy to extort in this sea of grievances.

The AC, in sum, fails to state a predicate act, whether of the substantive or conspiracy-to-commit variety. Because there is no racketeering activity, *a priori*, there cannot be a pattern of such activity. That is enough to dispose of the RICO claims. As to all defendants that remain, Count One is dismissed.

---

[45]     I quote three of the conspiracy allegations, which are typical. *See, e.g.,* AC ¶ 74 (alleging that Staats "conspired with the defendant governor, defendant medical board and defendant state in a scheme whose purpose was to revoke the plaintiff's medical license . . . Defendant is regularly in Washington, DC meeting with Congressmen and US Senators, and the defendant society of which he is the President, has an active political donation apparatus. The defendant's business partner was appointed to the defendant medical board by the defendant governor in approximately 2014, and was involved in the attempt by the defendant medical board to extort $450,000 from plaintiff."); AC ¶ 77 (Hollenbeck "conspired with the defendant governor, defendant state and defendant medical board to extort money from the plaintiff under the color of right, with a threat two weeks before the OAL hearing, that he would withdraw legal services if the plaintiff did not pay $196,000 within twenty-four hours. The defendant . . . is a member of the New Jersey Republican Party. The defendant has close professional and commercial ties with the defendant governor and defendant attorney general and has given money to the Republican Party. The defendant has offices in both Trenton and Washington, DC."); AC ¶ 125 (alleging that GEICO "conspired with the defendant governor and his executive agencies to impose a $450,000 'fine' which they attempted to extort from the plaintiff when he made an application for license reinstatement in 2014").

B.    Antitrust Violations

Count Two of the AC alleges violations of federal antitrust law.[46] No such claim, however, is pled plausibly here. The primary defect is the failure to define the relevant market, so I go no further in the analysis, but other defects lurk, and I allude to them briefly.

Contracts, combinations, and conspiracies in restraint of trade are illegal. 15 U.S.C. § 1. To sustain such a claim, the plaintiff must prove:

> (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy.

*Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81-82 (3d Cir. 1977); *accord Howard Hess Dental Laboratories Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) ("A plaintiff asserting a Section 1 claim . . . must allege four elements: '(1) concerted action by the defendants; that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.'") (citing *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005)).

It is also illegal to monopolize, attempt to monopolize, or conspire to monopolize trade. 15 U.S.C. § 2. Claims under Sherman Act section 2 generally come in two flavors: monopoly abuse and attempted monopolization.

> "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or

---

[46]    Specifically, the AC pleads violations of section 2 of the Sherman Act, which generally addresses single-firm conduct. Since this is a *pro se* plaintiff, I assume the AC intends to plead section 1 violations as well.

> development as a consequence of a superior product,
> business acumen, or historic accident."

*Queen City Pizza v. Domino's Pizza,* 124 F.3d 430, 437 (3d Cir. 1997) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596 n. 19 (1985)). An attempted monopolization claim has three elements: "a plaintiff must prove that the defendant (1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power." *Id.* at 442.

Under either section 1 or 2, the plaintiff bears the burden of pleading the relevant geographic and product markets. *See Queen City Pizza,* 124 F.3d at 436-37. The AC, however, contains virtually no allegations, factual or otherwise, about the relevant market in this case. There seem to be two contenders: generally, "the minimally invasive spine surgery market," and somewhat more specifically, the market for "minimally invasive spinal fusions." (*E.g.,* AC ¶¶ 95, 112) Either way, the AC contains none of the usual and necessary product market allegations. *Queen City Pizza,* 124 F.3d at 436 ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, . . . the relevant market is legally insufficient and a motion to dismiss may be granted.") There is no allegation concerning the relevant geographic market, which seems to include at least New Jersey, but might be larger. For these reasons, the antitrust claims are facially invalid, and therefore will be dismissed.

Even assuming that the AC pled a relevant market, these antitrust claims would still face an uphill battle, if not certain dismissal. As to the section 1 claims, for example, there are no *factual* allegations establishing one of the canonical *per se* violations (*e.g.,* horizontal price-fixing, horizontal market division, or group boycott), and absolutely no *factual* allegations

establishing anticompetitive effect.[47] As to the Section 2 claims, there are no *factual* allegations that defendants, however configured, possess substantial market power in the relevant market. These issues aside, there is a more fundamental pitfall: these antitrust claims seem to be based, at least in part, on the allegation that defendants lobbied for "legislation that enabled the defendant hospitals and neurosurgeons to monopolize the minimally invasive spine surgery market." (*E.g.*, AC ¶ 95) That conduct, however, squarely falls within the *Noerr-Pennington* doctrine, which "provides broad immunity from liability to those who petition the government, including administrative agencies and courts, for redress of their grievances." *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F. 3d 162, 179 (3d Cir. 2015).[48] Given the undisputed outcome of the disciplinary proceedings, moreover, the sole exception for "sham" litigation has not been adequately alleged. *Id.* 180-81.

The motions to dismiss Count Two are granted.

## C.    Section 1983

Count Eight alleges violations of 42 U.S.C. § 1983. I interpret it to be asserting violations of Dr. Kaul's due process and equal protection rights. As to each aspect, the AC fails to state a claim.

### 1.    *Due Process*

The AC alleges that the disciplinary proceedings violated Dr. Kaul's right to due process. In general, a procedural due process claim requires plaintiff to allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or

---

[47]    *E.g.*, AC ¶ 94 ("The effect of the monopolization has been an increase in the cost of care and a reduction in the availability of clinical services.")

[48]    *Noerr-Pennington*, by the way, would probably apply to the RICO claims as well. *Cf. We, Inc., v. City of Philadelphia*, 174 F.3d 322, 326-27 (3d Cir. 1999) ("This court, along with other courts, has by analogy extended the *Noerr-Pennington* doctrine to offer protection to citizens' petition activities in contexts outside the anti-trust area as well.").

property," and (2) the procedures afforded him did not constitute "due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)); *accord Res v. De Jongh*, 638 F.3d 169, 173 (3d Cir. 2011).

The individual interest at stake is Dr. Kaul's medical license; the unconstitutional procedure is the disciplinary hearing. I do not doubt that a license to practice medicine is an individual property interest deserving of due process protections. But the state afforded Dr. Kaul the full panoply of due process rights during the disciplinary proceedings. He was represented by counsel. He submitted evidence and was able to cross-examine the State's witnesses. The Board and the ALJ issued reasoned, written opinions, and Dr. Kaul had the opportunity to take exception to or appeal them. The disciplinary proceedings possessed virtually all the usual and expected safeguards, and therefore the probative value of allegations that additional safeguards could have been provided is very low. *E.g., Matthews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

Indeed, the thrust of the AC seems to involve procedural irregularities, rather than deficiencies in the procedures themselves. Examples include the alleged alteration of transcripts, the ALJ's consideration of extrinsic evidence, and witness perjury. These allegations, as discussed above, are meritless. Not a single pertinent example of transcript alteration can be found in the AC, let alone an alteration that would have been material to the outcome of the proceedings. Specifics are likewise lacking for the allegations of false testimony; the allegations are generic ones that could be expressed by any litigant who came out on the losing side of a credibility contest. The AC does allege that the Media Defendants published a hit job of Dr. Kaul. There is no plausible factual allegation, however, that ALJ Solomon knew about or would have been influenced by the article, and his written decision is closely tied to the evidence of record.

In short, no procedural due process violation has been alleged here.

2.  *Substantive Due Process*

A closely related claim is that the State Defendants violated Dr. Kaul's substantive due process rights. That claim, too, fails for lack of any specific, plausible factual allegations in support.

"To establish a substantive due process claim, a plaintiff must prove the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008) (citing *United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa.,* 316 F.3d 392, 400-02 (3d Cir. 2003)).

The substantive due process at issue here is the right to practice medicine. Whether construed broadly as a deprivation of liberty (*i.e.*, the ability to freely choose one's profession) or more narrowly as a deprivation of a property interest (*i.e.*, the license to practice medicine), the deprivation in any case does not "shock the conscience." That standard encompasses "'only the most egregious official conduct.'" *United Artists*, 316 F.3d at 400. New Jersey officials have a strong interest in regulating the medical profession, and, for reasons stated herein, there are no allegations plausibly establishing that use of government power was such as to "shock the conscience." No factual allegations establish that this license revocation, regular on its face, was arbitrary and wanton.

3.  *Equal Protection*

The third and final claim (it is pled as a Title VII violation, but I interpret it as an equal protection claim) alleges that the State Defendants discriminated against Dr. Kaul because he is Indian. "Eighty percent (80%) of revocations are against ethnic minorities," the AC alleges, "while they only account for twenty-five percent (25%) of the physician population." (AC ¶ 297) Dr. Kaul also "recollects that in 2009 he was asked questions about his race/nationality/ethnicity on his biennial license application, and believes that

his Indian nationality was a factor in the defendant governor's consideration to revoke his license." (*Id.* 301) These allegations are insufficient to establish a discrimination claim as a matter of law.

To state a claim under the Equal Protection Clause, a plaintiff must allege that (1) he is a member of a protected class; (2) that he was treated differently from similarly situated individuals; and (3) that this disparate treatment was based on his or her membership in the protected class. *See Kasper v. Cnty. of Bucks*, 514 F. App'x 210, 214-15 (3d Cir. 2013) (citing *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)).

The bare allegation that Dr. Kaul "believes" that race or nationality "was a factor" in the revocation of his license is not enough. No specific instances of similarly situated individuals being treated differently are alleged. Even disparate impact, assuming it has been alleged, is not itself sufficient to meet the threshold of intentional, purposeful discrimination. *E.g.*, *Washington v. Davis*, 426 U.S. 229, 248 (1976).

Because no violation of a constitutional right has been pled, Count 8, the section 1983 claim, must be dismissed.

D.    State Law Claims

For the reasons expressed above, the AC contains no viable federal cause of action. When a court has dismissed all claims over which it had original federal-question jurisdiction, it has the discretion to decline to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C. § 1367(c); *see also Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)). Where, as here, the federal claims are dismissed in the early, Rule 12(b)(6) stages of litigation, courts generally decline to exercise supplemental jurisdiction over state claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Considerations of judicial economy, convenience, fairness, or comity do not

weigh in Dr. Kaul's favor. I therefore decline to exercise supplemental jurisdiction over Counts Ten, Eleven, and Twelve.

## VI.   CONCLUSION

For the reasons set forth above, the defendants' motions to dismiss are GRANTED in part and DENIED in part, as follows.

1.   Because amendment would be futile, the following defendants are DISMISSED WITH PREJUDICE:

- Drs. Carmel, Moore, Przyblyski, NASS, and AMA, on res judicata and entire controversy grounds;

- New Jersey and the Board on sovereign immunity grounds;

- ALJ Solomon on absolute immunity grounds;

- Governor Christie, former AG Chiesa, ALJ Solomon, Roeder, and Dr. Lomazow on sovereign immunity and qualified immunity grounds;

2.   Because amendment would be futile, the following counts are DISMISSED WITH PREJUDICE:

- Counts Three, Four, Five, Six, Seven and Nine as to all defendants, for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6);

- Count Eight as to all non-state defendants (except Drs. Przybylski and Kaufman), for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6);

3.   As to all defendants not dismissed with prejudice, the following counts are DISMISSED WITHOUT PREJUDICE:

- Counts One, Two, and Eight as to all such defendants, for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6);

- Counts Ten, Eleven, and Twelve as to all such defendants, for lack of supplemental jurisdiction.

Although the AC states no claim upon which relief can be granted, this is a first dismissal. Any amended complaint shall be filed within 30 days after the date of this order and opinion.


Dated: February 25, 2019
(unamended version filed June 30, 2017)

**KEVIN MCNULTY**
**United States District Judge**